**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

NATIONAL ENDOWMENT FOR
DEMOCRACY,
1201 Pennsylvania Avenue NW
Suite 1100
Washington, DC 20004;

                     Plaintiff,

v.

THE UNITED STATES OF AMERICA;

UNITED STATES DEPARTMENT OF
STATE,
2201 C Street NW
Washington, DC 20520;

MARCO RUBIO, UNITED STATES
SECRETARY OF STATE, *in his official
capacity*,
2201 C Street NW
Washington, DC 20520;

UNITED STATES OFFICE OF
MANAGEMENT AND BUDGET,
725 17th Street NW
Washington, DC 20503;

RUSSELL VOUGHT, DIRECTOR OF
UNITED STATES OFFICE OF
MANAGEMENT AND BUDGET, *in his
official capacity*,
725 17th Street NW
Washington, DC 20503;

UNITED STATES DEPARTMENT OF
TREASURY,
1500 Pennsylvania Avenue NW
Washington, DC 20220;

SCOTT BESSENT, UNITED STATES
SECRETARY OF THE TREASURY, *in his
official capacity*,

Case No. _____

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF AND
PETITION FOR WRIT OF
MANDAMUS

1500 Pennsylvania Avenue NW
Washington, DC 20220;

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
Hubert H. Humphrey Building
200 Independence Avenue SW
Washington, DC 20201;

ROBERT F. KENNEDY, JR., THE UNITED
STATES SECRETARY DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *in his
official capacity*,
U.S. Department of Health and Human
Services
Hubert H. Humphrey Building
200 Independence Avenue SW
Washington, DC 20201;

and

MELISSA BRUCE, DIRECTOR OF THE
UNITED STATES SECRETARY
DEPARTMENT OF HEALTH AND
HUMAN SERVICES' PROGRAM
SUPPORT CENTER, *in her official capacity*,
U.S. Department of Health and Human
Services
Hubert H. Humphrey Building
200 Independence Avenue SW
Washington, DC 20201;

                    Defendants.

## **COMPLAINT**

1.    This case concerns the Executive Branch's unlawful impoundment of funds that
Congress appropriated for the National Endowment for Democracy (the "Endowment" or
"NED").  In the National Endowment for Democracy Act of 1983 (the "NED Act"), Congress
formally recognized the establishment of the Endowment as a private nonprofit corporation
whose mission is to "encourage free and democratic institutions throughout the world through

private sector initiatives." 22 U.S.C. § 4411. To further that objective, and as specified in the Act, the Endowment awards grants to four core institutes that work to strengthen the institutions of democracy, and to a range of nonprofit organizations around the world committed to advancing freedom in their own countries. In the NED Act, Congress directed that the Endowment would be funded by annual congressional appropriations to support its congressionally sanctioned mission and grantmaking activities. Specifically, Congress directed that the Endowment "shall" receive annual grants through the Department of State. 22 U.S.C. § 4412(a). Every year, Congress appropriates funding for the Endowment and directs that the full amount of those funds shall be available to the Endowment until spent. It has used the same mandatory language in every appropriations statute relevant here and in every one in recent memory. And every year, the Department of State has ensured that those funds have been timely transferred to the Endowment—until now.

2.      To ensure the Endowment can fulfill its statutory mandate, Congress appropriates funds directly to the Endowment through an annual congressional appropriation under Title I of the Department of State Foreign Operations and Related Programs ("SFOPS") appropriations legislation. After Congress appropriates the Endowment's funds, and OMB apportions them to the Department of State, the Department of State is required by statute to issue a grant in the full amount to the Endowment, thereby "obligating" the funds to be paid by the Executive Branch.

3.      As prescribed by federal regulations, the Endowment does not receive the appropriation as a single lump sum, but instead is required to withdraw money only on an as-needed basis. The appropriated funds are held in an account at the Department of Treasury, and the Endowment usually makes twice weekly withdrawals in order to pay its grantees pursuant to

their grant agreements, pay its staff, and cover operating expenses. As a result, the Endowment does not and cannot by law maintain significant cash reserves to fund its operations.

4.    For the last month, the Executive Branch has denied the Endowment access to its congressionally appropriated funds—something that has never occurred before in the Endowment's forty-two-year existence. That refusal has taken two forms. First, the Executive has withheld payment of routine drawdown requests necessary to fund the Endowment's operations from the $167 million of funds already appropriated by Congress and obligated by the Department of State. Second, the Department of State has refused to obligate the balance of the Endowment's annual appropriation, totaling approximately $72 million. No Executive Branch official has provided any explanation for those unprecedented actions. But whatever the purported reason, the Executive Branch lacks statutory authority or discretion to deny the Endowment its congressionally appropriated funds in this manner.

5.    As a result of the Executive's unlawful impoundment of the funds that Congress appropriated for the Endowment, the Endowment is experiencing a devastating cash flow crisis that jeopardizes its ability to fulfill its mission and its very existence, as well as that of its core institutes and grantees.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 1361.

7.    Venue is proper in this district because a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district. 28 U.S.C. § 1391(e).

## PARTIES

8.     Plaintiff the National Endowment for Democracy is a private, nonprofit 501(c)(3) corporation dedicated to the growth and strengthening of democratic institutions around the world, organized under the laws of Washington, D.C.

9.     Defendant the United States of America is sued in its governmental capacity as a proper party defendant for actions seeking relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

10.     Defendant United States Department of State is a federal agency headquartered in Washington, D.C., with responsibility for United States foreign relations and foreign policy.

11.     Defendant Marco Rubio is the United States Secretary of State.  He is sued in his official capacity.

12.     Defendant United States Office of Management and Budget ("OMB") is a federal agency headquartered in Washington, D.C., with responsibility for overseeing the management of federal financial assistance.

13.     Defendant Russell Vought is the Director of OMB.  He is sued in his official capacity.

14.     Defendant United States Department of Treasury is a federal agency headquartered in Washington, D.C., with responsibility for managing federal finances.

