# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | : | |
| NATIONAL ENDOWMENT FOR DEMOCRACY, | : | |
| | : | No. 1:25-cv-00648 |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, et al., | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...................................................................................................1

BACKGROUND .....................................................................................................3

    A.    The National Endowment for Democracy ........................................3

    B.    Congress's Direct Appropriations to the Endowment ....................5

    C.    The Recent Halt on Funds ...............................................................8

    D.    The Consequences of the Halt on Funds For the Endowment and Its Grantees .......................................................................................10

LEGAL STANDARD ............................................................................................12

ARGUMENT .........................................................................................................12

I.      THE ENDOWMENT IS LIKELY TO SUCCEED ON THE MERITS ...........................12

    A.    Congress Has Directly Appropriated Funds to the Endowment and the Executive Branch Lacks Statutory Authority to Withhold Those Appropriated Funds from the Endowment .......................................13

    B.    The Endowment Is Likely to Succeed on Its APA Claims ................18

        1.    The Executive Branch's Impoundment of the Endowment's Funding Must Be Set Aside Because It Exceeds the Executive's Statutory Authority ..............................18

        2.    The Executive Branch Is Unlawfully Withholding the Endowment's Funding ...............................................................21

        3.    The Endowment Is Likely to Prevail Regardless of Whether the APA Is Available ............................................................23

    C.    The Endowment is Likely to Succeed on Its Constitutional Claims ....................24

        1.    The Appropriations and Spending Clauses ...............................25

        2.    The Presentment Clause ............................................................28

        3.    The Take Care Clause ................................................................30

        4.    The Separation of Powers ..........................................................31

II.    THE ENDOWMENT WILL SUFFER IRREPARABLE HARM WITHOUT A TEMPORARY RESTRAINING ORDER .....................................................................33

    A.    The Halt in Funding Is Threatening the Endowment's Financial Viability and Undermining Its Essential Operations ..........................33

    B.    The Endowment Has Ceased Payments to Its Grantees, Jeopardizing Its Mission of Advancing Democracy and Freedom ...................................36

    C.    The Halt in Funding Threatens Irreparable Damage to the Endowment's Reputation as a Trusted Partner ............................................39

i

III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR
        OF GRANTING THE TEMPORARY RESTRAINING ORDER ....................................40

CONCLUSION .................................................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Aamer v. Obama,*
    742 F.3d 1023 (D.C. Cir. 2014)..................................................................12

*Abdullah v. Obama,*
    753 F.3d 193 (D.C. Cir. 2014)...................................................................12

*AIDS Vaccine Advoc. Coal. v. United States Dep't of State,*
    No. 25-cv-400 (AHA), 2025 WL 485324 (D.D.C. Feb. 13, 2025).........................7

*\*In re Aiken Cnty.,*
    725 F.3d 255 (D.C. Cir. 2013) .............................................................14, 26, 28, 31

*Am. Anti-Vivisection Soc'y v. United States Dep't of Agric.,*
    946 F.3d 615 (D.C. Cir. 2020)..................................................................22

*Am. Ass'n of Political Consultants v. SBA,*
    613 F. Supp. 3d 360 (D.D.C. 2020)............................................................40

*In re Am. Rivers & Idaho Rivers United,*
    372 F.3d 413 (D.C. Cir. 2004).................................................................22, 23

*American Foreign Serv. Ass'n v. Trump,*
    No. 25-cv-352 (CJN), 2025 WL 573762 (D.D.C. Feb. 21, 2025) ...........................7

*American Ins. Ass'n v. Garamendi,*
    539 U.S. 396 (2003)...........................................................................33

*Armour & Co. v. Freeman,*
    304 F.2d 404 (D.C. Cir. 1962)..................................................................39

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters,*
    280 F. Supp. 3d 59 (D.D.C. 2017).............................................................39

*Bennett v. Spear,*
    520 U.S. 154 (1997)...........................................................................19

*Buckley v. Valeo,*
    424 U.S. 1 (1976)............................................................................24

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.,*
    601 U.S. 416 (2024)..........................................................................25, 27

*City & Cnty. of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) .......................................................................................27

*\*Clinton v. City of New York*,
  524 U.S. 417 (1998) ..........................................................................................28, 29, 30

*Connecticut v. U.S. Dep't of Interior*,
  363 F. Supp. 3d 45 (D.D.C. 2019) .................................................................................19

*Costa v. Bazron*,
  456 F. Supp. 3d 126 (D.D.C. 2020) ...............................................................................12

*Davis v. Pension Benefit Guar. Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009) .....................................................................................12

*Doctors for America v. OPM*,
  No. 25-cv-322 (JDB), 2025 WL 452707 (D.D.C. Feb. 11, 2025) .........................................33

*Fed. Express Corp. v. U.S. Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022) .......................................................................................23

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ....................................................................................................24

*\*Friedman v. FAA*,
  841 F.3d 537 (D.C. Cir. 2016) ..................................................................................19, 21

*Harrington v. Bush*,
  553 F.2d 190 (D.C. Cir. 1977) .......................................................................................25

*Her Majesty the Queen in Right of Ontario v. EPA*,
  912 F.2d 1525 (D.C. Cir. 1990) .....................................................................................20

*Houston v. Ormes*,
  252 U.S. 469 (1920) ....................................................................................................16

*Huisha-Huisha v. Mayorkas*,
  27 F.4th 718 (D.C. Cir. 2022) .......................................................................................12

*INS v. Chadha*,
  462 U.S. 919 (1983) ....................................................................................................30

*Int'l Ass'n of Machinists & Aerospace Workers v. Nat'l Mediation Board*,
  374 F. Supp. 2d 135 (D.D.C. 2005) ...............................................................................34

*\*Kendall v. United States*,
  37 U.S. (12 Pet.) 524 (1838) ...................................................................................26, 31

iv

*League of Women Voters of the U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ......................................................................36, 40

*Lewis v. U.S. Parole Comm'n*,
    743 F. Supp. 3d 181 (D.D.C. 2024) ....................................................19, 20, 24

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ..............................................................................................25

*Maine Cmty. Health Options v. United States*,
    590 U.S. 296 (2020) ..............................................................................................13

*N.S. v. Hughes*,
    335 F.R.D. 337 (D.D.C. 2020) ............................................................................40

*NextWave Personal Cmmc'ns, Inc. v. FCC*,
    254 F.3d 130 (D.C. Cir. 2001) ............................................................................18

*Nken v. Holder*,
    556 U.S. 418 (2009) ..............................................................................................40

*Norton v. S. Utah Wilderness Alliance*,
    542 U.S. 55 (2004) ..........................................................................................21, 22

*Ramirez v. U.S. Immigr. & Customs Enf't*,
    471 F. Supp. 3d 88 (D.D.C. 2020) ......................................................................21

*Ramirez v. U.S. Immigr. & Customs Enf't*,
    568 F. Supp. 3d 10 (D.D.C. 2021) ......................................................................40

*Shawnee Tribe v. Mnuchin*,
    984 F.3d 94 (D.C. Cir. 2021) ..............................................................................40

*Sierra Club v. Thomas*,
    828 F.2d 783 (D.C. Cir. 1987) ............................................................................19

*Telecommc'ns Research & Action Ctr. v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984) ..............................................................................22

*Tex. Educ. Agency v. U.S. Dep't of Educ.*,
    992 F.3d 350 (5th Cir. 2021) ..............................................................................27

*Train v. City of New York*,
    420 U.S. 35 (1975) ..........................................................................................14, 26

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
    665 F.3d 1339 (D.C. Cir. 2012) ..........................................................................25

v

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) ................................................................................29

*Vietnam Veterans of Am. v. Shinseki*,
   599 F.3d 654 (D.C. Cir. 2010) .................................................................23

*W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*,
   59 F.4th 1124 (11th Cir. 2023) ................................................................27

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) .................................................................33

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ...............................................................24, 30, 31, 32

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
   576 U.S. 1 (2015) ...............................................................................32, 33

**FEDERAL STATUTES**

2 U.S.C. § 683(b) .........................................................................................14

5 U.S.C. § 551(10), (11), (13) .....................................................................19

5 U.S.C. § 704 ..............................................................................................18

5 U.S.C. § 706(1) ..............................................................................18, 21, 24

5 U.S.C. § 706(2) ...................................................................................18, 19

5 U.S.C. § 706(2)(B) ...................................................................................24

*22 U.S.C. §§ 4411 *et seq*. .................................................................... passim

   22 U.S.C. § 4411 .....................................................................................3

   22 U.S.C. § 4411(b) ........................................................................3, 5, 13

   22 U.S.C. § 4412(a) ........................................................................ passim

   22 U.S.C. § 4413(b) .................................................................................4

31 U.S.C. § 1512(c) ....................................................................................15

31 U.S.C. §§ 3321 *et seq*. ...........................................................................16

   31 U.S.C. § 3321 ...................................................................................16

   31 U.S.C. § 3322 ...................................................................................16

31 U.S.C. § 3325 ...................................................................................................16

Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, § 101,
    138 Stat. 1524 (2024)........................................................................................17

Pub. L. No. 116-94 (2020)........................................................................................13

Pub. L. No. 116-260 (2021)......................................................................................13

Pub. L. No. 117-103 (2022)......................................................................................13

Pub. L. No. 117-328 (2023)......................................................................................13

*Pub. L. No. 118-47, 138 Stat. 460 (2024)......................................................... passim

Pub. L. No. 118-83, 138 Stat. 1524 (2024)..............................................................8, 13

Pub. L. No. 118-158, 138 Stat. 1722 (2024)..........................................................9, 13, 17

**FEDERAL REGULATIONS**

2 C.F.R. § 200.305 ..............................................................................................8, 20

2 C.F.R. § 600.101(a)................................................................................................20

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 9, cl. 7......................................................................................25

U.S. Const. art. II, § 3 ............................................................................................30

**OTHER AUTHORITIES**

18 Comp. Gen. 285 (1938) ......................................................................................16

Federal Register, *United States Information Agency*,
    https://www.federalregister.gov/agencies/united-states-information-agency...........................5

GAO, *A Glossary of Terms Used in the Federal Budget Process* (Sept. 2005) .............................7

