# EXHIBIT A

## DECLARATION OF DAMON M. WILSON

I, Damon M. Wilson, declare as follows:

1. I am the President and CEO of the National Endowment for Democracy (NED). The statements made in this declaration are based on my personal knowledge and the information made available to me pursuant to my duties as President and CEO of the National Endowment for Democracy.

2. NED is a private, not-for-profit organization incorporated in the District of Columbia and enjoying tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. NED's business address is 1201 Pennsylvania Avenue NW, Suite 1101, Washington, DC 20004.

History and Mission of NED

3. With the NED Act (P.L. 98-164) in 1983, Congress formally recognized the National Endowment for Democracy as an independent, nongovernmental grantmaking organization authorized to receive federal funding through a congressional appropriation to strengthen democratic institutions and values around the world. Each year through its grantmaking program, NED supports approximately 2,000 projects of nongovernmental groups who are working for democratic goals in more than 100 countries around the world. NED's nongovernmental character allows it to work in some of the world's most difficult circumstances. The NED Act was the result of a bipartisan initiative and inspired by an address by President Ronald Reagan before the British Parliament in which he called for a global effort to support the infrastructure of democracy worldwide. The NED Act specified this effort to encourage free and democratic institutions throughout the world should be "through private sector initiatives."

4. NED's articles of incorporation were adopted on November 18, 1983, by six individuals, including the Chairs of the Democratic and Republican National Committees, as well as the President of the AFL-CIO and a Vice President of the U.S. Chamber of Commerce. See Appendix A (Articles of Incorporation). NED is governed by a bipartisan Board of Directors, which includes Members of Congress from both parties, prominent academics, foreign policy experts, former diplomats and policymakers, business and labor representatives, and nonprofit leaders. Board Directors are elected for a three-year term by a two-thirds vote of Directors present at a meeting at which a quorum is present. See Appendix B (NED Bylaws). The term of a Director expires before the end of a term only by "death, resignation, or removal in accordance with [the] Bylaws." NED Bylaws art. II, sec. 3. Removal under the Bylaws requires "a two-thirds vote of all Directors then in office." NED Bylaws art. II, sec. 11. The Board members' distinguished career experience informs the strategic guidance and oversight they provide to NED. The Board sets strategic direction, ensures all funds are used only for grants and activities consistent with the purposes of NED, selects and oversees the President, and ensures

programmatic and financial accountability. The Board is responsible for nominating and approving members. No members of the Board are appointed by the United States government.

5. NED's mission is to advance democracy and freedom around the world, consistent with the purposes set forth by Congress. It is dedicated to fostering the growth of a wide range of democratic institutions abroad, as well as the many elements of a vibrant civic life that ensure human rights, an independent media, and the rule of law. NED partners promote peaceful democratic reform. Per the NED Act, the Endowment encourages "the establishment and growth of democratic development in a manner consistent both with the broad concerns of United States national interests and with the specific requirements of the democratic groups in other countries which are aided by programs funded by the Endowment."

6. Unlike most other foundations and bilateral aid agencies, NED has an open application process and does not issue requests for proposals, but instead recognizes the importance of local organizations setting their own agendas and strategies. We do not impose democracy, but instead support the work of those on the frontlines who seek freedom. NED carefully manages its grants, but eschews a bureaucratic approach. It is organized to be highly flexible and responsive to the needs of its democratic partners often operating in highly fluid and dangerous environments.

7. All of our spending and operations are subject to rigorous financial controls and reporting requirements. Pursuant to the NED Act, the Endowment conducts annual audits, the results of which are publicly available. NED also provides regular updates and briefings to Congress and timely responses to investigative and oversight requests, and our leadership frequently briefs Members of Congress and testifies before Congressional committees. NED also provides oversight committees an annual planning document previewing its work. Our financial transactions and operational practices are subject to independent audit by the State Department Inspector General and the Government Accountability Office. Moreover, our bipartisan and experienced Board of Directors ensures that Endowment funds are used only for grants and activities consistent with our statutory mandate. This duty is provided in our bylaws, which state: "The Board of Directors will ensure that all funds are used only for grants and other activities that are consistent with the purposes of the Corporation as set forth in the Articles of Incorporation and the NED Act." NED Bylaws art. VI, sec. 4. The Board approves grants recommended by NED staff following a rigorous assessment of the project's effectiveness and impact. The Board also selects and oversees NED's President, ensuring proper governance and financial accountability. The Board also maintains a Budget, Audit, and Administration Committee which manages NED's internal audit process, financial reporting, risk management, and compliance functions.

8.  Independent audits conducted since FY12 have consistently resulted in clean, unmodified opinions, with no findings or questioned costs identified with respect to the internal controls over either NED's financial reporting or the expenditure of Federal awards.  The Department of State Office of Inspector General determined that NED used funds in compliance with applicable laws and regulations; that NED files reflected evidence to show adherence to the NED Act; and that this occurred because NED designed and implemented appropriate policies, internal controls, and procedures to ensure grantee compliance.

9.  NED is a family of five institutions, each of which plays a critical role in NED's ability to fulfill its mission.  Along with NED itself, NED has four core institutes – National Democratic Institute (NDI), International Republican Institute (IRI), Center for International Private Enterprise (CIPE), and Solidarity Center.  Each is incorporated as a 501(c)(3) corporation and has its own board of directors.  The institutes are loosely affiliated with institutions of American political and civic life – labor, business, and the two major political parties.  They ensure that our programs represent the full breadth of American political life, that NED grantmaking is informed by local community needs, and that we have the networks and expertise to properly vet, monitor, and assess projects we fund.  NED's bipartisan, multisectoral approach to democracy assistance also ensures that our work remains focused on the essential elements of democracy:  free and fair elections; robust and representative political parties; freedom of association and private enterprise; and protection of human rights and rule of law.

10. While our partners seek to advance freedom in their own countries, their success directly contributes to advancing the U.S. public interest, which benefits from a more prosperous, safer, and democratic world.  Moreover, NED supports an extensive network of frontline activists which serves the ancillary purpose of helping to build a deep reservoir of political, business, labor, and civic leaders around the world predisposed to working collaboratively with the United States in pursuit of shared interests.

11. NED supports work in some of the world's most challenging environments, where authoritarian governments and non-state actors such as drug cartels and terrorist organizations seek to eradicate all forms of freedom.  NED partners take great personal risk to:  document violations of fundamental freedoms, including freedom of religion, association, and expression; counter censorship by producing and distributing independent news and ensuring access to information; build accountable, transparent democratic institutions; and organize and mobilize citizens in advance of freedoms.

12. Over our four-decade history, NED has played critical roles in advancing democracy in every region of the world.  For example, NED and its core institutes supported major democratic movements that challenged communist authorities in Eastern Europe and led to the democratization of the region after the collapse of the Soviet Union in 1991.  After the fall of

Suharto's autocratic rule, NED supported a diverse array of programs in Indonesia—from election monitoring to training grassroots groups and bolstering independent media—which have helped mobilize public demand for reform and contributed significantly to Indonesia's shift toward democratic governance.  NED and its core institutes also supported transitions to democracy in Chile, the Philippines, Mongolia, Ghana, South Africa, and others.

13. The NED model works because our partners' success in advancing freedom in their own countries is in America's interest.  When people are free, America benefits.  The expansion and strengthening of democratic systems around the world provide a direct benefit to American citizens resulting in environments in which American businesses and workers can better compete, America faces less migration driven by hardship and violence, and the American people are more secure because of work that helps to mitigate the emergence of violent non-state actors.

NED's Customary Access to Funding

14. Approximately 95% of NED's total funding comes from its annual congressional appropriation, which is distinct from foreign assistance funding.  The remaining 5% of NED's funds are comprised primarily of so-called foreign assistance funds from the Department of State, and some private funds.

15. Based on the NED Act and annual congressional appropriations bills signed into public law, NED's annual appropriation (AA) funds are granted by Congress.  Once the congressional appropriation is passed and signed into law, the Bureau for Democracy, Human Rights, and Labor (DRL) at the Department of State (DOS) serves as the passthrough bureau that administers NED's annual appropriation award together with the Bureau for Administration (which serves as DRL's grants office), which issues the award to NED for the appropriated amount, obligating the funds to NED via a grant agreement.

16. The total annual appropriation award obligated to NED in the grant agreement is set aside for NED at Treasury.  As is standard with federal awards, NED can only access the obligated funds by regularly requesting payment drawdowns based on spending (which comprises NED's operational spending, core institutes' spending against their apportioned amounts, and discretionary grantee payment requests).  NED does not receive the funds in one lump sum cash payment, but there are no threshold limits to how much NED can drawdown from the available fund balances.

17. Typically, NED makes approximately twice-a-week payment requests via the online Payment Management System (PMS) portal, which is managed by the Department of Health and Human Services (HHS).  NED requests money from its available annual appropriation funds and special funds.

18. In the PMS system, DRL reviews and approves NED's payment requests and then the funds are released from Treasury to NED's bank account. In NED's experience, DRL approves NED's payment requests in PMS within 48 hours of the request being submitted, and then within 24 hours after approval the funds are disbursed from Treasury into NED's bank account. In fact, usually if the Endowment requests funds before 1:00 p.m., it receives them the next business day, and requests made after 1:00 p.m. are received on the second business day.

19. The appropriations bill for FY2024 appropriates $315,000,000 for "grants made by the Department of State to the National Endowment for Democracy," "to remain available until expended, of which $210,316,000 shall be allocated in the traditional and customary manner, including for the core institutes and $104,684,000 shall be for democracy programs." Of the funds "allocated in the traditional and customary manner," 55% is apportioned equally to the four core institutes, and the remaining 45% is for NED's discretionary grantmaking and institutional operations. The funds allocated for democracy programs also go to NED's discretionary grantmaking.

