**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

NATIONAL ENDOWMENT FOR
DEMOCRACY,
1201 Pennsylvania Avenue NW
Suite 1100
Washington, DC 20004;

                Plaintiff,

v.

THE UNITED STATES OF AMERICA;

UNITED STATES DEPARTMENT OF
STATE,
2201 C Street NW
Washington, DC 20520;

MARCO RUBIO, UNITED STATES
SECRETARY OF STATE, *in his official
capacity*,
2201 C Street NW
Washington, DC 20520;

UNITED STATES OFFICE OF
MANAGEMENT AND BUDGET,
725 17th Street NW
Washington, DC 20503;

RUSSELL VOUGHT, DIRECTOR OF
UNITED STATES OFFICE OF
MANAGEMENT AND BUDGET, *in his
official capacity*,
725 17th Street NW
Washington, DC 20503;

UNITED STATES DEPARTMENT OF
TREASURY,
1500 Pennsylvania Avenue NW
Washington, DC 20220;

SCOTT BESSENT, UNITED STATES
SECRETARY OF THE TREASURY, *in his
official capacity*,

Case No. ———— 1:25-cv-648-DLF

AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF AND PETITION FOR WRIT
OF MANDAMUS

1500 Pennsylvania Avenue NW
Washington, DC 20220;

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
Hubert H. Humphrey Building
200 Independence Avenue SW
Washington, DC 20201;

ROBERT F. KENNEDY, JR., THE UNITED
STATES SECRETARY DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *in his
official capacity*,
U.S. Department of Health and Human
Services
Hubert H. Humphrey Building
200 Independence Avenue SW
Washington, DC 20201;

and

MELISSA BRUCE, DIRECTOR OF THE
UNITED STATES SECRETARY
DEPARTMENT OF HEALTH AND
HUMAN SERVICES' PROGRAM
SUPPORT CENTER, *in her official capacity*,
U.S. Department of Health and Human
Services
Hubert H. Humphrey Building
200 Independence Avenue SW
Washington, DC 20201;

                    Defendants.

## AMENDED COMPLAINT[1]

1.      This case concerns the Executive Branch's unlawful impoundment of funds that

Congress appropriated for the National Endowment for Democracy (the "Endowment" or

"NED").  In the National Endowment for Democracy Act of 1983 (the "NED Act"), Congress

---

[1] By email on June 25, 2025, counsel for Defendants consented in writing to the filing of this
Amended Complaint.  *See* Fed. R. Civ. P. 15(a)(2).

formally recognized the establishment of the Endowment as a private, nonprofit corporation whose mission is to "encourage free and democratic institutions throughout the world through private sector initiatives." 22 U.S.C. § 4411. To further that objective, and as specified in the Act, the Endowment awards grants to four core institutes that work to strengthen the institutions of democracy, and to a range of nonprofit organizations around the world committed to advancing freedom in their own countries. In the NED Act, Congress directed that the Endowment would be funded by annual congressional appropriations to support its congressionally sanctioned mission and grantmaking activities. Specifically, Congress directed that the Endowment "shall" receive annual grants through the Department of State. 22 U.S.C. § 4412(a). Every year, Congress appropriates funding for the Endowment and directs that the full amount of those funds shall be available to the Endowment until spent. It has used the same mandatory language in every appropriations statute relevant here and in every one in recent memory. And every year, the ~~Department of State~~Executive Branch has ensured that those funds have been timely transferred to the Endowment—until now.

2.     To ensure the Endowment can fulfill its statutory mandate, Congress appropriates funds directly to the Endowment through an annual congressional appropriation under Title I of the Department of State Foreign Operations and Related Programs ("SFOPS") appropriations legislation. After Congress appropriates the Endowment's funds, ~~and OMB apportions them to~~ the ~~Department~~Office of ~~State,~~Management and Budget ("OMB") and the Department of State ~~is~~are required by statute to transfer the money to the Endowment. OMB must apportion the funds Congress appropriated to the Department of State, and then the Department of State must issue a grant in the full amount to the Endowment, thereby "obligating" the funds to be paid by the Executive Branch.

3.        As prescribed by federal regulations, the Endowment does not receive the appropriation as a single lump sum, but instead is required to withdraw money only on an as-needed basis. The appropriated funds are held in an account at the Department of Treasury, and the Endowment usually makes twice weekly withdrawals in order to pay its grantees pursuant to their grant agreements, pay its staff, and cover operating expenses. As a result, the Endowment does not and cannot by law maintain significant cash reserves to fund its operations.

3.        For the last month, the Executive Branch has For much of this calendar year, the Executive Branch has been intent on impounding the Endowment's congressionally appropriated funds. From the earliest days of the current administration, high-level officials and their affiliates were outspoken about their policy objections to the Endowment's work. Since then, they have repeatedly tried to interfere with the Endowment's ability to fulfill its congressionally sanctioned purpose.

4.        For two months between January and March 2025, the Executive Branch denied the Endowment access to its congressionally appropriated funds—something that has had never previously occurred before in the Endowment's forty-two-year existence. That refusal has taken took two forms. First, the Executive has withheld payment of routine drawdown requests necessary to fund the Endowment's operations from the $167 million of funds that had already been appropriated by Congress and obligated by the Department of State. Second, the Department of State has refused to obligate the balance of the Endowment's annual appropriation funds that Congress had appropriated to the Endowment at that point, totaling approximately $72 million. No To this day, no Executive Branch official has provided any explanation for those unprecedented actions. But whatever the purported reason, the Executive

4

Branch ~~lacks~~lacked statutory authority or discretion to deny the Endowment its congressionally appropriated funds in ~~this~~that manner.

5.    ~~As a result of the Executive's~~That unlawful impoundment inflicted extreme and unprecedented hardship on the Endowment.  The organization was forced to announce furloughs for up to 70% of its staff and eventually lay off 35% of its staff, and—for the first time ever—it defaulted on obligations to its grantees.  With its ability to carry out its purpose in jeopardy, and with outreach to Defendants providing no relief, the Endowment had no choice but to file this suit to restore its funding.

6.    In response to the filing of this suit, Defendants temporarily ceased their unlawful impoundment of the Endowment's appropriated funds.  But that did not stop them from exploring other pathways to frustrate the Endowment's mission.

7.    Defendants have now settled on a new tool for unlawfully impounding the Endowment's funds:  OMB's role in apportionment.  Defendants are withholding approximately $95 million in funding that Congress has appropriated specifically for obligation to the Endowment~~,~~ in fiscal year 2025, but that OMB has not yet apportioned.  According to Defendants, they are "reserving" those funds for the ~~Endowment is experiencing~~future in light of a ~~devastating~~"review" of the Endowment's funding "for alignment with Administration priorities."  This action is unprecedented.  Never before in the Endowment's forty-two-year history has OMB refused to apportion, and thus the State Department failed to obligate, the full amount of funds that Congress appropriated specifically for obligation to the Endowment in the fiscal year in which those funds were appropriated.

8.    If allowed to stand, that maneuver threatens to trigger a cash flow crisis ~~that jeopardizes its ability to~~ and exacerbate the operational and programmatic harms that began

5

earlier this year.  It also threatens immediate harm to the Endowment's ability to ~~its~~ fulfill ~~mission and its very existence, as well as that~~ the mission that Congress expects it to pursue.  The Endowment relies on consistent and predictable access to the funds that Congress appropriates for its use, including for purposes of making critical staffing decisions, approving support for its direct partners, and providing funds for projects of its core institutes ~~and grantees.~~.  The Endowment has traditionally made funding commitments based on the expectation that Congress's spending decision will be followed.  The refusal to apportion tens of millions of dollars of the Endowment's appropriated funds makes that impossible.

~~5.~~9.    The refusal to apportion the Endowment's congressionally appropriated funds runs afoul of the NED Act, the appropriations acts, and the Anti-Deficiency Act and amounts to an unreasonable and unconstitutional impoundment.  If allowed to stand, Defendants' actions will set a dangerous new precedent—giving a green light to the Executive Branch to withhold appropriated funds based on bare policy disagreement with Congress's spending decisions.  Federal law and the Constitution forbid the Executive Branch from countermanding Congress's power of the purse in that manner.  Defendants' actions must be set aside and enjoined.

**JURISDICTION AND VENUE**

~~6.~~10.   This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 1361.

~~7.~~11.   Venue is proper in this district because a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district.  28 U.S.C. § 1391(e).

**PARTIES**

~~8.~~12.   Plaintiff the National Endowment for Democracy is a private, nonprofit 501(c)(3) corporation dedicated to the growth and strengthening of democratic institutions around the world, organized under the laws of Washington, D.C.

6

9.13.   Defendant the United States of America is sued in its governmental capacity as a proper party defendant for actions seeking relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

10.14.   Defendant United States Department of State is a federal agency headquartered in Washington, D.C., with responsibility for United States foreign relations and foreign policy.

11.15.   Defendant Marco Rubio is the United States Secretary of State.  He is sued in his official capacity.

12.16.   Defendant United States Office of Management and Budget ("OMB") is a federal agency headquartered in Washington, D.C., with responsibility for overseeing the management of federal financial assistance.

13.17.   Defendant Russell Vought is the Director of OMB.  He is sued in his official capacity.

14.18.   Defendant United States Department of Treasury is a federal agency headquartered in Washington, D.C., with responsibility for managing federal finances.

15.19.   Defendant Scott Bessent is the United States Secretary of the Treasury.  He is sued in his official capacity.

16.20.   Defendant United States Department of Health and Human Services ("HHS") is a federal agency headquartered in Washington, D.C., with responsibility for administering the Payment Management Services system.

17.21.   Defendant Robert F. Kennedy, Jr. is the United States Secretary of HHS.  He is sued in his official capacity.

18.22.   Defendant Melissa Bruce is the Director of HHS's Program Support Center.  She is sued in her official capacity.

7

**FACTS**

**A.    The Endowment**

~~19.~~23.    The Endowment is a nonpartisan, nonprofit organization devoted to promoting democracy around the world.  For more than forty years, the Endowment has provided funding to organizations working to promote democratic governance, human rights, and political freedoms worldwide in some of the most challenging environments—including authoritarian regimes and areas in which non-state actors such as drug cartels and terrorist organizations suppress fundamental political freedoms.  The Endowment does not directly or indirectly undertake any work in the United States.

~~20.~~24.    The Endowment traces its origins to President Ronald Reagan's 1982 Westminster Address, delivered before the British Parliament in the midst of the Cold War. President Reagan called for a new initiative to "foster the infrastructure of democracy" around the world and announced that the United States would employ a bipartisan organization to support the "global campaign for democracy now gathering force."[2]

~~21.~~25.    President Reagan's leadership, together with that of the United States Congress, resulted in the formation of the Endowment as a private nonprofit organization, led by an independent self-appointing Board of Directors, to be funded by Congress.  In 1983 and on an overwhelming and bipartisan basis, Congress passed the National Endowment for Democracy Act (the "NED Act"), which formally recognized the establishment of the Endowment as a private foundation authorized to receive federal funding through congressional appropriation. *See* 22 U.S.C. § 4411 *et seq.*

_____

[2] ~~Adress~~Address to Members of the British Parliament, Palace of Westminster, London, England (June 8, 1982), https://www.reaganlibrary.gov/archives/speech/address-members-british-parliament.

22.26.  In the NED Act, Congress set forth several statutory purposes that the Endowment is to pursue.  The Endowment's mandate is to "encourage free and democratic institutions throughout the world through private sector initiatives, including activities which promote the individual rights and freedoms (including internationally recognized human rights) which are essential to the functioning of democratic institutions."  22 U.S.C. § 4411(b)(1).  The Endowment is also devoted to promoting "democratic training programs and democratic institution-building abroad," "strengthen[ing] democratic electoral processes abroad," -and "encourag[ing] the establishment and growth of democratic development in a manner consistent both with the broad concerns of United States national interests and with the specific requirements of the democratic groups in other countries which are aided by programs funded by [the Endowment]."  *Id.*

23.27.  The Endowment serves its mission of promoting freedom and democracy worldwide principally by operating as a grantmaking institution.  The Endowment funds four "core institutes" to fulfill the NED Act's mandate of promoting exchanges between democratic groups abroad and private sector initiatives, including "the two major American political parties, labor, and business."  *See* 22 U.S.C. § 44124411(b)(2).  The Endowment's core institutes are the National Democratic Institute, the International Republican Institute, the Center for International Private Enterprise, and the Solidarity Center.  The Endowment directs around one third of its total appropriation to these core institutes, as required by the appropriation.  The core institutes ensure that the Endowment's programs represent the full breadth of American political life, with the institutes associated with both of the major political parties, as well as labor and business.