15.     Defendant Scott Bessent is the United States Secretary of the Treasury.  He is sued in his official capacity.

16.     Defendant United States Department of Health and Human Services ("HHS") is a federal agency headquartered in Washington, D.C., with responsibility for administering the Payment Management Services system.

17.     Defendant Robert F. Kennedy, Jr. is the United States Secretary of HHS.  He is sued in his official capacity.

18.     Defendant Melissa Bruce is the Director of HHS's Program Support Center.  She is sued in her official capacity.

## FACTS

### A.     The Endowment

19.     The Endowment is a nonpartisan, nonprofit organization devoted to promoting democracy around the world.  For more than forty years, the Endowment has provided funding to organizations working to promote democratic governance, human rights, and political freedoms worldwide in some of the most challenging environments—including authoritarian regimes and areas in which non-state actors such as drug cartels and terrorist organizations suppress fundamental political freedoms.  The Endowment does not directly undertake any work in the United States.

20.     The Endowment traces its origins to President Ronald Reagan's 1982 Westminster Address, delivered before the British Parliament in the midst of the Cold War. President Reagan called for a new initiative to "foster the infrastructure of democracy" around the world and announced that the United States would employ a bipartisan organization to support the "global campaign for democracy now gathering force."[1]

21.     President Reagan's leadership, together with that of the United States Congress, resulted in the formation of the Endowment as a private nonprofit organization, led by an independent self-appointing Board of Directors, to be funded by Congress.  In 1983 and on an

---

[1] Adress to Members of the British Parliament, Palace of Westminster, London, England (June 8, 1982), https://www.reaganlibrary.gov/archives/speech/address-members-british-parliament.

overwhelming and bipartisan basis, Congress passed the National Endowment for Democracy Act (the "NED Act"), which formally recognized the establishment of the Endowment as a private foundation authorized to receive federal funding through congressional appropriation. *See* 22 U.S.C. § 4411 *et seq.*

22.     In the NED Act, Congress set forth several statutory purposes that the Endowment is to pursue.  The Endowment's mandate is to "encourage free and democratic institutions throughout the world through private sector initiatives, including activities which promote the individual rights and freedoms (including internationally recognized human rights) which are essential to the functioning of democratic institutions."  22 U.S.C. § 4411(b).  The Endowment is also devoted to promoting "democratic training programs and democratic institution-building abroad," "strengthen[ing] democratic electoral processes abroad,"  and "encourag[ing] the establishment and growth of democratic development in a manner consistent both with the broad concerns of United States national interests and with the specific requirements of the democratic groups in other countries which are aided by programs funded by [the Endowment]."  *Id.*

23.     The Endowment serves its mission of promoting freedom and democracy worldwide principally by operating as a grantmaking institution.  The Endowment funds four "core institutes" to fulfill the NED Act's mandate of promoting exchanges between democratic groups abroad and private sector initiatives, including "the two major American political parties, labor, and business."  *See* 22 U.S.C. § 4412(b)(2).  The Endowment's core institutes are the National Democratic Institute, the International Republican Institute, the Center for International Private Enterprise, and the Solidarity Center.  The Endowment directs around one third of its total appropriation to these core institutes, as required by the appropriation.  The core institutes

ensure that the Endowment's programs represent the full breadth of American political life, with the institutes associated with both of the major political parties, as well as labor and business.

24.     In addition to funding the core institutes, the Endowment funds approximately 1,700 individual projects active in over 100 countries.  Through this grant program, the Endowment discretionarily funds a network of frontline activists seeking to advance freedom in their own countries.  The Endowment's grantees include organizations devoted to documenting human rights abuses and ensuring access to a free press, with an emphasis on the world's most authoritarian regimes.  Some of the Endowment's grantees must keep their relationship to the Endowment discreet, given the sensitivity of their work in their home jurisdictions and the personal risks the work entails.

25.     The Endowment regularly invests in grantees who work in repressive or conflict-torn countries to foster peaceful efforts toward democracy.  In more open societies, the Endowment supports citizen groups working to strengthen democratic institutions and processes. The Endowment's record speaks for itself:  Many of the nations in which the Endowment and its core institutes have strategically invested over the years ultimately made the transition to democracy, including Chile, South Africa, Taiwan, the Philippines, Mongolia, Ghana, countries in Central and Eastern Europe, and others.  In that way, the Endowment is engaged in the critical long-haul work of pursuing a more democratic, stable, and prosperous world—a goal that the Endowment's founders and members of both parties have long recognized as furthering United States economic and security interests.

26.     The Endowment's unique structure allows it to function on an extremely cost-effective basis, ensuring that the vast majority of its appropriated funds go directly to grantees' democracy-supporting work.  Eighty-three percent of the Endowment's funding goes directly to

grantees.  Importantly, grantees do not receive those funds upfront.  Funding for all grantees is tied to submission of scheduled progress reports and other deliverables.  Even the core institutes must request payment drawdowns against their cash needs as they go.

27.    The Endowment's spending and operations are subject to rigorous financial controls and reporting requirements.  Pursuant to the NED Act, the Endowment conducts annual audits of its accounts, the results of which it provides to Congress as part of its annual report.  22 U.S.C. § 4413(e), (h).  The Endowment's financial transactions are also subject to government audit, the reports of which must also be reported to Congress.  22 U.S.C. § 4413(f), (g).  And the Endowment's bipartisan, experienced Board of Directors provides robust oversight of the Endowment's financials, ensuring that its funds are used only for grants and activities consistent with its statutory mandate.  More specifically, the Budget, Audit, and Administration Committee of the Board of Directors manages the Endowment's audit process, financial reporting, and compliance functions.

28.    The Endowment's mission of advancing the cause of liberty and democracy around the world is nonpartisan, and the Endowment is bipartisan by design.  The Endowment's self-appointed Board of Directors is bipartisan; it includes two members from the House and two honorary members from the Senate, with a Republican and a Democrat from each chamber.  The Endowment funds both the National Democratic Institute and the International Republican Institute.  As President Reagan explained, "One of the strengths of this organization is that it is constructed on a bipartisan basis."[2]

---

[2] Ronald Reagan, Message to the Congress Transmitting the Annual Report of the National Endowment for Democracy (Feb. 19, 1986), https://www.reaganlibrary.gov/archives/speech/ message-congress-transmitting-annual-report-national-endowment-democracy.