Cory Gill & Emily M. McCabe, Cong. Res. Serv., R40482, *Department of State,
    Foreign Operations, and Related Programs Appropriations: A Guide to
    Component Accounts* (updated June 18, 2024),
    https://crsreports.congress.gov/product/pdf/R/R40482 ..................................................6

Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*,
    164 U. Pa. L. Rev. 1835 (2016) ................................................................................31

William H. Rehnquist, *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools,* Office of Legal Counsel, 1 Op. O.L.C. Supp. 303 (1969)...................................................................................14, 26, 27

Transfer of Specific Appropriations of House of Representatives to Contingent Fund, 3 Op. Att'y Gen. 442 (1839)...........................................................................27

Transfers of Appropriations, 4 Op. Att'y Gen. 428 (1845) ...........................................27

## INTRODUCTION

The National Endowment for Democracy is an independent, nonpartisan, nonprofit organization devoted to supporting freedom worldwide.  Created against the backdrop of the Cold War at President Ronald Reagan's urging and with overwhelming bipartisan support in Congress, the organization's mission was and remains to bolster the "global campaign for democracy" that was then "gathering force."  To ensure that the Endowment could carry out its vital work without interruption, in 1983 Congress enacted the National Endowment for Democracy Act, which directs that the Endowment "shall" receive an annual grant of federal funding.  22 U.S.C. §§ 4411 *et seq.*  Every year, Congress mandates in annual appropriations statutes that the Endowment receive a sum certain, to be available to the Endowment until expended.  It has used the same mandatory language in every appropriations statute relevant here and in every one in recent memory.  And the Executive Branch has always executed its mandatory duty to provide those funds to the Endowment.  The Endowment has used those funds to fulfill its congressionally mandated purpose of making grants to private sector entities that foster democracy, human rights, and freedom in more than 100 countries.  And the Endowment has achieved great success even in some of the world's most challenging and repressive countries.

In a sharp and unexplained break with this decades-long practice, the Executive Branch has refused for a month to permit the Endowment to access the previously-obligated funds in its accounts and has refused to pass through to the Endowment the funds that Congress has specifically (and mandatorily) appropriated to it.  As a result, the Endowment has been forced to furlough staff and stop payments to grantees and partners—all of which has come at a devastating cost to the Endowment's ability to carry out its mission.  Unless funding is restored immediately, the Endowment, its core institutes, and its grantees may never recover.

1

A temporary restraining order is both necessary and warranted. This unprecedented defiance of congressional command is both unlawful and harmful to the vital objectives that President Reagan articulated and Congress created the Endowment to pursue. The Endowment is likely to succeed in showing that this funding cutoff contravenes multiple statutes, which provide that the Executive "shall" make grants to the Endowment and that the funds Congress appropriates shall "remain available" until entirely expended. And because Defendants' actions violate constitutional provisions directing that Congress makes the laws and exercises the power of the purse, as well as bedrock separation-of-powers principles, the Endowment is likely to succeed on its constitutional claims as well.

The equities also overwhelmingly favor a temporary restraining order. The Endowment suffers increasingly severe irreparable harm with each passing day. It is losing staff, critical capabilities, and the trust of partners on which it relies—all of which will take years to rebuild, if that is in fact possible. The Endowment's work has been severely compromised, as critical projects like elections monitoring have been halted. Confidential grantees in repressive regimes face a sudden loss of funding to sustain their efforts, which may publicly reveal their connection to the Endowment and thus place them at risk of legal or violent reprisals by the authoritarian regimes in which they work. These programmatic and institutional consequences already suffered will compound if allowed to continue, threatening the continued viability of the Endowment, its core institutes, and its grantees. The Endowment has attempted, with the support of a bipartisan coalition of Members of Congress, to find a political solution to this existential crisis. But because that effort has not succeeded, the Endowment has no choice but to ask this Court to intervene and to act—now—to forestall this irreparable harm.

# BACKGROUND

## A.    The National Endowment for Democracy

The Endowment is a private corporation entitled by federal statute to receive annual congressional appropriations that are specifically earmarked for its use and that enable it to further its congressionally established purposes.  The Endowment was born out of President Reagan's famous 1982 Westminster address to the British Parliament, in which he called for a new initiative to "foster the infrastructure of democracy" and fight authoritarianism through private-sector initiatives around the world.  Compl. ¶¶ 20-22.  The following year, Congress enacted and the President signed the National Endowment for Democracy Act (the "NED Act"), which formally recognized the establishment of the Endowment as a private nonprofit corporation entitled to receive federal funding through direct congressional appropriations.  *See* 22 U.S.C. §§ 4411 *et seq*.

In the NED Act, Congress set forth several purposes (also set forth in the Endowment's articles of incorporation) that the Endowment is to pursue.  22 U.S.C. § 4411.  The Endowment's mission is to "encourage free and democratic institutions throughout the world through private sector initiatives, including activities which promote the individual rights and freedoms (including internationally recognized human rights) which are essential to the functioning of democratic institutions." 22 U.S.C. § 4411(b).  The Endowment is also tasked with promoting "democratic training programs and democratic institution-building abroad," "strengthen[ing] democratic electoral processes abroad," and "encourag[ing] the establishment and growth of democratic development in a manner consistent both with the broad concerns of United States national interests and with the specific requirements of the democratic groups in other countries which are aided by programs funded by the Endowment." *Id.*

3

The Endowment has been—and remains—a nonpartisan, nonprofit, nongovernmental corporation with bipartisan origins and support.  The Endowment's original incorporators included the then-Chairs of both the Republican and Democratic National Committees, as well as representatives from labor unions and the Chamber of Commerce.  Appendix A to Declaration of Damon Wilson (NED Decl.) (attached as Exhibit A).  Throughout its history, the Endowment has been governed by a bipartisan Board of Directors.  NED Decl. ¶ 4.  The Board comprises Members of Congress, prominent academics, foreign policy experts, former diplomats and policymakers, business and labor representatives, and nonprofit leaders.  *Id.*  Their expertise enables them to effectively carry out their oversight of the Endowment's strategy and activities.  *Id.*

The Endowment advances its mission primarily by operating as a grantmaking organization.  22 U.S.C. § 4413(b) (Endowment may not "carry out programs directly").  It funds four "core institutes":  the International Republican Institute, the National Democratic Institute, the Center for International Private Enterprise, and the Solidarity Center.  NED Decl. ¶ 9.  In addition to carrying out projects to advance democracy, the institutes help to ensure that the Endowment's grantmaking is informed by local community needs and that the Endowment maintains the networks and expertise to properly vet, monitor, and assess the projects it funds.  *Id.*  The Endowment also funds nearly 2,000 projects each year in over 100 countries.  *Id.* ¶ 3.  These grants support organizations working to advance democratic principles and individual rights in their own countries.  *Id.*  Because some of the grantees operate in countries with highly repressive governments, they do so at great personal risk, and many must keep their relationship to the Endowment quiet.

The Endowment's work pays outsized dividends to the United States' interests, including by advancing democracy across the world.  For instance, the Endowment supported major pro-democracy movements that successfully opposed the continuation of communist rule in Eastern Europe after the fall of the Soviet Union in 1991.  *Id.* ¶ 12.  And even where change comes more gradually, the Endowment's cooperation with political, business, labor, and civic leaders around the world softens the ground for future collaboration with the United States.  *Id.* ¶ 10.  The Endowment's work contributes to "environments in which American businesses and workers can better compete, . . . less migration driven by hardship and violence," and reductions in "the emergence of violent non-state actors," like terrorist organizations.  *Id.* ¶ 13.

B.    **Congress's Direct Appropriations to the Endowment**

1.  From its inception, the Endowment was structured to ensure continuity of funding and independent decision-making authority.  Unlike other non-governmental organizations that receive funds at the discretion of federal agencies, the Endowment is funded through annual appropriations directly from Congress.  NED Decl. ¶ 15.

The NED Act provides that the Department of State "***shall make*** an annual grant to the Endowment to enable the Endowment to carry out its purposes as specified in section 4411(b) of this title."  22 U.S.C. § 4412(a) (emphasis added).[1]  To fund that grant, Congress has directly appropriated money for the Endowment's use every year since the Endowment's founding.  For fiscal year 2024, for instance, Congress provided in the Further Consolidated Appropriations Act: "For grants made by the Department of State to the National Endowment for Democracy, as

---

[1] As adopted, the NED Act identifies the United States Information Agency, which was consolidated with the Department of State in 1999 pursuant to the Foreign Affairs Reform and Restructuring Act of 1998.  *See* Federal Register, *United States Information Agency*, https://www.federalregister.gov/agencies/united-states-information-agency.

authorized by the National Endowment for Democracy Act (22 U.S.C. 4412), $315,000,000, to remain available until expended, of which $210,316,000 shall be allocated in the traditional and customary manner, including for the core institutes, and $104,684,000 shall be for democracy programs." Pub. L. No. 118-47, 138 Stat. 460, 737 (2024); NED Decl. ¶ 19. Although the amount of the appropriation has changed over time, its terms have long remained consistent. Again and again, Congress has directed that the full appropriated amount "shall be allocated" to the Endowment: a portion is earmarked for the Endowment's core institutes from the funds that "shall be allocated in the traditional and customary manner," and another portion "shall be for" the Endowment's democracy programs, that is, discretionary grantmaking, other programs, and the organization's operational costs. NED Decl. ¶ 19. In addition, the appropriated amount is to "remain available" to the Endowment "until expended." *Id.*

The Endowment's appropriation appears in Title I of the Department of State, Foreign Operations, and Related Programs ("SFOPS") appropriations legislation. Title I is directed to State Department operations and diplomatic programs, as well as certain "foreign affairs-focused nongovernmental organizations," including the Endowment.[2] By contrast, appropriations for U.S. foreign assistance, including appropriations for discretionary foreign-assistance grants administered by the State Department, appear in other titles of the appropriations legislation, including Titles III and IV.[3] Discretionary grants funded by this second, non-Title I category of appropriations have been the subject of other, recent litigation in this District. *See, e.g.*, *AIDS*

---

[2] *See* Cory Gill & Emily M. McCabe, Cong. Res. Serv., R40482, *Department of State, Foreign Operations, and Related Programs Appropriations: A Guide to Component Accounts* at 1, 8 (updated June 18, 2024), https://crsreports.congress.gov/product/pdf/R/R40482.