20. Of NED's total annual appropriation, around 83% goes to grantmaking (the core institutes' share combined with NED discretionary grantmaking), 2% goes to support NED's Democracy Support Activities initiatives, and the remaining 15% goes towards NED's institutional operational costs.

21. NED obligates funds to the core institutes incrementally, after submission, review, and approval of individual project proposals. NED normally obligates to each of the core institutes the cumulative amount of funding to support the proposals approved by NED's board of directors during each grant review cycle, with a cumulative obligated total by the end of the fiscal year equal to the apportioned amount. The core institutes access their funds from NED with periodic payment requests based on their immediate short-term spending needs across the approved projects.

22. For discretionary grants, applicants submit proposals directly to NED for review and final consideration by NED's board of directors. Once a discretionary grant proposal makes it through the review process and is approved by NED's board, NED obligates the approved project amount through a grant agreement to the discretionary grantee. NED has approximately 1,700 active discretionary grants.

23. For both core institute and discretionary grants, when NED obligates the approved grants, the grantee does not receive the cash up front upon signing of the grant agreement. For discretionary grantees, NED advances the first payment upon full execution of the grant agreement, and all subsequent payments are tied to submission of scheduled progress reports and

other deliverables. NED core institutes must request payment drawdowns against their cash needs as they go. NED then regularly bundles those core and discretionary payment requests together with NED's own operational payment requests, typically twice a week, to submit consolidated drawdown requests via PMS against each of its active annual appropriations grants, as applicable.

The Recent Halt to NED's Funding

24. As of January 15, 2025, the State Department obligated to NED all funds from the FY2024 appropriations bill and the first continuing resolution of FY2025.

25. On January 21, 2025, NED requested a PMS drawdown totaling $35,663,100 from its available AA funds. The payment request was approved by DRL, though only after NED re-confirmed that the funds requested were Title I funds not subject to the Executive Order on U.S. Foreign Aid funds issued on January 20, 2025. The funds were received in NED's bank account on January 22, 2025. NED then disbursed those funds to the core institutes and discretionary grantees to fulfill payment requests and reserved some for NED's operational expenses. That was the last time that NED was able to withdraw its AA funds.

26. On January 28, 2025, and January 30, 2025, NED requested in PMS a drawdown totaling $97,581,876 from its available AA funds. These requests were to cover additional ongoing grantee expense reimbursements and advance payments, NED operational expenses, and payments under the new core institute projects and discretionary grants that had been recently approved by the NED board at its regular meeting on January 17, 2025.

27. On January 31, with the PMS requests still pending, NED reached out to DRL for a status update on the pending payment request on Title I AA funds. Staff at DRL responded that they were working on it, and by 3:00 PM that afternoon, NED's Finance team saw that the requests were "approved" in PMS.

28. However, since January 31, those "approved" payment requests in PMS were marked with a never previously seen status update: "in transit." The funds have not been released into NED's bank account and remain inaccessible. When the cash had not been released to NED by February 7, 2025, and all available cash-on-hand for core institute and discretionary grantee payments had already been disbursed, NED had to suspend all of its active grants and notified grantees during the period of February 11-14, 2025. The "approved" payments have not been released to NED. This is the first time that NED payment requests in PMS have not been fulfilled for more than three weeks.

29. NED has had multiple exchanges with the Departments of State and Treasury to inquire about the disbursement status of the funds, including a letter to the Treasury Secretary on

February 11, 2025, requesting release of NED's approved amount. On February 12, our grant officer representative at DRL emailed to ask whether NED has any outstanding payments in PMS. She requested information, including screenshots, for each PMS request and stated that "submissions are subject to further review within the Department of State that may require additional processing for approval." We responded with the requested information, including that we are waiting for $97,581,876 from PMS. We provided a screenshot showing that our payment requests had been marked "approved." On February 20, DRL invited us to submit an "Obligation or Disbursement under Waiver of Foreign Assistance Pause" form for our pending PMS requests, on the condition that the requests were for costs incurred prior to January 24, 2025. The suggestion that our funding would require such a waiver was incorrect. This waiver does not apply to the funds we have requested because those funds are from our Title I appropriation and therefore exempt from the foreign aid spending freeze.

30. In total, there is $167,190,622 million that has been appropriated for NED by Congress and obligated to NED by the State Department, but not yet disbursed to NED from its Treasury account. This includes available funds from prior year annual appropriation awards and $69,898,500 from the first FY2025 continuing resolution. NED is currently unable to access any of these funds.

31. In addition, NED has yet to receive its second FY2025 continuing resolution (CR2) obligation of $72,481,500. DOS informed NED that it had received those funds in mid-January, and at that time prepared to obligate those funds through an amendment modification to its current FY2025 AA grant agreement. DOS staff informed NED staff that the draft amendment to obligate the FY2025 CR2 amount is in the DOS system and, on February 4, further informed NED staff that the modification is ready to be issued. More recently, the Grants Officer at DOS told NED that he is "waiting to get guidance regarding NED Core Project funding and approvals" before obligating this second tranche of NED's FY2025 Title I AA funding. DOS's withholding of appropriated funds in this manner is unprecedented.

32. NED does not have sufficient cash-on-hand to sustain basic institutional operating costs for 2025.

33. NED has taken substantial efforts to try to restore its funding. We have had extensive engagement with officials working for the Executive Branch, including those working at the State Department. We have had numerous meetings with Members of Congress and their staff. Despite these efforts, we still have not received access to our already obligated funds or the funds appropriated for NED in the second continuing resolution for FY2025.

Immediate Impacts of the Funding Freeze on NED's Operations

34. NED is facing an unprecedented cash flow crisis. Without the ability to draw down on our Congressionally appropriated funds, we do not have any cash available to fund the core institutes or discretionary grantees. Additionally, the longer this cash crisis is prolonged, the more danger NED is in of defaulting on our financial obligations, including to our staff, landlord, and other service providers. The prospect of declaring bankruptcy is a looming reality.

35. As of March 1, 62% of NED staff have been furloughed. By March 15, 75% of NED will be furloughed, with additional staffing actions—including layoffs and additional furloughs—expected by the end of March. We have also implemented salary reductions and shifted some staff to part-time, meaning that 100% of staff have been affected by some personnel action. These measures have been unavoidable and necessary for our survival. But they are also devastating. Beyond the immediate financial strain, these cuts have far-reaching consequences—undermining our ability to safeguard sensitive information, support democracy advocates, and maintain grantee relationships in closed societies.

36. First, the freeze impacts our ability to safeguard sensitive information. NED is a constant target of cyber threats due to the sensitive nature of our work. With staff furloughed and soon to be laid off, we are losing key personnel responsible for protecting grantee data, preventing cyberattacks, and safeguarding our digital infrastructure. Any security breach could expose democratic activists and civil society organizations in authoritarian states, putting their safety—and potentially their lives—at risk.

37. Second, we are losing staff's skills in critical areas, including language, regional and technical fields—capabilities that could take years to rebuild. Our team collectively speaks at least 45 languages, including those essential to working in some of the world's most repressive regimes—Iran, China, Venezuela, and North Korea. These language skills are not just a convenience; they are a necessity for maintaining trusted relationships, conducting secure communication, and understanding political and cultural nuances. Losing this expertise means losing access, understanding, and key relationships that have been developed over the past 40 years. NED's ability to operate effectively also depends on experts in grant compliance, program management, and risk mitigation—many of whom will leave us. Without them, we face significant operational risks, including the inability to ensure funds are properly managed, to meet federal and legal requirements, and to provide vital oversight.

38. Third, the freeze severely undercuts our ability to maintain grantee relationships, as explored in depth below.

Impacts of the Funding Freeze on the Core Institutes and NED's Discretionary Grantees

39. NED's grantees are fundamental to its ability to effectively carry out its mandate, as provided by Congress. NED does not administer programs directly; instead, it provides funding

to nongovernmental organizations globally. Without these grantees, NED's ability to carry out its mission would be impossible. NED's worldwide grants program is a cornerstone of NED's identity and primary means to carry out its mission. Harm to grantees, whether through staff layoffs, security vulnerabilities, or disruption of their programs, directly compromises NED's ability to fulfill our mandate under federal law.

40. For the first time in our 42-year history, NED is unable to meet its financial obligations to its core institutes and grantees.

41. First, NED has not been able to provide the four core institutes with the cumulative balance of $95,129,220 owed to them from already obligated grants. The following are the amounts due to each institute that NED cannot pay: $17,690,424 (IRI); $30,618,469 (NDI); $27,987,887 (CIPE); and $18,832,440 (Solidarity Center). The four core institutes collectively have 359 active projects that have now been disrupted because NED cannot access funding. Since NED's founding, the institutes have been central to the Endowment's success and impact. The demise of a core institute would not only weaken NED's programmatic impact, but also change its nature and balance, exposing NED to claims of partisan or ideological bias. Some are facing the prospects of bankruptcy in the coming weeks. I understand that declarations from the two core institutes with majority funding from NED—the Solidarity Center and CIPE—are being filed along with NED's motion for a temporary restraining order. I have included detailed information regarding the other two core institutes—IRI and NDI—which receive a minority of their funding from NED, at the end of this declaration.

42. Second, NED is unable to meet its obligations to its discretionary grantees. On February 11, 2025, for the first time in its 42 years of existence, NED notified grantee organizations with nearly 1,300 active discretionary grants funded through the annual appropriation in approximately 100 countries that NED was unable to meet its grant obligations or send payments that are due, because of NED's inability to access appropriated funds. NED grantees were instructed that once they ran out of NED funds they currently had on hand, grantees should consider their NED grant agreement suspended, that they should not incur any additional expenses under their NED award, and that NED may not be able to reimburse any costs incurred beyond the funds the grantee had available. More than $56 million in unpaid obligations for active grants have been cut off from discretionary grantees.