24.28.  In addition to funding the core institutes, the Endowment funds approximately 1,700 individual projects active in over 100 countries.  Through this grant program, the

Endowment discretionarily funds a network of frontline activists seeking to advance freedom in their own countries.  The Endowment's grantees include organizations devoted to documenting human rights abuses and ensuring access to a free press, with an emphasis on the world's most authoritarian regimes.  Some of the Endowment's grantees must keep their relationship to the Endowment discreet, given the sensitivity of their work in their home jurisdictions and the personal risks the work entails.

25.29.  The Endowment regularly invests in grantees who work in repressive or conflict-torn countries to foster peaceful efforts toward democracy.  In more open societies, the Endowment supports citizen groups working to strengthen democratic institutions and processes.  The Endowment's record speaks for itself:  Many of the nations in which the Endowment and its core institutes have strategically invested over the years ultimately made the transition to democracy, including Chile, Indonesia, South Africa, South Korea, Taiwan, the Philippines, Mongolia, Ghana, countries in Central and Eastern Europe, and others.  And even societies that are already democracies welcome and invite the Endowment's support.  These countries—which include many U.S. allies—believe the Endowment's work helps them make their democratic institutions and processes more effective, strengthens citizen engagement, and fosters accountable governance and the rule of law, helping them attract investment, achieve economic growth, and deliver for their citizens.  In that way, the Endowment is engaged in the critical long-haul work of pursuing a more democratic, stable, and prosperous world—a goal that the Endowment's founders and members of both parties have long recognized as furthering United States economic and security interests.

26.30.  The Endowment's unique structure allows it to function on an extremely cost-effective basis, ensuring that the vast majority of its appropriated funds go directly to grantees'

democracy-supporting work.  Eighty-three percent of the Endowment's funding goes directly to grantees.  Importantly, grantees do not receive those funds upfront.  Funding for all grantees is tied to submission of scheduled progress reports and other deliverables.  Even the core institutes must request payment drawdowns against their cash needs as they go.

27.31.  The Endowment's spending and operations are subject to rigorous financial controls and reporting requirements.  Pursuant to the NED Act, the Endowment conducts annual independent audits of its accounts, the results of which it provides to Congress as part of its annual report.  22 U.S.C. § 4413(e), (h).  The Endowment's financial transactions are also subject to government audit by the Government Accountability Office and the State Department, the reports of which must also be reported to Congress.  22 U.S.C. § 4413(f), (g).  And the Endowment's bipartisan, experienced Board of Directors provides robust oversight of the Endowment's financials, ensuring that its funds are used only for grants and activities consistent with its statutory mandate.  More specifically, the Budget, Audit, and Administration Committee of the Board of Directors manages the Endowment's audit process, financial reporting, and compliance functions.

28.32.  The Endowment's mission of advancing the cause of liberty and democracy around the world is nonpartisan, and the Endowment is bipartisan by design.  The Endowment's self-appointed Board of Directors is bipartisan; it includes two members from the House and two honorary members from the Senate, with a Republican and a Democrat from each chamber.  The Endowment funds both the National Democratic Institute and the International Republican

11

Institute.  As President Reagan explained, "One of the strengths of this organization is that it is constructed on a bipartisan basis."[3]

~~29.~~33.  The private, nongovernmental nature of the Endowment's work is also essential to its structure and purpose.  The Endowment's mandate is to support private American groups forging relationships with and supporting private groups abroad in pursuit of democratic goals around the world.

~~30.~~34.  In the forty-two years since its founding, leaders from across the political spectrum have hailed the Endowment's work.  Shortly after its founding, President Reagan proclaimed that the "establishment of the National Endowment goes right to the heart of America's faith in democratic ideals and institutions.  It offers hope to people everywhere."[4]

~~31.~~35.  President Jimmy Carter praised the Endowment and core institutes' work overseeing the balloting for Indonesia's first free election in more than 40 years.  President Carter explained that "[t]he creation of the NED in the 1980s reflected a bipartisan belief that the promotion of freedom is an enduring American interest and that nongovernmental representatives would best be able to help their counterparts build democracy in other countries."[5]

---

[3] Ronald Reagan, Message to the Congress Transmitting the Annual Report of the National Endowment for Democracy (Feb. 19, 1986), https://www.reaganlibrary.gov/archives/speech/message-congress-transmitting-annual-report-national-endowment-democracy.

[4] President Ronald Reagan's Remarks at a White House Ceremony Inaugurating the National Endowment for Democracy (December 16, 1983), https://www.ned.org/president-ronald-reagans-remarks-at-a-white-house-ceremony-inaugurating-the-national-endowment-for-democracy/.

[5] Jimmy Carter and Paul Wolfowitz, *Don't Take Democracy for Granted* (July 20, 1999), https://www.cartercenter.org/news/documents/doc1389.html.

32.36.  President Bill Clinton has commended the Endowment as "one of our most
effective means for supporting grass-roots trade union, business and citizen groups, which form
the basis for democratic reform."  As President Clinton explained, "[b]y fostering such reforms
abroad, we not only project our own values, we also increase our own security and create better
partners for trade and global problem solving."[6]

33.37.  President George W. Bush praised "the bipartisan spirit" of the Endowment,
describing the Endowment's work "promoting women's rights, and training Iraqi journalists, and
teaching the skills of political participation."[7] "By speaking for and standing for freedom," he
said, the Endowment has "lifted the hopes of people around the world," and has "brought great
credit to America."[8]  And President George H.W. Bush before him recognized that the
Endowment's "work is giving expression to the oldest and noblest tradition of this country—the
devotion to freedom for all humanity."[9]

34.38.  In 2017, Secretary of State Marco Rubio, formerly a board member of the
Endowment-funded International Republican Institute, celebrated the Endowment's grantees,
applauding their "courage" and "drive to combat corruption, press for transparency and
accountability and advance the cause of freedom and democracy around the world."  Secretary

---

[6] 140 Cong. Rec. 364 (Jan. 27, 1994).

[7] Remarks by President George W. Bush at the 20th Anniversary of the National Endowment for
Democracy, U.S. Chamber of Commerce, Washington, D.C., https://www.ned.org/remarks-by-
president-george-w-bush-at-the-20th-anniversary.

[8] *Id.*

[9] Remarks by the President to Polish and Chilean Human Rights Leaders, May 3, 1989, 135
Cong. Rec. S6365-02, S6366, 1989 WL 178259.

Rubio thanked the Endowment for its work to "advance the cause of freedom and carry out the vision President Reagan articulated those many years ago."[10]

**B.    The Endowment Is Funded By Direct Congressional Appropriation**

~~35.~~39.  From its inception, the Endowment was structured to ensure continuity of funding and independence.  Unlike other nongovernmental organizations, which receive funds at the discretion of federal agencies, the Endowment is funded through annual appropriations directly from Congress.

~~36.~~40.  In the NED Act, Congress directed the Department of State to convey the Endowment's annual appropriation to it.  The NED Act provides that the Department of State "**shall make an annual grant** to the Endowment to enable the Endowment to carry out its purposes as specified in section 4411(b) of this title~~."~~" and that "[s]uch grants shall be made with funds specifically appropriated for grants to the Endowment."  22 U.S.C. § 4412(a) (emphasis added).[11]  Section 4412 thus leaves the Department of State with no discretion:  It *must* make an annual grant to the Endowment each year with the funds appropriated by Congress for that very purpose.

~~37.~~41.  To enable that annual grant, Congress appropriates funds each year for the Endowment's use.  It has done so every year since the Endowment's founding.  For fiscal year 2024, for instance, Congress provided in the Further Consolidated Appropriations Act:  "For grants made by the Department of State to the National Endowment for Democracy, as

---

[10] Sen. Marco Rubio (R-FL) on NED's 2017 Democracy Awardees, National Endowment for Democracy (posted June 7, 2017), https://www.youtube.com/watch?v=kPihC7UQ9jk&t=15s.

[11] As adopted, the NED Act identified the United States Information Agency, which was consolidated with the Department of State in 1999 pursuant to the Foreign Affairs Reform and Restructuring Act of 1998.  *See* Federal Register, *United States Information Agency*, https://www.federalregister.gov/agencies/united-states-information-agency.

Formatted: Font: Bold

authorized by the National Endowment for Democracy Act (22 U.S.C. 4412), $315,000,000, to remain available until expended, of which $210,316,000 shall be allocated in the traditional and customary manner, including for the core institutes, and $104,684,000 shall be for democracy programs." ~~Pub.~~ Further Consolidated Appropriations Act, Pub. L. No. 118-47, 138 Stat. 460, 737 (2024). Although the amount of the appropriation has varied from year to year, the basic statutory command has not. Congress has consistently directed that the full appropriated amount "shall be allocated" to the Endowment: a portion is earmarked for the Endowment's core institutes from the funds that "shall be allocated in the traditional and customary manner," and another portion "shall be for" the Endowment's democracy programs. In addition, the appropriated amount is to "remain available" to the Endowment "until expended." The Department of State thus has no discretion to make less than the full appropriated amount available to the Endowment.

42.    In the appropriations process, Congress has unambiguously confirmed that the Department of State lacks substantive control over the Endowment's expenditures. The fiscal year 2024 appropriations act, for example, specified that funds appropriated "under the heading 'National Endowment for Democracy' may be made available notwithstanding any other provision of law" and "notwithstanding any . . . regulation." *Id.* § 7032(b)(1). The act further specified that the funds were "made available pursuant to the authority of" the NED Act, "including all decisions regarding the selection of beneficiaries," *id.* § 7032(b)(2)—meaning the funds were subject to the NED Act's directive that only the Endowment and its officers may decide which activities the Endowment will fund, *see* 22 U.S.C. § 4412(a). The accompanying House Report drove the point home, stating that "[f]unds made available under this heading shall

continue to be provided directly to" the Endowment and "shall not be subject to prior approval by the Department of State."  H.R. Rep. No. 118-146, at 34 (2023).

38.43.  The Endowment's appropriation appears in Title I of the Department of State Foreign Operations and Related Programs ("SFOPS") appropriations legislation.  Title I of the appropriations legislation is directed to Department of State operations and diplomatic programs, as well as certain "foreign affairs-focused nongovernmental organizations," including the Endowment.[12]  By contrast, appropriations for United States foreign assistance, including appropriations for discretionary foreign-assistance grants, appear in other titles of the appropriations legislation, including Titles III and IV.[13]

39.44.  The Historically, the Title I appropriations described above makehave made up approximately 95% of the Endowment's funding.  The Endowment has also receivesreceived certain foreign-assistance funding under Title III, comprisingwhich has comprised approximately 5% of its funding.  That in past years.  In that latter amount category, the State Department has terminated $6 million to support the Endowment's Cuba program.  However, the Endowment's Title III funding is not at issue here.

40.    Once the congressional appropriation is enacted and signed into law, OMB is responsible for apportioning the Endowment's appropriated funds to the Department of State, to be granted to the Endowment.  See 31 U.S.C. § 1513(b).[14]

---

[12] See Cory Gill & Emily M. McCabe, Cong. Res. Serv., R40482, *Department of State, Foreign Operations, and Related Programs Appropriations: A Guide to Component Accounts* 1, 8 (updated June 18, 20242025), https://crsreports.congress.gov/product/pdf/R/R40482.

[13] *Id.* at 1.

[14] The apportionment obligation is assigned by statute to the President, who has delegated the authority to the Director of OMB.  *See Notice; Delegation of Apportionment Authority,* 90 Fed. Reg. 9737 (Feb. 18, 2025), https://www.federalregister.gov/documents/2025/02/18/2025-02720/notice-delegation-of-apportionment-authority.