29.     The private, nongovernmental nature of the Endowment's work is also essential to its structure and purpose.  The Endowment's mandate is to support private American groups forging relationships with and supporting private groups abroad in pursuit of democratic goals around the world.

30.     In the forty-two years since its founding, leaders from across the political spectrum have hailed the Endowment's work.  Shortly after its founding, President Reagan proclaimed that the "establishment of the National Endowment goes right to the heart of America's faith in democratic ideals and institutions.  It offers hope to people everywhere."[3]

31.     President Jimmy Carter praised the Endowment and core institutes' work overseeing the balloting for Indonesia's first free election in more than 40 years.  President Carter explained that "[t]he creation of the NED in the 1980s reflected a bipartisan belief that the promotion of freedom is an enduring American interest and that nongovernmental representatives would best be able to help their counterparts build democracy in other countries."[4]

32.     President Bill Clinton has commended the Endowment as "one of our most effective means for supporting grass-roots trade union, business and citizen groups, which form the basis for democratic reform."  As President Clinton explained, "[b]y fostering such reforms

---

[3] President Ronald Reagan's Remarks at a White House Ceremony Inaugurating the National Endowment for Democracy (December 16, 1983), https://www.ned.org/president-ronald-reagans-remarks-at-a-white-house-ceremony-inaugurating-the-national-endowment-for-democracy/.

[4] Jimmy Carter and Paul Wolfowitz, *Don't Take Democracy for Granted* (July 20, 1999), https://www.cartercenter.org/news/documents/doc1389.html.

abroad, we not only project our own values, we also increase our own security and create better partners for trade and global problem solving."[5]

33.    President George W. Bush praised "the bipartisan spirit" of the Endowment, describing the Endowment's work "promoting women's rights, and training Iraqi journalists, and teaching the skills of political participation."[6]  And President George H.W. Bush before him recognized that the Endowment's "work is giving expression to the oldest and noblest tradition of this country—the devotion to freedom for all humanity."[7]

34.    In 2017, Secretary of State Marco Rubio, formerly a board member of the Endowment-funded International Republican Institute, celebrated the Endowment's grantees, applauding their "courage" and "drive to combat corruption, press for transparency and accountability and advance the cause of freedom and democracy around the world."  Secretary Rubio thanked the Endowment for its work to "advance the cause of freedom and carry out the vision President Reagan articulated those many years ago."[8]

**B.    The Endowment Is Funded By Direct Congressional Appropriation**

35.    From its inception, the Endowment was structured to ensure continuity of funding and independence.  Unlike other nongovernmental organizations, which receive funds at the discretion of federal agencies, the Endowment is funded through annual appropriations directly from Congress.

---

[5] 140 Cong. Rec. 364 (Jan. 27, 1994).

[6] Remarks by President George W. Bush at the 20th Anniversary of the National Endowment for Democracy, U.S. Chamber of Commerce, Washington, D.C., https://www.ned.org/remarks-by-president-george-w-bush-at-the-20th-anniversary.

[7] Remarks by the President to Polish and Chilean Human Rights Leaders, May 3, 1989, 135 Cong. Rec. S6365-02, S6366, 1989 WL 178259.

[8] Sen. Marco Rubio (R-FL) on NED's 2017 Democracy Awardees, National Endowment for Democracy (posted June 7, 2017), https://www.youtube.com/watch?v=kPihC7UQ9jk&t=15s.

36.     In the NED Act, Congress directed the Department of State to convey the Endowment's annual appropriation to it.  The NED Act provides that the Department of State "**shall make** an annual grant to the Endowment to enable the Endowment to carry out its purposes as specified in section 4411(b) of this title."  22 U.S.C. § 4412(a) (emphasis added).[9] Section 4412 thus leaves the Department of State with no discretion:  It *must* make an annual grant to the Endowment each year.

37.     To enable that annual grant, Congress appropriates funds each year for the Endowment's use.  It has done so every year since the Endowment's founding.  For fiscal year 2024, for instance, Congress provided in the Further Consolidated Appropriations Act:  "For grants made by the Department of State to the National Endowment for Democracy, as authorized by the National Endowment for Democracy Act (22 U.S.C. 4412), $315,000,000, to remain available until expended, of which $210,316,000 shall be allocated in the traditional and customary manner, including for the core institutes, and $104,684,000 shall be for democracy programs."  Pub. L. No. 118-47, 138 Stat. 460, 737 (2024).  Although the amount of the appropriation has varied from year to year, the basic statutory command has not.  Congress has consistently directed that the full appropriated amount "shall be allocated" to the Endowment: a portion is earmarked for the Endowment's core institutes from the funds that "shall be allocated in the traditional and customary manner," and another portion "shall be for" the Endowment's democracy programs.  In addition, the appropriated amount is to "remain available" to the

---

[9] As adopted, the NED Act identified the United States Information Agency, which was consolidated with the Department of State in 1999 pursuant to the Foreign Affairs Reform and Restructuring Act of 1998.  *See* Federal Register, *United States Information Agency*, https://www.federalregister.gov/agencies/united-states-information-agency.

Endowment "until expended."  The Department of State thus has no discretion to make less than the full appropriated amount available to the Endowment.

38.     The Endowment's appropriation appears in Title I of the Department of State Foreign Operations and Related Programs ("SFOPS") appropriations legislation.  Title I of the appropriations legislation is directed to Department of State operations and diplomatic programs, as well as certain "foreign affairs-focused nongovernmental organizations," including the Endowment.[10]  By contrast, appropriations for United States foreign assistance, including appropriations for discretionary foreign-assistance grants, appear in other titles of the appropriations legislation, including Titles III and IV.[11]

39.     The Title I appropriations described above make up approximately 95% of the Endowment's funding.  The Endowment also receives certain foreign-assistance funding under Title III, comprising approximately 5% of its funding.  That latter amount is not at issue here.