[3] *Id.* at 1.

*Vaccine Advoc. Coal. v. United States Dep't of State*, No. 25-cv-400 (AHA), 2025 WL 485324,

at *2 (D.D.C. Feb. 13, 2025); *American Foreign Serv. Ass'n v. Trump*, No. 25-cv-352 (CJN),

2025 WL 573762, at *2 (D.D.C. Feb. 21, 2025).

The Title I nondiscretionary, direct appropriations described above make up

approximately 95% of the Endowment's funding.  The Endowment also receives certain foreign-

assistance funding under Title III, comprising approximately 5% of its funding.  That latter

amount is not at issue here.

2.  As directed by Section 4412 of the NED Act, the State Department has the

administrative duty to transfer the appropriated funding to the Endowment.  The State

Department's Bureau for Democracy, Human Rights, and Labor ("DRL") serves as the

passthrough bureau that administers the Endowment's annual appropriation award by obligating

the funds to the Endowment.  NED Decl. ¶ 15.  In the language of the federal budget,

"obligating" funds entitles the grantee to receive the funds from the Executive Branch in the

form of disbursements.  See GAO, *A Glossary of Terms Used in the Federal Budget Process*,

GAO-05-734SP (Sept. 2005).  The NED Act directs that DRL use a grant agreement to deliver

the grant, but that "grant agreement may not require the Endowment to comply with

requirements other than those specified in this subchapter."  22 U.S.C. § 4412(a).

The Endowment accesses that funding through payment requests.  After the money is

obligated, it is set aside at the U.S. Treasury.  NED Decl. ¶ 16.  Historically, the Endowment has

then been able to access funds through the Payment Management Services (PMS) system, an

online portal operated by the Department of Health and Human Services.  *Id.* ¶ 17-18.  After an

Endowment staff member submits the request, a DRL official approves it.  *Id.* ¶ 18.  The funds

are then disbursed from the Treasury into the Endowment's bank account.  *Id.*

Throughout its history until now, the Endowment has made frequent drawdown requests, which have always been quickly and routinely approved. The organization funds both the core institutes and its discretionary grantees on an ongoing, intermittent basis, which means it must make multiple payments for each recipient over the course of a year or a project. *Id.* ¶¶ 20-23. And by regulation, the Endowment has a legal obligation to minimize the time between when it receives funds from the Department of State and when it disburses those funds. *See* 2 C.F.R. § 200.305(b). As a result, the Endowment is constantly sending payments out the door, but cannot keep much cash on hand, and thus must regularly request funds through PMS. *See* NED Decl. ¶ 23. Usually, it draws down money twice a week. *Id.* These requests are typically approved by State Department officials within 48 hours and then disbursed less than 24 hours later. *Id.* ¶ 18.

### C.    The Recent Halt on Funds

Initially, the funding process for the 2025 fiscal year proceeded as it has in recent years. In the 2024 fiscal year, Congress had appropriated $315,000,000 for "grants made by the Department of State to the National Endowment for Democracy," "to remain available until expended." Pub. L. No. 118-47, 138 Stat. 460, 737. As the fiscal year came to a close, Congress passed a continuing resolution to fund the government through December 20, 2024. Pub. L. No. 118-83, 138 Stat. 1524 (2024). It appropriated "[s]uch amounts as may be necessary, at a rate for operations as provided in" the prior year's appropriations act. *Id.* at 1524. In accordance with this directive from Congress, the Department of State obligated about $69 million to the Endowment. NED Decl. ¶ 30. That money was set aside in the Endowment's Treasury account. *See id.*

Congress passed a second continuing resolution just as the first was set to expire. This law amended the prior resolution to extend through March 14, 2025. Pub. L. No. 118-158, 138

8

Stat. 1722 (2024).  Commensurate with that extension, officials with the State Department prepared an amendment to the Endowment's existing grant agreement to obligate a second tranche of funds, which totaled around $72 million.  NED Decl. ¶ 31.

On January 21, 2025, the Endowment requested a drawdown of about $36 million through PMS.  *Id.* ¶ 25.  The funds hit its account the following day, and they were disbursed in the usual fashion.  *Id.*  The withdrawal left the Endowment with a balance of $167 million in its Treasury account, which consisted of money left over from prior annual appropriations and the $69 million obligated in the first continuing resolution.  *Id.* ¶ 30.

The Endowment has not been able to withdraw funds from Treasury since.  In multiple drawdown attempts on January 28 and 30, 2025, the Endowment requested a total of roughly $97 million.  *Id.* ¶ 26.  By January 31, the requests were still pending.  *Id.* ¶ 27.  That afternoon, Endowment staff noticed that the requests had been marked as "approved" in PMS.  *Id.* ¶ 28.  But in the days that followed, the same requests were "marked with a never previously seen status update: 'in transit.'"  *Id.*  The funds have not been transferred to the Endowment, and it still cannot access the money.  *Id.*

Compounding the Endowment's financial woes, the grant amendment for the $72 million appropriated in the second continuing resolution never came through.  A State Department official reported to an Endowment staff member that the modification was ready to be issued.  *Id.* ¶ 31.  Nevertheless, it has yet to be formally obligated.  *Id.*

As a result, the Endowment is quickly running out of money.  It has only limited cash in its bank account to cover "basic institutional operating costs."  *Id.* ¶ 32.  But it cannot access the $167 million in its Treasury account.  Nor can it access the $72 million that is due to be obligated.  *Id.* ¶ 31.

### D.    The Consequences of the Halt on Funds For the Endowment and Its Grantees

The Executive's impoundment of funds has created an immediate cash flow crisis that threatens devastation for the Endowment if not swiftly resolved.  As of March 1, almost two-thirds of the Endowment's staff has already been furloughed, with more furloughs and layoffs expected if the funding freeze continues.  NED Decl. ¶ 35.  These cuts have already had wide-ranging consequences for the Endowment, the core institutes, and the grantees.

The Endowment has already been damaged by the shut off of funds in at least four ways and will face even graver consequences if it continues.  First, a significant percentage of the Endowment's staff has been furloughed already, with more furloughs and layoffs to come if funding is not immediately restored.  *Id*.  Second, these furloughs have seriously weakened the Endowment's ability to withstand the frequent cyberattacks it experiences from hostile foreign actors and others.  *Id.* ¶ 36.  Maintaining data security is essential to protecting the identities of grantees, especially those who operate in authoritarian regimes.  Exposure would threaten grantees' liberty and in some instances their very lives.  *Id.*  Third, these furloughs and any layoffs will deprive the Endowment of critical capabilities in areas like language, regional knowledge, and technical fields.  These are essential to working in some of the world's most repressive regimes and could take years to rebuild.  *Id.* ¶ 37.  Fourth, the freeze undermines the Endowment's relationship with its grantees, who were left high and dry when the funding suddenly stopped.  *Id.* ¶ 38.  These impacts directly compromise the Endowment's ability to fulfill its statutorily mandated mission.  *See id.* ¶ 39.

The freeze has left the Endowment unable to pay for the projects and obligations that Congress created the Endowment to support.  The continued funding cutoff threatens the demise of the core institutes, to which the Endowment now collectively owes almost $100 million that it

cannot pay.  NED Decl. ¶ 41.  This has already disrupted over 350 projects the institutes were implementing with Endowment funds.  *Id.*  For example, by the end of March, the International Republican Institute "will have closed 31 offices worldwide that depend at least in part on [Endowment] funding."  NED Decl. ¶ 60.  Similarly, CIPE has been forced to halt work on projects focused on countering China's economic influence and coercion across the globe, protecting the global supply chain, and preventing the resurgence of hostile terrorist organizations in the Middle East.  A. Wilson Decl. ¶ 12 (attached as Exhibit B).  Other core institutes and their initiatives have been similarly affected.  NED Decl. ¶ 88; Bader-Blau Decl. ¶¶ 9, 11 (attached as Exhibit C).

The impoundment has already had a devastating impact on grantees that will only get worse if funding is not restored soon.  The Endowment has already informed organizations carrying out nearly 1,300 grants that it is unable to continue making grant payments.  NED Decl. ¶ 42.  The Endowment has also been forced to withdraw support for critical services that it and the core institutes provide grantees and partners, including digital security, safe houses, and legal assistance.  *Id.* ¶ 48.  And the Endowment's loss of funding has disrupted time-sensitive and mission-critical projects like election monitoring, legal aid, human rights monitoring, and information dissemination via broadcasts and publications.  *Id.* ¶ 50.

If funding is not restored soon, the effects on grantees will be ruinous and, in some cases, life-threatening.  The Endowment estimates that at least 70% of grantees "will have to either cut staff, reduce core operations, declare bankruptcy, or close offices on or before March 31, 2025." *Id.* ¶ 44.  Individual grantees in exile may be forced by loss of employment to return to countries where they face persecution and retribution.  *Id.* ¶ 49.  And the sudden interruption in support

11

may expose operations and staff as the Endowment's grantees, risking legal or other retribution from authoritarian governments or other factions that oppose their work.  *Id.* ¶ 50.

## LEGAL STANDARD

A motion for a temporary restraining order is analyzed using the same "factors applicable to preliminary injunctive relief."  *Costa v. Bazron*, 456 F. Supp. 3d 126, 133 (D.D.C. 2020).  To obtain a temporary restraining order, a movant "must establish [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (citation omitted); *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733–34 (D.C. Cir. 2022) (preliminary injunction preserves the "last uncontested status which preceded the pending controversy").  When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction."  *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)).  Those four factors clearly weigh in the Endowment's favor.

## ARGUMENT

### I.    THE ENDOWMENT IS LIKELY TO SUCCEED ON THE MERITS

Through the National Endowment for Democracy Act and subsequent legislation, Congress required the Executive Branch to ensure that the Endowment would have the ongoing funding it needs to promote its statutory purposes.  But Defendants have thrown the organization into an unprecedented cash flow crisis by cutting off the flow of money, declining to obligate grants, and failing to process the Endowment's payment requests.  That violates both their statutory and their constitutional obligations.