43. Third, due to both the withholding of NED's obligated AA funds and DOS' failure to obligate funds to NED under CR2, NED has also been unable to fully obligate the 409 discretionary grants totaling $49.6 million and the 84 core institute projects totaling $51.7 million which were approved by NED's Board of Directors in its regular January grant cycle.

44. As a result, NED partners are hemorrhaging resources and employees and consultants. Based on a survey of regional teams, we assess that at least 70% of discretionary grantees will have to either cut staff, reduce core operations, declare bankruptcy, or close offices on or before March 31, 2025.

45. Based on the survey of regional teams, we also assess that approximately 43% of existing discretionary grantees have already had to furlough or layoff staff and consultants or will need to do so by March 31, including in high-risk environments where it is difficult to identify, vet and recruit staff. This includes staff with specialized work-related knowledge, expertise and/or networks that are not easily replicable.

46. Grantees have already faced considerable hardship from the funding freeze, including: an inability to maintain broadcast and publication schedules, undermining their ability to retain audiences; an inability to meet tax, labor and other local obligations; and an inability to implement time-sensitive projects like election monitoring.

47. The freezing of these funds poses especially considerable risk to partners operating in highly authoritarian contexts, as the sudden interruption in support may expose their operations and staff as NED grantees, thereby inviting legal or other reprisal from authoritarian governments that oppose their work.

48. Our resources are critical to our grantees' ability to operate securely, including by maintaining digital security, operating safe houses, or providing legal assistance for those under threat for their non-violent political activities. Without NED funding, these grantees will struggle to protect in-country employees and partners in closed or hostile environments, making staff more vulnerable to persecution, arrests, or even assassination.

49. Grantee staff working in exile face different types of risks. For example, if those who have work visas connected to their jobs are laid off, they would be forced to return to their home countries where they face the risk of persecution, jail, and in some cases torture. In cases where the staff may remain in exile, those who lose their jobs may be forced to turn to other jobs to ensure that their families' basic expenses are covered.

50. Grantees have had to abruptly suspend time-sensitive activities including legal aid, humanitarian assistance to political prisoners, investigations, human rights monitoring, elections monitoring, and documentation, advocacy, broadcasting independent information, and other democracy-related work. At-risk grantees operating in closed or hostile environments who abruptly halt their activities, run additional risk of being exposed as recipients of NED or U.S. funding as a result of the timing between the suspension of their activities and the freeze on NED funds.

51. Grantees who owe money to vendors and staff that should have been covered by NED funds, are already facing legal liabilities. In some instances, grantees' legal registration status is at risk due to non-compliance with funding obligations in their local jurisdictions.

52. Examples of impacted programs and initiatives include the following:

- Holding the Chinese Government Accountable: NED's China grantees nurture critical networks inside the country to engage in a range of work, including conducting human rights advocacy, participating in citizen journalism and expanding access to uncensored information, supporting political prisoners and their families, providing legal defense to protect fundamental rights and freedoms, expanding civic space, and holding China's government accountable. Suspension of NED funding will weaken in-country networks, including grantees' abilities to provide digital and physical security to activists and reduce the number of reports and initiatives exposing and holding the Chinese Communist Party (CCP) accountable for rights violations.

- Strengthening Armenia's Democratic Trajectory: Disruption in NED's grantmaking in Armenia has a profound negative impact on both civil society and governmental efforts to politically integrate refugees from Nagorno-Karabakh and lay the groundwork for a lasting peace in the South Caucasus. Also affected are human rights and legal assistance organizations that are crucial to the country's ongoing reforms process, watchdog efforts, and strategic realignment with the West. A prolonged funding freeze will further decimate the country's independent media landscape, which is otherwise dominated by state-controlled or authoritarian-funded outlets.

- Countering China's Repression in Tibet: One of NED's longest running programs, Tibet grantees promote religious freedom, strengthen the free flow of independent information into and out of Tibet, document human rights atrocities, bolster international support, and strengthen the democratic institutions in the diaspora community. With the abrupt halt to NED funds, many of these efforts have had to cease or be significantly downscaled, imperiling efforts to hold China accountable for its systematic repression of the Tibetan people.

- Countering CCP Malign Influence: As China's influence has grown globally, local actors in Africa, Latin America, and Asia are struggling to understand the implications for their democracy, rule of law, security, and economy. In response, NED supports initiatives that inform public dialogue on the impact of China's engagement in key countries and regions around the world. These initiatives have nurtured a global community that helps policymakers, parliamentarians, civic actors, and journalists better

understand the evolving role and importance of China's influence in their local region. Without NED funding, these organizations would need to pause their work, terminate staff, and lose the communities they have nurtured over the years to counter the CCP's influence in their countries and regions.

- Promoting Freedom in Iran: NED's Iran grantees are one of the primary sources of information from inside the country to the outside world. Grantees support democracy activists inside Iran while holding the regime accountable through international advocacy. During the Woman, Life, Freedom protests, one grantee published the first report on Mahsa Amini, who became a powerful symbol of the movement. NED grantees also provided emergency support to frontline, at-risk activists within the country. The suspension of NED funds is resulting in groups having to lay off staff, the weakening of in-country networks built carefully over years, and reduced coverage of democracy-related events at a critical moment in the region.

- Advancing Accountability in Syria: With the fall of the Assad regime, NED partners are rising to the opportunities of the most dramatic political opening in 50 years—emerging from anonymity, opening offices, and pushing back against proposed constraints on hard fought freedoms. With a suspension of NED funding, the democratic forces seeking to build a more tolerant, peaceful Syria would lose critical momentum at this time, ceding space to non-democratic forces fighting for power and influence.

- In Venezuela, opposition leaders and activists would struggle to sustain political resistance, which recently exposed massive electoral fraud during the July 28 elections. Aid for hundreds of political prisoners would disappear at a critical moment and more than 150 journalists in more than 10 media outlets reaching 20 million citizens would face collapse—severely curtailing access to free information. Investigations exposing billions in stolen assets and the regime's crimes against humanity would halt, undermining international litigation efforts in more than 15 countries.

- In Nicaragua, suspending NED funding would severely weaken human rights groups monitoring the government's abuses, force the shutdown of in-country pro-democracy groups, silence networks exposing religious persecution, and deprive exiled organizations of resources needed to sustain civic resistance inside the country. Political prisoners and victims of repression would lose critical legal and psychological support.

- Sustaining Press Freedom in Latin America: Across Latin America, more than 50 NED-backed independent media outlets expose corruption, organized crime, and the influence of China and Russia. Without NED funding, these partners face closure, leaving millions without independent news.

- Sustaining Burma's Struggle for Democracy: NED supports 70 civil society organizations striving to restore democracy in Burma after the 2021 coup and the subsequent brutal crackdown on the opposition. The loss of NED funding could shutter nearly a dozen independent media outlets that counter the regime's narrative and provide real-time news about the conditions in the country to the people of Burma. Moreover, the loss of funding would disrupt the efforts of organizations that provide vital support to thousands of the approximately 20,000 Burmese citizens unjustly incarcerated for their nonviolent political activities.

- Exposing Corruption and Human Rights Violations in Bangladesh: NED support to civil society and independent media played an important role in their exposing the brutality of and impunity enjoyed by the Bangladesh government. The work of human rights documentation and advocacy groups, civic activists, and journalists informed the public of enforced disappearances, torture, and extrajudicial killings by security forces and corrupt practices of government officials. During the July uprising, the same partners investigated human rights violations and did so at great risk since the perpetrators remain powerful. A loss of support would jeopardize follow up investigations, advocacy, and the safety of team members, networks, and victim's families.

- Promoting Religious Freedom and Tolerance in Pakistan: In Pakistan, NED partners work with youth, civil society, and religious communities on grassroots campaigns to increase awareness of and support for democratic principles such as peace and tolerance. A loss of NED funding would threaten this work, including initiatives that disseminate democratic narratives and counter extremist discourse and arguments against democracy.

- Resisting Repression in Ethiopia: Ongoing ethnic conflict in Ethiopia, following a civil war that is estimated to have cost 600,000 lives, is perpetuating state repression and economic collapse. Ethiopia's political instability is further destabilizing an already fractured region that is also beset by the influence of global terror networks. The government's response is to de-register leading media and human rights groups that hundreds of thousands of Ethiopians rely on for professional, independent information. NED grantees are at the forefront of resisting efforts to silence critical voices and restrict freedom. A cessation of support will disrupt the multi-ethnic, religious, and sectoral efforts that are documenting abuses, supporting dialogue, and re-energizing the business and labor sectors as they all rebuild and push back on repression.

- Supporting a Democratic Sudan: Devastating civil war overwhelmed Sudan just five years after a tentative democratic breakthrough. Over 11 million civilians are displaced, and famine was declared in parts of the country, which ranks Sudan as the worst

humanitarian crisis in the world.  No organization has contributed more sustained support toward human rights documentation than NED, without which violations would not be recorded, limiting the possibility of future accountability efforts.  NED also supports media organizations covering the conflict, helping shine a light on the issue for both Sudanese and international audiences, and local organizations seeking to advance a tolerant, pluralistic political movement.  Without NED's flexibility, these grantees would not be able to continue to cover the war and its atrocities.

Long-Term Harms to NED

53. This funding freeze—if it is allowed to continue—harms NED's mission far into the future.  Already, NED has been forced to suspend its regularly scheduled grantmaking cycles for May and September 2025.  The demand for support has been unwavering; NED received more than 1,500 proposals from 101 countries for the January 2025 grant cycle alone, of which 412 were approved and, based on the experience of recent years, NED expected to receive more than 6,000 proposals by the end of the calendar year.  In an average year, NED approves only about 25% of the requests it receives for support after a rigorous review process.  NED is unable to meet commitments made to grantees to continue obligations for 382 multi-year projects approved by the Board of Directors in prior years.  This severely impacts NED's relationships going forward.