45.     ~~The~~Once the congressional appropriation is enacted and signed into law, OMB "apportions," or distributes, the funds, which makes them available for the spending agency (here, the State Department) to obligate or expend.  *See* GAO, *Principles of Federal Appropriations Law* 2-27 (4th ed. 2016) ("GAO Redbook"); GAO, *A Glossary of Terms Used in the Federal Budget Process* 12-13 (Sept. 2005) ("Federal Budget Glossary"); 31 U.S.C. §§ 1513(b), 1517(a)(1).[15]  When an appropriation is available for a definite period, OMB is generally required to apportion it "to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period." 31 U.S.C. § 1512(a).  When an appropriation is available for an indefinite period, OMB is required to apportion it "to achieve the most effective and economical use." *Id.*  And regardless of whether the appropriation is definite or indefinite, OMB is required to apportion funds by time period, by agency activity, or by a combination of the two.  *Id.*

46.     Apportionment is an administrative step.  It allows the Executive Branch, acting through OMB, to calibrate the funding schedule, but only to ensure efficient and orderly spending of the amounts Congress has appropriated—not to frustrate the policy objectives of that appropriation.  *See* GAO, *Office of Management and Budget—Withholding of Ukraine Security Assistance*, B-331564, at 6-7 (Jan. 16, 2020).  Indeed, OMB may not delay or withhold apportionment of funds for policy reasons.  The statute permits OMB to withhold appropriated funding—to "establish[]" a "reserve"—only "to provide for contingencies," to "achieve savings made possible by or through changes in requirements or greater efficiency of

---

[15] The apportionment obligation is assigned by statute to the President, who has delegated the authority to the Director of OMB.  *See Notice; Delegation of Apportionment Authority*, 90 Fed. Reg. 9737 (Feb. 18, 2025), https://www.federalregister.gov/documents/2025/02/18/2025-02720/notice-delegation-of-apportionment-authority.

operations," or "as specifically provided by law"  31 U.S.C. § 1512(c)(1); GAO Redbook 2-48 n.56.  Creating a reserve for any other purpose or under any other circumstance is unlawful.

47.    The NED Act and the appropriations acts require OMB to apportion the Endowment's appropriated funds to the State Department for obligation to the Endowment.  The NED Act requires the State Department to convey the Endowment's annual appropriation to it in a grant.  And, together with the appropriations acts, the NED Act requires that the State Department convey the entire sum that Congress has appropriated for the Endowment's use.  The State Department cannot carry out these administrative steps and obligate the Endowment's funds until OMB apportions the money.  *See* 31 U.S.C. § 1517(a)(1).  Accordingly, the NED Act and the appropriations acts leave OMB no discretion to decline to apportion the Endowment's appropriated funds.

48.    The NED Act and the appropriations acts place limits not only on *whether* but also on *how* OMB may exercise its authority to apportion the Endowment's funds.  These statutes require OMB to apportion the Endowment's funding in the fiscal year in which the funding is appropriated.  The NED Act makes express that Congress intended for the Endowment to operate on an annual funding cycle.  *See* 22 U.S.C. § 4412(a) (directing the State Department to make an "annual grant"); *id.* § 4413(e) (calling for the Endowment to be "audited annually" by an independent accountant); *id.* § 4413(i) (calling for an "annual report"); *see also* Further Consolidated Appropriations Act, Pub. L. No. 118-47 (2024).  And the Appropriations Committees confirm that understanding by routinely directing the Endowment, within 45 days of enactment of an appropriations act, to submit a planning report "on the proposed uses of funds provided" by Congress for the Endowment, "on a regional and country basis," including a "description of programmatic goals for each region and country and how the planned use of

funds will meet such goals." *E.g.*, H.R. Rep. No. 118-146, at 35.  The Endowment follows that directive by providing Congress with a planning report describing how it intends to spend every dollar appropriated by Congress in that fiscal year.  The Endowment is further directed to "consult with the Committees on Appropriations in advance of any significant deviation from the plans outlined in [that] report." *Id.*

49.     Consistent with that requirement and shared understanding, OMB has historically apportioned the full annual amount in the fiscal year of its appropriation, confirming that doing so reflects the appropriation's most "effective and economical use." *See* 31 U.S.C. § 1512(a).  OMB cannot legally thwart the annual funding structure Congress has chosen for the Endowment by refusing to apportion money appropriated in a particular year, especially against the backdrop of the agency's historical practice.

41.50.  After the funding is apportioned, the Department of State has the administrative obligation to transfer the fundingit to the Endowment.  The Department of State's Bureau for Democracy, Human Rights, and Labor ("DRL") serves as the passthrough bureau that administers the Endowment's annual appropriation award together with the Office of Acquisitions Management, located within the Department of State's Bureau for Administration, which serves as DRL's grants office.

42.51.  Pursuant to the NED Act, the Department of State (acting through DRL and the Office of Acquisitions Management) issues the award to the Endowment for the appropriated amount, thereby "obligating" the funds to be paid to the Endowment by the Executive Branch.  As required by the NED Act, the Department of State uses a grant agreement to structure the transfer.  The NED Act sets out the terms for this process:

> Such grants **shall be made** pursuant to a grant agreement between the Director and the Endowment which requires that grant funds will only be used for activities which the Board

of Directors of the Endowment determines are consistent with the purposes described in section 4411(b) of this title, that the Endowment will allocate funds in accordance with subsection (e) of this section, and that the Endowment will otherwise comply with the requirements of this subchapter. **The grant agreement may not require the Endowment to comply with requirements other than those specified in this subchapter**.

22 U.S.C. § 4412(a) (emphases added).

Thus, the Department of State has no statutory authority to impose additional conditions on the Endowment's use of the appropriated funds beyond those already set forth by Congress in the NED Act.

~~43.~~52.  After the Department of State obligates the appropriated funds to the Endowment, certain other agencies are involved in the mechanical process of transferring the funds to the Endowment.

~~44.~~    The annual appropriation award obligated to the Endowment is set aside for the Endowment in an account held at the Department of Treasury.  The Endowment cannot obtain the balance of its appropriated funds all at once.  Federal regulations provide that the Endowment may access its appropriated funds only by regularly requesting drawdowns from its Treasury account on an as-needed basis as it incurs expenses.  *See* 2 C.F.R. §§ 200.305, 600.101(a) ("payment methods must minimize the time elapsing between the transfer of funds from the Federal Agency . . . and the disbursement of funds by the recipient").  Those expenses include the Endowment's operational spending, the core institutes' appropriated spending, and payments to discretionary grantees.

~~45.~~53.  ~~As a result of this~~This payment structure~~,~~ effectively forces the Endowment ~~effectively operates~~to operate payment-to-payment and ~~cannot~~constrains its ability to maintain a significant cash reserve.  To ensure that it can fund its own operations, as well as the operations

of the core institutes and grantees, the Endowment typically submits two drawdown requests

every week.

46.54.  Though it is the Department of State that administers the Endowment's

appropriated funds, and the Department of Treasury that holds its funds and disburses payments,

the Endowment's drawdown requests are processed through a system called Payment

Management Services ("PMS"), administered by HHS's Program Support Center.  The PMS

portal is a shared system for processing grant payments used by various agencies across the

federal government.

47.55.  Typically, DRL approves the Endowment's drawdown requests through the PMS

portal in less than 48 hours.  After that, the Endowment's appropriated funds are transferred from

its account at the Department of Treasury to the Endowment's bank account, usually within 24

hours.  No statute gives any agency involved in ensuring that the Endowment receives its

congressionally appropriated and Department of State-obligated funding any discretion to

withhold timely delivery of that funding or to second guess the decision to award it.

**C.    The Executive Branch's Campaign to Impound the Endowment's Funds**

56.    Even before the current administration began, it was widely reported that the

Endowment's funding would be targeted for elimination.  For instance, on December 3, 2024,

*The New Criterion* reported that the incoming President's planned Department of Government

Efficiency ("DOGE") intended to "cut or severely reduce[] [the] scale" of the Endowment's

programs.[16]  And on December 10, *The Wall Street Journal* described the Endowment as

---

[16] James Piereson, *The DOGE versus the NED*, New Criterion (Dec. 3, 2024), https://
newcriterion.com/dispatch/the-doge-versus-the-ned/.

"coming under assault" and "reportedly near the top of the Department of Government Efficiency's hit list."[17]

57.    High-level executive officials and their close affiliates continued to criticize the Endowment after President Trump's inauguration.  On February 2, 2025, Elon Musk posted on X.com, arguing that "[a]nyone with integrity needs to resign from" the Endowment and that it "needs to be dissolved."[18]  He also baselessly contended that the Endowment is an "evil organization,"[19] that its employees are "crim[inals],"[20] and that the organization "is RIFE with CORRUPTION!!"[21]

58.    On February 7, 2025, the Center for Renewing America, a think tank founded by Defendant and OMB Director Russell Vought, added its voice to the mix, publishing an article chock full of unsubstantiated, inflammatory claims that enumerated its policy objections to the Endowment.[22]  The article described the Endowment as a "fully partisan political weapon aimed at delegitimizing popular democratic movements at odds with modern progressive orthodoxy."

---

[17] William A. Galston, *Save a Reagan Initiative from Musk and Ramaswamy*, Wall St. J. (Dec. 10, 2024, 12:28 P.M.), https://www.wsj.com/opinion/save-a-reagan-initiative-from-the-doge-national-endowment-for-democracy-funding-2b6cc072.
[18] Elon Musk (@elonmusk), X.com (Feb. 2, 2025, 11:55 A.M.), https://x.com/elonmusk/status/1886096100353818930.
[19] *Id.*
[20] Elon Musk (@elonmusk), X.com (Feb. 2, 2025, 12:08 P.M.), https://x.com/elonmusk/status/1886099259646173695.
[21] Karen Piper (@PiperK), X.com (Feb. 2, 2025, 5:21 P.M.), https://x.com/PiperK/status/1886176006819696940; DataRepublican (small r) (@DataRepublican), X.com (Feb. 2, 2025, 11:19 A.M.), https://x.com/datarepublican/status/1886086982293712966?s=46; *see* Phelim Kine, *Elon Musk's attacks on a group long backed by the GOP prompt Republican shrugs*, Politico (Feb. 13, 2025, 5:00 A.M.), https://www.politico.com/news/2025/02/13/national-endowment-democracy-musk-funding-017146.
[22] CRA Staff, *Primer: The National Endowment for Democracy and an NGO Ecosystem Actively Undermining America*, Ctr. for Renewing Am. (Feb. 7, 2025), https://americarenewing.com/primer-the-national-endowment-for-democracy-and-an-ngo-ecosystem-actively-undermining-america/.

The article even went so far as to accuse the Endowment of fomenting political revolution in Ukraine and causing the Russian invasion of Crimea.  A second piece, published by the Center for Renewing America on the same day, falsely described the Endowment as an "irredeemably corrupt" organization "that operates as a front for the State Department and Central Intelligence Agency" and "serves as the tip of the proverbial iceberg for a sprawling censorship industrial complex."[23]

59.    Under Defendant Vought's direction, OMB officials have continued to voice their strenuous objections to Congress's decision to fund the Endowment's work, again by resort to falsehoods and misleading allegations.  On May 2, OMB submitted the President's budget request for fiscal year 2026 to the Senate Committee on Appropriations.  The proposal called for eliminating any appropriation to the Endowment—despite the NED Act's requirement that the Endowment receive annual funding "to enable the Endowment to carry out its purposes."  22 U.S.C. § 4412(a).  The OMB cover memorandum explained the President's budget "eliminates funding for NED" because "NED blocked public access to its grant details," "funded [a] Ukraine disinformation organization," and "funded the now-infamous Disinformation Index Foundation that targeted and blacklisted conservative [American] media outlets."[24]  An accompanying fact sheet entitled "Ending Weaponization of the Federal Government" elaborated that the "Ukraine disinformation organization . . . funded by NED" also "called for prosecutions of Trump world"

---

[23] Wade Miller, *Policy Brief: Dismantle Entities Actively Censoring Americans*, Ctr. for Renewing Am. (Feb. 7, 2025), https://americarenewing.com/policy-brief-dismantle-entities-actively-censoring-americans/.
[24] Memorandum from Russell T. Vought, Dir., Off. of Mgmt. & Budget, to Sen. Susan Collins, Chair, Comm. on Appropriations (May 2, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/05/Fiscal-Year-2026-Discretionary-Budget-Request.pdf.

and "smeared the likes of Vice President Vance . . . as 'foreign propogandists [sic] of the Russian Federation.'"[25]