40.     Once the congressional appropriation is enacted and signed into law, OMB is responsible for apportioning the Endowment's appropriated funds to the Department of State, to be granted to the Endowment.  *See* 31 U.S.C. § 1513(b).[12]

41.     The Department of State has the administrative obligation to transfer the funding to the Endowment.  The Department of State's Bureau for Democracy, Human Rights, and Labor ("DRL") serves as the passthrough bureau that administers the Endowment's annual

---

[10] *See* Cory Gill & Emily M. McCabe, Cong. Res. Serv., R40482, *Department of State, Foreign Operations, and Related Programs Appropriations: A Guide to Component Accounts* 1, 8 (updated June 18, 2024), https://crsreports.congress.gov/product/pdf/R/R40482.

[11] *Id.* at 1.

[12] The apportionment obligation is assigned by statute to the President, who has delegated the authority to the Director of OMB.  *See Notice; Delegation of Apportionment Authority*, 90 Fed. Reg. 9737 (Feb. 18, 2025), https://www.federalregister.gov/documents/2025/02/18/2025-02720/notice-delegation-of-apportionment-authority.

appropriation award together with the Office of Acquisitions Management, located within the Department of State's Bureau for Administration, which serves as DRL's grants office.

42.     Pursuant to the NED Act, the Department of State (acting through DRL and the Office of Acquisitions Management) issues the award to the Endowment for the appropriated amount, thereby "obligating" the funds to be paid to the Endowment by the Executive Branch. As required by the NED Act, the Department of State uses a grant agreement to structure the transfer.  The NED Act sets out the terms for this process:

> Such grants **shall be made** pursuant to a grant agreement between the Director and the Endowment which requires that grant funds will only be used for activities which the Board of Directors of the Endowment determines are consistent with the purposes described in section 4411(b) of this title, that the Endowment will allocate funds in accordance with subsection (e) of this section, and that the Endowment will otherwise comply with the requirements of this subchapter.  **The grant agreement may not require the Endowment to comply with requirements other than those specified in this subchapter**.

22 U.S.C. § 4412(a) (emphases added).

Thus, the Department of State has no statutory authority to impose additional conditions on the Endowment's use of the appropriated funds beyond those already set forth by Congress in the NED Act.

43.     After the Department of State obligates the appropriated funds to the Endowment, certain other agencies are involved in the mechanical process of transferring the funds to the Endowment.

44.     The annual appropriation award obligated to the Endowment is set aside for the Endowment in an account held at the Department of Treasury.  The Endowment cannot obtain the balance of its appropriated funds all at once.  Federal regulations provide that the Endowment may access its appropriated funds only by regularly requesting drawdowns from its Treasury account on an as-needed basis as it incurs expenses.  *See* 2 C.F.R. §§ 200.305, 600.101(a)

("payment methods must minimize the time elapsing between the transfer of funds from the Federal Agency . . . and the disbursement of funds by the recipient").  Those expenses include the Endowment's operational spending, the core institutes' appropriated spending, and payments to discretionary grantees.

45.     As a result of this payment structure, the Endowment effectively operates payment-to-payment and cannot maintain a significant cash reserve.  To ensure that it can fund its own operations, as well as the operations of the core institutes and grantees, the Endowment typically submits two drawdown requests every week.

46.     Though it is the Department of State that administers the Endowment's appropriated funds, and the Department of Treasury that holds its funds and disburses payments, the Endowment's drawdown requests are processed through a system called Payment Management Services ("PMS"), administered by HHS's Program Support Center.  The PMS portal is a shared system for processing grant payments used by various agencies across the federal government.

47.     Typically, DRL approves the Endowment's drawdown requests through the PMS portal in less than 48 hours.  After that, the Endowment's appropriated funds are transferred from its account at the Department of Treasury to the Endowment's bank account, usually within 24 hours.  No statute gives any agency involved in ensuring that the Endowment receives its congressionally appropriated and Department of State-obligated funding any discretion to withhold timely delivery of that funding or to second guess the decision to award it.

**C.     The Executive Branch Has Denied the Endowment Access to Obligated, Congressionally Appropriated Funds**

48.     For over a month, the Endowment has been locked out of its approximately $167 million cash balance of obligated, appropriated funds held in its Treasury account.  In the first

fiscal year 2025 Continuing Resolution (Continuing Appropriations and Extensions Act, 2025 (Sept. 24, 2024)), Congress appropriated additional funds to the Endowment based on its fiscal year 2024 appropriation, amounting to $69,898,500.  Around January 15, 2025, the Department of State obligated the $69,898,500 in appropriated funds to the Endowment for payment by the Executive Branch.  The $167 million cash balance in the Endowment's Treasury account includes that amount, as well as other available, already-obligated funds from prior years' annual appropriation awards.  These funds are referred to here as "tranche 1" funds.  Ordinarily, the full $167 million would be available to the Endowment to draw down at its discretion, consistent with 2 C.F.R. §§ 200.305, 600.101(a), to pay its operational expenses and fulfill its payment obligations to grantees.

49.    On January 21, 2025, the Endowment requested from PMS a drawdown totaling $36,663,100 from its appropriated funds to pay for its operational expenses and grants.  DRL ultimately approved that request, but only after receiving confirmation that the funds requested were congressionally appropriated Title I funds, and that they were therefore not subject to a January 20, 2025 Executive Order titled "Reevaluating and Realigning United States Foreign Aid."  Exec. Order No. 14169, 90 F.R. 8619 (2025).  That Executive Order paused certain foreign assistance—but, as the Department of State itself has explained, only those funds appropriated under Title III and Title IV of SFOPS and to "International Organizations and Programs" under Title V.  The Endowment's Title I funds thus were not (and could not be) subject to the Executive Order.  After the Endowment explained to DRL staff that its payment request concerned congressionally appropriated Title I funds not subject to the Executive Order, DRL approved the Endowment's request.