A.      **Congress Has Directly Appropriated Funds to the Endowment and the Executive Branch Lacks Statutory Authority to Withhold Those Appropriated Funds from the Endowment**

1.  In the NED Act and annual appropriations statutes, Congress directed the Executive Branch to convey the Endowment's annual appropriation to it.  The NED Act provides in unusually clear mandatory language that the State Department "***shall make*** an annual grant to the Endowment to enable the Endowment to carry out its purposes as specified in section 4411(b) of this title."  22 U.S.C. § 4412(a) (emphasis added).  As relevant here, "[s]uch grants ***shall be made*** with funds specifically appropriated for grants to the Endowment."  *Id.* (emphasis added). The repeated use of "shall" imposes an unambiguous mandatory duty on the State Department to obligate the money appropriated to the Endowment.  *See Maine Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020) (statute using "the word 'shall'" imposed a mandatory duty on the Executive Branch).

To enable that annual grant, Congress appropriates funds each year for the Endowment's use—and it does so in a manner that underscores that the Executive Branch has no discretionary statutory authority over disbursement of the funding.[4]  For fiscal year 2024, for instance, Congress provided in the Further Consolidated Appropriations Act: "For grants made by the Department of State to the National Endowment for Democracy, as authorized by the National Endowment for Democracy Act (22 U.S.C. 4412), $315,000,000, to remain available until expended, of which $210,316,000 shall be allocated in the traditional and customary manner,

---

[4] Over the course of the past five fiscal years, Congress has appropriated a total of more than 1.5 billion dollars to the Endowment.  *See* Pub. L. No. 118-47 (FY2024); Pub. L. No. 117-328 (FY2023); Pub. L. No. 117-103 (FY2022); Pub. L. No. 116-260 (FY2021); Pub. L. No. 116-94 (FY2020).  In just the past few months, Congress has authorized continuing appropriations, at the rate specified in the 2024 appropriations act, for the Endowment's "continuing projects or activities."  Pub. L. No. 118-83, 138 Stat. 1524, 1524 (Sept. 26, 2024); Pub. L. No. 118-158, 138 Stat. 1722 (Dec. 21, 2024).

including for the core institutes, and $104,684,000 shall be for democracy programs." Pub. L. No. 118-47, 138 Stat. 460, 737. Although the amount of the appropriation has varied from year to year, the basic statutory command has not. Congress has consistently directed that the full appropriated amount "shall be allocated" to the Endowment. And the appropriated amount is to "remain available" to the Endowment "until expended." The Executive Branch thus has no discretion to make less than the full appropriated amount available to the Endowment.

The mandatory language used in the NED Act and annual appropriations statutes makes crystal clear that Congress left the Executive Branch no discretion over the Endowment's funding. Bedrock principles of appropriations law confirm that conclusion. As the D.C. Circuit has explained, the Executive Branch does not have "unilateral authority" to refuse to spend the "full amount appropriated by Congress for a particular project or program." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). Instead, if a statutory mandate to spend conflicts with a contrary Presidential directive, the statute prevails. *See Train v. City of New York*, 420 U.S. 35, 41, 47-49 (1975) (invalidating a Presidential directive to "withhold[]" funding because it could not be "squared with the statute"); William H. Rehnquist, *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, Office of Legal Counsel, 1 Op. O.L.C. Supp. 303, 309 (1969) (rejecting the notion of a presidential power to "decline to spend appropriated funds" as unsupported by "reason" or "precedent"). If the Executive Branch prefers to spend less than what Congress has appropriated, it must ask Congress to pass a new statute to that effect pursuant to the Impoundment Control Act of 1974—and Congress has directed that if it does not enact a rescission statute within 45 days, the funds in question "shall be made available [by the Executive Branch] for obligation." 2 U.S.C. § 683(b); *see In re Aiken*

14

*Cnty.*, 725 F.3d at 261 n.1.[5]  The Executive Branch's duty is therefore doubly mandatory here: the NED Act and appropriations laws leave the Executive no discretion to deny the Endowment's funding, and the Impoundment Control Act reaffirms that only Congress has the authority to reconsider its decision to direct appropriated funds to the Endowment.  Needless to say, it has not done so.  The Endowment is entitled to its statutorily appropriated funds.

2.  The Executive's denial of the Endowment's appropriated funds has proceeded along two tracks, both of which exceed the Executive's statutory authority.

*First*, the Executive Branch has denied the Endowment access to the approximately $167 million cash balance of obligated, appropriated funds held in its Treasury account.  These funds (which include Congress's appropriation of approximately $69 million to the Endowment in the first 2025 continuing resolution, plus other available, already-obligated funds from prior years' annual appropriation awards) have already been obligated to the Endowment by the State Department.  Those funds therefore should be available to the Endowment to draw down at its discretion to pay its operational expenses and fulfill its payment obligations to grantees.  Following its ordinary course, the Endowment has submitted drawdown requests for payment out of those funds.  The requests total $97 million, and ordinarily would be fulfilled within a few days—yet a month after those requests, the Treasury Department has not released the funds to Endowment.

---

[5] The Antideficiency Act is to similar effect.  It permits the Executive Branch to "reserve" appropriated funds, but only for three limited reasons: 1) "to provide for contingencies"; 2) "to achieve savings made possible by or through changes in requirements or greater efficiency of operations"; or 3) "as specifically provided by law."  31 U.S.C. § 1512(c)(1).  And if the Executive Branch ultimately concludes that the reserved funding should be rescinded, it must comply with the strictures of the ICA.  *Id.* § 1512(c)(2).

It is indisputable that Congress's direction in the NED Act to make grants to the Endowment in the amount that Congress has directly appropriated necessarily includes a direction to the Executive Branch to actually make the funds available to the Endowment. Congress provided in the NED Act, and reaffirmed in each annual appropriations statute since, that it intends that the amounts it appropriates specifically to the Endowment shall be provided to the Endowment so that it can expend the funds to further its congressionally mandated purposes. 22 U.S.C. § 4412(a); *see, e.g.*, Pub. L. No. 118-47.  In those statutes, Congress did not provide the State Department—or any part of the Executive Branch—with authority or discretion to second-guess Congress's determination that specific amounts should be directly appropriated to the Endowment.  Thus, although the Treasury Department and HHS (by virtue of its electronic payment system) play mechanical roles in disbursing the funds that the State Department has obligated to the Endowment, see 31 U.S.C. §§ 3321(a), (b), 3322, 3325(a), (b), those agencies lack any authority to refuse to disburse obligated funds.

That conclusion is confirmed by the statutory framework governing the Treasury Department's disbursement role.  It does not provide the Treasury Department with any authority to second-guess the wisdom of disbursing funds that have been appropriated by Congress and obligated by an agency.  See 31 U.S.C. §§ 3321 *et seq.*; 31 U.S.C. § 3325 (permitting "disbursing official" to review disbursement voucher provided by obligating agency only for form and computation); *Houston v. Ormes*, 252 U.S. 469, 472 (1920) (once Congress has appropriated funds for a specific recipient, the Treasury Department has a mandatory duty to make payment on demand); 18 Comp. Gen. 285, 292 (1938) ("the question with the accounting officers is not the apparent general merit of a proposed expenditure, but whether the Congress, controlling the purse, has by law authorized the expenditure").  Thus, the Executive Branch lacks

16

statutory authority to deny the Endowment access to its congressionally appropriated funds that have been obligated by the State Department and that therefore should be available for immediate disbursement.

*Second*, the State Department has refused to obligate to the Endowment its second fiscal year 2025 continuing resolution obligation of approximately $72 million. *See* Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, § 101, 138 Stat. 1524-25 (2024) (incorporating by reference 2024 appropriations statute); American Relief Act, Pub. L. No. 118-158, 138 Stat. 1722 (2024). The State Department has confirmed that it received those funds in mid-January. Compl. ¶ 65; NED Decl. ¶ 31. The State Department has also taken all the preparatory steps needed to obligate the funds. *Id.* After officials informed the Endowment that they had received the money, they began to prepare to obligate the sum. *Id.* And on February 4, a State Department official informed a member of the Endowment's staff that the agreement is ready to be issued. *Id.* Yet the State Department has not obligated the funds. That month-long withholding of an obligation is unprecedented. And taken together with the Executive's similarly unprecedented denial of the Endowment's payment requests, it amounts to an unambiguous refusal to obligate appropriated funds.[6] That is a straightforward violation of the NED Act and the annual appropriations statutes, which direct that the State Department "shall make" grants to the Endowment in the amount appropriated by Congress. 22 U.S.C. § 4412; Pub. L. No. 118-47, 138 Stat. 460, 737 (2024).

---

[6] Officials at the Department report that they are "waiting to get guidance" before formally obligating the Endowment's funding. NED Decl. ¶ 31. But guidance has no role to play in the ministerial act of signing off on the Endowment's direct congressional appropriation.

**B.    The Endowment Is Likely to Succeed on Its APA Claims**

Under the APA, a reviewing court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  A court must also "compel agency action" that is "unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  Whether Defendants' obstruction of the Endowment's funding is characterized as unauthorized action under § 706(2) or unlawful inaction under § 706(1), the Endowment is likely to prevail in showing that relief is warranted.

**1.    The Executive Branch's Impoundment of the Endowment's Funding Must Be Set Aside Because It Exceeds the Executive's Statutory Authority**

a.  The Endowment is likely to succeed in showing that the Executive Branch's denial of its funding is "not in accordance with law" and "in excess of statutory . . . authority."  5 U.S.C. § 706(2).  That provision requires a court to invalidate agency action that conflicts with a federal statute.  *NextWave Personal Cmmc'ns, Inc. v. FCC*, 254 F.3d 130, 149 (D.C. Cir. 2001).  For the reasons discussed above, the Executive Branch's refusal to make the Endowment's funding available to it violates Congress's express direction that the Executive "shall" grant to the Endowment the funds that Congress has appropriated specifically for its use, as well as the direction that appropriated funds are "to remain available" to the organization "until expended."  *See, e.g.*, Pub. L. No. 118-47, 138 Stat. 460, 737.  In addition, the Executive's contravention of Congress's statutory directives violates the constitutional provisions discussed further below, *see infra* pp. 24-33, and the Executive's impoundment therefore must be set aside on that basis as well.

b.  The denial of funding is reviewable "final agency action."  5 U.S.C. § 704.  "[A]gency action" includes an agency's "denial" of "recognition" to a "claim" or "right"; the "denial" of a "grant of money"; and the "failure to act" or "withholding" with respect to claims, rights, and

18

grants of money.  5 U.S.C. § 551(10), (11), (13).  The Executive's refusal to disburse already-obligated funding that ordinarily would have become immediately available to the Endowment for drawdowns, and its refusal to obligate specifically-appropriated funds that ordinarily would have been immediately obligated, clearly constitute agency action under those definitions.