54. The funding freeze also harms NED's reputation.  NED engages partners based on trust and mutual respect.  Groups around the world, particularly in the most dangerous and difficult environments, seek out NED due to our well-established reputation for transparency, consistency, security-consciousness, and partnership as well as our capacity to adapt our grantmaking to dynamic political scenarios and engage in crisis response.  NED specializes in grassroots organizations and is often a grantee's first donor; NED helps build the capacity of partners to manage funds, projects, and reporting, enabling them to compete more effectively for other funding.  Each NED partner enters into a grant agreement with the Endowment with the expectation that the institution will honor its financial and operational obligations to partners, as NED has done for 42 years.  Our reputation is critical to NED's ability to engage productively with partners worldwide, who see us as trusted partners.

55. Given the harms experienced by the grantees so far, many NED grantees may simply not be around to continue their important work if our funding were to resume at a later date.  Many NED grantees operate in closed, unstable, and/or conflict-torn environments.  It takes time and hard work for them to build trust and credibility and once it is gained, abruptly shutting their doors and ceasing their activities will destroy the trust, credibility, relationships, and networks these organizations have built up over decades.

56. Lastly, the funding freeze undermines our independence. Across administrations, NED has worked to advance the purposes of the organization as set forth by Congress. Our focus on democracy and robust bipartisan support have enabled us to maintain programs and support organizations consistently during political transitions in Washington, or changes in policy in other agencies. Our bipartisan and multisectoral structure coupled with our status as a private non-governmental organization allows us to pursue our mission. It has allowed NED to advance democracy and freedom, understanding it is in the United States' long-term interests. American security, prosperity, and global leadership benefit when the world is freer and more prosperous. NED plays a critical role in achieving these goals as we invest in America's ground game of pro-freedom allies, especially in the most repressive countries. The current freeze on NED's funding will likely lead organizations to refrain from engaging us, particularly those in the world's most authoritarian states where our nongovernmental status allows for partnership. This funding freeze severely undermines our unique, independent contribution to democracy and freedom around the world.

Impacts on IRI

57. As of January 24, 2025, IRI worked in more than 100 countries worldwide. IRI's mission is to advance democracy and freedom around the world by working with partners to strengthen democratic practices and institutions. IRI accomplishes its mission by:

- Working with political parties devoted to democracy to increase their ability to represent constituents effectively;

- Enhancing citizens' ability to participate in decision-making and hold government accountable, while helping those in office respond to citizen needs with accountability and transparency;

- Helping citizen groups build skills, networks, and knowledge needed to advance democracy and make their voices heard;

- Fostering the conditions for free and fair elections through programs to educate voters and through impartial international election monitoring missions;

- Assisting democratic actors to deploy digital technologies in ways that advance transparency, accountability, and protect individual rights;

- Bolstering the efforts of citizens and governments to enhance their resilience to authoritarian influence;

- Engaging governments to address governance deficiencies that leave countries vulnerable to conflict, instability, and violent extremism; and

- Deploying rigorous oversight, monitoring, evaluation, and learning systems to ensure that IRI programs are effective, evidence-based, and results-oriented.

58. IRI has been a part of historic democratic milestones all over the world, from supporting the growth of strong democratic institutions in the Eastern Bloc countries of the former Soviet Union to supporting the development of democracy in Latin America and beyond. IRI has worked alongside a variety of stakeholders in Ukraine from the earliest days of the country's independence, providing crucial assistance in building the architecture of democracy from the ground up. IRI has worked in Mongolia for more than thirty years and was a key partner in the country's transition to democracy following the democratic revolution of 1990. IRI has conducted 250 election observation missions, including for elections that proved critical to propelling countries towards democracy, such as Ukraine, Georgia, Nigeria, North Macedonia, and Kenya. More specific examples of IRI's NED-funded programs include:

- Exposing China's rights violations against Uyghurs, Tibetans, and the people of Hong Kong;

- Supporting Russia's political and civic opposition;

- Supporting the participation and political leadership of women in Nigeria;

- Countering violent extremism in the Sahel region, including in Mali;

- Supporting transparency in political financing in North Macedonia; and

- Promoting democratic reform in Iraq.

59. As a core partner of NED, IRI receives a significant share of its funding from NED's congressionally appropriated funds. In FY24, IRI received $32 million from NED, accounting for approximately 25 percent of IRI's overall funding. After each NED Board meeting where IRI project proposals are approved by NED's Board of Directors, IRI receives a new funding obligation from NED; this occurred once per quarter in FY24. IRI regularly submits drawdown payment requests for active projects to NED, usually on a monthly basis. IRI received payment on its last drawdown request from the NED on February 4, 2025. Since then, due to NED's inability to access its appropriated funds, IRI has been unable to receive funding from NED.

60. NED's inability to access appropriated funding has severely impacted IRI's operations and frozen IRI's ability to pursue its congressionally mandated democracy mission. By the end of March, IRI will have closed 31 offices worldwide that depend at least in part on NED funding, 11 of which rely solely on NED funding to operate. NED's inability to drawdown appropriated funds, compounded with the effect of the foreign assistance freeze, is forcing IRI to close all of its field offices, including in priority countries such as Turkey, Taiwan, Nigeria, Kenya, Ukraine, Serbia, Jordan, and Iraq.

61. Where IRI has been forced to close offices, the resultant harm to the Institute and its partners as a result of the sudden and complete cessation of funding also includes substantial damage to reputation and local standing that may prove irreparable. As offices are shuttered, IRI has been forced to abrogate formal agreements with local governments and key institutional stakeholders, terminate hundreds of subawards and contracts with local partners, vendors, and subject matter experts, and furlough or terminate entire office staffs with decades of combined experience. Simultaneously, IRI has been forced into a position where it may be unable to meet statutory obligations to these terminated staff, breaching their trust, eradicating years of hard-earned loyalty and good will, and upending IRI's unbroken 40-year commitment to doing right by its staff no matter where they live or work.

62. On top of that, the expenses arising from unplanned lease and employment contract terminations cannot be understated: each office closure brings with it penalties, termination fees, and tax and audit liabilities that IRI could not plan for and largely cannot mitigate. In a normal operating environment, IRI is extremely practiced in avoiding or minimizing these expenses as a long-standing federally funded grantee. However, because of the calamitous speed at which events have unfolded, these costs will exhaust already limited funds that would have supported IRI's mission. All of that despite IRI's rigorous financial and procurement controls, which prior to the freeze of NED funds have successfully protected IRI and taxpayers from the kinds of enormously expensive contractual remediation IRI now faces.

63. Office closures also jeopardize IRI's legal registration in those locations—and thus its ability to work in a country in the future. IRI's registration status in the various countries in which IRI operates is typically predicated on having a physical office and legal representative in the country, neither of which IRI is able to do in a growing number of locations. The loss of registration can be a dramatic setback for its work. In less-than-free operating environments, foreign entity registrations are hard-earned, the result of months or years of strategic negotiation with local authorities, the navigation of deliberately byzantine registration processes, and the expenditure of political capital by IRI and democratically minded partners and friends in those countries. Typically, the loss of registration has a raft of knock-on effects including the loss of access to banking, the inability to meet legal and tax obligations for locally employed staff, and the loss of freedom of movement for IRI staff. Lastly, surrendering IRI's registration may even render IRI uncompetitive or entirely ineligible for future government funding in some locations, as registration is at times a threshold requirement for any such funding application.

64. IRI's greatest asset in the fight for freedom and democracy is its people and the relationships it brings to international partners and beneficiaries worldwide. As of February 28, 2025, IRI has had to furlough 279 headquarters staff. IRI has estimated that approximately 70 of these staff (25 percent) would not have been furloughed but for the compounding impact of the loss of NED funding. These staff represent regional and technical experts spanning the entirety

of IRI's global footprint and who have deep knowledge and trusted relationships with key partners and stakeholders around the world. IRI has placed most of the remaining IRI headquarters staff on reduced pay.

65. In addition to the loss of this critical regional and technical expertise, IRI has degraded its operational capacity with the reduction of its global footprint, leaving IRI with less of an ability to respond to worldwide events or provide critical technical assistance related to the mission of IRI and NED. By the end of March 2025, IRI will furlough or terminate the employment of more than 35 expatriate program directors including 22 positions substantially funded through NED programs. These senior IRI representatives and technical experts lead IRI's program implementation, steward NED and U.S. Government resources, and in a very tangible way serve as ambassadors of American values and priorities. IRI's expatriate staff comprise a uniquely qualified workforce, the loss of which is already undermining American influence and soft power in the countries where IRI worked. In the 31 offices being closed that rely on NED funding, IRI is also in the process of providing notice to terminate the employment of 178 local national staff by the end of March 2025. This represents only a portion of IRI's total local national workforce whose employment will be terminated due to the loss of NED funding.

66. Given the ongoing freeze on funding disbursements, including from NED, IRI is at grave risk of insolvency in a matter of weeks. IRI is not able to meet all of its legal and contractual obligations, and depending on the scale of the liabilities, may be forced to file for bankruptcy.

67. The unexpected freeze on NED funds has caused IRI to prematurely cut funding to its partners, cancel engagements and activities that provided critical and unique technical assistance to partners and beneficiaries, and is preventing IRI from meeting its legal and contractual obligations in many countries around the world. This situation exposes IRI to significant legal and financial liabilities, including potential breach of contract claims, lawsuits from vendors and partners, and employment-related legal actions from staff facing furloughs or termination. Failure to fulfill obligations under existing agreements may also trigger penalties and legal disputes in multiple jurisdictions, further compounding IRI's financial instability. Additionally, the need to furlough and terminate IRI staff has caused interruptions in communication and engagement with key partners and stakeholders around the world, including with those in priority countries. Moving forward, IRI will have to resolve each of these matters individually– potentially incurring significant costs and programming delays—before it is able to resume normal options in those countries.