60.    As the Endowment has detailed at length elsewhere, these claims are misleading at best and patently false at worst.[26]  In truth, the Endowment *never* provided funding to the Ukrainian organization that OMB seemingly referenced.  Similarly, the Endowment *never* funded, supported, or authorized any work by the Disinformation Index Foundation or its affiliates to target U.S. media outlets .  And as for the insinuation that the Endowment has flouted transparency requirements by blocking public access to its grant details, the Endowment has *fully complied* with all legal disclosure requirements and provides regular briefings to Members of Congress and congressional staff.  At the same time, the Endowment has taken necessary precautions to safeguard grantees in high-risk environments.  For example, just prior to the Russian invasion of Ukraine, National Security Council officials notified the Endowment that its grantees were on Russian "kill and capture" lists, prompting the Endowment temporarily to remove its public grants listings to protect those partners.  The Endowment has since published a complete list of all active grants for fiscal year 2024 on its website.[27]

61.    OMB's false criticisms of the Endowment have been levied against the backdrop of OMB's broader effort to seize more power over federal spending.  Defendant Vought has long argued for an expansive (and unconstitutional) vision of the Executive Branch's ability to refuse

---

[25] *Ending Weaponization of the Federal Government*, https://www.whitehouse.gov/wp-content/uploads/2025/05/Ending-Weaponization-of-the-Federal-Government-Fact-Sheet.pdf (last visited June 30, 2025).
[26] *Fact-Sheet: NED and the 2026 Discretionary Budget Request*, Nat'l Endowment for Democracy (May 2, 2025), https://www.ned.org/fact-sheet-ned-and-the-2026-discretionary-budget-request/.
[27] Damon Wilson, *2024 Grants Listings*, Nat'l Endowment for Democracy (Apr. 28, 2025), https://www.ned.org/2024-grant-listings/.

to spend appropriated funds where the Executive Branch ~~Has~~disagrees with the policy objectives for which the funds were appropriated.[28]  In the first six months of the administration, the Executive Branch has already "stalled" a "wide spectrum of government spending."[29]  And in recent weeks, employees across the federal government have reported that the administration "appears to be readying to push the boundaries" of the President's power to "unilaterally overturn[] spending decisions made by Congress" even further.[30]

**~~C.~~D.   The Executive Branch Denied the Endowment Access to Obligated, Congressionally Appropriated Funds**

62.      ~~For over a month~~Meanwhile, Executive Branch officials quietly moved to block the Endowment's ability to pursue its congressionally recognized mission by attempting to impound its congressionally appropriated funding.

~~48.~~63.  By the end of January 2025, the Endowment ~~has been locked out of its approximately $167 million~~held a cash balance of ~~obligated,~~$167 million of congressionally appropriated ~~held~~in its Treasury account.  In the first fiscal year 2025 Continuing Resolution (Continuing Appropriations and Extensions Act, 2025 (Sept. 24, 2024)), Congress had appropriated additional funds to the Endowment based on its fiscal year 2024 appropriation, amounting to $69,898,500.  Around January 15, 2025, the Department of State obligated the $69,898,500 in appropriated funds to the Endowment for payment by the Executive Branch.  The $167 million cash balance in the Endowment's Treasury account ~~includes~~included that amount, as well as other available, already-obligated funds from prior years' annual appropriation awards.

---

[28] Damon Linker, *Who Is Russell Vought?*, N.Y. Times (Jan. 23, 2025), https://www.nytimes.com/2025/01/23/opinion/russell-vought-trump-second-term.html.
[29] Jeff Stein, et al., *Trump administration is preparing to challenge budget law, U.S. officials say*, Wash. Post (June 25, 2025), https://www.washingtonpost.com/business/2025/06/25/trump-budget-law-challenge/.
[30] *Id.*

These funds are referred to here as "tranche 1" funds.  Ordinarily, the full $167 million would

~~be~~have been available to the Endowment to draw down at its discretion, consistent with 2

C.F.R. §§ 200.305, 600.101(a), to pay its operational expenses and fulfill its payment obligations

to grantees.

~~49.~~64.   On January 21, 2025, the Endowment requested from PMS a drawdown totaling

$36,663,100 from its appropriated funds to pay for its operational expenses and grants.  DRL

ultimately approved that request, but only after receiving confirmation that the funds requested

were congressionally appropriated Title I funds, and that they were therefore not subject to a

January 20, 2025 Executive Order titled "Reevaluating and Realigning United States Foreign

Aid."  Exec. Order No. 14169, 90 ~~F.R.~~Fed. Reg. 8619 (2025).  That Executive Order paused

certain foreign assistance—but, as the Department of State itself has explained, only those funds

appropriated under Title III and Title IV of SFOPS and to "International Organizations and

Programs" under Title V.  The Endowment's Title I funds thus were not (and could not be)

subject to the Executive Order.  After the Endowment explained to DRL staff that its payment

request concerned congressionally appropriated Title I funds not subject to the Executive Order,

DRL approved the Endowment's request.

~~50.~~65.   ~~January 22, 2025 was the last time that the Endowment was able to withdraw its~~

~~appropriated, obligated funds.~~  Until the Executive Branch began refusing to disburse the

Endowment's funds, the Endowment's activities ~~were~~had been continuing in the ordinary course.

~~51.~~66.   On January 28 and January 30, 2025 the Endowment submitted drawdown

requests totaling approximately $97 million of its obligated, congressionally appropriated funds.

The Endowment made the request to cover grantee expense reimbursements and advance

payments, the Endowment's own operational expenses, and payments for new core institute

projects and discretionary grantees that recently had been approved by the Endowment's Board at its regular January meeting.

52.67.  With its PMS requests still pending on January 31, 2025, the Endowment reached out to DRL for a status update.  In the Endowment's experience, a multi-day delay is highly unusual.  In the ordinary course, if the Endowment requests funds before 1:00 p.m., it receives them the next business day; requests made after 1:00 p.m. are received on the second business day.  That promptness is necessitated by federal regulations that require payment methods to "minimize" the time between the transfer of funds from the government and the disbursement by the recipient.  2 C.F.R. §§ 200.305(b), 600.101(a).

53.68.  DRL staff responded that they were "working on it," and by 3:00 p.m. that afternoon, the Endowment's finance team saw that the requests were "approved" in the PMS system.

54.69.  Since Beginning on January 31, however, those "approved" payment requests have been were marked in PMS with a status that the Endowment has had never before seen: "in transit."

55.    A month later, the funds still have not been released to the Endowment's bank account and remain inaccessible.

56.70.  On February 6, 2025, the White House issued a memorandum to the heads of executive departments and agencies directing them to "review all funding that agencies provide to [nongovernmental organizations ("NGOs")] . . . on the basis of applicable authorizing statutes, regulations, and terms."[31]  The Department of State has not asserted never expressed that it is was

---

[31] Memorandum for the Heads of Executive Departments and Agencies (Feb. 6, 2025), *available at*, https://www.whitehouse.gov/presidential-actions/2025/02/memorandum-for-the-heads-of-

relying on that memorandum as justification for refusing to make available the Endowment's appropriated Title I funds.  The memorandum ~~does~~did not purport to freeze or discontinue funds pending executive review, and it therefore does not and cannot provide authority to deny the Endowment its funding.  In all events, an Executive Branch memorandum cannot provide authority to freeze or discontinue the Endowment's congressionally appropriated funding.

~~57.~~71.   On February 11, the Endowment wrote to Treasury Secretary Scott Bessent requesting the release of its appropriated funds, payment of which the Department of State had approved on January 31.  The letter reiterated that the funds in question are Title I funds and, therefore, not subject to the January 20 Executive Order on foreign aid.

~~58.~~72.   The next day, the Endowment's grant officer representative at DRL emailed to ask whether the Endowment had any outstanding payment requests in PMS.  She requested specific information, including screenshots, for each PMS request and advised the Endowment that "submissions are subject to further review within the Department of State that may require additional processing for approval."

~~59.~~73.   The Endowment promptly responded with the requested information and to indicate that it was awaiting $97,581,876 in funding from PMS.  The Endowment included in its response a screenshot of the PMS system, which showed three pending requests, all marked as "approved."

~~60.~~74.   More than a week later, on February 20, DRL invited the Endowment to submit an "Obligation or Disbursement under Waiver of Foreign Assistance Pause" form for its pending PMS requests, on the condition that the requests were for costs incurred prior to January 24,

---

executive-departments-and-agencies/.  The memorandum currently is not available in either the Weekly or Daily Compilation of Presidential Documents.

2025.  As noted, the administration's January 24, 2025 foreign aid freeze, in place pursuant to the January 20 Executive Order described above, did not and does not apply to the Endowment's appropriated Title I funds.  But regardless, the Executive Branch lacks authority under the NED Act and annual appropriations legislation to "freeze" or otherwise withhold the Endowment's obligated, congressionally appropriated funds.

61.75.  On February 26, 2025, OMB issued a memorandum calling for data on foreign assistance funding.  *See* Office of Mgmt. & Budget, Exec. Office of the President, OMB Memorandum M-25-08, Agency Foreign Assistance Review (FAR) Data Call 1.  The memorandum directsdirected that agencies by March 17, 2025 "review their foreign assistance programs" and "make a recommendation on whether to continue, modify, or cease each foreign assistance program."  *Id.* at 2.  Based on that data, the memorandum said that the "responsible Department and Agency heads, in consultation with the Director of OMB," and "with [the] concurrence of the Secretary of State," "will would "make recommendations" "to the President for final determinations."  *Id.* at 2–3.  The memorandum definesdefined foreign assistance as including "any activity funded under Title 22 of the United States Code."  *Id.*  The Department of State hasdid not assertedassert that it iswas relying on this memorandum as justification for withholding the Endowment's appropriated Title I funds.  The memorandum doesdid not purport to freeze or discontinue funds pending executive review, and it therefore does not and cannot provide authority to deny the Endowment its funding.  In all events, an Executive Branch memorandum cannot provide authority to freeze or discontinue the Endowment's congressionally appropriated funding.

62.76.  Defendants' withholding of the Endowment's congressionally appropriated, obligated funds iswas unprecedented.

63.77.  Defendants have thus thereby unreasonably and unlawfully impounded the
Endowment's congressionally appropriated funds.

**D.E.    The Executive Branch Has Refused to Obligate to the Endowment Its Annual
Appropriation**

64.78.  On During a similar time frame, on top of denying payment on the Endowment's
approved drawdown requests for already-obligated funding, the Department of State has failed to
obligate to the Endowment its second fiscal year 2025 Continuing Resolution obligation of
approximately $72 million.  *See* Continuing Appropriations and Extensions Act, 2025, Pub. L.
No. 118-83, § 101, 138 Stat. 1524, 1524–1525 (2024); American Relief Act, Pub. L. No. 118-
158, 138 Stat. 1722 (2024).[32]

65.79.  On January 16, 2025, DRL informed the Endowment that it had "received the
second tranche of NED's FY 2025 funding in the amount of $72,481,500."  DRL, through the
Office of Acquisitions Management, accordingly prepared to obligate to the Endowment its
appropriated funds through an amendment to the current fiscal year 2025 annual appropriation
grant agreement.

66.80.  The DRL told the Endowment has been told by DRL that the amendment
obligating the Endowment's appropriated funds is was complete and ready to be issued.

67.81.  Yet for over a month State has refused to obligate, as required by statute, the
second tranche of the Endowment's fiscal year 2025 Title I annual appropriation funding.
On February 20, 2025, an Office of Acquisitions Management grants officer told the Endowment
that he was waiting to "get guidance regarding NED Core Project funding and approvals" and
would alert the Endowment as soon as he got a response.  He did not specify from whom he was

---

[32] These funds can be referred to as "tranche 2" funds, and, like tranche 1, they are entirely Title
I funds.

awaiting guidance or what legal authority would allow the Department of State to do anything
other than obligate the funds that Congress has appropriated to the Endowment.  The
Endowment responded to again confirm that its core annual appropriation is Title I funding.

68.82.   The Executive Branch's Defendants' unilateral refusal to obligate the
Endowment's appropriated funds iswas unprecedented.

69.    In addition to the January 20 Executive Order discussed above, the Executive
Branch has issued additional executive orders and memoranda purporting to freeze various types
of federal grants and spending.  The Executive Branch has not suggested that any of those
memoranda or orders provide authority to impound the Endowment's funding.  For the reasons
explained above, the January 20 Executive Order does not apply to the Endowment's funds.
And whatever the purported reason behind Defendants' actions with respect to the Endowment's
congressionally appropriated funds, the statutory scheme is clear:  The Executive Branch lacks
discretion to override the Endowment's statutorily mandated appropriations funds.

83.    Harm toDefendants thereby unreasonably and unlawfully impounded the
Endowment's congressionally appropriated funds.