50.     January 22, 2025 was the last time that the Endowment was able to withdraw its appropriated, obligated funds. Until the Executive Branch began refusing to disburse the Endowment's funds, the Endowment's activities were continuing in the ordinary course.

51.     On January 28 and January 30, 2025 the Endowment submitted drawdown requests totaling approximately $97 million of its obligated, congressionally appropriated funds. The Endowment made the request to cover grantee expense reimbursements and advance payments, the Endowment's own operational expenses, and payments for new core institute projects and discretionary grantees that recently had been approved by the Endowment's Board at its regular January meeting.

52.     With its PMS requests still pending on January 31, 2025, the Endowment reached out to DRL for a status update. In the Endowment's experience, a multi-day delay is highly unusual. In the ordinary course, if the Endowment requests funds before 1:00 p.m., it receives them the next business day; requests made after 1:00 p.m. are received on the second business day. That promptness is necessitated by federal regulations that require payment methods to "minimize" the time between the transfer of funds from the government and the disbursement by the recipient. 2 C.F.R. §§ 200.305(b), 600.101(a).

53.     DRL staff responded that they were "working on it," and by 3:00 p.m. that afternoon, the Endowment's finance team saw that the requests were "approved" in the PMS system.

54.     Since January 31, however, those "approved" payment requests have been marked in PMS with a status that the Endowment has never before seen: "in transit."

55.     A month later, the funds still have not been released to the Endowment's bank account and remain inaccessible.

56.    On February 6, 2025, the White House issued a memorandum to the heads of executive departments and agencies directing them to "review all funding that agencies provide to [nongovernmental organizations ("NGOs")] . . . on the basis of applicable authorizing statutes, regulations, and terms."[13]  The Department of State has not asserted that it is relying on that memorandum as justification for refusing to make available the Endowment's appropriated Title I funds.  The memorandum does not purport to freeze or discontinue funds pending executive review, and it therefore does not and cannot provide authority to deny the Endowment its funding.  In all events, an Executive Branch memorandum cannot provide authority to freeze or discontinue the Endowment's congressionally appropriated funding.

57.    On February 11, the Endowment wrote to Treasury Secretary Scott Bessent requesting the release of its appropriated funds, payment of which the Department of State had approved on January 31.  The letter reiterated that the funds in question are Title I funds and, therefore, not subject to the January 20 Executive Order on foreign aid.

58.    The next day, the Endowment's grant officer representative at DRL emailed to ask whether the Endowment had any outstanding payment requests in PMS.  She requested specific information, including screenshots, for each PMS request and advised the Endowment that "submissions are subject to further review within the Department of State that may require additional processing for approval."

59.    The Endowment promptly responded with the requested information and to indicate that it was awaiting $97,581,876 in funding from PMS.  The Endowment included in its

---

[13] Memorandum for the Heads of Executive Departments and Agencies (Feb. 6, 2025), *available at*, https://www.whitehouse.gov/presidential-actions/2025/02/memorandum-for-the-heads-of-executive-departments-and-agencies/.  The memorandum currently is not available in either the Weekly or Daily Compilation of Presidential Documents.

response a screenshot of the PMS system, which showed three pending requests, all marked as "approved."

60.    More than a week later, on February 20, DRL invited the Endowment to submit an "Obligation or Disbursement under Waiver of Foreign Assistance Pause" form for its pending PMS requests, on the condition that the requests were for costs incurred prior to January 24, 2025.  As noted, the administration's January 24, 2025 foreign aid freeze, in place pursuant to the January 20 Executive Order described above, does not apply to the Endowment's appropriated Title I funds.  But regardless, the Executive Branch lacks authority under the NED Act and annual appropriations legislation to "freeze" or otherwise withhold the Endowment's obligated, congressionally appropriated funds.

61.    On February 26, 2025, OMB issued a memorandum calling for data on foreign assistance funding.  *See* Office of Mgmt. & Budget, Exec. Office of the President, OMB Memorandum M-25-08, Agency Foreign Assistance Review (FAR) Data Call 1.  The memorandum directs that agencies by March 17, 2025 "review their foreign assistance programs" and "make a recommendation on whether to continue, modify, or cease each foreign assistance program."  *Id.* at 2.  Based on that data, the "responsible Department and Agency heads, in consultation with the Director of OMB," and "with [the] concurrence of the Secretary of State," "will make recommendations" "to the President for final determinations."  *Id.* at 2–3.  The memorandum defines foreign assistance as including "any activity funded under Title 22 of the United States Code."  *Id.*  The Department of State has not asserted that it is relying on this memorandum as justification for withholding the Endowment's appropriated Title I funds.  The memorandum does not purport to freeze or discontinue funds pending executive review, and it therefore does not and cannot provide authority to deny the Endowment its funding.  In all

events, an Executive Branch memorandum cannot provide authority to freeze or discontinue the Endowment's congressionally appropriated funding.

62.     Defendants' withholding of the Endowment's congressionally appropriated, obligated funds is unprecedented.

63.     Defendants have thus unreasonably and unlawfully impounded the Endowment's congressionally appropriated funds.

**D.     The Executive Branch Has Refused to Obligate to the Endowment Its Annual Appropriation**

64.     On top of denying payment on the Endowment's approved drawdown requests for already-obligated funding, the Department of State has failed to obligate to the Endowment its second fiscal year 2025 Continuing Resolution obligation of approximately $72 million.  *See* Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, § 101, 138 Stat. 1524, 1524–1525 (2024); American Relief Act, Pub. L. No. 118-158, 138 Stat. 1722 (2024).[14]

65.     On January 16, 2025, DRL informed the Endowment that it had "received the second tranche of NED's FY 2025 funding in the amount of $72,481,500."  DRL, through the Office of Acquisitions Management, accordingly prepared to obligate the Endowment its appropriated funds through an amendment to the current fiscal year 2025 annual appropriation grant agreement.

66.     The Endowment has been told by DRL that the amendment obligating the Endowment's appropriated funds is complete and ready to be issued.

67.     Yet for over a month State has refused to obligate, as required by statute, the second tranche of the Endowment's fiscal year 2025 Title I annual appropriation funding.