The Executive's denial of funding is also final.  Agency action is final if it "mark[s] the 'consummation' of the agency's decisionmaking process," meaning that it is not tentative or interlocutory, and determines "rights [and] obligations" or imposes "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted); *Friedman v. FAA*, 841 F.3d 537, 541 (D.C. Cir. 2016).  The inquiry is "pragmatic and flexible" in nature, conducted with an eye toward "ensur[ing] justice" and preventing agencies from "thwarting" judicial review of agency actions that "in practical effect" determine rights or obligations.  *Friedman*, 841 F.3d at 542, 543.  Courts therefore do not require "formal acknowledgement" by the agency that it has reached a final resolution, *id.* at 542, but instead consider agency action to be "effectively final"—and thus reviewable—if it has "the same impact on the rights of the parties" as a formal decision would, *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987); see *Friedman*, 841 F.3d at 541 (finding a "constructive denial" of an application was final agency action); *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 192 (D.D.C. 2024) ("[A] plaintiff can also challenge agency inaction under § 706(2) where the agency's failure to act is the functional equivalent of final agency action." (citation and alterations omitted)); *Connecticut v. U.S. Dep't of Interior*, 363 F. Supp. 3d 45, 60 (D.D.C. 2019).  In other words, the test is "whether the impact of the [action] is sufficiently 'final' to warrant review in the context of the particular case."  *Friedman*, 841 F.3d at 542 (citation omitted).

Defendants' refusal to make the Endowment's appropriated funds available easily qualifies as final agency action because it is the "functional equivalent" of an express denial of payment. *Lewis*, 743 F. Supp. 3d at 192; *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990).  The consequences of that refusal to the Endowment are indistinguishable from the consequences of an express statement of denial.  As Defendants well know, regulations require the Endowment to keep very little cash on hand and to make frequent drawdown requests that "minimize the time elapsing between the transfer of funds from the Federal Agency . . . and the disbursement of funds by the recipient."  2 C.F.R. §§ 200.305, 600.101(a); *see* NED Decl. ¶ 23.  The Endowment therefore must make drawdown requests multiple times a week in order to fund immediate obligations for operational expenses and to pay its grantees—and Executive Branch officials necessarily must respond promptly to those drawdown requests in order to ensure that the Endowment is able to continue operating.  Until now, they have always done so, ensuring that the Endowment receives its funds within three days of a request.  NED Decl. ¶ 18.

The Executive's month-long refusal of funding therefore has had the inevitable, immediate consequence of bringing the Endowment's operations to a standstill.  The Endowment has been unable to support its core institutes.  *Id.* ¶ 34.  It has reduced salaries and furloughed staff, losing employees with years of experience and vital skillsets.  *Id.* ¶¶ 35, 37.  More furloughs and layoffs are imminent.  *Id.* ¶ 35.  And the abrupt halt in funding has already severely damaged the Endowment's relationships with its grantees, causing it to fail to meet its obligations for the first time in its history and resulting in considerable hardship to those grant recipients.  *Id.* ¶¶ 38, 40, 46.  Unless the Endowment's funds are restored, it will be forced to entirely cease operations in the near future.  These concrete and irreversible effects are

indistinguishable from the consequences that would have flown from a formal announcement that the Executive Branch was—contrary to Congress's express directives—eliminating the Endowment's funding entirely.  The absence of such a formal announcement does nothing whatsoever to alter the fact that "in practical effect," the Executive's actions have determined the Endowment's rights and its ability to operate.  *Friedman*, 841 F.3d at 542.  Those actions qualify as final—and unlawful—agency action.

<strong>2. The Executive Branch Is Unlawfully Withholding the Endowment's Funding</strong>

For much the same reasons, the Endowment is also likely to succeed in showing that the Court should "compel" the Executive Branch to release its funding.  5 U.S.C. § 706(1).  To the extent that the Executive's refusal to make the Endowment's funds available is conceptualized as a failure to take the nondiscretionary steps necessary to provide appropriated funds to the Endowment, that refusal constitutes agency action "unlawfully withheld."  *Id.*; *see Ramirez v. U.S. Immigr. & Customs Enf't*, 471 F. Supp. 3d 88, 94, 191 (D.D.C. 2020) (allowing plaintiffs to bring two counts, under sections 706(1) and 706(2), that "focus[ed] on the same conduct").  Section 706(1) requires a plaintiff to identify a "discrete agency action" that the agency is "required to take," either by statute or regulation.  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64-65 (2004).  Defendants' failure to obligate the Endowment's funds and their refusal to approve the Endowment's payment requests satisfy that requirement.

As described above, section 4412 and the appropriations acts create a mandatory duty for Defendants—one they have not fulfilled.  These statutes require the State Department to obligate congressionally appropriated funds to the Endowment and to ensure that those funds "remain available" to the organization "until expended."  22 U.S.C. § 4412(a); *see, e.g.*, Pub. L. No. 118-47, 138 Stat. 460, 737.  But the Executive has refused to disburse the already-obligated $167

21

million in the Endowment's Treasury account, and the State Department has refused to obligate the $72 million that Congress appropriated for the Endowment in the second continuing resolution.  NED Decl. ¶ 30.

There can be no question that in so doing, Defendants have failed to take "discrete" and "required" steps.  *Norton*, 542 U.S. at 64-65.  With respect to the funds that the State Department has already obligated, disbursement is discrete and required.  *See supra* pp. 15-16.  The act of obligating specifically appropriated funds to the Endowment is likewise a discrete action that is required by the NED Act; the State Department enjoys no discretion to second-guess Congress's decision that the Endowment should receive the funds.  And as discussed above, the legal framework governing disbursement necessitates that the Executive take those actions expeditiously in order to permit the Endowment to continue to operate—as Congress clearly intends it to do—and to fulfill its congressionally mandated purposes.[7]  The Executive has thus unequivocally failed to take discrete actions that Congress has commanded it to take.  *Cf. Am. Anti-Vivisection Soc'y v. United States Dep't of Agric.*, 946 F.3d 615, 621 (D.C. Cir. 2020) (failure to follow statutory direction to promulgate welfare standards for birds constituted discrete, required action).

---

[7] Nor can Defendants justify their inaction as mere delay.  Just as this Court must "compel agency action" that is "unlawfully withheld," it must do the same for action that is "unreasonably delayed."  *Telecommc'ns Research & Action Ctr. v. FCC*, 750 F.2d 70, 76 (D.C. Cir. 1984) (citation omitted).  And the delay to date is already unreasonable in light of the gross departure from the ordinary funding timeline and the immediate, devastating effects of the freeze on both the Endowment and its grantees.  *See id.* at 79-80; *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 420 (D.C. Cir. 2004) (finding the agency unreasonably delayed in part because "its dilatoriness is . . . uncharacteristic of the relatively swift treatment it routinely gives similar petitions").

### 3.    The Endowment Is Likely to Prevail Regardless of Whether the APA Is Available

1. Wholly apart from its APA claims, the Endowment is likely to prevail on its nonstatutory *ultra vires* claim. Where a party is unable to bring a traditional APA challenge, an *ultra vires* cause of action is available when an "agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (citation omitted).[8]

The Endowment is clearly entitled to that relief here. The Defendants' conduct "disregard[s] a specific and unambiguous statutory directive." *Id.* at 764 (citation omitted). By refusing to make the Endowment's appropriated funds available, Defendants contravene their mandatory statutory duty to fund the Endowment. And while the standard for bringing an *ultra vires* claim is a demanding one—requiring agency action that goes "beyond mere legal or factual error" and amounts to a "clear departure by the agency from its statutory mandate," *id.* (citation omitted and alteration adopted)—the challenged conduct easily satisfies that test. In light of the inescapably mandatory statutory language at work, Defendants' disregard for their responsibilities is "utterly unreasonable." *Id.*

2. Similarly, the Endowment is likely to prevail in its request for mandamus. A writ of mandamus may be granted to "correct transparent violations of a clear duty to act." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d at 418 (citation omitted). The standard for concluding that an agency has failed to fulfill such a duty are the same as those for concluding that an agency has "unlawfully withheld" action under the APA. *See Vietnam Veterans of Am. v.*

---

[8] For an *ultra vires* cause of action to lie, the plaintiff also must show that "there is no express statutory preclusion of all judicial review" and "there is no alternative procedure for review of the statutory claim." *Fed. Express Corp.*, 39 F.4th at 763 (citation omitted). Those requirements are satisfied here.

*Shinseki*, 599 F.3d 654, 659 n.6 (D.C. Cir. 2010); *Lewis*, 743 F. Supp. 3d at 199.  Accordingly,

for all the reasons Defendants' conduct amounts to "agency action unlawfully withheld," 5

U.S.C. § 706(1); *see supra* pp. 21-22, it likewise supports a claim for mandamus relief.  As a

result, if this Court were to conclude that the Endowment is unlikely to satisfy some other

requirement for relief under 5 U.S.C. § 706(1), the Endowment would still be likely to prevail in

challenging Defendants' unlawful withholding of funds through mandamus.

### C.    The Endowment is Likely to Succeed on Its Constitutional Claims

The Defendants' actions here violate the Appropriations Clause, the Spending Clause, the

Presentment Clause, and the Take Care Clause.  The Endowment raises these claims both as

implied constitutional causes of action, *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,

561 U.S. 477, 491 n.2 (2010), and through the APA, which provides relief where agency action

is "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B); *see

supra* p. 18.