68. Beyond the financial and legal repercussions, the reputational damage to U.S.-funded entities unable to deliver on their obligations is vast. IRI's inability to deliver on commitments undermines its credibility with partners, funders, and stakeholders, potentially jeopardizing future support and collaboration. This loss of trust extends beyond IRI, raising concerns about

the reliability of U.S. assistance programs more broadly. Additionally, adversarial actors may exploit these disruptions to question U.S. leadership and credibility, complicating diplomatic and development efforts in key regions.

69. In parallel with the NED funding freeze, IRI has been subjected to a sustained and deliberate campaign of defamatory attacks through interviews, social media posts, and other public statements. These attacks have targeted not only IRI as an organization, but also its programs, individual employees, and some board members. These false and damaging accusations include claims of fraud and money laundering. The highly visible, public nature of these allegations threatens to materially damage IRI's standing among donors, grantors, and partner organizations, while also harming its ability to secure funding. The impact of these false and defamatory statements has already been significant and far-reaching. They have undermined IRI's credibility, weakened key partnerships, and provoked unwarranted scrutiny of its operations and personnel outside the United States by foreign governments seeking the opportunity to leverage these baseless claims for their own ends.

70. To carry out its core democracy mission, IRI relies on a diverse array of partnerships with citizen groups and key stakeholders in the countries where IRI works. These partnerships are typically structured as subawards and contracts to provide direct material support along with technical assistance. These agreements are essential to IRI's ability to implement programs effectively; they are IRI's primary tools to facilitate capacity-building, institutional strengthening, and grassroots engagement. Whether due to funding constraints, legal barriers, or operational challenges, disruptions to these partnerships severely impact IRI's ability to fulfill its mission, jeopardizing programmatic outcomes and long-term relationships with trusted local actors. Because of the cutoff of NED funding, IRI has suspended support to 50 subaward recipients around the world valued at $1,100,000. This includes subawards to groups working on critical democracy priorities that align with IRI's and NED's mission, including to raise awareness of the Chinese Communist Party's (CCP) rights violations inside China and support to Russia's democratic political and civic opposition.

71. Similarly, NED's inability to draw funds has cut off IRI's Moldova program during a critical window of time before parliamentary elections expected to occur in September 2025. The program would provide campaign training and public opinion survey data to pro-western candidates and political parties. Failure to provide this assistance could result in the election of a pro-Russian government on the Eastern flank of NATO.

72. Another example is IRI's partner in Guatemala which works with citizen entrepreneurs to create an enabling environment for economic growth through sound economic policy. NED's inability to access funds has resulted in the program's termination, including cancellation of seven consultant contracts required to implement the program. The program is focused in areas

of the country where illegal migration rates to the United States are high and the lack of investment, economic growth, and job creation in these areas creates increased potential for illegal migration to the United States.

73. Among IRI's most sensitive programs is its Russia program. IRI's partners face extreme physical security risks as result of the Kremlin's targeting of political and civic opposition. One IRI partner has been forced to cut 30 percent of its staff due to the inability to access funds provided by IRI through a subaward, more than 20 percent of that funding from NED funds. Without access to resources beyond their cash-on-hand, that organization will be forced to cease operations within the next two months.

74. Another IRI partner working inside Russia has suspended all activity, including communication with community members supporting grassroots projects. Given Russian political repression and its weaponized surveillance state, the abrupt stoppage in work 'exposes' the fact that the group was being supported by funds provided by IRI and NED, creating a circumstance of increased risk for individuals involved in the program. IRI is deemed an undesirable organization by the Russian Federation and thus any exposure of individuals working with IRI creates legal jeopardy for them and heightens the potential for criminal prosecution.

75. NED funds have also played a crucial role in uniting leaders from Burma's diverse ethnic political groups, enabling them to develop cohesive strategies and messaging for international advocacy. The suspension of funds significantly weakens their ability to sustain political momentum and forge a unified democratic coalition relative to the pro-China military junta that controls Burma through force of arms. Furthermore, it leaves these groups increasingly vulnerable to external influence, particularly from China. As one key ethnic leader in Burma's democratic movement informed IRI, since the freeze on NED funds, China has aggressively expanded its outreach to ethnic political groups, aiming to strike deals that secure control over rare earth deposits and other valuable natural resources within ethnic-controlled territories.

76. NED funds were the primary source of support for IRI's efforts to strengthen Taiwan's resilience against China's aggression. With this support, IRI established a groundbreaking cross-party network aimed at bridging deep partisan divides and forging consensus on the critical steps needed to safeguard Taiwan's democracy and free way of life. A prolonged suspension of funds causes the network to lose momentum and atrophy, thereby undermining Taiwan's democratic resilience in the face of aggressive CCP influence and information operations designed to subvert Taiwan's political and civic institutions.

77. NED programs were a major source of support for IRI's work with Chinese diaspora groups working to raise awareness of CCP rights violations inside China, including the Uyghur

genocide, and in the Hong Kong and Tibetan communities. These efforts were designed to push back against CCP repression and mobilize international support for more humane treatment of minorities inside China. Without this support, these critical advocacy efforts risk losing momentum, allowing the CCP's unchecked influence to grow.

78. NED programs were the primary source of support for IRI's rights advocacy partners inside China. Those activists have stopped work on a range of projects that raised awareness of the CCP's failure to provide basic services and legal protections to all Chinese citizens. The freeze on foreign assistance is widely known within China, and the timing of these halted projects raises concerns about inadvertently exposing partners as recipients of United States support through IRI and NED. At least one partner has already received questions about whether their project was funded by the United States, solely based on the timing of their suspension. If funding is not resumed, it may unintentionally reveal which groups were receiving IRI support—something IRI and its partners have worked diligently to prevent—ultimately making it easier for the CCP to identify and target potential dissidents.

79. In the Sahel region of Africa, for example, IRI works with local organizations to further governance in countries where radical Islamist terrorism incidents are the highest in the world. In Mali, the suspension of NED funding led to one IRI partner dismissing 67 percent of its staff. Their offices in two regions with serious terrorist activity will likely close imminently. These closures undermine key soft power capabilities in the fight against extremism. In Burkina Faso for example, the halt in NED funding led to an IRI partner terminating eight people; the organization will end operations and could be become insolvent if IRI is unable to access NED funds.

80. In Kenya, IRI's sub-awardee terminated contracts for 11 program staff due to the NED funding freeze, leaving only two staff working under significantly reduced hours. IRI's other NED sub-awardee in Kenya—a group focused on transparency and accountability in the Kenyan government—is facing bankruptcy, layoffs, and operational collapse. The inability to access funds is forcing layoffs for nine staff members and causing the organization to default on its financial obligations, damaging its credibility and making any future work impossible.

Impacts on NDI

81. Over its history, NDI has supported the people doing the work of democracy in civic groups, political parties, parliaments and governments in more than 150 countries around the world. While headquartered in Washington, D.C., NDI's programs only address democratic development outside of the United States. NDI delivers its programs to strengthen and/or advance democracy in three primary ways: through in-country offices led by an expert director and local staff; through organizing, convening, and engaging with international and regional networks; and through the development, dissemination, and implementation of international

norms and standards around aspects of democratic governance such as term limits and election processes.

82. NDI's work is rooted in the belief that free people having a say in how they are governed-and leaders who are responsive and accountable to their people-provide the foundation for stability, peace, and shared prosperity. NDI's programs help people unleash their power to make their governments work for them. NDI provides training, guidance, tools and resources proven to be effective in: empowering people by increasing their capacity to have a say in how they are governed; making democracy work by helping political parties, institutions, and governments be more accountable and more responsive to their people; and strengthening democratic societies by pushing back on those who seek to undermine freedom around the world.

83. NDI's programs, among other things, lift up democratic voices in Cuba, help women and children escape ISIS recruitment in Syria, and expose corruption and debt-trap deals that strengthen People's Republic of China (PRC) influence in other countries, while leaving ordinary citizens trapped in poverty. NDI's efforts level the playing field for international trade and investment, reduce conflict, and advance peace and security.

84. NED was NDI's foundational donor in 1983 and continues to be NDI's most important institutional partner. Unlike funds from other donors, in pursuit of which NDI responds to the donors' predefined funding opportunities, NED funds allow NDI to work together with NED on strategic activities squarely aligned with our complementary missions. For example:

- NED support was foundational in establishing NDI's principles and practices for international election observation, and ultimately for creating the international standards for those activities that are set forth in the Global Declaration of Principles for International Observation. With NED support, NDI conducted the first international observation of the Philippines' snap elections in 1986. The observation model adopted for the Philippines served as the foundation for international election-observation norms and standards, as well as developing the framework that has enabled NDI to assess more than 150 elections since 1986.

- NED's support enabled NDI, beginning in 1985, to provide technical assistance to Chilean political parties that sought a return to democracy in their country to develop united efforts toward that end. NDI also assisted voter registration initiatives, engaged with Chilean nonpartisan election monitors, and organized an international election observation mission. NDI's central efforts in supporting Chile's return to democracy were recognized recently by Chile's President Gabriel Boric, who presented NDI and three other American organizations with medals honoring the role they played.

- NED support enabled NDI, in collaboration with others, to found Debates International, a 41-country network of debate organizations that exchanges experiences and provides a website full of practical resources open to all to improve the quality of debates as a tool for voter education and citizen engagement. NDI, along with members of the Debates International network, has helped partner groups organize nearly 450 debates in more than 45 countries for candidates from mayors and legislators to prime ministers and presidents.

- Support from NED, through NDI, enabled one of the most important democratic achievements of the past 40 years–the establishment of nonpartisan citizen organizations around the world to observe elections in their own countries, and the association of these groups in the Global Network for Domestic Election Monitors (GNDEM).  GNDEM now includes more than 300 nonpartisan citizen observer organizations from nearly 100 countries and is recognized globally as the leading network of citizen observers.