E.F.    **The Impoundment Threw** the **Endowment** Into Crisis

70.84.   As a result ofBy the beginning of March 2025, the Executive Branch's
impoundment of the Endowment's appropriated funds, had caused the Endowment is
experiencingto suffer an unprecedented cash flow crisis that jeopardizesjeopardized its very
existence and ability to fulfill its mission.

71.85.  As of March 1, the Endowment had furloughed 62% of its staff.  The Endowment
has also given notice that an additional 13% of its staff will be furloughed by March 15.  In total,
75% of the Endowment's staff will be furloughed  and the Endowment expects and was on the
verge of having no choice but to take additional staffing actionsfurther steps to reduce personnel

costs, including additional furloughs and even layoffs. ~~Already, 100% of the Endowment's staff has~~The Endowment had also already been ~~affected by salary reductions or~~forced to reduce salaries and take other related personnel ~~action, like~~ actions, such as moving employees to part-time status. These measures affected 100% of the Endowment's employees. Beyond the immediate financial strain, these cuts ~~have~~had far-reaching consequences—undermining the Endowment's ability to safeguard sensitive information, support democracy advocates, and maintain grantee relationships in closed societies.

~~72.~~86.  Given the nature of the Endowment's work advancing freedom, it is a frequent target of cyber threats from hostile foreign adversaries. ~~With its staff furloughed or laid off,~~The furloughs deprived the Endowment ~~is losing~~of essential personnel responsible for protecting grantee data, preventing cyberattacks, and safeguarding the Endowment's digital infrastructure. ~~Any breach risks exposing~~It was at risk of a data breach, which could have exposed democratic activists and civil society organizations in authoritarian states, putting their security, and potentially their lives, at risk.

~~73.~~87.  The Endowment ~~is~~also ~~losing~~lost employees who have skills in critical areas, including language, regional expertise, and technical fields. ~~These capabilities could take years to rebuild.~~ The Endowment has spent years building a team that collectively speaks more than 45 languages, including Farsi, Mandarin, Spanish, Arabic, Urdu, ~~Khmer~~Tibetan, Lingala, and Swahili, which is essential to the Endowment's work around the globe, including in Iran, China, Venezuela, and Pakistan. ~~Losing~~Threats to this expertise ~~means losing~~risk the Endowment's access, understanding, and key relationships ~~that~~, which have been developed over decades and cannot be easily rebuilt.

74.88.  Without the ability to draw down its appropriated funds, the Endowment ~~does~~did not have cash on hand to fund the core institutes or discretionary grantees.  For the first time in its decades-long history, the Endowment ~~has~~ failed to meet its financial obligations to the core institutes and grantees and, as a result, ~~has been~~was forced to suspend nearly 1,300 grant projects worldwide. ~~The suspension of all grants, if it continues, will have a profound reputational impact on the Endowment, threatening the Endowment's future ability to cultivate partners and relationships~~.

75.89.  Because the Endowment does not administer any programs directly, its grantees are fundamental to its ability to effectively carry out its mandate, as provided by Congress. ~~Harm to~~As a result of Defendants' impoundment, grantees~~, whether through staff layoffs or disruption of their programs,~~ faced harms that directly ~~compromises~~compromised the Endowment's ability to fulfill its mandate ~~under federal law.~~, as recognized by Congress in the NED Act.

76.90.  Grantees ~~have already~~ faced considerable hardship from the funding freeze, including: an inability to maintain broadcast and publication schedules, the undermining of their ability to retain audiences; an inability to meet tax, labor, and other local obligations; and an inability to implement time-sensitive projects like election monitoring ~~and get-out-the-vote campaigns.~~.  The freezing of the Endowment's funds ~~poses~~posed special risk to partners operating in highly authoritarian contexts, as the sudden interruption in support ~~may expose~~risked exposing their operations and staff as Endowment grantees, thereby inviting legal or other reprisal from authoritarian governments that oppose their work.~~–~~

77.91.  The funding freeze ~~if it is allowed~~ threatened to ~~continue~~ ~~harms~~harm the Endowment ~~not just now, but~~ far into the future as well. ~~Already,~~It forced the Endowment ~~has~~

~~been forced~~ to suspend its acceptance of any proposals for regularly scheduled grantmaking cycles ~~for~~in May and September 2025.  The freeze also ~~has and will continue to harm~~harmed the Endowment's reputation.~~.~~  The Endowment engages partners based on trust and mutual respect, and each partner enters in a grant agreement with the Endowment with the expectation that the foundation will honor its financial and operational obligations.~~.~~  The Endowment's reputation is critical to its ability to engage productively with partners worldwide and fulfill its mission.  And, given the harms experienced by grantees ~~so far~~, the Endowment was deeply concerned that many ~~may~~would simply not be around to continue their important work, even if the Endowment's funding were to ~~eventually~~ resume at a later date.

### G.    The Endowment Was Forced to Sue and the Executive Branch Released the Endowment's Funds in Response

92.    After weeks of beseeching Defendants to stop interfering with its congressionally appropriated funds and weeks of engaging extensively with Capitol Hill, the Endowment was forced to resort to litigation.  On March 5, 2025, the Endowment filed a complaint demanding that Defendants cease their impoundment.  ECF No. 1.  The following day, the Endowment filed a motion for a temporary restraining order.  ECF No. 5.  This Court set a briefing schedule, directing Defendants to file their opposition by 5:00 p.m. on March 11, 2025.

93.    On Friday, March 7, the day after the Endowment filed its motion for a temporary restraining order, counsel for Defendants emailed counsel for the Endowment to report that he was "still conferring with [his] clients" and did not have "specific details" to "provide just yet," but that he "th[ought] there [was] a good chance that . . . [the Endowment's] request for a temporary restraining order[] could soon become moot."

94.    On Monday, March 10, the Endowment received approximately $97 million in its bank account—the total amount that it had requested from PMS, but that Defendants had refused

34

to disburse for weeks.  Defendants also represented that the relevant officials at the State Department were finalizing the Endowment's long-overdue request to obligate the $72 million in funding that had been appropriated by Congress in the second Continuing Resolution, but that the State Department had thus far refused to obligate.  Defendants also represented that they expected the obligation would be complete around the end of that week.

95.     In light of these changed circumstances, the Endowment and Defendants jointly moved to hold the proceedings on the Endowment's motion for a temporary restraining order in abeyance.  ECF No. 14.

96.     On March 19, the State Department obligated to the Endowment the approximately $72 million that Congress had appropriated in the second Continuing Resolution.

**H.     Executive Branch Officials Attempted To Find Another Mechanism to Interfere With the Endowment's Mission**

97.     On the morning of Thursday, March 13, the Endowment submitted a drawdown request of $450,000 in PMS.  Although the Endowment typically receives a payment requested before 1:00 p.m. on the following business day, it did not receive the requested funds for eight days.  The money came through only after State Department officials asked the Endowment whether the drawdown was for expenses incurred prior to January 24, 2025, which they indicated was necessary to support a "waiver."  That inquiry did not make sense to the Endowment, which does not need a "waiver" to access its obligated funds, and which is statutorily entitled to reimbursement for expenses incurred both prior to and after January 24.  Counsel for Defendants chalked the delay up to new guidance on payment processes, and indicated that drawdown requests would likely move faster in the future.

98.     On March 15, President Trump signed a third Continuing Resolution (Full-Year Continuing Appropriations and Extensions Act, 2025 (Mar. 14, 2025)), which appropriated funds

35

for the remainder of fiscal year 2025.  Like the first and second Continuing Resolutions, the Endowment's appropriation was based on the funding it received in fiscal year 2024.  This third sum amounted to an additional $172,620,000, bringing the Endowment's total appropriation for fiscal year 2025 to $315 million.

99.     On the morning of March 31, the Endowment learned that OMB had apportioned to the State Department only a portion of the funds appropriated for the Endowment in the full-year appropriations act.  In recent years, after Congress has passed and the President has signed a regular, full-year appropriations act, OMB has apportioned the entirety of the Endowment's funding within 30 days.[33]  However, on March 31, DRL reported that it had only received around $26 million of the Endowment's $172 million appropriation.  Counsel for Defendants promised to investigate.

100.    On April 17, counsel for Defendants reported that apportionment for the rest of the fiscal year would be available only after the State Department submitted its full-year spending plan.  *See* ECF No. 17 (Joint Status Report of April 30, 2025).

101.    On Thursday, April 24, just before 3:00 p.m., the Executive Branch tried a new line of attack: the Department of Governmental Efficiency ("DOGE").  Endowment executives received an email from Marshall Wood, who identified himself as a "member of the DOGE team working at the General Services Administration."  Mr. Wood informed the Endowment that DOGE "would like to have a call" at 11:00 a.m. the next day "to discuss onboarding [the]

---

[33] *See* Pub. L. No. 118-47 (Mar. 23, 2024); *National Endowment for Democracy Account*, OpenOMB, https://openomb.org/file/11334500#tafs_11334500--019-0210--3--2024 (apportioned on Apr. 3, 2024); Pub. L. No. 117-328 (Dec. 29, 2022); *National Endowment for Democracy Account*, OpenOMB, https://openomb.org/file/11256635#tafs_11256635--019-0210-3--2023 (apportioned on Jan. 24, 2023); Pub. L. No. 117-103 (Mar. 15, 2022), *National Endowment for Democracy Account*, OpenOMB, https://openomb.org/file/11214141#tafs_11214141--019-0210--3--2022 (apportioned on Mar. 24, 2022).

Endowment's team in accordance with" one of the President's executive orders, *Establishing and Implementing the President's "Department of Government Efficiency." See* Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025). "If we do not hear from you," Mr. Wood wrote, "we will assume you do not plan to comply with the President's Executive Order."

102.    The threat to "onboard" a DOGE team was unlawful.  DOGE is a component of the Executive Branch, and its authority extends only to government agencies. *See* Exec. Order No. 14158, § 3(c).  The Endowment is a "private, nonprofit corporation . . . which is not an agency or establishment of the United States Government." 22 U.S.C. § 4411(a).  Congress has been explicit about the Endowment's independent, nongovernmental status: "Nothing [in the NED Act] shall be construed to make the Endowment an agency or establishment of the United States Government or to make the members of the Board of Directors of the Endowment, or the officers or employees of the Endowment, officers or employees of the United States." *Id.* § 4412(c).  Installing a DOGE team in the Endowment would, at minimum, violate the Endowment's statutory guarantee of independence and interfere with the NED Act's directive that the Endowment is neither an "agency" nor an "establishment of the United States Government." *Id.* §§ 4411(a), 4412(c).

103.    Further, earlier that month, DOGE team members had attempted to infiltrate other private nonprofit corporations that receive federal grants.[34]  And it had been widely reported that

_____

[34] Perry Stein, *DOGE sought to assign a team to an independent nonprofit group*, Wash. Post (Apr. 16, 2025), https://www.washingtonpost.com/national-security/2025/04/15/doge-musk-nonprofit-vera-institute/.

DOGE employees who had onboarded with federal agencies were abusing their data access and mishandling sensitive information.[35]

104.    That evening, counsel for the Endowment forwarded Mr. Wood's email to counsel for Defendants, noting that the Endowment is not an agency covered by the Executive Order cited by Mr. Wood.  Counsel also reported that if DOGE did not stand down, the Endowment would be forced to seek a TRO.  The following morning, counsel for Defendants conveyed that the Endowment "should be receiving a clarifying communication soon."  Within the hour, Mr. Wood "clarif[ied]" that DOGE was "not seeking to onboard at this time."

105.    The Endowment proceeded to have a call with DOGE that same morning.  On that call, the DOGE representatives refused to acknowledge the Endowment's private, nongovernmental status, instead stating that they would not "litigate" that issue at this time.

106.    Following the call, DOGE emailed Endowment leadership a list of 12 questions regarding the Endowment, its operations, and its compliance with the law.  The Endowment voluntarily responded in writing to each question, while reiterating its private, nongovernmental status.  As of this filing, DOGE has yet to acknowledge in any communication with the Endowment that DOGE is barred by law from onboarding a team at the Endowment.

I.    **The Executive Branch Lands on a New Impoundment Mechanism**

107.    Meanwhile, OMB continued to withhold a full apportionment of the Endowment's funds pending the State Department's submission of a full-year spending plan.  In both April and May, OMB made apportionments that each accounted for 30 days' worth of the

---

[35] *See, e.g.*, Jenna McLaughlin, *A whistleblower's disclosure details how DOGE may have taken sensitive labor data*, Nat'l Pub. Radio (Apr. 15, 2025, 5:00 A.M.), https://www.npr.org/2025/04/15/nx-s1-5355896/doge-nlrb-elon-musk-spacex-security; Eli Murray, et al., *The DOGE Playbook Targeting Federal Agencies*, N.Y. Times (Mar. 27, 2025), https://www.nytimes.com/interactive/2025/03/27/us/politics/doge-playbook-musk-cuts.html.