---

[14] These funds can be referred to as "tranche 2" funds, and, like tranche 1, they are entirely Title I funds.

On February 20, 2025, an Office of Acquisitions Management grants officer told the Endowment that he was waiting to "get guidance regarding NED Core Project funding and approvals" and would alert the Endowment as soon as he got a response.  He did not specify from whom he was awaiting guidance or what legal authority would allow the Department of State to do anything other than obligate the funds that Congress has appropriated to the Endowment.  The Endowment responded to again confirm that its core annual appropriation is Title I funding.

68.    The Executive Branch's unilateral refusal to obligate the Endowment's appropriated funds is unprecedented.

69.    In addition to the January 20 Executive Order discussed above, the Executive Branch has issued additional executive orders and memoranda purporting to freeze various types of federal grants and spending.  The Executive Branch has not suggested that any of those memoranda or orders provide authority to impound the Endowment's funding.  For the reasons explained above, the January 20 Executive Order does not apply to the Endowment's funds.  And whatever the purported reason behind Defendants' actions with respect to the Endowment's congressionally appropriated funds, the statutory scheme is clear:  The Executive Branch lacks discretion to override the Endowment's statutorily mandated appropriations funds.

**E.    Harm to the Endowment**

70.    As a result of the Executive Branch's impoundment of the Endowment's appropriated funds, the Endowment is experiencing an unprecedented cash flow crisis that jeopardizes its very existence and ability to fulfill its mission.

71.    As of March 1, the Endowment furloughed 62% of its staff.  The Endowment has also given notice that an additional 13% of its staff will be furloughed by March 15.  In total, 75% of the Endowment's staff will be furloughed—and the Endowment expects to take additional staffing actions, including layoffs.  Already, 100% of the Endowment's staff has been

affected by salary reductions or related personnel action, like part-time status. Beyond the immediate financial strain, these cuts have far-reaching consequences—undermining the Endowment's ability to safeguard sensitive information, support democracy advocates, and maintain grantee relationships in closed societies.

72.     Given the nature of the Endowment's work advancing freedom, it is a frequent target of cyber threats from hostile foreign adversaries. With its staff furloughed or laid off, the Endowment is losing essential personnel responsible for protecting grantee data, preventing cyberattacks, and safeguarding the Endowment's digital infrastructure. Any breach risks exposing democratic activists and civil society organizations in authoritarian states, putting their security, and potentially their lives, at risk.

73.     The Endowment is also losing skills in critical areas, including language, regional expertise, and technical fields. These capabilities could take years to rebuild. The Endowment has spent years building a team that collectively speaks more than 45 languages, including Farsi, Mandarin, Spanish, Arabic, Urdu, Khmer, Lingala, and Swahili, which is essential to the Endowment's work around the globe, including in Iran, China, Venezuela, and Pakistan. Losing this expertise means losing access, understanding, and key relationships that have been developed over decades.

74.     Without the ability to draw down its appropriated funds, the Endowment does not have cash on hand to fund the core institutes or discretionary grantees. For the first time in its decades-long history, the Endowment has failed to meet its financial obligations to the core institutes and grantees and, as a result, has been forced to suspend nearly 1,300 grant projects worldwide. The suspension of all grants, if it continues, will have a profound reputational

impact on the Endowment, threatening the Endowment's future ability to cultivate partners and relationships.

75.     Because the Endowment does not administer any programs directly, its grantees are fundamental to its ability to effectively carry out its mandate, as provided by Congress. Harm to grantees, whether through staff layoffs or disruption of their programs, directly compromises the Endowment's ability to fulfill its mandate under federal law.

76.     Grantees have already faced considerable hardship from the funding freeze, including: an inability to maintain broadcast and publication schedules, undermining their ability to retain audiences; an inability to meet tax, labor, and other local obligations; and an inability to implement time-sensitive projects like election monitoring and get-out-the-vote campaigns. The freezing of the Endowment's funds poses special risk to partners operating in highly authoritarian contexts, as the sudden interruption in support may expose their operations and staff as Endowment grantees, thereby inviting legal or other reprisal from authoritarian governments that oppose their work.

77.     The funding freeze—if it is allowed to continue—harms the Endowment not just now, but far into the future as well. Already, the Endowment has been forced to suspend its regularly scheduled grantmaking cycles for May and September 2025. The freeze also has and will continue to harm the Endowment's reputation. The Endowment engages partners based on trust and mutual respect, and each partner enters into a grant agreement with the Endowment with the expectation that the foundation will honor its financial and operational obligations. The Endowment's reputation is critical to its ability to engage productively with partners worldwide and fulfill its mission. And, given the harms experienced by grantees so far, many may simply

not be around to continue their important work, even if the Endowment's funding were to

eventually resume at a later date.

## CLAIMS FOR RELIEF

### COUNT ONE

### APA, 5 U.S.C. § 706(2)(A)–(C)

### (Against All Defendants)

78.    The Endowment realleges and incorporates by reference all prior and subsequent

paragraphs.

79.    The APA provides that a court "shall" "hold unlawful and set aside agency

action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law[,]" "contrary to constitutional right, power, privilege, or immunity[,]" or "in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right[.]"  5 U.S.C.

§ 706(2)(A)–(C).

80.    Defendants' impoundment of the Endowment's congressionally appropriated

funding is final agency action reviewable under 5 U.S.C. § 704.  The denial of funding is

reviewable "final agency action."  5 U.S.C. § 704.  "Agency action" includes an agency's

"denial" of "recognition" to a "claim" or "right"; the "denial" of a "grant of money"; and the

"failure to act" or "withholding" with respect to claims, rights, and grants of money.  5 U.S.C.

§ 551(10), (11), (13).  Defendants' actions are "final" because they are the "functional

equivalent" of an express denial of payment—the consequences of Defendants' impoundment of

the Endowment's funds are identical to the consequences of an express statement of denial.  *See*

*Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 192 (D.D.C. 2024).