Each of these clauses acts in service of the Constitution's fundamental of separation of

powers between the three branches of government.  *See infra* (describing each clause).  These

"checks and balances" are "a self-executing safeguard against the encroachment or

aggrandizement of one branch at the expense of the other."  *Buckley v. Valeo*, 424 U.S. 1, 122

(1976).  The goal of this structure was to "diffuse[] power" to "secure liberty."  *Youngstown

Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635 (1952) (Jackson, J., concurring).  While a

likelihood of success on even one of these violations is sufficient to show a likelihood of success

on the merits for purposes of this motion, taken together they reinforce the dramatic extent to

which the Executive has overstepped its constitutional authority and usurped that of Congress, in

violation of the separation of powers.  *See id.* at 637-38.

1.    **The Appropriations and Spending Clauses**

The Executive's refusal to disburse congressionally-appropriated funds to the

Endowment infringes Congress's "exclusive power over the federal purse."  *U.S. Dep't of Navy*

*v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (citation omitted).  That exclusive

power is conferred and protected by the Appropriations and Spending Clauses, and the Executive

has no constitutional authority to countermand it.

a.  The Appropriations Clause is the "bulwark of the Constitution's separation of powers"

and a "particularly important . . . restraint . . . on the Executive Branch."  *Id.* at 1347; *see also*

U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause).  Congress has extensive authority to define

the terms of its appropriations.  *See CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416,

425-32 (2024); *see also Harrington v. Bush*, 553 F.2d 190, 194 (D.C. Cir. 1977) (describing

Congress's "plenary power" to define the terms of appropriations).  Congress has exercised that

authority both in passing generally applicable laws related to spending, *id.*, and in how it crafts

specific appropriations, *CFPB*, 601 U.S. at 425-32.  Congress may use a lump-sum appropriation

to "give an agency the capacity to adapt to changing circumstances and meet its statutory

responsibilities in what it sees as the most effective or desirable way."  *Lincoln v. Vigil*, 508 U.S.

182, 192 (1993).  But Congress is under no constitutional obligation to proceed in that manner.

To the contrary, "Congress may always circumscribe agency discretion to [spend] by putting

restrictions in the operative statutes."  *Id.* at 193.

The Executive Branch lacks any independent constitutional authority to contravene

Congress's direction about how appropriated funds will be disbursed and spent.  Where Congress

mandates that certain funds be spent in a particular way or in a particular amount, the Executive

is "not free simply to disregard [those] statutory responsibilities."  *Id.*  Courts have repeatedly

affirmed that the President—and by extension the Executive Branch—"does not have unilateral

authority to refuse to spend" congressionally-appropriated funds. *In re Aiken Cnty.*, 725 F.3d at 261 n.1.

In *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 610 (1838), the Supreme Court granted a writ of mandamus to compel the Postmaster General to pay a congressionally mandated award that the Postmaster General had attempted to withhold. The Court explained that Congress had authority to "impose" a duty on an executive officer to comply with the appropriation, and that "his obligation to perform, or his right to resist the performance, must depend upon the act of congress." *Id.* at 610-11. In other words, the Executive Branch lacked any independent constitutional authority to disregard Congress's direction by withholding appropriated funds.

Likewise, in *Train v. City of New York*, 420 U.S. 35, 43 (1975), the Supreme Court construed a statute providing that sums "authorized to be appropriated . . . *shall be allotted*" to *require* the appropriation of the entire amount, leaving the Executive no discretion to reduce the amount of funding. *Id.* at 42-43. These decisions establish that the Executive Branch lacks constitutional authority to override Congress's mandatory appropriations decisions—and that as a result, any executive discretion to decline to spend appropriated funds must be granted by Congress. Put simply, where, as here, Congress mandates an expenditure, the Executive must comply. *See supra* pp. 14-15.

Those precedents are consistent with the Executive Branch's own longstanding view that it lacks the authority to impound or otherwise impede the flow of mandatory appropriations. In 1969, the Department of Justice's Office of Legal Counsel ("OLC"), in a memorandum authored by William Rehnquist, concluded that any asserted presidential constitutional power to "decline to spend appropriated funds . . . is supported by neither reason nor precedent." William H. Rehnquist, *Presidential Authority to Impound Funds Appropriated for Assistance to Federally*

*Impacted Schools*, Office of Legal Counsel, 1 Op. O.L.C. Supp. 303, 309 (1969).  Instead, as OLC explained, the Executive had no "power to refuse to spend appropriations *other than such power as may be found or implied in the legislation itself*."  *Id.* at 310 (emphasis added).  Indeed, OLC found no instance, in almost two hundred years of prior practice, in which the Executive had refused to comply with a congressional appropriations law that deprived the Executive of discretion.[9]  *Id.* at 309.

b.  The Spending Clause similarly empowers Congress and limits the President's authority over federal spending.  "[T]he ability to place conditions on federal grants ultimately comes from the Spending Clause, which empowers Congress, *not the Executive*, to spend for the general welfare."  *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021) (emphasis added); *see also City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018).  Thus, "[a]llowing an executive agency to impose a condition that is not otherwise ascertainable in the law Congress enacted 'would be inconsistent with the Constitution's meticulous separation of powers.'"  *W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023) (quoting *Tex. Educ. Agency*, 992 F.3d at 362).  The Executive therefore cannot impose additional conditions on the disbursal of funds to the Endowment beyond those that Congress has provided.

Indeed, Congress made particularly clear that it was exercising the full extent of its constitutional authority in the NED Act.  The Act states unequivocally that the grant agreements

---

[9] Early Executive Branch legal analysis similarly understood the Executive to be without power to defy congressional funding commands.  *See, e.g.*, Transfers of Appropriations, 4 Op. Att'y Gen. 428, 428-29 (1845) (concluding the Executive lacked the authority to transfer funds between appropriated items); Transfer of Specific Appropriations of House of Representatives to Contingent Fund, 3 Op. Att'y Gen. 442, 442-43 (1839) (same).  And these views are consistent with founding-era and common law practices.  *See CFPB*, 601 U.S. at 430-32 (describing historical practice of both permissive and mandatory appropriations).

the State Department uses as the mechanism for disbursing the Endowment's appropriated funds "may not require the Endowment to comply with requirements other than those specified in this subchapter." 22 U.S.C. § 4412(a).  The Executive therefore has no constitutional or statutory authority to impose additional conditions (stated or unstated) on the Endowment's funding.  A fortiori, the Executive may not simply withhold the Endowment's appropriated funds.  *See In re Aiken*, 725 F.3d at 261 (the Executive lacks authority to decline to spend funds for policy reasons).

### 2.    The Presentment Clause

The Executive's effective nullification of both the NED Act and the Endowment's appropriations statutes also violates the Presentment Clause because it far exceeds the President's limited role in the legislative process.  "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes"—let alone unilaterally.  *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).  Yet that is precisely what the Executive has done here.  As already explained, both the NED Act and the appropriations statutes require the Executive Branch to fund the Endowment's activities at a particular level.  *See id.*  The Executive's refusal to comply with Congress's instructions effectively cancels those congressional commands.  Because such unilateral amendment or appeal of statutes is beyond the power of the President (or, by extension, his subordinates), the Executive's interference with the Endowment's funding violates the Presentment Clause.

The Supreme Court's decision in *Clinton v. City of New York*, 524 U.S. at 438, which struck down the Line Item Veto Act, is dispositive here.  That Act authorized the President to "cancel in whole" certain kinds of statutory provisions, including: "(1) any dollar amount of discretionary budget authority; (2) any item of new direct spending; or (3) any limited tax benefit."  *Id.* at 436 (citation omitted).  President Clinton had exercised the authority granted to

28

him by that act to cancel both a statutory provision that would have relieved certain state and

local entities of their obligation to pay certain back taxes and an amendment to the capital gains

tax. *Id.* The Supreme Court reasoned that this authority to cancel portions of duly enacted

statutes—though provided to the President via legislation—violated the Presentment Clause

because "[i]n both legal and practical effect," it gave the President the authority to "amend[] . . .

Acts of Congress by repealing . . . portion[s]" thereof. *Id.* at 438. Consistent with extensive

historical practice, the Supreme Court construed the Presentment Clause as requiring that the

President either "approve all the parts of a Bill, or reject it in toto." *Id.* at 439-40. The Line Item

Veto Act exceeded that limitation by authorizing the President to cancel portions of a bill *after* it

became law.

Zeroing out funding for the Endowment that Congress has specifically provided is simply

a line item veto by another name. As already explained, both the NED Act and the

appropriations bill leave no room for executive discretion to reduce the Endowment's grant

funding *at all*—let alone to entirely defund it. *See supra* pp. 13-17. If the President wants to

eliminate or reduce federal funding for the Endowment, under *Clinton v. City of New York*, the

proper recourse is for him to work with Congress to repeal the bill. He may not, now that these

bills are law, functionally repeal or amend their terms. Nor may his subordinates. *Cf. Util. Air

Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) (holding that an agency may not "rewrite clear

statutory terms to suit its own sense of how the statute should operate").

To the extent the Government may try to distinguish *Clinton* on the grounds that the

Executive has not expressly purported to "cancel" any statute, that argument is wrong.

Separation-of-powers inquiries are functional, not formal, in character. *See Clinton*, 524 U.S. at

438 (describing the Line Item Veto Act as a functional repeal because of its "legal *and practical*

*effect*" (emphasis added)); *see also INS v. Chadha*, 462 U.S. 919, 953 (1983) ("Whether actions taken by either House are, in law and fact, an exercise of legislative power *depends not on their form* but upon whether they contain matter which is properly to be regarded as legislative in its character and effect." (emphasis added and citation omitted)).  By entirely cutting off funds to the Endowment, the Executive's actions have the practical effect of repealing both the appropriations laws mandating such funds be provided to the Endowment and the NED Act itself.  In that light, the facts here are indistinguishable from *Clinton*:  Just as President Clinton's line item veto denied the plaintiffs congressionally-mandated tax relief, the Executive's refusal to pay the Endowment denies it congressionally-mandated funds.  And, if anything, the fact that President Clinton was operating pursuant to an (unconstitutional) grant of authority by Congress to cancel its own statutes makes the Executive's actions here *more* offensive to the separation of powers, not less.[10]  *See Youngstown Sheet & Tube Co.*, 343 U.S. at 637 (Jackson, J., concurring).