85. NDI receives its NED funding annually through a core grant, with a start date of February 1 each year.  The specific amount of the grant is based on the approved annual appropriations from Congress. NDI's specific program proposals are reviewed by the NED Board according to its procedures, and receive approval at each NED board meeting.  Once the proposals are approved, NED amends the core grant to allow NDI to commence with and request funds for approved programming.

86. Prior to the grant being issued, NED and NDI conduct a planning process to align critical strategic priorities in the coming year that support both the NED and NDI missions. This planning process includes regional, global and executive-level strategic planning discussions, as well as the submission of a planning document that describes, by region and globally, how NDI plans to program NED funding in the coming year.

87. Over the past 40 years, in addition to this core grant from the NED, NDI has received funding from various other sources, including USAID, U.S. Department of State, UK Foreign Commonwealth and Development Office, Danish Ministry of Foreign Affairs, Swedish International Development Cooperation Agency, Global Affairs Canada, Swiss Agency for Development and Cooperation, as well as foundations and private donors.  In recent years, NED's funding to NDI has comprised approximately 20% of NDI's annual funding.  Today, however, as a result of actions by the government freezing U.S. foreign assistance, NED's funding would comprise 75% of NDI's funding.

88. Before the freeze on foreign assistance, NDI was implementing more than 290 programs across more than 78 countries, with 60 country offices in the Western Hemisphere, Central and Eastern Europe, Eurasia, Africa, the Middle East and Asia.  In addition to its 101 USAID and Department of State programs being suspended and most receiving subsequent termination

notices as a result of the foreign assistance funding freeze, NDI has not been able to access any U.S. funds through the payment system for legitimate costs in accordance with federal regulations and agreement terms.

89. As a result of the suspensions and NDI's inability to access U.S. government funds for legitimate expenses through the payment system, NDI was compelled to reduce its operations and staffing to align with the level of funding it expected to retain from the NED and non-U.S. government donors. NDI furloughed 66% of its DC staff, and reduced compensation for all those remaining. It also began reducing its global presence from 60 to 14 offices. These steps included reducing its international staff by 52% and local, in-country staff by 87%.

90. The last payment NDI received from NED was on February 4, for $5,616,113. Even this amount was $4,037,244 less than the amount NDI requested in accordance with its active grants from NED. The reduced amount provided to NDI was due to NED's inability to access its congressionally appropriated funds.

91. The crippling impact of these steps extend beyond NDI's operational infrastructure and NDI's subgrantees, to include the rupture of trusted relationships with local partners and networks that have taken decades to build and are essential to fulfilling NDI's and NED's missions. NDI was forced to pause all NED activities at the end of January, including all NED subgrants activities, given its inability to access NED's congressionally approved funds. As NDI continues to be unable to access funds, NDI will be terminating all of its subgrantees for programs remaining open, not just the programs that are closing, in the coming weeks.

92. Further, prior to the foreign assistance freeze, NDI was able to leverage its USAID and Department of State funding to conduct 132 NED programs, which is now being reduced to 56 NED programs. NDI will be forced to close these programs as well if NED does not receive its congressionally approved funds.

93. If NED is unable to access its congressionally appropriated funds, NDI will be forced to minimize staffing and operations, and risks losing all of its remaining funding from non-US donors. NDI will not be able to retain expert staff in the remaining 14 countries where NDI has worked for decades, abruptly cutting off relationships with local officials and civic actors and destroying years of investment in democratic progress. Without NED support for NDI's core activities including program planning, monitoring and evaluation, global convening and NDI participation in NED activities, NDI will effectively lose the capacities required to sustain quality work even for its non-US bilateral donors, threatening the loss of that funding as well. To sum up, without access to congressionally appropriated NED funding, NDI may well lose the ability to continue operations.

94. NED's inability to access its funds has compelled NDI to interrupt, halt, and/or cancel a number of important, time-sensitive NED-funded activities. These include:

- With NED funding, NDI works with political parties, civil society organizations and legislatures to advocate for, prepare, observe and participate in free and fair elections. This work has been halted in a number of countries expecting elections in the coming months, including Honduras and the Philippines, resulting in a lack of meaningful observation to mitigate potential electoral violence or fraud.

- NDI halted its NED-funded technical support to partners in Africa that are advocating for debt transparency and an end to the confidentiality clauses that the PRC imposes in its lending agreements, including for the extraction of critical minerals. Undisclosed loans from the PRC fuel corruption and disadvantage law-abiding private sector actors from the U.S. and other countries. In addition, PRC investments in the mining and infrastructure sectors have disproportionately negative impacts on the citizens of affected countries. NDI's NED-funded programs have allowed civic activists to develop innovative approaches to confront this malign PRC influence and to advance fair and transparent management of public funds and natural resources.

- NDI halted its NED-funded work in Bosnia to a cross-party, cross-ethnic, and cross-parliamentary group of young Members of Parliaments (MPs), eliminating the only venue for such dialogue in a country teetering on renewed ethnic conflict.

- NDI's Rapid Response Transitions (RRT) initiative is designed to help countries achieve peaceful and effective alternations of power; it is dependent on the Institute's ability to quickly mobilize technical assistance to countries undergoing leadership transitions in their executive or legislative branches. NDI had to halt its NED-funded technical support to the National Assembly of Senegal, in which over 80% of members are first-time legislators. The lack of access to NED funds for NDI's RRT also means that NDI is unable to offer assistance to governments in similarly situated and fragile countries undergoing transition processes, such as Bangladesh, Ecuador, Gabon, and Malawi.

- NDI relied on NED funding to strengthen the capacity of members of the Tibetan Parliament in Exile (TPiE) to effectively advocate to international stakeholders on China's human rights and religious persecution in Tibet. The program included strategic advocacy workshops, coalition-building, and the creation of advocacy tools. However, without access to NED funding, these initiatives were halted, causing the TPiE to miss a crucial opportunity to mobilize international actors to help preserve Tibetan religion and culture, withstand China's efforts to undermine Tibetans' right to self-determination, and combat transnational repression against Tibetan refugees.

- This year is the 20th anniversary of the Global Declaration of Principles for International Observation, with organizations coming together at the United Nations to strengthen norms supporting international electoral observation in the face of increasing efforts to undermine the rights of citizens around the world to freely exercise their right to vote. The disruption in NED funding has prevented NDI, a principal drafter, from participating and offering the other members the benefit of NDI's nearly 40 years of experience observing elections.

95. Several NDI partner organizations face immediate operational challenges due to the inability of NED to access its congressionally appropriated funding, including being forced to postpone planned activities that were to be funded by NED.

- In response to growing threats to electoral integrity, GNDEM developed an action plan for 2025 to enhance the network's capacity and to provide greater support to member organizations. The NED funding freeze has undermined GNDEM programmatically and organizationally, as the network has been forced to suspend time-sensitive work on advancing observer rights, as well as to cancel its spring board meeting and implementation of its action plan for 2025. This lack of access to funds is undermining citizen observation at a time when electoral integrity is under global threat.

- In Mozambique, NDI supported the formation of the Inter-party Youth Forum, a multi-party youth platform and one of the only mechanisms through which political parties from across the political spectrum constructively engage with one another – key in this deeply divided country. The NED funding freeze will likely lead to the stagnation of the forum, a crucial mechanism for political dialogue in the midst of post-election crises that emerged from the disputed 2024 general elections.

- In Belarus, NDI was providing critical technical assistance on communications strategy and messaging to the democratic movement in exile. The NED funding freeze undermines the movement's ability to effectively reach Belarusians, potentially damaging its credibility with citizens and exiles, and leaving an information void for the Belarusian regime to fill with anti-democratic propaganda and censorship efforts.

96. As a result of the inability to access NED funding to sustain NDI's operations and activities in the face of the ongoing State Department and USAID funding freeze, NDI is incurring reputational harm and facing questions and concerns about its viability as an organization.

- In Eurasia, NDI is in negotiations with a number of non-U.S.-government donors for programs that would work in synergy with NED-funded programs. These donors are

now considering whether to fund the proposals, and in one case so far has declined due to lack of NED complementary funding.

- In Iraq, NED-funded activities are part of a cost-share arrangement with the Government of Canada to fund programs supporting women in areas formerly held by ISIS and in the Shia-dominated south. Not honoring the promise of cost share carries serious reputational risk to NDI with its Canadian donor.

- In Turkey, local partners are expressing concerns about NDI's reliability as a partner due to the uncertainty surrounding NDI's ability to pursue planned activities. Some partner municipalities are now expressing hesitancy to engage with the Institute. Continued inability to pursue planned activities could make future engagement and relationship-building extremely challenging, if not impossible.

97. NDI works with NED-supported organizations and individuals in sensitive contexts. NED's inability to access its congressionally appropriated funds could expose these partners to additional scrutiny, persecution, and even threats or harm to their personal and physical security.

- In Cuba, the government cracks down on civic engagement and considers U.S. funding to citizen activists and organizations to be a tool of foreign interference. NED's inability to access its funding has led to a freeze in NED financial support for independent activists, journalists, and pro-democracy groups. Cuban authorities could easily correlate these groups' shrinking or closing operations at this moment to the funding freeze, allowing them to identify and target these partners. Authorities may also use the revelation of support originating from the U.S. government as justification for legal actions, harassment, or restrictions on movement, further isolating activists and limiting their ability to operate.

- For Hong Kong, the cessation of NED and NDI support for diaspora organizations would inflict irreparable harm on Hong Kong's pro-democracy movement and undermine global efforts to counter malign PRC influence. This support has been crucial in protecting exiled Hong Kong advocates facing transnational repression from the PRC. NDI, current and former NDI staff, and many NDI partners already face sanctions or arrest warrants from the PRC. Cutting off support not only threatens programs but puts at risk staff's personal safety, given the PRC's tactics of global repression.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 5 , in Washington, DC.