Endowment's appropriated funds, but did not provide the full amount that Congress appropriated and that the President signed into law in the Third Continuing Resolution for fiscal year 2025.

108.    On May 29, the State Department submitted a full-year spending plan to Congress.  Although OMB had only apportioned—and the State Department had only obligated—$220,059,030 of the Endowment's $315,000,000 appropriation, the plan did not request apportionment of any additional funds in fiscal year 2025.  Instead, it specified that "[r]emaining resources may be made available for obligation in FY 2025 subject to review for alignment with Administration priorities."  Exhibit 1 (State Department Spending Plan) at 54.

109.    On June 11, counsel for Defendants informed counsel for the Endowment that the Executive Branch had decided to withhold the ~$95 million balance of the funding appropriated for the Endowment in fiscal year 2025.  Counsel stated that the State Department's spending plan "contemplates reserving funds from State's no-year FY25 appropriation for grants to NED for FY 2026."  Exhibit 2 (DOJ E-Mail).  In a Joint Status Report submitted the following day, Defendants confirmed that the Executive Branch was "reserving" the remainder of the Endowment's funding.  ECF No. 33 (Joint Status Report of June 12) at 2.  According to Defendants, "[i]n the past it may have been the case that NED received its funds as a lump sum once a full-year appropriations Act was enacted; however, that is not required by the authorizing statute nor the appropriation for NED.  In fact, because these are no-year funds, Congress specifically permits State to obligate these funds for the relevant purposes in this fiscal year and any subsequent fiscal year 'until expended.'  OMB is required to apportion no-year funds 'to achieve the most effective and economical use.'"  *Id.* (citing 31 U.S.C. § 1512(a)).  Defendants concluded: "[F]unding in this case requires apportionment for FY 2026 rather than additional obligations for FY 2025."  *Id.*

110.    Beyond Defendants' communication through counsel and the subsequent filing of a Joint Status Report, the Endowment has received no direct notification from the Executive Branch regarding this apportionment decision.

111.    Defendants have thus refused to apportion, obligate, disburse, or otherwise make available the remainder of the Endowment's fiscal year 2025 appropriation.

112.    Defendants have also made clear that they will continue to refuse to apportion, obligate, disburse, or otherwise make available the remainder of the Endowment's fiscal year 2025 appropriation at least through the end of the fiscal year, and they have provided no specific timeline for the apportionment and obligation of that appropriation in fiscal year 2026 or beyond.

113.    Defendants have refused to apportion, obligate, disburse, or otherwise make available the remainder of the Endowment's fiscal year 2025 appropriation because, in the Executive Branch's view, the Endowment's use of those funds does not align with Administration priorities.

114.    No realistic "contingenc[y]" or reasonable possibility of "savings made possible by or through changes in requirements or greater efficiency of operations" exists that could justify the creation of a reserve.  *See* 31 U.S.C. § 1512(c).

115.    Defendants have thus, once again, unreasonably and unlawfully impounded the Endowment's congressionally appropriated funds.

116.    By withholding the Endowment's congressionally appropriated funds for policy reasons, in the absence of any circumstance that could justify reserving funds, Defendants have established an unlawful reserve.

117.    That the Endowment's funding is provided in a "no-year appropriation" provides no justification for Defendants' actions.  Congress's decision to appropriate funds for the

40

Endowment in a no-year appropriation ensures that *the Endowment* can expend those funds at any time, in furtherance of the Endowment's mission as set forth in the NED Act.  Defendants' decision to *withhold* those funds from apportionment and obligation frustrates the Endowment's ability to do precisely that.  Defendants' action is unsupported by any plausibly reasonable explanation and runs directly contrary to congressional intent.

**J.    Defendants Are Again Imposing Irreparable Harm on the Endowment**

118.    The withholding of the Endowment's congressionally appropriated funds is causing and, absent judicial relief, will continue to cause irreparable harm to the Endowment.

119.    As OMB refused to apportion the full amount that Congress appropriated, and the Endowment lacked any certainty that a full apportionment was forthcoming, the Endowment has been forced to undertake significant operational reductions, including workforce cuts to 100 staff members—approximately 35 percent of the team.  Those cuts have led to substantial, unbudgeted severance and leave payouts.  They also have led to the halting of critical initiatives that help to advance its mission, as well as attrition of valued employees and the loss of their critical skills, institutional knowledge, and operational capacity.  These capabilities are not easily replaced, and the losses severely compromise the Endowment's organizational stability, business continuity, and strategic effectiveness.  Staff cuts also pose heightened security risks to the Endowment, including due to the loss of information security personnel, which increases the risk of adversaries launching a successful cyberattack.  If funds continue to be withheld, the Endowment will be compelled to explore additional steps, including the possibility of more staff reductions.

120.    In addition, the significant financial uncertainty is directly impacting the Endowment's core grantmaking mission.  Without its full appropriation, the Endowment will not be able to support 500 of its direct partners and 67 core institute projects.  Many of these partners

41

and projects were explicitly outlined in the fiscal year 2025 annual planning document and would be fully operational if not for Defendant's unlawful withholding of appropriated funds. Those projects are in direct furtherance of the Endowment's mission; they would support critical election monitoring, help democracy activists overcome censorship, maintain access to independent news and information across many media environments, and advance reforms to level the playing field for American businesses and workers.

121.    Defendants' actions have also, once again, threatened the core institutes and direct grantees that rely on the Endowment.  Without access to the full amount Congress appropriated, the core institutes would need to delay, suspend, or cancel critical activities that promote democracy and freedom around the world.  They will also need to make further operational cuts, potentially including additional staffing reductions and office closures.  Endowment grantees typically do not have the ability to maintain significant reserves, meaning that disruptions in their funding could imperil their existence and again jeopardize grantee staff in certain circumstances who rely on their employment to maintain their legal status in third countries and avoid returning to authoritarian regimes.  They would also face risks as to time-sensitive projects, including projects relating to upcoming elections or emerging opportunities in the case of democratic openings.

122.    Finally, Defendants' actions would irreparably harm the Endowment's reputation by once again threatening the Endowment's ability to make good on its promise as a trusted and reliable partner across the world.

**CLAIMS FOR RELIEF**

**COUNT ONE**

**APA, 5 U.S.C. § 706(2)(A)–(C)**

**(Against All Defendants)**

~~78.~~123.        The Endowment realleges and incorporates by reference all prior and subsequent paragraphs.

~~79.~~124.        The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" "contrary to constitutional right, power, privilege, or immunity[,]" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"  5 U.S.C. § 706(2)(A)–(C).

~~80.~~125.        Defendants' impoundment of the Endowment's congressionally appropriated funding is final agency action reviewable under 5 U.S.C. § 704.  The denial of funding is reviewable "final agency action."  5 U.S.C. § 704.  "~~Agency~~"[A]gency action" includes an agency's "denial" of "recognition" to a "claim" or "right"; the "denial" of a "grant of money"; and the "failure to act" or "withholding" with respect to claims, rights, and grants of money~~.~~_ 5 U.S.C. § 551(10), (11), (13).  Defendants' actions are "final" because they are the "functional equivalent" of an express denial of payment—the consequences of Defendants' impoundment of the Endowment's funds are identical to the consequences of an express statement of denial.  *See Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 192 (D.D.C. 2024~~).~~) (citation omitted).  Indeed, even if characterized as a suspension pending review pursuant to the Executive's various ongoing spending reviews, Defendants' actions have had the effect of denying the Endowment access to its congressionally appropriated funds.

Formatted: Indent: Left:  0", First line:  0"

81.126.    Defendants' actions are contrary to law and in excess of statutory authority because the statutory scheme creates a mandatory, non-discretionary duty for Defendants to make availableapportion, obligate, and disburse, and otherwise make available the Endowment's congressionally appropriated funds.  22 U.S.C. § 4412(a); Further Consolidated Appropriations Act, Pub. L. No. 118-47 (2024); 31 U.S.C. §§§ 1512, 3325.  Defendants' decision to indefinitely withhold from apportionment ~$95 million of the Endowment's congressionally appropriated funds violates this statutory scheme.

82.127.    Defendants' actions are also contrary to the United States Constitution because they violate the Separation of Powers, as well as the Take Care Clause, the Appropriations Clause, the Spending Clause, and the Presentment Clause of the United States Constitution.

83.128.    Even if characterized as a suspension pending review pursuant to the Executive's various ongoing spending reviews, Defendants' actions have had the effect of denying the Endowment access to its congressionally appropriated funds.  That denial is are also arbitrary and capricious and contrary to law because Defendants have a mandatory, non-discretionary statutory duty to make available, obligate, and disburse the Endowment's congressionally appropriated funds; because Defendants' actions lack any lawful basis; because Defendants have refusedfailed to provide anya reasoned explanation for their actions; Defendants have failed to consider reliance interests of the Endowment, its core institutes, and its longstanding grantees; Defendants have relied on factors which Congress did not intend for them to consider; and because Defendants' actions threaten the Endowment's continued existence in light of regulations preventing it from maintaining a significant cash reserve, in direct

contravention of Congress's expressed intention that the Endowment shall use its appropriated funds to fulfill its ~~statutory~~ mandate~~.~~ as reflected in the NED Act.

129.    Judicial relief is warranted to ensure that Defendants do not unlawfully withhold the Endowment's appropriations.  Defendants are currently unlawfully withholding the Endowment's appropriations by refusing to apportion and obligate the funds that Congress specifically appropriated for obligation to the Endowment.  In addition, prior to the filing of the Complaint, ECF No. 1, Defendants withheld the Endowment's appropriations by refusing to obligate and disburse the funds that Congress specifically appropriated for obligation to the Endowment.  In light of the current withholding of the Endowment's funding and the broader Executive Branch efforts to interfere with the Endowment's mission, there is every reason to think that Defendants' wrongful withholding of the Endowment's funds will persist and recur absent judicial relief.

130.    Absent relief from this Court, the Endowment will face irreparable harm, including to its ability to fulfill its mission and to its reputation as a reliable source of funding for democracy and freedom around the world.

~~84.~~131.    This Court should hold unlawful, enjoin, and set aside Defendants' unlawful impoundment of the Endowment's appropriated funds.

## COUNT TWO

**APA, 5 U.S.C. § 706(1)**

**(Against All Defendants)**

~~85.~~132.    The Endowment realleges and incorporates by reference all prior and subsequent paragraphs.

~~86.~~133.      The APA provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed[.]"  5 U.S.C. § 706(1).

~~87.~~134.      The Department of the Treasury has a non-discretionary duty to disburse the funds in its charge upon receipt of a properly executed voucher.  31 U.S.C. § 3325.  When HHS exercises delegated authority to disburse federal, 31 U.S.C. §§ 3321(a), 3322, it has the same non-discretionary duty.

~~88.~~135.      ~~Neither~~ Treasury ~~nor~~and HHS ~~has complied~~did not comply with that mandatory duty as it relates to the Endowment's obligated funds located in its Treasury account and requested through the PMS system as of March 5, 2025 (that is, the tranche 1 funds).

~~89.~~136.      The Department of State has a non-discretionary duty to make an annual grant to the Endowment "to enable the Endowment to carry out its purposes."  22 U.S.C. § 4412(a); *see* Further Consolidated Appropriations Act, Pub. L. No. 118-47 (2024).

~~90.~~137.      The Department of State ~~has~~did not ~~complied~~comply with that mandatory duty as it relates to the Endowment's obligated funds located in its Treasury account and requested through the PMS system.  Neither ~~has~~did the Department of State ~~complied~~comply with that mandatory duty as it relates to the Endowment's appropriated, apportioned funds, which the Department of State had received but ~~has~~had not obligated as of March 5, 2025, despite preparing a grant-agreement amendment that ~~is~~was ready to go.  The Department of State has also not complied with that mandatory duty as it relates to those funds that were appropriated for obligation to the Endowment in fiscal year 2025, but that still have not been obligated.

138.    OMB has a non-discretionary duty to apportion the Endowment's appropriated funds to the State Department for obligation to the Endowment.  31 U.S.C. § 1512.