81.    Defendants' actions are contrary to law and in excess of statutory authority because the statutory scheme creates a mandatory, non-discretionary duty for Defendants to make available, obligate, and disburse the Endowment's congressionally appropriated funds.  22 U.S.C. § 4412(a); Further Consolidated Appropriations Act, Pub. L. No. 118-47 (2024); 31 U.S.C. § 3325.

82.    Defendants' actions are also contrary to the United States Constitution because they violate the Separation of Powers, as well as the Take Care Clause, the Appropriations Clause, the Spending Clause, and the Presentment Clause of the United States Constitution.

83.    Even if characterized as a suspension pending review pursuant to the Executive's various ongoing spending reviews, Defendants' actions have had the effect of denying the Endowment access to its congressionally appropriated funds.  That denial is arbitrary and capricious and contrary to law because Defendants have a mandatory, non-discretionary statutory duty to make available, obligate, and disburse the Endowment's congressionally appropriated funds; because Defendants' actions lack any lawful basis; because Defendants have refused to provide any explanation for their actions; and because Defendants' actions threaten the Endowment's continued existence in light of regulations preventing it from maintaining a significant cash reserve, in direct contravention of Congress's expressed intention that the Endowment shall use its appropriated funds to fulfill its statutory mandate.

84.    This Court should hold unlawful and set aside Defendants' unlawful impoundment of the Endowment's appropriated funds.

## COUNT TWO

### APA, 5 U.S.C. § 706(1)

### (Against All Defendants)

85.    The Endowment realleges and incorporates by reference all prior and subsequent

paragraphs.

86.    The APA provides that a reviewing court "shall" "compel agency action

unlawfully withheld or unreasonably delayed[.]"  5 U.S.C. § 706(1).

87.    The Department of the Treasury has a non-discretionary duty to disburse the

funds in its charge upon receipt of a properly executed voucher.  31 U.S.C. § 3325.  When HHS

exercises delegated authority to disburse federal funds, 31 U.S.C. §§ 3321(a), 3322, it has the

same non-discretionary duty.

88.    Neither Treasury nor HHS has complied with that mandatory duty as it relates to

the Endowment's obligated funds located in its Treasury account and requested through the PMS

system (that is, the tranche 1 funds).

89.    The Department of State has a non-discretionary duty to make an annual grant to

the Endowment "to enable the Endowment to carry out its purposes."  22 U.S.C. § 4412(a); *see*

Further Consolidated Appropriations Act, Pub. L. No. 118-47 (2024).

90.    The Department of State has not complied with that mandatory duty as it relates

to the Endowment's obligated funds located in its Treasury account and requested through the

PMS system.  Neither has the Department of State complied with that mandatory duty as it

relates to the Endowment's appropriated funds, which the Department of State received but has

not obligated despite preparing a grant-agreement amendment that is ready to go.

91.     Defendants' actions are also contrary to the United States Constitution because they violate the Separation of Powers, as well as the Take Care Clause, the Appropriations Clause, the Spending Clause, and the Presentment Clause of the United States Constitution.

92.     The Court should thus compel Defendants to disburse and otherwise make accessible the Endowment's obligated funds and to obligate the remainder of the Endowment's annual appropriation.

## COUNT THREE

**Mandamus Act, 28 U.S.C. § 1361; All Writs Act, 28 U.S.C. § 1651**

**(Against Defendants Department of State, OMB, Department of Treasury, HHS, Marco Rubio, Russell Vought, Scott Bessent, Robert F. Kennedy, Jr., and Melissa Bruce)**

93.     The Endowment realleges and incorporates by reference all prior and subsequent paragraphs.

94.     The Mandamus Act, 28 U.S.C. § 1361, vests this Court with original jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed" to the Endowment.

95.     The All Writs Act, 28 U.S.C. § 1651, authorizes this Court to issue all writs "necessary or appropriate" in aid of its jurisdiction.

96.     The Department of State has a non-discretionary duty to make an annual grant to the Endowment; and the Department of the Treasury and HHS have a non-discretionary duty to disburse federal funds upon receipt of a properly executed voucher. *See* 22 U.S.C. § 4412(a); Further Consolidated Appropriations Act, Pub. L. No. 118-47 (2024); 31 U.S.C. § 3325.

97.     Defendants' actions are also contrary to the United States Constitution because they violate the Separation of Powers, as well as the Take Care Clause, the Appropriations Clause, the Spending Clause, and the Presentment Clause of the United States Constitution.

98.     It is necessary and appropriate for this Court to issue a writ of mandamus pursuant to 28 U.S.C. §§ 1361 and 1651 and under this Court's equitable authority to compel Defendants to act.

## COUNT FOUR

### Presentment Clause, U.S. Const. art. I, § 7, cl. 2

### (Against Defendants Marco Rubio, Russell Vought, Scott Bessent, Robert F. Kennedy, Jr., and Melissa Bruce)

99.     The Endowment realleges and incorporates by reference all prior and subsequent paragraphs.

100.     This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

101.     The Presentment Clause provides, in relevant part:  "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it[.]"  U.S. Const. art. I, § 7, cl. 2.  Under the Presentment Clause, the President lacks authority to modify or amend duly enacted Legislation—the President may only "approve all the parts of a Bill, or reject it in toto."  *Clinton v. City of New York*, 524 U.S. 417, 439–40 (1998) (citation omitted).  The President cannot delegate powers to other executive branch officials that violate the Constitution.

102.     Both the NED Act and the congressional appropriations laws mandating that funds be provided to the Endowment, including for fiscal years 2024 and 2025, are duly enacted legislation that leave no room for executive discretion.

103.    Defendants' unlawful impoundment of the Endowment's congressionally appropriated funds therefore amounts to an attempt to amend, modify, or partially veto duly enacted legislation in violation of the Presentment Clause.