### 3.     The Take Care Clause

The Executive's refusal to comply with the direction contained in the NED Act and associated appropriations laws also constitutes a failure of the Executive to fulfill its obligations under the Take Care Clause.  That Clause imposes on the President, and by extension his subordinates, the duty to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3. The Clause imposes a significant limitation on Executive power: "the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co.*, 343 U.S. at 587.  As already explained, effectively repealing duly

---

[10] The fact that the Endowment seeks relief against Defendants who are not the President does not affect its ability to seek relief on this claim because the President may not delegate power he does not possess.

enacted statutes is a legislative, not executive, act.  *See supra* pp. 25-26, 28.  The Executive's actions here thus overstep the President's Take Care authority as well.

The principle that the President cannot refuse to implement duly enacted laws is a foundational limitation of the Take Care Clause.  *See Kendall*, 37 U.S. (12 Pet.) at 612-13.  In requiring the Executive to comply with Congress's spending mandate in *Kendall*, the Supreme Court expressly rejected the idea that the Take Care Clause's obligation "to see the laws faithfully executed, implies a power to forbid their execution."  *Id*. at 612-13.  The Court explained that the Constitution does not vest in the President any power analogous to the "dispensing power" that the Crown enjoyed at common law to dispense with or suspend acts of Parliament.  *Id*.; *see* Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*, 164 U. Pa. L. Rev. 1835, 1850 & n.110 (2016) (describing the dispensing power and its rejection in the English Bill of Rights).  More recently, the D.C. Circuit described as "settled, bedrock principles of constitutional law" the propositions that "[u]nder Article II of the Constitution … the President must follow statutory mandates," and that "the President may not decline to follow a statutory mandate or prohibition simply because of policy objections."  *In re Aiken Cty*., 725 F.3d at 259.  Here, the Executive's refusal to comply with Congress's mandates—with respect to both the creation and funding of the Endowment—functionally effects a repeal of those laws, in violation of the core of the Take Care Clause's limitation on Executive authority.

### 4.    The Separation of Powers

In addition to violating certain specific clauses, the Executive's seizure of legislative power here directly violates the Constitution's general structural separation of powers.  The Executive has defied a straightforward, mandatory statutory command.  *See supra* pp. 13-17.  In such cases, its "power is at its lowest ebb," *Youngstown Sheet & Tube Co.*, 343 U.S. at 637 (Jackson, J., concurring), and the Executive's action is permissible only if it is based "on powers

31

the Constitution grants to [it] alone," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10

(2015).  Such powers must be both "exclusive" and "conclusive," *id*., and the Executive's

exclusive authorities are narrowly drawn.  Here, as explained above, the Executive lacks any

constitutional authority over appropriations or spending—let alone any exclusive authority.

Rather, the Executive is purporting to exercise powers assigned to Congress—in some cases,

solely so—in effectively rewriting both the NED Act and the appropriations laws to deny the

Endowment funding Congress required the Executive to provide.  *See supra* pp. 25-26, 28, 30-

31.

Defendants cannot justify their defiance of Congress by relying on the fact that the

Endowment's work involves foreign affairs.  "In foreign affairs, as in the domestic realm, the

Constitution 'enjoins upon its branches separateness but interdependence, autonomy but

reciprocity.'"  *Zivotofsky*, 576 U.S. at 16 (quoting *Youngstown*, 343 U.S. at 635 (Jackson, J.,

concurring)).  And as the Court emphasized in *Zivotofsky*, "whether the realm is foreign or

domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law."  *Id*. at

21.  Even in the foreign affairs context, then, the President "may rely solely on powers the

Constitution grants to him alone" to contravene a statutory command.  *Id*. at 10.

The Endowment's work does not implicate any aspect of the foreign affairs power that is

expressly conferred to the President "alone," such as the recognition power or the negotiation of

treaties.  *See id*.  In *Zivotofsky* itself, the Court recognized that Congress may exert authority over

foreign affairs via the Appropriations Clause, confirming that this is not an area in which the

President possesses exclusive authority.  *Id*. at 16.  The Endowment's work overseas is, by

congressional design, done by private parties.  And while grantees are always aware of the U.S.

government's role in their funding, they do not always choose to publicize it in the communities

in which they work—for safety or other reasons.  The Endowment's work therefore, by definition, cannot be something on which "the Nation must 'speak . . . with one voice.'"  *Id.* at 14 (quoting *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 424 (2003)).  Because Defendants have no inherent authority to cut off the Endowment's funds or its critical work, their disregard for Congress's express command violates the separation of powers.

## II.    THE ENDOWMENT WILL SUFFER IRREPARABLE HARM WITHOUT A TEMPORARY RESTRAINING ORDER

The Endowment is suffering irreparable harm due to the halt in funding—harm to essential operations of the Endowment, harm to the mission it serves through its grantees, and harm to the Endowment's reputation as a reliable partner around the globe.  Those injuries become more severe with each passing day.  They warrant immediate judicial intervention.  *See Doctors for America v. OPM*, No. 25-cv-322 (JDB), 2025 WL 452707, at *8 (D.D.C. Feb. 11, 2025) ("To establish irreparable harm, a plaintiff must show that it is suffering, or will suffer, a harm that is 'both certain and great,' 'actual . . . not theoretical,' and 'of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

### A.    The Halt in Funding Is Threatening the Endowment's Financial Viability and Undermining Its Essential Operations

The Endowment is facing an "unprecedented cash flow crisis."  NED Decl. ¶ 34.  It is unable to access hundreds of millions of dollars in appropriated funds and has limited cash on hand to sustain basic institutional operating costs.  *Id.* ¶ 30-32.  The longer that the funding halt persists, the greater the danger that the Endowment will default on financial obligations— including to its landlord and service providers.  *Id.* ¶ 34.  Because of the funding halt, the Endowment is facing the "prospect of declaring bankruptcy."  *Id.*; *see Wis. Gas*, 758 F.2d at 674

(explaining that financial harm can "constitute irreparable harm" when "the loss threatens the very existence of the movant's business").

Even before it reaches that point, the Endowment is enduring irreparable harms to its essential operations. The Endowment has already furloughed 62% of its staff and will have furloughed 75% by March 15, "with additional staffing actions—including layoffs and additional furloughs—expected by the end of March." NED Decl. ¶ 35. Unless they are quickly reversed, these cuts will produce immediate and far-reaching consequences. The Endowment is losing critical capabilities and expertise—from language skills, to the ability to communicate securely with its grantees, to an understanding of political and cultural nuances—that "have been developed over the past 40 years" and are essential to the Endowment's ability to maintain key relationships. *Id.* ¶ 37. The Endowment is also losing "key personnel responsible for protecting grantee data, preventing cyberattacks, and safeguarding . . . digital infrastructure"—presenting significant vulnerabilities to an organization that is a "constant target of cyber threats." *Id.* ¶ 36. Unlike typical financial harms, these threats to the Endowment's operations cannot be remedied at the end of litigation. *Cf. Int'l Ass'n of Machinists & Aerospace Workers v. Nat'l Mediation Board*, 374 F. Supp. 2d 135, 142 (D.D.C. 2005) ("[A] loss of income does not constitute irreparable injury because the financial loss can be remedied with money damages."). They immediately threaten the Endowment's work and long-term viability.

So too do the substantial harms inflicted on the Endowment's core institutes. The Endowment considers itself a "family of five institutions"—the Endowment and the four core institutes—"each of which plays a critical role in [the Endowment's] ability to fulfill its mission." NED Decl. ¶ 9; *see also id.* ¶ 41 ("The demise of a core institute would not only weaken [the Endowment's] programmatic impact, but also change its nature and balance.").

These institutes ensure that Endowment initiatives "represent the full breadth of American political life," including labor, business, and the two major political parties. *Id.* ¶ 9. Because of the halt in funding, however, the core institutes are collectively owed over $95 million that the Endowment cannot pay. *Id.* ¶ 41.

Each core institute is severely affected. The International Republican Institute has suspended support to 50 subaward recipients, *id.* ¶ 70, including a grantee in Guatemala focused on promoting economic growth in an area where a struggling economy contributes to unlawful migration to the United States, *see id.* ¶ 72. The National Democratic Institute is cutting "staffing and operations," *id.* ¶ 93, and has stopped or canceled "a number of important, time-sensitive" projects, including work to ensure free and fair elections abroad, *id.* ¶ 94. The Center for International Private Enterprise (CIPE), which receives 55-60% of its annual budget from the Endowment, has been forced to halt work on projects focused on countering unfair Chinese business practices, protecting the global supply chain, and preventing the resurgence of hostile terrorist organizations. A. Wilson Decl. ¶¶ 5, 12. "Without immediate funding relief, CIPE will need to make difficult decisions about its future, including the viability of the organization, by early April 2025." *Id.* ¶ 11. The Solidarity Center planned for over half of its FY2025 expenditures to come from the Endowment, Bader-Blau Decl. ¶ 6, making the halt in Endowment funding an "existential threat to the Solidarity Center's mission," *id.* ¶ 8. The Solidarity Center has laid off "uniquely qualified staff," it projects to close 17 of 26 field offices, and it has "already begun exploring the bankruptcy protection process." *Id.* ¶¶ 9-15. In short, the institutes that have been "central to the Endowment's success and impact" are being decimated, leaving critical work halted around the globe. NED Decl. ¶ 41.

**B.     The Endowment Has Ceased Payments to Its Grantees, Jeopardizing Its Mission of Advancing Democracy and Freedom**

The halt in funds has not only threatened the financial viability of the Endowment and its core institutes, but it has also forced the Endowment to cease payments to its discretionary grantees—substantially compromising the Endowment's ability to accomplish its fundamental mission of advancing democracy and freedom around the world. *See* NED Decl. ¶ 39 ("Without [its] grantees, [the Endowment's] ability to carry out its mission would be impossible."). That is irreparable harm. *See League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) ("[O]bstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission . . . provide injury for purposes . . . [of] irreparable harm.").