Damon M. Wilson
President and CEO
National Endowment for Democracy

# APPENDIX A

## ARTICLES OF INCORPORATION

### OF

## NATIONAL ENDOWMENT FOR DEMOCRACY

TO:        The Recorder of Deeds, D. C.
           Washington, D. C.

We, the undersigned natural persons of the age of twenty-one years or more, acting as incorporators of a corporation, adopt the following Articles of Incorporation for such corporation pursuant to the District of Columbia Nonprofit Corporation Act:

FIRST:     The name of the corporation is National Endowment for Democracy (herein "corporation" or "Endowment").

SECOND:    The period of duration is perpetual.

THIRD:     The purposes for which the corporation is organized are those described in Section 501(c)(3) of the Internal Revenue Code and, specifically to the extent not inconsistent therewith, shall include the following:

(a)  to encourage free and democratic institutions throughout the world through private sector initiatives, including activities which promote the individual rights and freedoms, including internationally recognized human rights and fundamental freedoms, which are essential to the functioning of democratic institutions;

(b)  to facilitate exchanges between United States private sector groups (labor and business) and democratic groups abroad;

(c)  to promote United States nongovernmental participation, especially through the two major American political parties, labor, business, and other private sector groups, in democratic training programs and democratic institution-building abroad;

(d)  to strengthen democratic electoral processes abroad through timely measures in cooperation with indigenous democratic forces;

(e)  to support the participation of labor, business, and other United States private sector groups in fostering cooperation with those abroad dedicated to the cultural values, institutions, and organizations of democratic pluralism;

(f)  to encourage the establishment and growth of democratic development in a manner consistent both with the broad concerns of United States national interests and with the specific requirements of the democratic groups in other countries which are aided by programs funded by the Endowment; and

(g)  in addition, the corporation shall have all other powers now or hereafter granted to non-profit corporations pursuant to the District of Columbia Nonprofit  Corporation Act to be used in furtherance of the above purposes.

FOURTH
AND
FIFTH:    The corporation shall have no members.

SIXTH:    The manner in which directors shall be elected or appointed, with the exception of the initial Board of Directors, shall be provided for in the bylaws of the corporation.

SEVENTH:  Provisions for the regulation of the internal affairs of the corporation shall be provided for in the bylaws of the corporation.

The corporation shall have the power to indemnify its directors and officers and its former directors and officers in accordance with the District of Columbia Nonprofit Corporation Act.

Provisions for distribution of assets on dissolution or final liquidation, are as follows:

No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, its directors or officers or other private persons, except that, unless otherwise prohibited by law, the corporation shall be authorized and empowered to pay reasonable compensation for services rendered.

Upon dissolution of the corporation, the Board of Directors, after paying or making provision for the payment of all the liabilities of the corporation, shall dispose of all of the assets of the corporation,

as the Board shall determine, for purposes
described in Section 501(c)(3) of the Internal
Revenue Code, provided, however, that all assets
of the corporation which are attributable to
appropriations of the Congress of the United
States shall be returned to the Treasury of the
United States.

EIGHTH:    The address, including street and number, of the
corporation's initial registered office is
Washington Square, Suite 300, 1050 Connecticut Avenue,
Washington, D. C., 20036, and the name of its
initial registered agent at such address is
Stuart Philip Ross.

NINTH:    The number of directors constituting the initial
Board of Directors is fourteen and the names and
addresses, including street and number, of the
persons who are to serve as the initial directors
until the first annual meeting or until their
successors are elected and qualified are:

| Name | Address |
| --- | --- |
| Hon. Dante B. Fascell<br>Interim Chairman | U.S. House of<br>   Representatives<br>Washington, D.C. 20515 |
| Hon. William E. Brock III<br>U.S. Trade Representative | 600 - 17th Street, N.W.<br>Suite 209<br>Washington, D.C. 20506 |
| Hon. Charles T. Manatt<br>Chairman | Democratic National Committee<br>1625 Massachusetts Avenue, N.W.<br>Washington, D.C. 20036 |
| Hon. Frank J. Fahrenkopf, Jr.<br>Chairman | Republican National Committee<br>310 First Street, S. E.<br>Washington, D.C. 20003 |
| Hon. Lane Kirkland<br>President | AFL-CIO<br>815 - 16th Street, N. W.<br>Washington, D.C. 20006 |
| Charles H. Smith, Jr.<br>Chairman of the Board | SIFCO<br>970 East 64th Street<br>Cleveland, Ohio 44103 |

-3-

| | |
|---|---|
| Mrs. Legree Daniels<br>Chairman | National Black Republican<br>  Council<br>715 Glenside Drive<br>Harrisburg, Pa.  17109  . |
| Mrs. Polly Baca Barragan<br>Vice-Chairman | Democratic National Committee<br>1625 Massachusetts Avenue,N.W.<br>Washington, D.C. 20036 |
| Albert Shanker<br>President | American Federation of<br>  Teachers<br>11 DuPont Circle<br>Washington, D.C. 20036 |
| Jan Van Andel<br>Chairman of the Board | Amway Corporation<br>7575 East Fulton Road<br>Ada, Michigan 49355 |
| Louis E. Martin<br>Assistant Vice-President<br>  for Communications | Howard University<br>Administration Building<br>Room 309<br>Washington, D.C. 20059 |
| John Richardson, Jr. | Youth for Understanding<br>3501 Newark Street<br>Washington, D.C. 20016 |
| Sally Shelton | 2927 South Dakota Avenue,N.W.<br>Washington, D.C. 20017 |
| Olin Robison<br>President | Middlebury College<br>Middlebury, Vermont 05753 |

TENTH:    The name and address of each incorporator is:

| Name | Address |
|---|---|
| Hon. Dante B. Fascell | U.S. House of<br>  Representatives<br>Washington, D.C. 20515 |
| Hon. William E. Brock, III<br>U.S. Trade Representative | 600 - 17th Street, N. W.<br>Suite 209<br>Washington, D.C. 20506 |
| Hon. Charles T. Manatt<br>Chairman | Democratic National Committee<br>1625 Massachusetts Avenue,N.W.<br>Washington, D.C. 20036 |

| | |
|---|---|
| Hon. Frank J. Fahrenkopf, Jr. | Republican National Committee |
| Chairman | 310 First Street, S. E. |
| | Washington, D.C. 20003 |
| | |
| Hon. Lane Kirkland | AFL-CIO |
| President | 815 - 16th Street, N.W. |
| | Washington, D.C. 20006 |
| | |
| Hon. Michael A. Samuels | U.S. Chamber of Commerce |
| Vice President, | 1615 H Street, N. W. |
| International | Washington, D.C. 20062 |

DATED:      November 18, 1983

_Dante B. Fascell_
Dante B. Fascell


_William E. Brock_
William E. Brock, III

_Charles T. Manatt_
Charles T. Manatt

_Frank J. Fahrenkopf, Jr_
Frank J. Fahrenkopf, Jr.

_Lane Kirkland_
Lane Kirkland

_Michael A. Samuels_
Michael A. Samuels

DISTRICT OF COLUMBIA ss:

       The undersigned, a Notary Public, in and for the
District of Columbia, hereby certifies that on October 28, 1983,
personally appeared before me Dante B. Fascell, who signed the
foregoing document as an incorporator, and stated that the
statements therein contained are true.

                              _Bethaara Bunn_
                              Notary Public

My Commission expires: _January 14, 1987_

DISTRICT OF COLUMBIA ss:

The undersigned, a Notary Public, in and for the
District of Columbia, hereby certifies that on October 25, 1983,
personally appeared before me William E. Brock, III, who signed the
foregoing document as an incorporator, and stated that the
statements therein contained are true.

Philip A. Guarino
Notary Public

My Commission expires: My Commission Expires June 15, 1986

DISTRICT OF COLUMBIA ss:

        The undersigned, a Notary Public, in and for the
District of Columbia, hereby certifies that on October 27, 1983,
personally appeared before me Charles T. Manatt, who signed the
foregoing document as an incorporator, and stated that the
statements therein contained are true.

                              Notary Public

My Commission expires: _____

DISTRICT OF COLUMBIA ss:

        The undersigned, a Notary Public, in and for the District of Columbia, hereby certifies that on October 27, 1983, personally appeared before me Frank J. Fahrenkopf, Jr., who signed the foregoing document as an incorporator, and stated that the statements therein contained are true.

_Philip A. Guarino_
Notary Public


My Commission expires: __My Commission Expires June 15, 1986__

DISTRICT OF COLUMBIA ss:

        The undersigned, a Notary Public, in and for the District of Columbia, hereby certifies that on October 26th 1983, personally appeared before me Lane Kirkland, who signed the foregoing document as an incorporator, and stated that the statements therein contained are true.

                                      Notary Public

My Commission expires: My Commission Expires December 14, 1984

DISTRICT OF COLUMBIA ss:

        The undersigned, a Notary Public, in and for the District of Columbia, hereby certifies that on October 28, 1983, personally appeared before me Michael A. Samuels, who signed the foregoing document as an incorporator, and stated that the statements therein contained are true.

*Bernadette P. Shannon*
Notary Public

My Commission expires: _My Commission Expires November 30, 1985_

# APPENDIX B

NATIONAL ENDOWMENT FOR DEMOCRACY

BYLAWS

(As amended March 22, 2024)

ARTICLE I
Offices and Registered Agent

Section 1.  Registered Office.

The registered office of the Corporation shall be in Washington, D.C.

Section 2.  Other Offices.

The Corporation may also have offices at such other places, both within and without

Washington, D.C., as the Board of Directors may from time to time determine.

Section 3.  Agent.

The Corporation shall maintain continuously within the District of Columbia a registered

agent, which agent shall be designated by the Board of Directors or the President.

ARTICLE II
Board of Directors

Section 1.  Powers.