46

139.    OMB has not complied with that mandatory duty as it relates to those funds that were appropriated for obligation to the Endowment in fiscal year 2025 but that OMB has declined to apportion.

140.    Defendants' actions are also contrary to the United States Constitution because they violate the Separation of Powers, as well as the Take Care Clause, the Appropriations Clause, the Spending Clause, and the Presentment Clause of the United States Constitution.

141.    Judicial relief is warranted to ensure that Defendants do not unlawfully withhold the Endowment's appropriations.  Defendants are currently unlawfully withholding the Endowment's appropriations by refusing to apportion and obligate the funds that Congress specifically appropriated for obligation to the Endowment.  In addition, prior to the filing of the Complaint, ECF No. 1, Defendants withheld the Endowment's appropriations by refusing to obligate and disburse the funds that Congress specifically appropriated for obligation to the Endowment.  In light of the current withholding of the Endowment's funding and the broader Executive Branch efforts to interfere with the Endowment's mission, there is every reason to think that Defendants' wrongful withholding of the Endowment's funds will persist and recur absent judicial relief.

142.    Absent such relief, the Endowment will face irreparable harm, including to its ability to fulfill its mission and to its reputation as a reliable source of funding for democracy and freedom around the world.

91.1.    Defendants' actions are also contrary to the United States Constitution because they violate the Separation of Powers, as well as the Take Care Clause, the Appropriations Clause, the Spending Clause, and the Presentment Clause of the United States Constitution.

47

92.143.    The Court should thus compel Defendants to apportion, obligate, disburse, and otherwise make accessibleavailable the Endowment's obligated funds andthat Congress appropriated for grants to obligate the remainder of the Endowment's annual appropriationEndowment.

**<u>COUNT THREE</u>**

**Mandamus Act, 28 U.S.C. § 1361; All Writs Act, 28 U.S.C. § 1651**

**(Against Defendants Department of State, OMB, Department of Treasury, HHS, Marco Rubio, Russell Vought, Scott Bessent, Robert F. Kennedy, Jr., and Melissa Bruce)**

93.144.    The Endowment realleges and incorporates by reference all prior and subsequent paragraphs.

94.145.    The Mandamus Act, 28 U.S.C. § 1361, vests this Court with original jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed" to the Endowment.

95.146.    The All Writs Act, 28 U.S.C. § 1651, authorizes this Court to issue all writs "necessary or appropriate" in aid of its jurisdiction.

96.147.    TheOMB has a non-discretionary duty to apportion the Endowment's funds; the Department of State has a non-discretionary duty to make an annual grant to the Endowment; and the Department of the Treasury and HHS have a non-discretionary duty to disburse federal funds upon receipt of a properly executed voucher.  *See* 22 U.S.C. § 4412(a); Further Consolidated Appropriations Act, Pub. L. No. 118-47 (2024); 31 U.S.C. §§§ 1512, 3325.

148.    Defendants' actions are also contrary to the United States Constitution because they violate the Separation of Powers, as well as the Take Care Clause, the Appropriations Clause, the Spending Clause, and the Presentment Clause of the United States Constitution.

149.    Judicial relief is warranted to ensure that Defendants do not unlawfully withhold the Endowment's appropriations.  Defendants are currently unlawfully withholding the Endowment's appropriations by refusing to apportion and obligate the funds that Congress specifically appropriated for obligation to the Endowment.  In addition, prior to the filing of the Complaint, ECF No. 1, Defendants withheld the Endowment's appropriations by refusing to obligate and disburse the funds that Congress specifically appropriated for obligation to the Endowment.  In light of the current withholding of the Endowment's funding and the broader Executive Branch efforts to interfere with the Endowment's mission, there is every reason to think that Defendants' wrongful withholding of the Endowment's funds will persist and recur absent judicial relief.

150.    Absent relief from this Court, the Endowment will face irreparable harm, including to its ability to fulfill its mission and to its reputation as a reliable source of funding for democracy and freedom around the world.

151.    It is necessary and appropriate for this Court to issue a writ of mandamus pursuant to 28 U.S.C. §§ 1361 and 1651 and under this Court's equitable authority to compel Defendants to act.

97.1.    Defendants' actions are also contrary to the United States Constitution because they violate the Separation of Powers, as well as the Take Care Clause, the Appropriations Clause, the Spending Clause, and the Presentment Clause of the United States Constitution.

98.1.    It is necessary and appropriate for this Court to issue a writ of mandamus pursuant to 28 U.S.C. §§ 1361 and 1651 and under this Court's equitable authority to compel Defendants to act.

**COUNT FOUR**

**APA, 5 U.S.C. § 706(2)(A)–(C):**

**Unlawful Refusal to Apportion Funds in Fiscal Year 2025**

**(Against Defendants United States of America, Department of State, OMB, Marco Rubio, and Russell Vought)**

152.    The Endowment realleges and incorporates by reference all prior and subsequent paragraphs.

153.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" "contrary to constitutional right, power, privilege, or immunity[,]" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"  5 U.S.C. § 706(2)(A)–(C).

154.    Defendants' refusal to apportion the Endowment's congressionally appropriated funding in fiscal year 2025 is final agency action reviewable under 5 U.S.C. § 704.  The denial of funding is reviewable "final agency action."  5 U.S.C. § 704.  "[A]gency action" includes an agency's "denial" of "recognition" to a "claim" or "right"; the "denial" of a "grant of money"; and the "failure to act" or "withholding" with respect to claims, rights, and grants of money.  5 U.S.C. § 551(10), (11), (13).  Defendants have expressly and permanently decided to withhold the Endowment's funds for the rest of fiscal year 2025.

155.    Defendants' actions are contrary to law and in excess of statutory authority because the statutory scheme requires Defendants to apportion and obligate those funds that were appropriated for obligation to the Endowment in fiscal year 2025 during this same fiscal year. *See* 22 U.S.C. §§ 4412(a), 4413(e), (i); Further Consolidated Appropriations Act, Pub. L. No. 118-47 (2024).

156.    Defendants' actions are also contrary to the United States Constitution because they violate the Separation of Powers, as well as the Take Care Clause, the Appropriations Clause, the Spending Clause, and the Presentment Clause of the United States Constitution.

157.    Defendants' refusal to apportion the Endowment's congressionally appropriated funding in fiscal year 2025 is arbitrary and capricious because Defendants have failed to provide a reasoned explanation for their actions; Defendants have failed to consider reliance interests of the Endowment, its core institutes, and its longstanding grantees; Defendants have relied on factors which Congress did not intend for them to consider; Defendants have departed from past practice without justification; and Defendants have offered an explanation that runs counter to the evidence or is implausible.

158.    Judicial relief is warranted to ensure that Defendants do not unlawfully withhold the Endowment's appropriations.  Defendants are currently unlawfully withholding the Endowment's appropriations by refusing to apportion and obligate the funds that Congress specifically appropriated for obligation to the Endowment.

159.    Absent relief from this Court, the Endowment will face irreparable harm, including to its ability to fulfill its mission and to its reputation as a reliable source of funding for democracy and freedom around the world.

160.    This Court should hold unlawful, enjoin, and set aside Defendants' unlawful impoundment of the Endowment's appropriated funds.

## COUNT FIVE

### APA, 5 U.S.C. § 706(2)(A)–(C);

### Violation of the Anti-Deficiency Act, 31 U.S.C. § 1512

### (Against Defendants United States of America, Department of State, OMB, Marco Rubio, and Russell Vought)

161.    The Endowment realleges and incorporates by reference all prior and subsequent paragraphs.

162.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" "contrary to constitutional right, power, privilege, or immunity[,]" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(A)–(C).

163.    Defendants have created a "reserv[e]" of, ECF No. 33, or otherwise refused to apportion in fiscal year 2025, approximately $95 million that Congress specifically appropriated for obligation to the Endowment in fiscal year 2025.  That is final agency action reviewable under 5 U.S.C. § 704.  To be final, an agency action "must mark the 'consummation' of the agency's decisionmaking process" and "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted).  The decision to establish a reserve with the balance of the Endowment's appropriated funds for fiscal year 2025, or otherwise to withhold such funds from apportionment this fiscal year, is neither "tentative" nor "interlocutory."  *Id.* at 178.  And that apportionment decision determines "rights," *id.*, because it dictates when the Endowment's funding becomes legally eligible for obligation, 31 U.S.C. § 1517(a).

164.    Defendants' actions are contrary to law and in excess of statutory authority.  To the extent Defendants have attempted to create a reserve, that action is unlawful.  "[A] reserve may be established only . . . (A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law."  31 U.S.C. § 1512(c)(1).  None of those circumstances is present.  Instead, the Executive Branch has withheld the Endowment's funds on the impermissible ground that, in the view of Defendants, Congress's decision to fund the Endowment does not align with the Administration's policy priorities.  The Anti-Deficiency Act prohibits the Executive Branch from using apportionment to "implement[] policy impoundments."  *City of New Haven v. United States*, 809 F.2d 900, 906 (D.C. Cir. 1987).  There is no basis in the Anti-Deficiency Act or any other law for the withholding of the Endowment's funds.  *See* 31 U.S.C. § 1512.

165.    Defendants' actions are also contrary to the United States Constitution because they violate the Separation of Powers, as well as the Take Care Clause, the Appropriations Clause, the Spending Clause, and the Presentment Clause of the United States Constitution.

166.    To the extent Defendants have determined that withholding the remainder of the Endowment's fiscal year 2025 appropriation is the "most effective and economical use" of those funds, 31 U.S.C. § 1512(a), they have exceeded their statutory authority.  Abruptly starving the Endowment of money that the Endowment had intended to expend this year to carry out programs in service of its mission cannot possibly be an effective or economical use of funds Congress appropriated to the Endowment for that very purpose.

167.    Any determination that withholding the remainder of the Endowment's fiscal year 2025 appropriation is the "most effective and economical use" of those funds, *id.*, is arbitrary and capricious because Defendants have failed to provide a reasoned explanation for their actions;

Defendants have failed to consider reliance interests of the Endowment, its core institutes, and its longstanding grantees; Defendants have relied on factors which Congress did not intend for them to consider; Defendants have departed from past practice without justification; and Defendants have offered an explanation that runs counter to the evidence or is implausible.

168.    Judicial relief is warranted to ensure that Defendants do not unlawfully withhold the Endowment's appropriations.  Defendants are currently unlawfully withholding the Endowment's appropriations by refusing to apportion and obligate the funds that Congress specifically appropriated for obligation to the Endowment.

169.    Absent relief from this Court, the Endowment will face irreparable harm, including to its ability to fulfill its mission and to its reputation as a reliable source of funding for democracy and freedom around the world.

170.    The Court should hold unlawful, enjoin, and set aside Defendants' unlawful withholding of the Endowment's funds from apportionment, through creation of a reserve or otherwise, and otherwise compel Defendants to apportion and obligate to the Endowment the remainder of the Endowment's annual appropriation.

### COUNT ~~FOUR~~SIX

**Presentment Clause, U.S. Const. art. I, § 7, cl. 2**

**(Against Defendants Marco Rubio, Russell Vought, Scott Bessent, Robert F. Kennedy, Jr., and Melissa Bruce)**

~~99.~~171.    The Endowment realleges and incorporates by reference all prior and subsequent paragraphs.

~~100.~~172.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

54

101.173.    The Presentment Clause provides, in relevant part: "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it[.]"  U.S. Const. art. I, § 7, cl. 2.  Under the Presentment Clause, the President lacks authority to modify or amend duly enacted Legislation—the President may only "approve all the parts of a Bill, or reject it in toto."  *Clinton v. City of New York*, 524 U.S. 417, 439–40 (1998) (citation omitted).  The President cannot delegate powers to other executive branch officials that violate the Constitution.

102.174.    Both the NED Act and the congressional appropriations laws mandating that funds be provided to the Endowment, including for fiscal years 2024 and 2025, are duly enacted legislation that leave no room for executive discretion.

103.175.    Defendants' unlawful impoundment of the Endowment's congressionally appropriated funds therefore amounts to an attempt to amend, modify, or partially veto duly enacted legislation in violation of the Presentment Clause.