## COUNT FIVE

### Appropriations Clause, U.S. Const. art. I, § 9, cl. 7

### (Against Defendants Marco Rubio, Russell Vought, Scott Bessent, Robert F. Kennedy, Jr., and Melissa Bruce)

104.    The Endowment realleges and incorporates by reference all prior and subsequent paragraphs.

105.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

106.    The Appropriations Clause of the Constitution provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law[.]"  U.S. Const. art. I, § 9, cl. 7.  The Clause protects Congress's "exclusive power over the federal purse."  *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)).  The Executive Branch does not have constitutional authority to override or disregard Congress's appropriations.  *In re Aiken Cnty.*, 725 F.3d 255, 260–61 (D.C. Cir. 2013).

107.    Defendants' unlawful impoundment of the Endowment's congressionally-appropriated funds infringes Congress's exclusive power over the federal purse.  That exclusive power is conferred and protected in part by the Appropriations Clause, and the Executive has no constitutional authority to countermand it.

## COUNT SIX

### Spending Clause, U.S. Const. art. I, § 8, cl. 1

### (Against Defendants Marco Rubio, Russell Vought, Scott Bessent, Robert F. Kennedy, Jr., and Melissa Bruce)

108.    The Endowment realleges and incorporates by reference all prior and subsequent paragraphs.

109.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

110.    The Spending Clause of the Constitution provides:  "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States."  U.S. Const. art. I, § 8, cl. 1.  The Spending Clause vests the power of the purse, including the power to attach conditions to the expenditure of federal funds, exclusively with Congress.

111.    Defendants' unlawful impoundment of the Endowment's congressionally-appropriated funds infringes Congress's exclusive power over the federal purse.  That exclusive power is conferred and protected in part by the Spending Clause, and the Executive has no constitutional authority to countermand it.

## COUNT SEVEN

**Take Care Clause, U.S. Const. art. II, § 3**

**(Against Defendants Marco Rubio, Russell Vought, Scott Bessent, Robert F. Kennedy, Jr., and Melissa Bruce)**

112.    The Endowment realleges and incorporates by reference all prior and subsequent paragraphs.

113.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

114.    Under the Constitution, the executive power vested in the President and, by extension, all subordinate officers to whom he may delegate executive functions, includes the duty to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.

115.    The Take Care Clause forbids the Executive Branch from refusing to faithfully execute the laws of the United States.

116.    Defendants' unlawful impoundment of the Endowment's congressionally appropriated funds violates the Take Care Clause.

## COUNT EIGHT

**Violation of the Separation of Powers**

**(Against Defendants Marco Rubio, Russell Vought, Scott Bessent, Robert F. Kennedy, Jr., and Melissa Bruce)**

117.    The Endowment realleges and incorporates by reference all prior and subsequent paragraphs.

118.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

119.    Defendants' unlawful impoundment of the Endowment's congressionally appropriated funds exceeds the executive branch's constitutional authority and impermissibly usurps the legislative power, in violation of the Separation of Powers.  *See* U.S. Const. art. II, § 3; U.S. Const. art. I, § 9, cl. 7; U.S. Const. art. I, § 8, cl. 1; U.S. Const. art. I, § 7, cl. 2.

## COUNT NINE

### *Ultra Vires*

### (Against All Defendants)

120.    The Endowment realleges and incorporates by reference all prior and subsequent paragraphs.

121.    This Court has inherent equitable power to enjoin *ultra vires* executive conduct. *See Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 743 (D.C. Cir. 2022).

122.    No statute, constitutional provision, or other source of law authorizes Defendants to impound the Endowment's congressionally appropriated funds.  To the contrary, the statutory scheme creates a mandatory duty for Defendants to grant and disburse the Endowment's congressionally appropriated funds.  22 U.S.C. § 4412(a); Further Consolidated Appropriations Act, Pub. L. No. 118-47 (2024); 31 U.S.C. § 3325.

123.    Defendants' unlawful impoundment of the Endowment's congressionally appropriated funds is *ultra vires*.

## PRAYER FOR RELIEF

Wherefore, the Endowment requests judgment in its favor against Defendants as follows:

A.      Order Defendants to cease (1) their unlawful refusal to disburse and otherwise make accessible the Endowment's obligated funds and (2) their unlawful refusal to obligate the remainder of the Endowment's annual appropriation;

B.      Declare unlawful and set aside the Executive Branch's impoundment of the Endowment's congressionally appropriated funds as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C);

C.      Issue a temporary restraining order and preliminary injunction barring Defendants from impounding the Endowment's congressionally appropriated funds;

D.      Order Defendants to file a status report with the Court within 24 hours of entry of a temporary restraining order, and at regular intervals thereafter, confirming the regular disbursement and obligation of the Endowment's appropriated funds and reporting all steps that Defendants have taken to comply with the Court's temporary restraining order;

E.      Issue a permanent injunction barring Defendants from impounding the Endowment's congressionally appropriated funds;

F.      Award Plaintiffs reasonable attorneys' fees and costs; and

G.      Grant such other relief as the Court deems necessary, just, and proper.

Dated: March 5, 2025                    Respectfully submitted,


                                        */s/ Donald B. Verrilli, Jr.*
                                        Donald B. Verrilli, Jr. (D.C. Bar No. 420434)
                                        Ginger D. Anders (D.C. Bar No. 494471)
                                        Jeremy S. Kreisberg (D.C. Bar No. 1048346)
                                        Helen E. White (D.C. Bar No. 1741368)*
                                        Esthena L. Barlow (D.C. Bar No. 90000252)*
                                        MUNGER, TOLLES & OLSON LLP
                                        601 Massachusetts Avenue NW, Suite 500E
                                        Washington, D.C. 20001
                                        (202) 220-1100
                                        Donald.Verrilli@mto.com
                                        Ginger.Anders@mto.com
                                        Jeremy.Kreisberg@mto.com
                                        Helen.White@mto.com
                                        Esthena.Barlow@mto.com

                                        Gabriel M. Bronshteyn (*pro hac vice* forthcoming)
                                        MUNGER, TOLLES & OLSON LLP
                                        560 Mission Street, Twenty-Seventh Floor
                                        San Francisco, California 94105
                                        (415) 512-4000
                                        Gabriel.Bronshteyn@mto.com

                                        * *admission pending*

                                        *Attorneys for the National Endowment for
                                            Democracy*