Three weeks ago, "for the first time in its 42 years of existence," the Endowment notified its active discretionary grantees—organizations carrying out nearly 1,300 grants across approximately 100 countries—that the Endowment would be unable to meet its grant obligations due to the halt in funding. *See* NED Decl. ¶ 42. The Endowment instructed its grantees that once they run out of Endowment funds, they should consider their grant agreement suspended and should not incur any additional expenses under their Endowment award. *Id.* The Endowment currently has more than $56 million in unpaid obligations for active discretionary grants. *Id.*

The consequences have been immediate and dire. Grantees are being forced to reduce core operations, *see id.* ¶¶ 44, 46, and to furlough or lay off staff with specialized expertise and difficult-to-replicate networks, including in high-risk environments, *id.* ¶ 45. They have had to suspend "time-sensitive" work, including "legal aid, humanitarian assistance to political prisoners, investigations, human rights monitoring, [and] elections monitoring." *Id.* ¶ 50. The suspensions are affecting high-impact initiatives, including work to expose human rights

36

violations in China, promote freedom in Iran, aid political prisoners in Venezuela, sustain press freedom in Latin America, and promote religious freedom in Pakistan. *See id.* ¶ 52.

Several grantees have come forward to tell their story. The Citizens' Alliance for North Korean Human Rights (NKHR) plays a pivotal role in exposing human rights violations in North Korea, providing independent and credible information to journalists, governments, and international organizations. Hosaniak Decl. ¶¶ 2-3 (attached as Exhibit E). NKHR receives about 60-70% of its funding from the Endowment, but that funding has now stopped—sapping NKHR of nearly all of its core support funding and requiring layoffs of staff with specialized training, with additional layoffs soon to follow. *See id.* ¶¶ 4-6. Those cuts are diminishing NKHR's ability to pursue important investigations, emboldening North Korean perpetrators of human rights abuses. *See id.* ¶ 6.

The Uyghur Transitional Justice Database (UTJD) documents the "human rights violations committed against the Uyghurs and other Turkic peoples in East Turkistan." Abdurihim Decl. ¶ 2 (attached as Exhibit F). UTJD publishes visual and written products, including work that may be admissible in judicial proceedings. *See id.* ¶¶ 3-4. The "vast majority" of UTJD's funding comes from the Endowment, but the Endowment has now informed UTJD that it cannot make further payments. *Id.* ¶¶ 5-6. As a result, UTJD will provide notices of termination in early March to core staff, whom UTJD expects to begin finding new work. By April, UTJD will have exhausted all of its Endowment funds and will need to rely on volunteer work to continue its operations. *Id.* ¶ 7.

Kloop is one of the last remaining investigative media organizations in Kyrgyzstan; it is known for exposing high-level corruption through investigative reporting and data-driven journalism. Tuhvatshin Decl. ¶¶ 2, 4 (attached as Exhibit D). Despite efforts in Kyrgyzstan to

suppress independent journalism, Kloop has been successful in uncovering money laundering schemes, election fraud, and abuses of power. *See id.* ¶¶ 5-6, 9. The Endowment funds about two-thirds of Kloop's operation, but since the halt in funding, Kloop has stopped receiving funds from the Endowment. *Id.* ¶¶ 12, 14. This loss in funding has created a "severe financial gap" for Kloop, "directly threatening Kloop's core activities and long-term sustainability." *Id.* ¶ 18. Kloop has already "laid off several journalists," diminishing its "ability to develop and maintain key investigative tools," *id.* ¶ 20, and Kloop may need to close its investigative unit if it does not secure new funding before April, *see id.* ¶ 30. The "most severe and urgent risk" is to Kloop's personnel in exile, as Endowment funding was planned to be the only funding source available for those team members after limited funds are exhausted in March. *Id.* ¶ 21; *see id.* ¶ 17. Without continuing paid employment, these individuals could lose their immigration status in Poland, potentially forcing them to return to Kyrgyzstan, where they could face political persecution and immediate threats to their safety. *See id.* ¶¶ 24-25.

Other grantees whose identity cannot be revealed have likewise attested that they face substantial threats to their critical operations due to the halt in Endowment funding. *See* Sealed Decl. ¶¶ 13-27 (attached as Exhibit G); Sealed Decl. ¶¶ 12-13 (attached as Exhibit H).

This widespread reduction in grantees' critical operations not only hinders the Endowment's work to advance freedom and democracy—it also poses a substantial security risk for the grantees on which the Endowment relies. Confidential grantees operating in "hostile environments" who "abruptly halt their activities" run the "risk of being exposed as recipients of [Endowment] or US. funding." NED Decl. ¶ 50. Such exposure would invite "legal or other reprisal from authoritarian governments that oppose their work." *Id.* ¶ 47. The loss of funding presents additional security risks. Endowment resources allow grantees to "operate securely,

including by maintaining digital security" and "operating safe houses." *Id.* ¶ 48. Without Endowment funding, "these grantees will struggle to protect in-country employees and partners in closed or hostile environments, making staff more vulnerable to persecution, arrests, or even assassination." *Id.* All of that is antithetical to the Endowment's steadfast support for its network of grantees.

### C.    The Halt in Funding Threatens Irreparable Damage to the Endowment's Reputation as a Trusted Partner

The funding crisis goes beyond the immediate work of the Endowment; it reaches the Endowment's long-term reputation. *See Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (finding irreparable harm where conduct "could not fail to damage [the plaintiff's] good name"); *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017) ("Injury to reputation can, at least at times, rise to the level necessary to support the issuance of an injunction.").

Nongovernmental organizations "around the world, particularly in the most dangerous and difficult environments, seek out [the Endowment] due to [its] well-established reputation for transparency, consistency, security-consciousness, and partnership." NED Decl. ¶ 54. Indeed, each Endowment partner "enters into a grant agreement . . . with the expectation that [the Endowment] will honor its financial and operational obligations to partners, as [the Endowment] has done for 42 years." *Id.* This reputation—as a consistent and reliable source of support—"is critical to [the Endowment's] ability to engage productively with partners worldwide"—partners who have seen the Endowment as "trusted partners." *Id.*

The reputational harms caused by a stop in funding cascade to the Endowment's grantees as well. "[A]bruptly shutting their doors and ceasing their activities will destroy the trust, credibility, relationships, and networks these organizations have built up over decades." *Id.*

¶ 55.  Accordingly, absent prompt relief, many Endowment grantees "may simply not be around to continue their important work," even if Endowment funding "were to resume at a later date." *Id.*  That is quintessential irreparable harm.

### III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF GRANTING THE TEMPORARY RESTRAINING ORDER

The final two temporary restraining order factors—balancing the equities and weighing the public interest—"merge when the Government is the opposing party." *Am. Ass'n of Political Consultants v. SBA*, 613 F. Supp. 3d 360, 365 (D.D.C. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  The equities and the public interest both counsel in favor of a temporary restraining order—to halt the Executive Branch's unlawful failure to follow a clear congressional direction, and to restore critical funds that the Endowment, its core institutes, and its grantees need now.

Here, the Endowment's likelihood of success on the merits, *see supra* pp. 12-33, establishes that a temporary restraining order would serve the public interest because "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (quoting *Newby*, 838 F.3d at 12).  In those circumstances, "any hardship" the Government "might claim is not legally relevant because as a legal matter '[t]he Government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required.'" *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 34 (D.D.C. 2021) (citations omitted); *see also N.S. v. Hughes*, 335 F.R.D. 337, 355 (D.D.C. 2020) ("[T]he government has no legitimate interest in acting unlawfully.").  On the other side of the ledger, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12 (citation omitted).  That is precisely what the Endowment seeks here—and thus the

40

Endowment's likelihood of success on the merits should suffice to satisfy the final two factors as well.

Beyond the conclusive public interest in having the Executive Branch follow the law, there are still more reasons to weigh the balance of equities and public interest in favor of the Endowment.  As an initial matter, there is a strong public interest in the proper functioning of the Endowment.  In 1982, President Reagan called for a global effort to support the infrastructure of democracy worldwide, inspiring Congress to establish the Endowment as an independent grantmaking organization dedicated to strengthening democratic institutions in some of the world's most difficult environments.  NED Decl. ¶ 3.  For over forty years, the Endowment has contributed directly to our national interest by helping to foster a "more prosperous, safer, and democratic world" and building a "deep reservoir" of world leaders "predisposed to working collaboratively with the United States in pursuit of shared interests."  *Id.* ¶ 10.  These critical functions are overseen by a bipartisan Board, *see id.* ¶ 4, and have been celebrated by American leaders across the political and ideological spectrum, *see* Compl. ¶¶ 30-34.  It is not in the public interest for this important institution to be thrust into financial jeopardy and hamstrung from pursuing its fundamental mission.

Nor is there an equitable basis for withholding a temporary restraining order.  Since its inception, the Endowment has received a consistent source of funds from Congress, and it has used those funds to meet its grant obligations to its core institutes and grantees.  *See* NED Decl. ¶ 39.  A temporary restraining order would restore that forty-plus-year status quo and avert the substantial and irreparable injuries that the Endowment is facing.  *See supra* pp. 36-40.  It would also restore the appropriate balance between Congress, with its power of the purse, and the Executive Branch, which must take care that Congress's instructions are followed.  Conversely,

41

allowing the freeze on the Endowment's funds to persist would not serve any articulated interest of the Defendants.

## CONCLUSION

The court should grant a temporary restraining order.

Dated: March 6, 2025

Respectfully submitted,

/s/ Donald B. Verrilli, Jr.

Donald B. Verrilli, Jr. (D.C. Bar No. 420434)
Ginger D. Anders (D.C. Bar No. 494471)
Jeremy S. Kreisberg (D.C. Bar No. 1048346)
Helen E. White (D.C. Bar No. 1741368)*
Esthena L. Barlow (D.C. Bar No. 90000252)*
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com
Ginger.Anders@mto.com
Jeremy.Kreisberg@mto.com
Helen.White@mto.com
Esthena.Barlow@mto.com

Gabriel M. Bronshteyn (*pro hac vice* forthcoming)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105
(415) 512-4000
Gabriel.Bronshteyn@mto.com

*admission pending*

*Attorneys for the National Endowment for Democracy*