The affairs of the Corporation shall be managed by or under the direction of its Board of

Directors.  The Board of Directors shall have, and may exercise, any and all powers provided in

the Articles of Incorporation or the District of Columbia Nonprofit Corporation Act of 2010

which are necessary or convenient to carry out the purposes of the Corporation.

Section 2.  Number of Directors.

The number of Directors constituting the Board of Directors shall be not fewer than

nineteen nor more than thirty-one.  The composition of the Board shall be politically and

institutionally balanced and consist of individuals with a deep commitment to advancing democracy.

Section 3.  Term of Office and Election.

Directors shall be elected by a two-thirds vote of Directors present at a meeting at which a quorum is present.  The term of each Director shall be three years.  The term of a Director shall also expire by his or her death, resignation or removal in accordance with these Bylaws.  No Director may be elected for more than three successive terms; provided, however, that the Board retains discretion to override this term limitation in exceptional circumstances.

Section 4.  Place of Meetings.

The Board of Directors of the Corporation may hold annual, regular and special meetings within or without Washington, D.C.

Section 5.  Meetings.

Regular meetings of the Board of Directors shall be held at least three times per year, with the date, time and place of each meeting to be determined by the Board.  Special meetings of the Board of Directors may be called by the Chair of the Board or upon the written request of one-third of the Directors then in office.  The first regular meeting of the Board of Directors in each calendar year shall constitute its annual meeting.

Section 6.  Notice of Meetings.

(a)    Notice of not fewer than fourteen days shall be given to each Director of a regular meeting of the Board of Directors.  Notice of not fewer than three days shall be given for a special meeting of the Board of Directors.

(b)    Notice of a meeting of the Board of Directors shall be in writing and shall specify the date, time and place of the meeting, but, except as provided in Article VII of these Bylaws and for a special meeting, need not specify the purpose of the meeting or the business to be

- 2 -

conducted.  Notice must be either delivered personally to each Director, mailed to his or her address as it appears on the records of the Corporation, sent by facsimile to his or her facsimile number as it appears on the records of the Corporation, or sent to his or her email address as it appears on the records of the Corporation.  If such notice is given by mail, it shall be deemed delivered two days after being deposited in the United States mail properly addressed and with postage prepaid thereon.  If such notice is given by facsimile or email, it shall be deemed delivered upon receipt of confirmation that the transmittal has been successful.  Notwithstanding the foregoing, a Director may waive notice of any regular or special meeting of the Board of Directors by written statement filed with the Board of Directors, or by oral statement at any such meeting.  Attendance at a meeting of the Board of Directors shall also constitute a waiver of notice, except where a Director states that he or she is attending for the purpose of objecting to the conduct of business on the ground that the meeting was not lawfully called or convened.

Section 7.  Quorum at Meetings.

One-half of the number of Directors then in office shall constitute a quorum for the transaction of business at any meeting of the Board of Directors.

Section 8.  Required Vote.

The vote of a majority of Directors present at a meeting at which a quorum is present shall be the act of the Board of Directors, except as may be otherwise specifically provided by statute, by the Certificate of Incorporation or by these Bylaws.

Section 9.  Telephone Meetings.

Members of the Board of Directors or any Committee designated by the Board may participate in a meeting of such Board or Committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other.  Such participation shall constitute presence in person at the meeting.

Section 10.  Action Without Meeting.

Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any Committee may be taken without a meeting, if all members of the Board or Committee, as the case may be, consent to such action in writing, setting forth the action taken.  Such consent in writing shall have the same force and effect as a vote of the Board of Directors or the Committee at a meeting and shall be filed with the minutes of proceedings of the Board of Directors or Committee.

Section 11.  Removal of Directors.

A Director may be removed, with or without cause, by a two-thirds vote of all Directors then in office.

ARTICLE III
Committees

Section 1.  Executive Committee.  The Executive Committee of the Board shall consist of the Officers of the Corporation who are members of the Board and such other Board members appointed by the Board from time to time.  Except as otherwise required by law or these Bylaws, the Executive Committee shall have such authority as the Board of Directors shall grant to it for the management of the Corporation, including the power to authorize the seal of the Corporation to be affixed to all papers that may require it.  The Executive Committee shall keep regular minutes of its proceedings and shall report the same to the Board of Directors when requested.

Section 2.  Other Committees.  The Board of Directors may create other Committee(s) consisting of Directors or other persons, which Committee(s) shall have such authority as the Board of Directors may delegate.

ARTICLE IV
Officers

Section 1.  Positions.

The Officers of the Corporation shall be a Chair of the Board and Vice Chair of the Board, who shall be members of the Board, a President, a Secretary and a Treasurer, and such other Officers as the Board of Directors may from time to time appoint.  Any number of offices may be held by the same person, unless otherwise provided in the Certificate of Incorporation or these Bylaws, provided that in no event shall the President and the Secretary be the same person.

Section 2.  Election of Officers.

The Officers of the Corporation shall be elected for a one-year term by a two-thirds vote of the Directors present at the annual meeting at which a quorum is present or at any meeting at which a quorum is present after a vacancy occurs.

Section 3.  Term of Office.

The Officers of the Corporation shall hold office until successors are chosen and qualify or until their earlier resignation or removal.  Any Officer may resign at any time upon written notice to the President.  Any Officer may be removed at any time, with or without cause, by a two-thirds vote of all Directors then in office.

Section 4.  Chair of the Board.

The Chair of the Board shall preside at all meetings of the Directors and shall have such other duties and shall have such other powers as may be vested in said person by the Board of Directors.

Section 5.  Vice Chair.

In the absence of the Chair or in the event of inability or refusal of the Chair to act, the Vice Chair shall perform the duties of the Chair, and when so acting shall have all the powers of and be subject to all the restrictions upon the Chair.  The Vice Chair shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

Section 6.  President.

(a)    The President shall be the chief executive officer of the Corporation, shall perform all duties customary to that office and shall supervise and control all of the affairs of the Corporation in accordance with any policies and directives approved by the Board of Directors, and shall see that all orders and resolutions of the Board of Directors are carried into effect.  The President shall have authority to affix the corporate seal of the Corporation to any instrument requiring it, and, when so affixed, it may be attested by the signature of the President.

(b)    In the event of a vacancy or an impending vacancy in the office of the President, the Chair, after consultation with the Executive Committee of the Board, shall appoint a Search Committee of no more than nine persons, to be selected from the current members of the Board to ensure bipartisan composition of the Committee and may include one or more Endowment staff persons.  The Search Committee may engage the services of a search firm with appropriate expertise and experience.  The Search Committee shall recommend its preferred candidate for President to the full Board for its approval and election.  If a vacancy occurs under circumstances which necessitate appointment of an Acting President to serve pending the election of a new President, the Chair, after consultation with the Executive Committee of the Board, shall appoint a person to serve as Acting President until a new President is elected and takes office.

<u>Section 7.  Secretary.</u>

Unless otherwise requested by the Board, the Secretary shall attend all meetings of the Board of Directors and shall record, or cause to be recorded, all the proceedings of the meetings of the Board of Directors, and shall perform such duties for Board Committees when requested. The Secretary shall give, or cause to be given, notice of all meetings of the Directors, and shall perform such other duties as may be prescribed by the Board of Directors or by the President, under whose supervision the Secretary shall be.  The Secretary shall have custody of the corporate seal of the Corporation, and the Secretary shall have authority to affix the same to any instrument requiring it, and, when so affixed, it may be attested by the signature of the Secretary. The Secretary may also attest all instruments signed by the Chair of the Board, the President, any Vice President or the Chief Operating Officer.

<u>Section 8.  Treasurer.</u>

The Treasurer shall perform all duties customary to that office, shall be responsible for the custody and control for all corporate funds and securities, and shall keep, or cause to be kept, full and accurate accounts or receipts and disbursements in books belonging to the Corporation and shall deposit, or cause to be deposited, all monies and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors.  The Treasurer shall disburse, or cause to be disbursed, the funds of the Corporation as ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the President, and to the Board of Directors at its regular meetings, or when the Board of Directors so requests, an account of all transactions as Treasurer and of the financial condition of the Corporation.

ARTICLE V
Indemnification

The Corporation shall indemnify to the full extent permitted by law any person made, or threatened to be made, a party to an action, suit or proceeding (whether civil, criminal, administrative or investigative) by reason of the fact that the person, or the person's testator or intestate, is or was a Director or Officer of the Corporation.  The Directors are authorized to procure insurance providing for the indemnification of Directors and Officers of the Corporation.

ARTICLE VI
General Provisions

Section 1.  Fiscal Year.

The fiscal year of the Corporation shall coincide with the fiscal year of the United States federal government.

Section 2.  Seal.

The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Washington, D.C."  The seal may be used by causing it or a facsimile thereof to be impressed or affixed or otherwise reproduced.

Section 3.  Abstention from Consideration.

Any Board member who is an officer or director of an organization seeking to receive grants from the Corporation must abstain from consideration of and any vote on such grant.  This provision shall not prevent any Director from supplying to the Board any factual information it may seek regarding such grant proposal.

Section 4.  Approval of Grants and Other Activities.

The Board of Directors will ensure that all funds are used only for grants and other activities that are consistent with the purposes of the Corporation as set forth in the Articles of Incorporation and the NED Act.

Section 5.  Prohibition on Programs.

In advancing the purposes of the Corporation and consistent with its legal responsibilities, the Corporation may provide grants only to private sector groups and may conduct other appropriate activities but may not carry out programs directly.

ARTICLE VII<br>Amendments

These Bylaws may be altered, amended or repealed or new Bylaws may be adopted by the Board of Directors by the affirmative vote of two-thirds of all Directors then in office.  Any proposal to amend the Bylaws shall be submitted to the Directors by at least three Directors at a duly noticed meeting of the Directors, provided, however, that no such proposal to amend the Bylaws may be acted upon unless all Directors shall have received written notice of any such proposal and the proposal itself at least seven days prior to the meeting at which such proposal is to be considered.