176.    Judicial relief is warranted to ensure that Defendants do not unlawfully withhold the Endowment's appropriations.  Defendants are currently unlawfully withholding the Endowment's appropriations by refusing to apportion and obligate the funds that Congress specifically appropriated for obligation to the Endowment.  In addition, prior to the filing of the Complaint, ECF No. 1, Defendants withheld the Endowment's appropriations by refusing to obligate and disburse the funds that Congress specifically appropriated for obligation to the Endowment.  In light of the current withholding of the Endowment's funding and the broader Executive Branch efforts to interfere with the Endowment's mission, there is every reason to

55

think that Defendants' wrongful withholding of the Endowment's funds will persist and recur absent judicial relief.

177.    Absent relief from this Court, the Endowment will face irreparable harm, including to its ability to fulfill its mission and to its reputation as a reliable source of funding for democracy and freedom around the world.

178.    This Court should hold unlawful, enjoin, and set aside Defendants' unlawful impoundment of the Endowment's appropriated funds.

**COUNT ~~FIVE~~SEVEN**

**Appropriations Clause, U.S. Const. art. I, § 9, cl. 7**

**(Against Defendants Marco Rubio, Russell Vought, Scott Bessent, Robert F. Kennedy, Jr., and Melissa Bruce)**

~~104.~~179.    The Endowment realleges and incorporates by reference all prior and subsequent paragraphs.

~~105.~~180.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

~~106.~~181.    The Appropriations Clause of the Constitution provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law[.]"  U.S. Const. art. I, § 9, cl. 7.  The Clause protects Congress's "exclusive power over the federal purse." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)).  The Executive Branch does not have constitutional authority to override or disregard Congress's appropriations. *In re Aiken Cnty.*, 725 F.3d 255, 260–61 (D.C. Cir. 2013).

107.182.    Defendants' unlawful impoundment of the Endowment's congressionally-appropriated funds infringes Congress's exclusive power over the federal purse.  That exclusive power is conferred and protected in part by the Appropriations Clause, and the Executive has no constitutional authority to countermand it.

183.    Judicial relief is warranted to ensure that Defendants do not unlawfully withhold the Endowment's appropriations.  Defendants are currently unlawfully withholding the Endowment's appropriations by refusing to apportion and obligate the funds that Congress specifically appropriated for obligation to the Endowment.  In addition, prior to the filing of the Complaint, ECF No. 1, Defendants withheld the Endowment's appropriations by refusing to obligate and disburse the funds that Congress specifically appropriated for obligation to the Endowment.  In light of the current withholding of the Endowment's funding and the broader Executive Branch efforts to interfere with the Endowment's mission, there is every reason to think that Defendants' wrongful withholding of the Endowment's funds will persist and recur absent judicial relief.

184.    Absent relief from this Court, the Endowment will face irreparable harm, including to its ability to fulfill its mission and to its reputation as a reliable source of funding for democracy and freedom around the world.

185.    This Court should hold unlawful, enjoin, and set aside Defendants' unlawful impoundment of the Endowment's appropriated funds.

**COUNT** ~~SIX~~EIGHT

**Spending Clause, U.S. Const. art. I, § 8, cl. 1**

**(Against Defendants Marco Rubio, Russell Vought, Scott Bessent, Robert F. Kennedy, Jr., and Melissa Bruce)**

~~108.~~186.    The Endowment realleges and incorporates by reference all prior and subsequent paragraphs.

~~109.~~187.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

~~110.~~188.    The Spending Clause of the Constitution provides: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art. I, § 8, cl. 1. The Spending Clause vests the power of the purse, including the power to attach conditions to the expenditure of federal funds, exclusively with Congress.

~~111.~~189.    Defendants' unlawful impoundment of the Endowment's congressionally-appropriated funds infringes Congress's exclusive power over the federal purse. That exclusive power is conferred and protected in part by the Spending Clause, and the Executive has no constitutional authority to countermand it.

190.    Judicial relief is warranted to ensure that Defendants do not unlawfully withhold the Endowment's appropriations. Defendants are currently unlawfully withholding the Endowment's appropriations by refusing to apportion and obligate the funds that Congress specifically appropriated for obligation to the Endowment. In addition, prior to the filing of the Complaint, ECF No. 1, Defendants withheld the Endowment's appropriations by refusing to

58

obligate and disburse the funds that Congress specifically appropriated for obligation to the Endowment.  In light of the current withholding of the Endowment's funding and the broader Executive Branch efforts to interfere with the Endowment's mission, there is every reason to think that Defendants' wrongful withholding of the Endowment's funds will persist and recur absent judicial relief.

191.    Absent relief from this Court, the Endowment will face irreparable harm, including to its ability to fulfill its mission and to its reputation as a reliable source of funding for democracy and freedom around the world.

192.    This Court should hold unlawful, enjoin, and set aside Defendants' unlawful impoundment of the Endowment's appropriated funds.

**COUNT ~~SEVEN~~NINE**

**Take Care Clause, U.S. Const. art. II, § 3**

**(Against Defendants Marco Rubio, Russell Vought, Scott Bessent, Robert F. Kennedy, Jr., and Melissa Bruce)**

~~112.~~193.    The Endowment realleges and incorporates by reference all prior and subsequent paragraphs.

~~113.~~194.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

~~114.~~195.    Under the Constitution, the executive power vested in the President and, by extension, all subordinate officers to whom he may delegate executive functions, includes the duty to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.

~~115.~~196.    The Take Care Clause forbids the Executive Branch from refusing to faithfully execute the laws of the United States.

59

116.197.     Defendants' unlawful impoundment of the Endowment's congressionally appropriated funds violates the Take Care Clause.

198.     Judicial relief is warranted to ensure that Defendants do not unlawfully withhold the Endowment's appropriations.  Defendants are currently unlawfully withholding the Endowment's appropriations by refusing to apportion and obligate the funds that Congress specifically appropriated for obligation to the Endowment.  In addition, prior to the filing of the Complaint, ECF No. 1, Defendants withheld the Endowment's appropriations by refusing to obligate and disburse the funds that Congress specifically appropriated for obligation to the Endowment.  In light of the current withholding of the Endowment's funding and the broader Executive Branch efforts to interfere with the Endowment's mission, there is every reason to think that Defendants' wrongful withholding of the Endowment's funds will persist and recur absent judicial relief.

199.     Absent relief from this Court, the Endowment will face irreparable harm, including to its ability to fulfill its mission and to its reputation as a reliable source of funding for democracy and freedom around the world.

200.     This Court should hold unlawful, enjoin, and set aside Defendants' unlawful impoundment of the Endowment's appropriated funds.

## COUNT ~~EIGHT~~TEN

### Violation of the Separation of Powers

**(Against Defendants Marco Rubio, Russell Vought, Scott Bessent, Robert F. Kennedy, Jr., and Melissa Bruce)**

117.201.     The Endowment realleges and incorporates by reference all prior and subsequent paragraphs.

118.202.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

119.203.    Defendants' unlawful impoundment of the Endowment's congressionally appropriated funds exceeds the executive branch's constitutional authority and impermissibly usurps the legislative power, in violation of the Separation of Powers.  *See* U.S. Const. art. II, § 3; U.S. Const. art. I, § 9, cl. 7; U.S. Const. art. I, § 8, cl. 1; U.S. Const. art. I, § 7, cl. 2.

204.    Judicial relief is warranted to ensure that Defendants do not unlawfully withhold the Endowment's appropriations.  Defendants are currently unlawfully withholding the Endowment's appropriations by refusing to apportion and obligate the funds that Congress specifically appropriated for obligation to the Endowment.  In addition, prior to the filing of the Complaint, ECF No. 1, Defendants withheld the Endowment's appropriations by refusing to obligate and disburse the funds that Congress specifically appropriated for obligation to the Endowment.  In light of the current withholding of the Endowment's funding and the broader Executive Branch efforts to interfere with the Endowment's mission, there is every reason to think that Defendants' wrongful withholding of the Endowment's funds will persist and recur absent judicial relief.

205.    Absent relief from this Court, the Endowment will face irreparable harm, including to its ability to fulfill its mission and to its reputation as a reliable source of funding for democracy and freedom around the world.

206.    This Court should hold unlawful, enjoin, and set aside Defendants' unlawful impoundment of the Endowment's appropriated funds.

61

**COUNT ~~NINE~~ELEVEN**

***Ultra Vires***

**(Against All Defendants)**

~~120.~~207.      The Endowment realleges and incorporates by reference all prior and subsequent paragraphs.

~~121.~~208.      This Court has inherent equitable power to enjoin *ultra vires* executive conduct.  *See Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, ~~743~~763 (D.C. Cir. 2022).

~~122.~~209.      No statute, constitutional provision, or other source of law authorizes Defendants to impound the Endowment's congressionally appropriated funds.  To the contrary, the statutory scheme creates a mandatory duty for Defendants to ~~grant and~~ apportion, obligate, disburse, and otherwise make available the Endowment's congressionally appropriated funds. 22 U.S.C. § 4412(a); Further Consolidated Appropriations Act, Pub. L. No. 118-47 (2024); 31 U.S.C. ~~§~~§§ 1512, 3325.

~~123.~~210.      Defendants' unlawful impoundment of the Endowment's congressionally appropriated funds is *ultra vires*.

211.    Judicial relief is warranted to ensure that Defendants do not unlawfully withhold the Endowment's appropriations.  Defendants are currently unlawfully withholding the Endowment's appropriations by refusing to apportion and obligate the funds that Congress specifically appropriated for obligation to the Endowment.  In addition, prior to the filing of the Complaint, ECF No. 1, Defendants withheld the Endowment's appropriations by refusing to obligate and disburse the funds that Congress specifically appropriated for obligation to the Endowment.  In light of the current withholding of the Endowment's funding and the broader Executive Branch efforts to interfere with the Endowment's mission, there is every reason to

think that Defendants' wrongful withholding of the Endowment's funds will persist and recur absent judicial relief.

212.    Absent relief from this Court, the Endowment will face irreparable harm, including to its ability to fulfill its mission and to its reputation as a reliable source of funding for democracy and freedom around the world.

213.    This Court should hold unlawful, enjoin, and set aside Defendants' unlawful impoundment of the Endowment's appropriated funds.

**PRAYER FOR RELIEF**

Wherefore, the Endowment requests judgment in its favor against Defendants as follows:

A.    Order Defendants to cease (1) their unlawful refusal to disburse and otherwise make ~~accessible~~available the Endowment's obligated funds and (2) their unlawful refusal to apportion and obligate the remainder of the Endowment's annual appropriation;

B.    Declare unlawful and set aside the Executive Branch's impoundment of the Endowment's congressionally appropriated funds as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C);

C.    Issue a ~~temporary restraining order and~~ preliminary injunction barring Defendants from impounding the Endowment's congressionally appropriated funds;

D.    Order Defendants to file a status report with the Court within 24 hours of entry of a ~~temporary restraining order~~preliminary injunction, and at regular intervals thereafter, confirming the apportionment, obligation, and regular disbursement ~~and obligation~~ of the

63

Endowment's appropriated funds and reporting all steps that Defendants have taken to comply

with the Court's ~~temporary restraining order~~preliminary injunction;

      E.     Issue a permanent injunction barring Defendants from impounding the

Endowment's congressionally appropriated funds;

      F.     Award Plaintiffs reasonable attorneys' fees and costs; and

      G.     Grant such other relief as the Court deems necessary, just, and proper.


Dated: ~~March 5~~June 30, 2025         Respectfully submitted,


                  */s/ Donald B. Verrilli, Jr.*

                  Donald B. Verrilli, Jr. (D.C. Bar No. 420434)
                  Ginger D. Anders (D.C. Bar No. 494471)
                  Jeremy S. Kreisberg (D.C. Bar No. 1048346)
                  Helen E. White (D.C. Bar No. 1741368~~)*~~)
                  Esthena L. Barlow (D.C. Bar No. 90000252~~)*~~)
                  MUNGER, TOLLES & OLSON LLP
                  601 Massachusetts Avenue NW, Suite 500E
                  Washington, D.C. 20001
                  (202) 220-1100
                  Donald.Verrilli@mto.com
                  Ginger.Anders@mto.com
                  Jeremy.Kreisberg@mto.com
                  Helen.White@mto.com
                  Esthena.Barlow@mto.com


                  Gabriel M. Bronshteyn (*pro hac vice* ~~forthcoming~~)
                  MUNGER, TOLLES & OLSON LLP
                  560 Mission Street, Twenty-Seventh Floor
                  San Francisco, California 94105
                  (415) 512-4000
                  Gabriel.Bronshteyn@mto.com


                  ~~* admission pending~~


                  *Attorneys for the National Endowment for*
                    *Democracy*