## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | : | |
| NATIONAL ENDOWMENT FOR DEMOCRACY, | : | |
| | : | No. 1:25-cv-00648-DLF |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, et al., | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION .................................................................................................................... 1

BACKGROUND ..................................................................................................................... 4

    A.    The National Endowment for Democracy ............................................................ 4

    B.    Congress's Direct Appropriations to the Endowment .............................................. 6

    C.    The Executive Branch's Policy Objections to the Endowment .............................. 8

    D.    The First Halt on the Endowment's Funds ............................................................ 9

    E.    The Continued Assault on the Endowment .......................................................... 10

    F.    The Current Impoundment ..................................................................................... 11

    G.    The Consequences of the Halt on Funds for the Endowment and Its
           Grantees ................................................................................................................ 13

LEGAL STANDARD ........................................................................................................... 14

ARGUMENT ......................................................................................................................... 14

I.       THE ENDOWMENT IS LIKELY TO SUCCEED ON THE MERITS ........................... 14

    A.    Defendants Are Violating the NED Act by Withholding the Endowment's
           Funds for Impermissible Policy Reasons ............................................................. 15

           1.    Defendants' actions leave no doubt that Defendants are attempting
                 to eliminate the Endowment's funding because Defendants
                 disagree with that funding on policy grounds ............................................ 15

           2.    Defendants' denial of the Endowment's remaining funding for
                 policy reasons is a blatant violation of the NED Act ................................ 19

    B.    Defendants' Denial of Funding Violates the Antideficiency Act ......................... 21

           1.    Section 1512(c)'s reserve provision does not permit Defendants'
                 denial of funding ........................................................................................ 21

           2.    Section 1512(a)'s apportionment provision does not permit
                 Defendants' denial of funding ................................................................... 23

    C.    Delaying the Endowment's Funding to Future Fiscal Years Violates the
           NED Act and the Appropriations Laws ................................................................ 28

    D.    The Executive Branch's Withholding of the Endowment's Funds Is
           Arbitrary and Capricious ...................................................................................... 31

           1.    The decision to create a reserve is arbitrary and capricious ..................... 32

           2.    Any determination that withholding the Endowment's funds is
                 "effective and economical" is arbitrary and capricious ............................. 33

    E.    The Endowment is Likely to Succeed on Its Constitutional Claims .................... 35

| | 1. | The Appropriations and Spending Clauses | 36 |
| | 2. | The Presentment Clause | 37 |
| | 3. | The Take Care Clause | 38 |
| | 4. | The Separation of Powers | 38 |
| II. | | THE ENDOWMENT WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION | 39 |
| | A. | The $95 Million Funding Cut Will Severely Damage the Endowment's Ability to Fulfill Its Congressionally Recognized Mission | 39 |
| | B. | The Halt in Funding Threatens Irreparable Damage to the Endowment's Reputation as a Trusted Partner | 44 |
| III. | | THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF GRANTING THE PRELIMINARY INJUNCTION | 44 |
| CONCLUSION | | | 45 |

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

* *In re Aiken Cnty.*,
  725 F.3d 255 (D.C. Cir. 2013) .................................................................................36, 37, 38

*Am. Ass'n of Political Consultants v. SBA*,
  613 F. Supp. 3d 360 (D.D.C. 2020) .................................................................................44

*Am. Horse Prot. Ass'n, Inc. v. Lyng*,
  812 F.2d 1 (D.C. Cir. 1987) .................................................................................19

*Am. Wild Horse Preservation Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017) .................................................................................35

*Armour & Co. v. Freeman*,
  304 F.2d 404 (D.C. Cir. 1962) .................................................................................44

*AT&T Wireless Servs. v. FCC*,
  270 F.3d 959 (D.C. Cir. 2001) .................................................................................34

*Bennett v. Spear*,
  520 U.S. 154 (1997) .................................................................................15

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962) .................................................................................32

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
  601 U.S. 416 (2024) .................................................................................36

* *City of New Haven v. United States*,
  809 F.2d 900 (D.C. Cir. 1987) .................................................................................22, 23, 25

*Clinton v. City of New York*,
  524 U.S. 417 (1998) .................................................................................37, 38

*Consolidated Edison Co. of N.Y. v. FERC*,
  823 F.2d 630 (D.C. Cir. 1987) .................................................................................33

*CSL Plasma Inc. v. CBP*,
  628 F. Supp. 3d 243 (D.D.C. 2022) .................................................................................35

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) .................................................................................19

iii

*Dep't of Homeland Sec. v. Regents of the Univ of Cal.,*
    591 U.S. 1 (2020) .........................................................................................................35

*Drs. for Am. v. OPM,*
    766 F. Supp. 3d 39 (D.D.C. 2025) .............................................................................39

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ....................................................................................................34

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
    561 U.S. 477 (2010) ....................................................................................................35

*Harrington v. Bush,*
    553 F.2d 190 (D.C. Cir. 1977) ...................................................................................36

*Huisha-Huisha v. Mayorkas,*
    27 F.4th 718 (D.C. Cir. 2022) ....................................................................................14

*Kendall v. United States,*
    37 U.S. (12 Pet.) 524 (1838) .................................................................................36, 38

*League of Women Voters v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ...........................................................................14, 40, 45

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ....................................................................................................36

*Maine Cmty. Health Options v. United States,*
    590 U.S. 296 (2020) ....................................................................................................20

*Md. Dep't of Hum. Res. v. HHS,*
    854 F.2d 40 (4th Cir. 1988) ........................................................................................31

\* *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................................32, 33

*Nat'l Fuel Gas Supply Corp. v. FERC,*
    468 F.3d 831 (D.C. Cir. 2006) ...................................................................................33

*NextWave Personal Cmmc'ns, Inc. v. FCC,*
    254 F.3d 130 (D.C. Cir. 2001) ...................................................................................15

*Nken v. Holder,*
    556 U.S. 418 (2009) ....................................................................................................44

*Point Park Univ. v. NLRB,*
    457 F.3d 42 (D.C. Cir. 2006) .....................................................................................33

iv

*Ramirez v. ICE*,
    568 F. Supp. 3d 10 (D.D.C. 2021) ........................................................................45

*Shawnee Tribe v. Mnuchin*,
    984 F.3d 94 (D.C. Cir. 2021) ...............................................................................45

*Sinclair Wyo. Refining Co. v. EPA*,
    114 F.4th 693 (D.C. Cir. 2024) ............................................................................32

*Smiley v. Citibank (S.D.), N.A.*,
    517 U.S. 735 (1996) ..............................................................................................34

*State Highway Comm'n of Mo. v. Volpe*,
    479 F.2d 1099 (8th Cir. 1973) ........................................................................22, 23

*Tex. Educ. Agency v. U.S. Dep't of Educ.*,
    992 F.3d 350 (5th Cir. 2021) ................................................................................37

*Train v. City of New York*,
    420 U.S. 35 (1975) ................................................................................................36

*U.S. Dep't of Navy v. FLRA*,
    665 F.3d 1339 (D.C. Cir. 2012) ...........................................................................36

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ..............................................................................................26

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ..............................................................................................26

*West Virginia v. U.S. Dep't of the Treasury*,
    59 F.4th 1124 (11th Cir. 2023) ............................................................................37

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ..............................................................................................25

* *Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ..................................................................................35, 36, 38

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) ............................................................................................38, 39

**FEDERAL STATUTES**

5 U.S.C. § 551 ...........................................................................................................15

5 U.S.C. § 704 ...........................................................................................................15

5 U.S.C. § 706(2) ...........................................................................................15, 31, 35

* 22 U.S.C. §§ 4411 *et seq.*............................................................................... *passim*

31 U.S.C. § 665(c) (1964)..........................................................................................22

* 31 U.S.C. § 1512.............................................................................................. *passim*

31 U.S.C. § 1513(b) .....................................................................................................7

31 U.S.C. § 1517(a) ...............................................................................................15, 29

General Appropriations Act, 1951, ch. 896, 64 Stat. 595 ..........................................25

Congressional Budget and Impoundment Control Act of 1974
    Pub. L. No. 93-344, 88 Stat. 297 ...........................................................................22

Consolidated Appropriations Act, 2022
    Pub. L. No. 117-103, 136 Stat. 49 ...........................................................................7

Consolidated Appropriations Act, 2023
    Pub. L. No. 117-328, 136 Stat. 4459 .......................................................................7

* Further Consolidated Appropriations Act, 2024
    Pub. L. No. 118-47, 138 Stat. 460 ..............................................................6, 7, 29, 30

Continuing Appropriations and Extensions Act, 2025
    Pub. L. No. 118-83, 138 Stat. 1524 .........................................................................7

American Relief Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722 ...............................7

* Full-Year Continuing Appropriations and Extensions Act, 2025
    Pub. L. No. 119-4, 139 Stat. 9 .................................................................................7

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 7, cl. 2........................................................................................37

U.S. Const. art. I, § 8, cl. 1........................................................................................37

U.S. Const. art. I, § 9, cl. 7........................................................................................36

U.S. Const. art. II, § 3 ...............................................................................................38

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 118-554 (2024)..............................................................................28, 30

S. Rep. No. 93-688 (1974) ................................................................................23

**OTHER AUTHORITIES**

CRA Staff, *Primer: The National Endowment for Democracy and an NGO Ecosystem Actively Undermining America*, Ctr. for Renewing Am. (Feb. 7, 2025), https://americarenewing.com/primer-the-national-endowment-for-democracy-and-an-ngo-ecosystem-actively-undermining-america/ ..................................8, 16

Damon Linker, *Who Is Russell Vought?*, N.Y. Times (Jan. 23, 2025), https://www.nytimes.com/2025/01/23/opinion/russell-vought-trump-second-term.html ................................................................................9

Damon Wilson, *2024 Grants Listings*, Nat'l Endowment for Democracy (Apr. 28, 2025), https://www.ned.org/2024-grant-listings/ ..........................................9

Elon Musk (@elonmusk), X.com (Feb. 2, 2025, 11:55 A.M.), https://x.com/elonmusk/status/1886096100353818930 ....................................8

Elon Musk (@elonmusk), X.com (Feb. 2, 2025, 12:08 P.M.), https://x.com/elonmusk/status/1886099259646173695 ....................................8

*Ending Weaponization of the Federal Government*, https://www.whitehouse.gov/wp-content/uploads/2025/05/Ending-Weaponization-of-the-Federal-Government-Fact-Sheet.pdf (last visited July 18, 2025) ........................................17

Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ....................................11

*Fact-Sheet: NED and the 2026 Discretionary Budget Request*, Nat'l Endowment for Democracy (May 2, 2025), https://www.ned.org/fact-sheet-ned-and-the-2026-discretionary-budget-request/ ........................................9

Federal Register, *United States Information Agency*, https://www.federalregister.gov/agencies/united-states-information-agency ............................6

GAO, *A Glossary of Terms Used in the Federal Budget Process* (Sept. 2005) ....................7, 22

GAO, *Issues Raised by the Apportionment and Obligation of Certain Funds Under the Fiscal Year 1994 Continuing Resolution*, B-255529 (Jan. 10, 1994) ....................28

GAO, *Letter to Hon. Sam J. Ervin, Jr.*, B-135564 (July 26, 1973) ....................................22

GAO, *Letter to Hon. William Proxmire*, B-163628 (Jan. 4, 1974) ................................24

GAO, *Office of Management and Budget-Withholding of Ukraine Security Assistance*, B-331564 (Jan. 16, 2020) ........................................23

\* GAO, *Principles of Federal Appropriations Law* ("Red Book") ..................................... *passim*

James Piereson, *The DOGE versus the NED*, New Criterion (Dec. 3, 2024),
https://newcriterion.com/dispatch/the-doge-versus-the-ned/ .................................... 8

Jeff Stein, et al., *Trump administration is preparing to challenge budget law, U.S. officials say*, Wash. Post (June 25, 2025) ................................................. 9

Karen Piper (@PiperK), X.com (Feb. 2, 2025, 5:21 P.M.), https://x.com/PiperK/
status/1886176006819696940 ...................................................................... 8

Louis Fisher, *Congressional Budget Reform: The First Two Years*, 14 Harv. J.
Legis. 413 (1977) ......................................................................................... 22

Memorandum from Russell T. Vought, Dir., Off. of Mgmt. & Budget, to Sen.
Susan Collins, Chair, Comm. on Appropriations (May 2, 2025),
https://www.whitehouse.gov/wp-content/uploads/2025/05/Fiscal-Year-2026-
Discretionary-Budget-Request.pdf .......................................................... 9

*National Endowment for Democracy Account*, OpenOMB, https://openomb.org/
file/11214141#tafs_11214141--019-0210--3--2022 (last visited June 30, 2025) .................... 7

*National Endowment for Democracy Account*, OpenOMB, https://openomb.org/
file/11256635#tafs_11256635--019-0210--3--2023 (last visited June 30, 2025) .................... 7

*National Endowment for Democracy Account*, OpenOMB, https://openomb.org/
file/11334500#tafs_11334500--019-0210--3--2024 (last visited June 30, 2025) .................... 7

OMB Circular No. A-11 (2024) ................................................................................ 24

Phelim Kine, *Elon Musk's attacks on a group long backed by the GOP prompt
Republican shrugs*, Politico (Feb. 13, 2025), https://www.politico.com/news/
2025/02/13/national-endowment-democracy-musk-funding-017146 ....................... 8

Wade Miller, *Policy Brief: Dismantle Entities Actively Censoring Americans*, Ctr.
for Renewing Am. (Feb. 7, 2025), https://americarenewing.com/policy-brief-
dismantle-entities-actively-censoring-americans/ ............................................. 8

William H. Rehnquist, *Presidential Authority to Impound Funds Appropriated for
Assistance to Federally Impacted Schools*, Office of Legal Counsel, 1 Op.
O.L.C. Supp. 303 (1969) ................................................................................ 36

## INTRODUCTION

The National Endowment for Democracy is an independent, nonpartisan, nonprofit organization devoted to supporting freedom worldwide. The Endowment was created against the backdrop of the Cold War at President Reagan's urging and with overwhelming bipartisan support in Congress. Its mission was and remains to bolster the "global campaign for democracy" that was then "gathering force." To ensure that the Endowment could carry out its vital work without interruption, in 1983 Congress enacted the National Endowment for Democracy Act (the NED Act), which directs that the Endowment "shall" receive an annual grant of federal funding. 22 U.S.C. §§ 4411 *et seq*. Every year, Congress mandates in appropriations statutes that the Endowment receive a sum certain, to be available to the Endowment until expended.

In every appropriations statute relevant here and in every one in recent memory, Congress has used the same mandatory language directing the Executive Branch to provide the full amount of appropriated funding to the Endowment. Critically, Congress has also provided that the Executive may not impose or enforce any conditions on the use of the appropriated funds beyond those that Congress itself has imposed—making clear that the Executive has not been delegated any discretion to override or alter Congress's policy judgment that the Endowment's defined mission serves the national interest. 22 U.S.C. § 4412(a). Since its inception, the Endowment has carried out its assigned responsibilities by making grants to private entities that foster democracy, human rights, and freedom, with great success even in some of the world's most repressive countries.

Until now, every Administration since President Reagan has faithfully executed its constitutional responsibility to ensure that the Endowment receives the full funding Congress has appropriated to it. No more. The current Administration has evidently decided that it need not respect the laws that recognize the Endowment, define its mission, and provide it with mandatory funding to carry out that mission. In blatant defiance of unambiguous statutory commands and

fundamental constitutional precepts, the Executive Branch has embarked on a sustained campaign to eliminate the Endowment. The first broadside was fired in January 2025, when, without warning or explanation, the Executive peremptorily cut off the Endowment's ability to draw on funds already obligated for the Endowment's use. That initial lawless step—which forced the Endowment to furlough much of its staff and to suspend funding of vital ongoing projects—ceased only after the Endowment brought this lawsuit and sought a temporary restraining order.

Unfortunately, the Executive's campaign did not end there. Stymied in their direct effort to withhold all funding, the Administration shifted to bureaucratic subterfuge. It has manufactured one spurious rationale after another to diminish or delay the funding that the Endowment needs to carry out its work, only to back off after the Endowment's counsel apprised the Department of Justice of the unlawfulness of each action and threatened to return to this Court. The Administration even went so far as to threaten a takeover by the Department of Government Efficiency (DOGE), which was abandoned only after the Endowment's counsel pointed out that DOGE lacked any authority over the Endowment because the Endowment is not an executive agency.

With all of its prior bureaucratic machinations having fallen flat, the Executive has now declared that it will withhold all of the Endowment's remaining unobligated fiscal year 2025 funds—about $95 million, almost a third of the Endowment's annual appropriation—on the ground that disbursing the money this fiscal year does not align with "Administration priorities." That action is just as unlawful, and just as threatening to the separation of powers, as every prior attack. But efforts to persuade the Administration to abandon its most recent gambit have not succeeded, so the Endowment has no choice but to seek this Court's intervention. A preliminary injunction is fully warranted.

The Endowment is very likely to succeed in establishing that the Executive's decision to

2

withhold all remaining fiscal year 2025 funding lacks any conceivable legal basis, is the very definition of arbitrary agency action, and offends the separation of powers. Congress has specified in the NED Act itself, and in the controlling appropriations statutes, that the Endowment "shall" receive its funds and "shall" spend them to advance the purposes Congress has identified. In fact, Congress has gone further and directed that the Endowment's leadership shall determine how to spend those funds to carry out Congress's instructions, and has forbidden the Executive from imposing any additional conditions on the funds. 22 U.S.C. § 4412(a). Given those unambiguous statutory directives, the Executive simply has no authority to decide that the funds Congress has appropriated should not be spent for the purposes that Congress appropriated them for. Indeed, by nonetheless asserting such authority, the Executive is violating the most fundamental precepts of the constitutional separation of powers.

The Executive's recent rabbit-out-of-a-hat invocation of the arcane budgeting provisions in 31 U.S.C. § 1512 changes none of that. The authority conferred by that provision is extremely limited in scope. It gives the Office of Management and Budget (OMB) the power to reserve appropriated funds under particular narrow conditions that are not remotely present here. The provision does not delegate to the Executive the power to override Congress's policy determinations based on the Executive's disagreement with the choices Congress has made in the legitimate exercise of its legislative powers. Indeed, it is inconceivable that Congress would have delegated to the Executive the sweeping power to override Congress's policy determinations any time the Executive decided that the money would not be well spent in furthering the choices Congress made—much less that it would do so by using the obscure and elliptical language of 31 U.S.C. § 1512. History confirms as much: the one time a President sought to use this statutory authority to supplant Congress's policy choices (President Nixon in the 1970s), Congress swiftly amended

3

the statute to eliminate the language the President relied on. *See infra* at p. 22. No President since has even suggested that this narrow statutory authority could be used in the expansive manner in which OMB now seeks to use it. In all events, Defendants' barebones post hoc justification for the exercise of authority does not come close to satisfying the basic Administrative Procedure Act requirement of reasoned decision-making.

Defendants' lawlessness is irreparably harming the Endowment. It is driving away critical employees, including those with specialized technical and language skills that are necessary for the Endowment's success and nearly impossible to replace. The Endowment's mission suffers every single day, as the withholding prevents the Endowment from fully funding hundreds of time-sensitive projects. The grantees that rely on Endowment funding face imminent security risks because a funding pause could expose them as Endowment grantees, inviting harsh reprisal from authoritarian regimes. The core institutes that carry out some of the Endowment's most important work are at grave risk, as the primary source of their funding has run dry and critical projects will go unfunded. And the Endowment's reputation as a trusted partner is on the line. This Court's immediate intervention is needed to avert these irreparable harms.

## BACKGROUND

### A.    The National Endowment for Democracy

In 1983, Congress enacted the NED Act, which formally recognized the Endowment's establishment as a private nonprofit corporation entitled to receive mandatory annual grants of congressionally appropriated funds to fulfill its congressionally ratified purposes. *See* 22 U.S.C. §§ 4411 *et seq.* The Endowment was established in 1982, to fulfill President Reagan's call for a new initiative to "foster the infrastructure of democracy" and fight authoritarianism through private-sector initiatives around the world. Am. Compl. ¶¶ 24-25.

The    Endowment    was    created    as—and    remains—a    nonpartisan,    nonprofit,

nongovernmental corporation with bipartisan origins and support. Appendix A to Declaration of Damon Wilson in Support of Mot. for TRO ¶¶ 2-3 ("TRO Decl.") (attached as Exhibit A to Motion for TRO, ECF No. 5-2). The Endowment has always been governed by a bipartisan Board of Directors that includes Members of Congress, foreign policy experts, former diplomats and poli-cymakers, business and labor representatives, and nonprofit leaders. *Id.* ¶ 4. Their expertise enables them to effectively carry out their oversight of the Endowment's strategy and activities. *Id.*

In the NED Act, Congress recognized that the Endowment's mission is to "encourage free and democratic institutions throughout the world through private sector initiatives, including activities which promote the individual rights and freedoms (including internationally recognized human rights) which are essential to the functioning of democratic institutions." 22 U.S.C. § 4411(b). The Endowment also promotes "democratic training programs and democratic institution-building abroad" and "strengthen[ing] democratic electoral processes abroad." *Id.*

The NED Act envisioned that the Endowment would advance its mission by operating as a grantmaking organization. *Id.* § 4413(b); *see id.* §§ 4412(d), (f), 4413(j); 4414(a), 4416. It funds four "core institutes": the International Republican Institute, the National Democratic Institute, the Center for International Private Enterprise, and the Solidarity Center. TRO Decl. ¶ 9. In addition to working to advance democracy, the institutes help ensure that the Endowment's grantmaking is grounded in local knowledge and priorities and that the Endowment maintains the networks and expertise to properly vet and monitor the projects it funds. *Id.* The Endowment also funds nearly 2,000 democracy-supporting projects each year across the world. *Id.* ¶ 3. Because some grantees operate under repressive regimes, they do so at great personal risk, and many must keep their relationship to the Endowment quiet for safety reasons. *Id.* ¶¶ 11, 47.

The Endowment's work pays outsized dividends to the United States' interests, including

by advancing freedom and democracy across the world. For instance, Endowment-supported efforts helped solidify the end of communist rule in Eastern Europe after the fall of the Soviet Union. *Id.* ¶ 12. And the Endowment's cooperation with political, business, labor, civic, and faith leaders around the world fosters future collaboration with the United States. *Id.* ¶ 10. The Endowment's work contributes to "environments in which American businesses and workers can better compete, . . . less migration driven by hardship and violence," and reductions in "the emergence of violent non-state actors," like terrorist organizations. *Id.* ¶ 13.

    **B.**    **Congress's Direct Appropriations to the Endowment**

    1. From its inception, the Endowment was structured to ensure continuity of funding and independent decision-making authority.

    The NED Act provides that the Department of State "*shall make* an *annual grant* to the Endowment to enable the Endowment to carry out its purposes as specified in section 4411(b) of this title" and that "[s]uch grants *shall be made* with funds specifically appropriated for grants to the Endowment." 22 U.S.C. § 4412(a) (emphasis added).[1] To fund that grant, Congress has directly appropriated money for the Endowment's use every year since the Endowment's founding. For fiscal year 2024, for instance, Congress provided in the Further Consolidated Appropriations Act: "For grants made by the Department of State to the National Endowment for Democracy, as authorized by the National Endowment for Democracy Act (22 U.S.C. 4412), $315,000,000, to remain available until expended, of which $210,316,000 shall be allocated in the traditional and customary manner, including for the core institutes, and $104,684,000 shall be for democracy programs." Pub. L. No. 118-47, 138 Stat. 460, 737 (2024). Although the amount of the appropriation

---

[1] The NED Act's references to the United States Information Agency now apply to the State Department. *See* Federal Register, *United States Information Agency*, https://www.federalregister.gov/agencies/united-states-information-agency.

has changed over time, its terms have long remained consistent.  Congress has consistently directed that the full appropriated amount "shall be allocated" by the Endowment: a portion is set aside for the Endowment's core institutes and "shall be allocated in the traditional and customary manner," and a portion "shall be for" the Endowment's democracy programs.  Congress has directed that these funds be obligated "as authorized by the" NED Act, which includes a requirement that the funds are obligated on an "annual" basis.  And the appropriated amount is to "remain available" to the Endowment "until expended," meaning that the appropriation consists of so-called "no-year" funds, which do not expire at the end of the fiscal year.

The Endowment's fiscal year 2025 appropriation is no different.  In three continuing resolutions, Congress has appropriated the same $315,000,000 sum as in 2024, under the same terms. *See* Pub. L. No. 118-83, 138 Stat. 1524 (2024); Pub. L. No. 118-158, 138 Stat. 1722 (2024); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9.

2.  When funds are appropriated for the Endowment, OMB must apportion those funds.  31 U.S.C. § 1513(b).  In the apportionment process, OMB sets a schedule governing when appropriated funds will become available for the relevant executive agency (here, the State Department) to spend or obligate (i.e., legally commit to pay).  GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP at 12-13, 70 (Sept. 2005) ("Federal Budget Glossary").  In recent years, OMB has made the Endowment's full annual appropriation available for obligation upon enactment of a full-year appropriations law.[2]

3.  After apportionment, the State Department must transfer the funding to the Endowment.

---

[2] *See* Pub. L. No. 118-47 (Mar. 23, 2024) and https://openomb.org/file/11334500#tafs_11334500--019-0210--3--2024 (apportioned on Apr. 3, 2024); Pub. L. No. 117-328 (Dec. 29, 2022) and https://openomb.org/file/11256635#tafs_11256635--019-0210--3--2023 (apportioned on Jan. 24, 2023); Pub. L. No. 117-103 (Mar. 15, 2022) and https://openomb.org/file/11214141#tafs_11214141--019-0210--3--2022 (apportioned on Mar. 24, 2022).

TRO Decl. ¶ 15.  The NED Act directs that the State Department use an "annual grant" agreement, but that "grant agreement may not require the Endowment to comply with requirements other than those specified" in the Act.  22 U.S.C. § 4412(a).  The obligated funds are set aside for the Endowment at the Treasury, and the Endowment requests disbursals.  TRO Decl. ¶¶ 16-18.

### C.      The Executive Branch's Policy Objections to the Endowment

Even before the current administration began, incoming executive officials publicly disagreed with Congress's longstanding support for the Endowment and promised to eliminate its funding.  In December 2024, *The New Criterion* reported that DOGE intended to "cut or severely reduce[] [the] scale" of the Endowment.[3]

The criticism intensified after Inauguration Day.  On February 2, 2025, Elon Musk argued that the Endowment "needs to be dissolved."[4]  The Center for Renewing America, a think tank founded by Defendant and OMB Director Russell Vought, published two pieces criticizing the Endowment's funding decisions and enumerating policy objections to its mission.[5]

Under Vought's direction, OMB has continued to object to the Endowment's work, relying on false and misleading allegations.  On May 2, OMB submitted to the Senate the President's

---

[3] James Pierson, *The DOGE versus the NED*, New Criterion (Dec. 3, 2024), https://newcriterion.com/dispatch/the-doge-versus-the-ned/.

[4] Elon Musk (@elonmusk), X.com (Feb. 2, 2025, 11:55 A.M.), https://x.com/elonmusk/status/1886096100353818930; *see also* Elon Musk (@elonmusk), X.com (Feb. 2, 2025, 12:08 P.M.), https://x.com/elonmusk/status/1886099259646173695; Karen Piper (@PiperK), X.com (Feb. 2, 2025, 5:21 P.M.), https://x.com/PiperK/status/1886176006819696940; *see* Phelim Kine, *Elon Musk's attacks on a group long backed by the GOP prompt Republican shrugs*, Politico (Feb. 13, 2025), https://www.politico.com/news/2025/02/13/national-endowment-democracy-musk-funding-017146.

[5] CRA Staff, *Primer: The National Endowment for Democracy and an NGO Ecosystem Actively Undermining America*, Ctr. for Renewing Am. (Feb. 7, 2025), https://americarenewing.com/primer-the-national-endowment-for-democracy-and-an-ngo-ecosystem-actively-undermining-america/; Wade Miller, *Policy Brief: Dismantle Entities Actively Censoring Americans*, Ctr. for Renewing Am. (Feb. 7, 2025), https://americarenewing.com/policy-brief-dismantle-entities-actively-censoring-americans/.

budget request for fiscal year 2026, calling for eliminating the Endowment's funding. OMB justified this proposal on the ground that the Endowment "blocked public access to its grant details," "funded [a] Ukraine disinformation organization," and "funded the now-infamous Disinformation Index Foundation that targeted and blacklisted conservative [American] media outlets."[6] As the Endowment has detailed, these claims are misleading at best and patently false at worst.[7]

OMB's false criticisms of the Endowment have been levied against the backdrop of OMB's broader effort to seize more power over spending. Vought has long argued for an expansive (and unconstitutional, *see infra* at pp. 35-39) vision of the Executive's prerogative to refuse to spend appropriated funds where the Executive disagrees with the policy objectives for which the funds were appropriated.[8] The Executive has already "stalled" a "wide spectrum of government spending," and federal employees recently have reported that the administration intends to assert even broader authority to "unilaterally overturn[] spending decisions made by Congress."[9]

### D.    The First Halt on the Endowment's Funds

By the end of January 2025, through two continuing resolutions, Congress had

---

[6] Memorandum from Russell T. Vought, Dir., Off. of Mgmt. & Budget, to Sen. Susan Collins, Chair, Comm. on Appropriations (May 2, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/05/Fiscal-Year-2026-Discretionary-Budget-Request.pdf.

[7] *See Fact-Sheet: NED and the 2026 Discretionary Budget Request*, Nat'l Endowment for Democracy (May 2, 2025), https://www.ned.org/fact-sheet-ned-and-the-2026-discretionary-budget-request/. The Endowment *never* provided funding to the Ukrainian organization that OMB seemingly referenced. Similarly, the Endowment *never* funded, supported, or authorized any work by the Disinformation Index Foundation or its affiliates to target U.S. media outlets. The Endowment has *fully complied* with all legal disclosure requirements and provides regular briefings to Members of Congress and congressional staff, while taking necessary precautions to safeguard grantees in high-risk environments. *See id.*; Damon Wilson, *2024 Grants Listings*, Nat'l Endowment for Democracy (Apr. 28, 2025), https://www.ned.org/2024-grant-listings/.

[8] Damon Linker, *Who Is Russell Vought?*, N.Y. Times (Jan. 23, 2025), https://www.nytimes.com/2025/01/23/opinion/russell-vought-trump-second-term.html.

[9] Jeff Stein, et al., *Trump administration is preparing to challenge budget law, U.S. officials say*, Wash. Post (June 25, 2025), https://www.washingtonpost.com/business/2025/06/25/trump-budget-law-challenge/.

appropriated roughly $142 million to the Endowment for fiscal year 2025.  TRO Decl. ¶¶ 30-31.

A little under half of that sat in the Endowment's Treasury account.  *Id.* ¶ 30.  The remainder, from

the second continuing resolution, was awaiting obligation to the Endowment.  *Id.* ¶ 31.

That is when the Endowment first began to encounter problems accessing its money.  It

was suddenly unable to draw down from its Treasury account.  *Id.* ¶ 28.  For weeks, the State

Department refused to obligate the funds from the second continuing resolution.  *Id.* ¶ 31.  The

Endowment was forced to furlough staff.  *Id.* ¶ 35.  It defaulted on grant obligations for the first

time.  *Id.* ¶ 40.  And it found itself at risk of a data breach, and of suffering irreparable harm to its

reputation and its relationships with partners around the world.  *Id.* ¶¶ 35-56.

With its very existence in jeopardy, the Endowment filed this lawsuit and moved for a

temporary restraining order.  ECF Nos. 1, 5.  Just days later, Defendants stopped blocking the

Treasury account funds.  ECF No. 14 at 2.  Defendants also represented that the State Department

was finalizing the obligation of the remaining funds.  *Id.*  The Court therefore paused the TRO

proceedings at the parties' urging.  Minute Order of Mar. 11, 2025.  The obligation of the funds

from the second continuing resolution went through just over one week later.  ECF No. 15 at 1.

###     E.    The Continued Assault on the Endowment

Although Defendants changed tactics in response to this litigation, they were not done.

The next few months saw numerous attempts to interfere with the Endowment's funds.  First,

Defendants delayed approval of one of the Endowment's drawdown requests, incorrectly claiming

the Endowment needed some kind of "waiver" to access the money.  ECF No. 16 at 1-2.  Ulti-

mately, after outreach from counsel, Defendants acknowledged no waiver was needed.  *Id.* at 2.

Next, on March 31, the Endowment learned that OMB had only apportioned a subset of

the remainder of the Endowment's full-year appropriation—$26 million out of $172 million, or

one month's worth.  That was highly unusual; in recent years, OMB has apportioned the *entirety*

of the Endowment's annual funding within 30 days. *See supra* at p. 7 & n.2. In response to inquiries, Defendants indicated that OMB would apportion funds in 30-day increments until the State Department submitted a full-year spending plan to Congress. ECF No. 17.

On April 24, while the Endowment was still receiving funding month-to-month, the Executive Branch tried another line of attack: DOGE. Endowment executives received an email from Marshall Wood, who identified himself as a "member of the DOGE team." Supplemental Declaration of Damon Wilson ("Decl.") ¶ 21 (attached as Exhibit A to this Motion). Mr. Wood informed the Endowment that DOGE "would like to have a call" the next day "to discuss onboarding [the] Endowment's team." *Id.* He threatened that if he did not hear back, he would "assume [the Endowment did] not plan to comply with the President's Executive Order." *Id.* He made this threat notwithstanding that it would be unlawful for DOGE to forcibly onboard a team at the Endowment. DOGE's authority extends only to government agencies. *See* Exec. Order No. 14158, § 3(c), 90 Fed. Reg. 8441, 8441 (Jan. 20, 2025). The Endowment is a private corporation, not a government entity. 22 U.S.C. §§ 4411(a), 4412(c). Ultimately, the Endowment proceeded to have a call with DOGE and voluntarily answered a list of questions. Decl. ¶¶ 25-26. DOGE has yet to acknowledge to the Endowment that it is barred from onboarding a team there. *Id.* ¶ 26.

### F.    The Current Impoundment

Meanwhile, OMB continued to withhold a full apportionment of the Endowment's funds pending the State Department's submission of a full-year spending plan. In both April and May, OMB made apportionments that each accounted for 30 days' worth of funds.

On May 29, the State Department submitted a full-year spending plan to Congress. Although OMB had only apportioned—and the State Department had only obligated—roughly $220 million of the Endowment's $315 million appropriation, the plan did not account for any additional apportionments or obligations to the Endowment in fiscal year 2025. AR000003, ¶ 3. Instead, it

specified that "[r]emaining resources may be made available for obligation in FY 2025 subject to review for alignment with Administration priorities."  AR000060.

On June 11, counsel for Defendants informed counsel for the Endowment that the Executive Branch had decided to withhold the ~$95 million balance of the funding appropriated for the Endowment in fiscal year 2025.  Defendants' counsel stated that the State Department's spending plan "contemplates reserving funds from State's no-year FY25 appropriation for grants to NED for FY 2026."  Am. Compl. Ex. 2 (DOJ E-Mail).  In a Joint Status Report submitted the following day, Defendants confirmed that the Executive Branch was "reserving" the remainder of the Endowment's funding.  ECF No. 33 at 2.  According to Defendants, "[i]n the past it may have been the case that NED received its funds as a lump sum once a full-year appropriations Act was enacted; however, that is not required by the authorizing statute nor the appropriation for NED.  In fact, because these are no-year funds, Congress specifically permits State to obligate these funds for the relevant purposes in this fiscal year and any subsequent fiscal year 'until expended.'  OMB is required to apportion no-year funds 'to achieve the most effective and economical use.'"  *Id.* (citing 31 U.S.C. § 1512(a)).  Defendants concluded: "[F]unding in this case requires apportionment for FY 2026 rather than additional obligations for FY 2025."  *Id.*  Defendants did not, however, articulate any reason why the remaining funds should be apportioned for fiscal year 2026, rather than for the current fiscal year (as had been OMB's consistent practice before this year).

On July 10, Defendants filed the administrative record, which consisted only of the State Department's Spending Plan and a three-page declaration from a State Department official, signed on July 10—weeks *after* the apportionment decision.  The declaration confirmed that Defendants are withholding the remaining $95 million from the Endowment's fiscal year 2025 appropriation and repeated the legal arguments just described.  The declaration added that the "State Department

12

in consultation with OMB determined that disbursing the funds in Fiscal Year 2026 would achieve the most effective and economical use of the remaining funds because sufficient funds had already been disbursed to NED for FY2025." AR000004, ¶ 7. It also asserted that "[r]eserving the unobligated $94,941,000 of FY 2025 funds ensures that NED will retain at least that level of funding in the coming fiscal year." AR000004, ¶ 8. Again, no further explanation was provided.

### G.    The Consequences of the Halt on Funds for the Endowment and Its Grantees

In recent months, the Endowment has been forced to make difficult decisions. Lacking any certainty that full funding was forthcoming, and committed to honoring its obligations to grantees, the Endowment cut its workforce by 35% and terminated several important democracy support initiatives. Decl. ¶¶ 33-34.

Despite those steps, the current impoundment of $95 million—almost one third of the Endowment's annual appropriation—has proven too great for the organization to bear. The very grantmaking activities that the staffing cuts were designed to protect are now in grave jeopardy. *Id.* ¶ 35. The Endowment will not be able to fully support over 500 grants and 53 core institute projects. *Id.* ¶ 48. Those projects directly further the Endowment's mission; they would advance reforms to level the playing field for American businesses and workers, support election monitoring, and fight censorship. *Id.* ¶ 52.

Defendants' actions have also threatened the core institutes and direct grantees that rely on the Endowment. Without access to the full appropriated amount, the core institutes will need to delay, suspend, or cancel critical activities. *Id.* ¶ 66. They will also need to make further operational cuts, including staff and offices. *Id.* Grantees typically cannot maintain significant reserves, meaning that disruptions in their funding could imperil their existence and jeopardize staff who rely on their employment to maintain legal status in third countries and avoid returning to authoritarian regimes. *Id.* ¶¶ 55, 58. Even a temporary lack of resources also compromises time-sensitive

13

projects, such as promoting free-and-fair elections in upcoming cycles. *Id.* ¶ 52.

In short, just as it did in March, the Endowment faces devastating consequences from Defendants' unreasonable and lawless withholding of its appropriated funds. Unless this Court steps in, Defendants' unlawful impoundment threatens immediate and irreparable harm to the Endowment's ability to fulfill the mission that Congress expects it to pursue.

## LEGAL STANDARD

To obtain a preliminary injunction, a movant must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016); *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733-34 (D.C. Cir. 2022) (preliminary injunction preserves the "last uncontested status which preceded the pending controversy" (citation and alterations omitted)).

## ARGUMENT

## I.    THE ENDOWMENT IS LIKELY TO SUCCEED ON THE MERITS

In the NED Act, Congress acknowledged the Endowment's establishment; directed it to pursue a congressionally recognized democracy-support mission; and directed that the Executive Branch "shall make an annual grant" to the Endowment with funds specifically appropriated to the Endowment each year. Congress further directed that the Executive may not impose additional requirements on the Endowment's funding. Congress could not have been clearer that it expects the Endowment to fulfill its statutory purposes using appropriated funds, and it expects the Executive to execute congressional direction by disbursing the Endowment's appropriated funds to it.

From even before January 2025, however, incoming Administration officials expressed vehement disagreement with Congress's policy judgments regarding the Endowment. Unsurprisingly, as soon as they assumed office, those very same officials sought ways to cut off the

14

Endowment's appropriated funding.  Defendants began with the brazenly illegal tactic of freezing the Endowment's funds; then after the Endowment filed this lawsuit, Defendants shifted to subtler methods, finally settling on their current invocation of arcane administrative OMB apportionment procedures to refuse to disburse the remaining $95 million in 2025 funding.  Though the tactics have evolved, the intent has not: Defendants have been quite explicit that they are withholding the balance of the Endowment's full-year appropriation because they disagree with Congress's funding decision.  That is a brazen violation of the NED Act and a usurpation of Congress's constitutional prerogatives to set policy and determine spending.  And Defendants' recent invocation of OMB apportionment procedures cannot justify their actions: Defendants' overt abuse of the Executive's apportionment authority violates the Antideficiency Act.  It is also textbook arbitrary and capricious decisionmaking.

### A.    Defendants Are Violating the NED Act by Withholding the Endowment's Funds for Impermissible Policy Reasons.

Under the APA, a court must set aside agency action that is "not in accordance with law" or "in excess of statutory . . . authority."  5 U.S.C. § 706(2)(A)-(C).  That provision requires a court to invalidate agency action that conflicts with a federal statute.  *NextWave Personal Cmmc'ns, Inc. v. FCC*, 254 F.3d 130, 149 (D.C. Cir. 2001).  Here, Defendants are violating the NED Act by withholding the Endowment's funds because they object to its work on policy grounds.[10]

### 1.    Defendants' actions leave no doubt that Defendants are attempting to eliminate the Endowment's funding because Defendants disagree with that funding on policy grounds.

---

[10]  The denial of funding is reviewable "final agency action."  5 U.S.C. § 704.  "[A]gency action includes an agency's "denial" or "withholding" of a "grant of money," 5 U.S.C. § 551(10), (11), (13), and here, the Executive is withholding the balance of the Endowment's appropriated funds. That refusal to make the money available is final.  It is both definitive, *see* Am. Compl. Ex. 2 (DOJ Email) at 1; AR000004, ¶ 6 (State Dept. Declaration), and dictates when the Endowment's funding becomes legally eligible for obligation by the State Department, 31 U.S.C. § 1517(a).  *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

a. Defendants have been remarkably explicit about their desire to eliminate the Endowment. They announced that goal even before this administration took office. Elon Musk called for the Endowment to be "dissolved." And the think tank founded by OMB Director Vought argued that the Endowment should be eliminated because it allegedly "is operating a rogue foreign policy independent of the Executive Branch (i.e. President)." CRA Staff, Primer, *supra* note 5. Of course, the Endowment's independence from the Executive Branch is by *congressional design*: Congress purposely recognized the Endowment as a private, nongovernmental entity so that it could pursue democracy-support activities in areas where those same activities would be less effective if pursued directly by the Executive. 22 U.S.C. § 4411. And Congress decided the appropriate level of Executive oversight, establishing limited consultation requirements and providing for extensive *congressional* oversight of the Endowment's activities. *Id*. §§ 4413(e), 4414(b).

Given the Endowment's status as a private entity, Defendants could not simply eliminate the Endowment—or "dissolve" it, in Elon Musk's parlance—once they took office. So instead they attempted to cut off the Endowment's funding. Their first gambit—simply freezing NED's funding, some of it already obligated and sitting in NED's Treasury account—was blatantly illegal, so much so that when the Endowment filed this lawsuit, Defendants quickly agreed to release the Endowment's funds. Next, Defendants attempted to slow walk NED's funding, first asserting that the Endowment required a waiver to receive appropriated funding (a position that Defendants abandoned after the Endowment pointed out its unlawfulness), and then parceling out the funds in 30-day apportionments—a sharp departure from past practice. *See supra* at p. 7. For months, OMB delayed a full-year apportionment to the Endowment while waiting for the State Department to submit a spending plan. *See, e.g.*, ECF No. 17. During that period, OMB proposed zeroing out the Endowment's funding for 2026 based on spurious accusations in a public transmission to

16

Congress signed by Vought. In particular, OMB baselessly alleged in a fact sheet entitled "Ending Weaponization of the Federal Government" that the Endowment had funded a Ukrainian "disinformation organization" that "called for prosecutions of Trump world" and "smeared" Vice President Vance.[11] None of that is even remotely close to the truth. *See supra* at p. 9 & n.7.

Meanwhile, Defendants' attacks on the Endowment's fiscal year 2025 funding continued apace. Any doubt that policy disagreements are the motivation for Defendants' actions is eliminated by the State Department's Spending Plan, submitted May 29. That plan—for the first time in the history of the State Department's relationship with the Endowment—did not contemplate disbursing the remainder of the Endowment's fiscal year 2025 funds in fiscal year 2025. Instead, State declared that "[r]emaining resources may be made available for obligation in FY 2025 *subject to review for alignment with Administration priorities*." Am. Compl. Ex. 1 at 54 (emphasis added); AR000060. Then on June 11, in connection with this litigation, Defendants informed counsel for the Endowment that they have declined to make those "remaining resources" available for obligation in fiscal year 2025. That sequence of events, and Defendants' own stated intention in the Spending Plan, allow only one possible conclusion: Defendants have decided that providing the Endowment's remaining appropriated funding does not align with Administration priorities.

b. Defendants have attempted to paper over their policy-based motivations through made-for-litigation assertions. But that effort cannot overcome the incontrovertible evidence.

In a declaration signed and inserted into the record on July 10—a document that, unlike the State Spending Plan, was created for purposes of litigation well *after* Defendants had decided to withhold the Endowment's funds—Defendants state that they are withholding additional funds

---

[11] *Ending Weaponization of the Federal Government*, https://www.whitehouse.gov/wp-content/uploads/2025/05/Ending-Weaponization-of-the-Federal-Government-Fact-Sheet.pdf (last visited July 18, 2025).

this year "because sufficient funds had already been disbursed to NED for FY2025," and because reserving the balance "ensures that NED will retain at least that level of funding in the coming fiscal year." AR000004, ¶¶ 7-8. Neither purported basis withstands scrutiny.

As to the first, Defendants' assertion that the Endowment has received "sufficient funds" this year is nothing more than a rearticulation of their policy disagreement with Congress. Every year since the Endowment's inception, Congress has appropriated a sum certain to the Endowment (recently, $315 million)—which means that *Congress* has determined what level of annual funding is "sufficient." Defendants' determination that $95 million less than that amount is "sufficient" is simply a disagreement with Congress's policy determination that the Endowment should receive $315 million. And, after all, Defendants were explicit that they assessed the sufficiency of the Endowment's funding based on a "review for alignment with Administration priorities"—not based on any conclusion that additional funding was unnecessary to carry out Congress's priorities. AR000060. The only possible conclusion is that Defendants are denying the remaining funding because the Endowment does not serve Administration priorities as Defendants understand them.

The second purported justification strains credulity. Defendants' professed concern with "ensur[ing] that NED will retain at least that level of funding in the coming fiscal year," AR000004, ¶ 8, is at minimum implausible, given that Defendants themselves have urged Congress to *eliminate* the Endowment's funding in 2026. And that point only highlights the larger problem with Defendants' assertion: the proper level of funding in 2026 is for *Congress* to decide, not the Executive. The possibility that Congress will reduce or eliminate the Endowment's funding in the future is no justification for suddenly withholding the balance of the Endowment's *already*-appropriated funding for 2025. Thus, this justification too collapses.

More fundamentally, this Court is under no obligation to credit Defendants' late-breaking,

conclusory explanations for their withholding. Defendants' explicit admission that their withholding is based on a "review for alignment with Administration priorities," AR000060, combined with the blatant unlawfulness of the preceding monthslong campaign against the Endowment, makes crystal clear that Defendants are driven by policy objections pure and simple. Courts "are 'not required to exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (citation omitted). That adage is especially apt here, considering that Defendants' alternative explanations appear in a post hoc July 10 declaration—signed after the State Department Spending Plan (May 29), after the apportionment decision (reported to this Court on June 12), and after the filing of the amended complaint (June 30). *See Am. Horse Prot. Ass'n, Inc. v. Lyng*, 812 F.2d 1, 6 (D.C. Cir. 1987) ("We are adjured to take a critical view of an agency's 'post hoc rationalization.'" (citation omitted)). Having already stated that they would decide whether to withhold the Endowment's remaining funding based on "Administration priorities," and then in fact deciding to withhold that funding, Defendants should not be permitted to obscure their obvious motivation through litigation submissions.

## 2. Defendants' denial of the Endowment's remaining funding for policy reasons is a blatant violation of the NED Act.

The NED Act unequivocally denies the Executive Branch any authority to interfere with the Endowment's funding for policy reasons. The Act first declares that the Endowment will fulfill a number of congressionally recognized purposes, including "encourag[ing] free and democratic institutions throughout the world through private sector initiatives." 22 U.S.C. § 4411(b). The Act then provides in unusually clear mandatory language that the State Department "*shall make* an annual grant to the Endowment to enable the Endowment to carry out its purposes as specified in section 4411(b) of this title." 22 U.S.C. § 4412(a) (emphasis added). As relevant here, "[s]uch grants *shall be made* with funds specifically appropriated for grants to the Endowment." *Id.*

(emphasis added). Congress's repeated use of "shall" imposes a mandatory duty to obligate the money appropriated to the Endowment to fulfill the purposes that *Congress* has defined. *See Maine Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020).

Reinforcing that point, the Act directs that the "grant agreement" between State and the Endowment shall "require[]" that appropriated funds shall "only be used for activities which the *Board of Directors of the Endowment* determines are consistent with the purposes described in section 4411(b) of this title"—in other words, Congress specified that the Endowment itself, not the Executive, would determine what activities would be consistent with its statutory purposes. 22 U.S.C. § 4412(a) (emphasis added). The statute further provides that the grant agreement must require the Endowment to "otherwise comply with the requirements *of this subchapter*," and it prohibits the Executive from "requir[ing] the Endowment to comply with requirements other than those specified *in this subchapter*." *Id.* § 4412(a) (emphasis added). Thus, Congress expressly denied the Executive any discretion to require the Endowment to comply with requirements beyond those specified in the statute—including additional conditions reflecting the Executive's own policies or priorities. And it has no authority to determine that the Endowment's projects do not further statutory purposes or withhold funding on that basis. At every turn, Congress directed that the Executive may not interfere with the Endowment's activities or its funding for policy reasons.

Against that backdrop, it is crystal clear that Defendants' "review" of the Endowment's remaining 2025 funding "for alignment with Administration priorities," AR000060, and its withholding of the remainder on that ground, violate the NED Act. The Executive has no authority to evaluate whether providing the Endowment with its funding is consistent with "Administration priorities," much less to deny funding on that basis. To require consistency with "Administration priorities" is to impose a "requirement[] other than those specified in this subchapter"—and

Congress has expressly prohibited the Executive from doing just that.  22 U.S.C. § 4412(a).

**B.    Defendants' Denial of Funding Violates the Antideficiency Act**

Having cast about for months seeking a statutory pretext for denying the Endowment's funding that would withstand legal scrutiny, Defendants appear to have settled on the Antideficiency Act, and in particular, OMB's apportionment authority under 31 U.S.C. § 1512.  But the Antideficiency Act does not confer on the Executive the authority that the NED Act expressly denies—that is, the authority to withhold appropriated funding because the Executive disagrees with Congress's decision to appropriate the funds.  In all events, Defendants' action violates the Antideficiency Act just as clearly as it violates the NED Act because the statutory preconditions for OMB's apportionment actions are unquestionably not satisfied here.

In post hoc litigation filings made well after the State Department announced that it would review the Endowment's funding for compliance with "Administration priorities," Defendants appear to invoke two distinct—and mutually exclusive—Antideficiency Act provisions.  On the one hand, Defendants assert that they are "[r]eserving" the Endowment's funds, an apparent reference to OMB's authority to create a reserve in limited circumstances under 31 U.S.C. § 1512(c). AR000004, ¶ 8; s*ee* Am. Compl. Ex. 2 (DOJ Email) (asserting Executive could "reserv[e]" Endowment's "funds"); ECF No. 33 (Joint Status Report of June 12) (same).  On the other hand, Defendants assert that "OMB is required to apportion no-year funds 'to achieve the most effective and economical use,'" an apparent reference to 31 U.S.C. § 1512(a).  AR000004, ¶ 6.  Neither provides the Executive with the peremptory authority to deny appropriated funding that Defendants assert here.

**1.    Section 1512(c)'s reserve provision does not permit Defendants' denial of funding.**

Defendants first appear to invoke OMB's limited authority to create a budgetary

"reserve"—that is, to withhold funds from the spending agency altogether instead of setting an apportionment timetable.  31 U.S.C. § 1512(c)(1); Federal Budget Glossary 11, 25-26.  OMB may establish a reserve only in three narrow circumstances: to "provide for contingencies"; to "achieve savings made possible by or through changes in requirements or greater efficiency of operations"; or "as specifically provided by law."  31 U.S.C. § 1512(c)(1).

a.  Notably, none of the statutory bases authorizes OMB to create a reserve based on Executive Branch policy preferences.  That is by congressional design.  Before 1974, § 1512(c)'s predecessor authorized the Executive to reserve funds on the grounds listed above, and also to effect savings based on "*other developments subsequent to the date on which such appropriation was made available.*"  31 U.S.C. § 665(c) (1964) (emphasis added).  The prevailing view was that this language did not "authorize[] the President to withhold funds for general economic, fiscal, or policy reasons."  GAO, *Letter to Hon. Sam J. Ervin, Jr.*, B-135564 (July 26, 1973); *see also, e.g.*, *State Highway Comm'n of Mo. v. Volpe*, 479 F.2d 1099, 1118 (8th Cir. 1973).  Yet President Nixon invoked the "other developments" clause to defend his prolific efforts to impound funds based on policy disputes with Congress.  *See City of New Haven v. United States*, 809 F.2d 900, 906 n.18 (D.C. Cir. 1987); Louis Fisher, *Congressional Budget Reform: The First Two Years*, 14 Harv. J. Legis. 413, 445-46 (1977).

In response, Congress made emphatically clear that the Executive lacks authority to create reserves for policy reasons: it removed the "other developments" language, leaving only the limited bases for reserves found in the Antideficiency Act today.  *Compare* Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93-344, § 1002, 88 Stat. 297, 332, *with* 31 U.S.C. § 1512(c).  That change was intended to clarify that the "apportionment process is to be used only for routine administrative purposes" and to ensure that "the practice of reserving funds d[id] not

become a vehicle for furthering Administration policies and priorities at the expense of those de-
cided by Congress." S. Rep. No. 93-688, at 3573, 3575 (1974); *see New Haven*, 809 F.2d at 906
& n.18, 909. The Executive is thus "foreclose[d]" from relying on the Antideficiency Act "for
*policy* deferrals"—that is, delays "intended to *negate* the will of Congress by substituting the fiscal
policies of the Executive Branch for those established by the enactment of budget legislation."
*New Haven*, 809 F.2d at 901, 909; *see* GAO, *Office of Management and Budget—Withholding of
Ukraine Security Assistance*, B-331564, at 6 (Jan. 16, 2020) (finding that Executive acted unlaw-
fully in withholding funds from obligation to "ensure" compliance "with the President's foreign
policy" (citation omitted)); GAO, *Principles of Federal Appropriations Law* ("Red Book"), 2-27,
6-122 to 6-125; *see also Volpe*, 479 F.2d at 1118. But that is precisely what Defendants have
purported to do here.

b. Any doubt on that score is eliminated by the fact that none of the permissible statutory
bases for a reserve is present here—and Defendants have not attempted to suggest otherwise. No
realistic "contingencies" could justify suddenly withholding $95 million. 31 U.S.C.
§ 1512(c)(1)(A). Nor is there any reasonable "possib[ility]" that "changes in requirements or
greater efficiency of operations" could yield $95 million in "savings." *Id.* § 1512(c)(1)(B). The
Endowment disburses the vast majority of its funding to grantees and core institutes; having al-
ready planned its disbursements based on the full-year funding amount, there are no "changes in
requirements" or potential savings to be had at this point in the fiscal year. And certainly this
reserve is not "specifically provided by law." *Id.* § 1512(c)(1)(C). Defendants' silence on these
statutory preconditions speaks volumes. Defendants have created an unlawful policy reserve; but
even if Defendants' motivations were not so obvious, any reserve would exceed OMB's authority.

**2.    Section 1512(a)'s apportionment provision does not permit
Defendants' denial of funding.**

Defendants alternatively appear to invoke § 1512(a)'s instruction to OMB that "[a]n appropriation for an indefinite period . . . shall be apportioned to achieve the most effective and economical use." 31 U.S.C. § 1512(a). But that provision does not authorize OMB to use apportionment as a pretext for exercising policy control over Congress's appropriations. And Defendants' sudden, unexplained withholding of 30% of the Endowment's yearly funding is *antithetical* to "achiev[ing] the most effective and economical use" of funding.

a. Section 1512(a) does not give OMB authority to delay apportionment for policy reasons under the guise of apportioning "to achieve the most effective and economical use." The provision allows OMB to calibrate the apportionment schedule (ordinarily, by time period or project), but only to ensure efficient and orderly spending of the amounts Congress appropriated. *See* Red Book 2-27. GAO has long defined the phrase "achieve the most effective and economical use" to *exclude* any policy control over how the funds are used. GAO has explained that "the apportionment power may not lawfully be used as a *form of executive control or influence over agency functions*. *Rather*, it may *only* be exercised by OMB in the manner and for the purposes prescribed in 31 U.S.C. § [1512]—i.e., to . . . achieve the most effective and economical use of appropriations." GAO, *Letter to Hon. William Proxmire*, B-163628, at 2 (Jan. 4, 1974) (obtained from GAO; attached as Ex. B) (emphasis added). In other words, apportionment for "effective and economical use" is an "administrative control[]" only, and cannot be used to "affect the operation of statutory requirements concerning the availability or use of appropriated funds." Red Book 6-122. Until now, *OMB itself* has agreed that apportionment is not substantive. *See, e.g.*, OMB Circular No. A-11 at § 120.8 (2024) ("apportionment of funds is not a means for resolving any question dealing with . . . the legality of using funds for the purpose for which they are apportioned").

Any other conclusion would violate bedrock principles of statutory construction. For one

thing, construing § 1512(a) to permit OMB to withhold or delay appropriations based on "Administration priorities" would confer on OMB the very authority that Congress expressly denied the Executive Branch in the NED Act. *See supra* at pp. 19-21. Congress could not have intended, by generally authorizing OMB to apportion for the administrative purpose of effectiveness and economy, to nullify the NED Act's specific unequivocal direction that the Executive must convey the Endowment's funding without imposing additional requirements on that funding. Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

It is equally implausible that Congress would have intended § 1512(a) to allow the Executive to use apportionment delays to "substitut[e] the fiscal policies of the Executive Branch" for those established by Congress, when Congress amended neighboring § 1512(c)(1) to *forbid* the Executive from using reserves to accomplish that very same purpose. *New Haven*, 809 F.2d at 901. Indeed, a provision requiring the "most effective and economical" apportionment of funds has been the law for 75 years. *See* General Appropriations Act, 1951, ch. 896, 64 Stat. 595, 765. And yet there has long been consensus that this language does not authorize policy impoundments. *See supra* at p. 24. When President Nixon invoked language in the reserve provision to achieve policy-based deferrals, Congress removed that language. *New Haven*, 809 F.2d at 906. That statutory history forecloses construing § 1512(a) to permit the Executive to use the "most effective and economical" provision to effectuate its own policy preferences at the expense of Congress's.

Defendants will doubtless deny that they are using § 1512(a)'s "most effective and economical" language to override Congress's policy decisions. But even taking their own made-for-litigation assertions at face value, Defendants are unquestionably asserting sweeping authority to withhold apportionment—authority that is so broad that it inevitably would permit the Executive to effect policy-based deferrals. Defendants have made no effort whatsoever to explain why

withholding $95 million of the Endowment's 2025 funds—most of the way through the fiscal year, and without advance warning—could conceivably achieve the "most effective and economical" use under § 1512(a). They have simply declared that the Endowment has already received "sufficient" funds in 2025—which does not even purport to explain why it would be *more* effective *and* economical for the Endowment to receive the $95 million in 2026 than in 2025. Nor can OMB simply declare existing funding "sufficient" and withhold further funding in the name of being "economical"—§ 1512(a) requires the apportionment to be both the "*most effective* and economical." The conclusory declaration that existing funding is "sufficient" does not begin to explain how withholding funding achieves the most "*effective*" use of that funding. If that bald assertion were adequate, the Executive's authority to withhold apportionment would be limitless. OMB could decide that it disagrees with any no-year appropriation and indefinitely withhold apportionment on the ground that the agency has already received "sufficient" funding.

The Court should view Defendants' sudden discovery of such sweeping authority in § 1512(a) with extreme "skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). The "most effective and economical" apportionment language has long been viewed as a narrow and ancillary administrative timing provision. *See supra* at p. 24. But Defendants are now invoking it to nullify congressional appropriations based on nothing more than a conclusory assertion of "sufficiency." When an agency claims to unearth this kind of "transformative" authority in a "long-extant statute" never thought to confer such power, courts should "hesitate" before adopting the agency's interpretation. *West Virginia v. EPA*, 597 U.S. 697, 724-25 (2022) (citations omitted). It is simply "not plausible" that Congress buried such a powerful tool, especially one that gravely undermines its own power of the purse, in the "vague language" of an "ancillary provision" calling for effective and economical apportionments. *Id*. at 724, 735; *UARG*, 573 U.S. at 324.

26

b.   Section 1512(a) therefore permits OMB to adjust apportionment timing only if doing so is in fact calibrated to "achieve the most effective and economical use" of the funding.  That language, properly understood, requires the apportionment to achieve the most economical use, *and also* the use that is the most effective, in that it furthers Congress's expressed purposes for the funding.  Defendants' peremptory withholding is neither effective nor economical—nor could it be, given the nature of the Endowment's activities and unbroken historical practice.

Most glaringly, § 1512(a) directs that any apportionment of the Endowment's funding "*shall*" achieve "the most effective and economical use."  31 U.S.C. § 1512(a) (emphasis added). Every year since the Endowment's inception, OMB has interpreted that directive in the same way: OMB has apportioned the *full* appropriated amount for that fiscal year, without withholding or delaying any portion.  See Decl. ¶ 32.  OMB has thus recognized, every year until now, that apportioning the full amount *does* achieve the "most effective and economical use."

Now, however, OMB has reversed course—without a word of explanation as to how suddenly withholding 30% of the Endowment's annual funding is the "most effective" or "economical" use of those funds.  If withholding the funds mid-year were effective or economical, one would expect Defendants to be able to explain why that is.  But they have not.  Defendants' unsupported assertion that "sufficient" funds have been disbursed cannot suffice.  *See supra* at p. 18.

Denying 30% of the Endowment's funding without warning, midstream, in no way promotes economy and efficiency.  To the contrary, Defendants' action has wreaked havoc on the Endowment's grantmaking activities, *undermining* efficiency and economy.  Indeed, that is the evident point of withholding funds—as everything Defendants have said and done leading up to the withholding vividly confirms.  Defendants know perfectly well that the Endowment depends on the certainty provided by its yearly upfront, lump-sum appropriation to carry out its statutorily

27

mandated grantmaking activities.  22 U.S.C. § 4413(b)(1); *see* Decl. ¶ 12.  The Endowment cannot make commitments to partners and grantees if it does not know when (or if) it will actually receive its funding, and it cannot fulfill its statutory mission if it is unable to serve as a reliable and trusted partner for the organizations that depend on its grants.  The Endowment's ability to effectively and efficiently use its funding therefore depends on advance certainty about how much funding it has to disburse and when that funding will be available.[12]  Pursuant to direction by the House Appropriations Committee, the Endowment provided Congress with a report that was premised on reliable access to all of the $315 million total appropriated to the Endowment and that described how each dollar will be spent this fiscal year.  Decl. ¶ 47.[13]  The sudden withholding of 30% of that funding will prevent the Endowment from executing its plans and force it to walk back the commitments it made to Congress.  *Id.*  That is not remotely an "effective" use of the Endowment's funding.  Nor is it "economical" to deprive the Endowment of 30% of its funding without warning, well into the fiscal year, thus forcing the Endowment to scramble to address the ensuing disruption.

In sum, any argument that Defendants' denial of the Endowment's $95 million achieves the most effective and economical use of the funding, as required if Defendants are to invoke §1512(a), is not even colorable.  That only confirms that Defendants are withholding the Endowment's funding for policy reasons, plain and simple.

### C.    Delaying the Endowment's Funding to Future Fiscal Years Violates the NED Act and the Appropriations Laws

---

[12] Indeed, OMB has implicitly acknowledged that grantmaking requires upfront planning, as it typically apportions all or most of a grantmaking entity's funds upon appropriation, instead of intermittently, because those entities' financial needs "differ [from] that where, for example, an appropriation is primarily available for salaries and administrative expenses."  GAO, *Issues Raised by the Apportionment and Obligation of Certain Funds Under the Fiscal Year 1994 Continuing Resolution*, B-255529, at 6 (Jan. 10, 1994) (citation omitted); *see* Red Book 6-126 to 6-127.

[13] Each year, the House Appropriations Committee requires the Endowment to explain how it will use its entire full-year appropriation.  *See, e.g.*, H.R. Rep. No. 118-554, at 33 (2024).

Defendants' impoundment must be set aside for an independent reason: the NED Act and Congress's consistent appropriation of sums certain to the Endowment foreclose OMB from withholding any portion of the Endowment's full-year appropriation for provision in a future fiscal year. OMB's apportionment discretion is always subject to control by other statutes. *See* Red Book 6-126. The NED Act and the appropriations laws have precisely that effect: they leave the Executive with no policy discretion to withhold funds at any stage between appropriation by Congress and payment to the Endowment, including apportionment. Accordingly, whatever Defendants' reasons for refusing to make funds available for obligation, the Endowment is likely to succeed in showing they have exceeded their statutory authority.

1. In the NED Act and appropriations acts, Congress directed the Executive Branch to convey the Endowment's annual appropriation to it. The NED Act *requires* the State Department to make an "*annual* grant to the Endowment" with "specifically appropriated" funds earmarked for the Endowment. 22 U.S.C. § 4412(a) (emphasis added); *see supra* at pp. 19-20. Because the State Department cannot obligate funds until OMB apportions them, *see* 31 U.S.C. § 1517(a), the same provisions require OMB to apportion the Endowment's appropriated funds. The NED Act also deprives the Executive of any discretion to interfere with the Endowment's funding, *see supra* at p. 20—making clear that Congress has sole control over the amounts the Endowment receives.

Congress's appropriation of a sum certain to the Endowment each year, combined with those provisions, indicates that Congress intends the Endowment to receive the full appropriated amount in that fiscal year. The 2024 appropriations acts, as in previous years, specified the exact amount the Endowment must receive "as authorized by the [NED] Act"—i.e., through an "annual" grant—and instructed that the Endowment must direct a portion "in the traditional and customary manner" to the core institutes, and use the remainder "for democracy programs." Pub. L. No. 118-

47, 138 Stat. 460, 737. That acknowledged unbroken practice demonstrates that Congress intends the Endowment to receive its full appropriation and to make the directed allocation each year.

That conclusion is reinforced by the Endowment's status as a grantmaking organization. The Endowment passes through virtually all of its programmatic funding to core institutes and grantees, and it needs a reliable, concrete annual financial commitment in making decisions about disbursements each year. Congress is well aware of that fact, and so its practice of appropriating a definite annual amount reflects its intent that the Endowment should be able to plan around that amount each year. In addition, the NED Act requires the Endowment to carry out and report on its efforts in an annual funding cycle. 22 U.S.C. § 4413(e), (i). And, as noted above, the House has annually directed the Endowment to report on how it will use the full-year amount in *that* fiscal year. *E.g.*, H.R. Rep. No. 118-554, at 33. In those ways, the NED Act unmistakably conveys that Congress meant for the Endowment to receive the full appropriated amount in that same year.

2. It is true that Congress's annual appropriation takes the form of a no-year appropriation and that OMB therefore must apportion for the most "effective and economical use" under § 1512(a). But that does not give the Executive Branch the authority to use § 1512(a) to interfere in the Endowment's funding that Congress has otherwise denied at every turn. Congress uses no-year appropriations when it wishes to provide discretion to the entity responsible for spending the appropriated funds to disburse the money over multiple years. *See* Red Book 5-7 to 5-9. Here, that is the Endowment—not the passthrough agency that disburses its funds pursuant to Congress's mandatory instruction. The flexibility afforded to the Endowment by Congress's no-year appropriation is essential because it enables the Endowment to fund multi-year projects that may incur expenses over several years. *See* Decl. ¶ 7.

In granting that flexibility to the Endowment, Congress could not have intended to confer

on the Executive authority to interfere in the Endowment's funding by indefinitely delaying apportionment of no-year funding.  Under Defendants' apparent view, OMB could refuse to apportion *most or all* of the Endowment's congressionally defined annual appropriation through the expedient of invoking § 1512(a)'s "most effective and economical use" provision.  And OMB could do that year after year—thus starving the Endowment of its appropriated funding—simply by asserting that the funds will be disbursed in some future fiscal year.  That would be irreconcilable with the NED Act's requirement that the State Department "shall" make an "annual" grant to the Endowment; that such grant "shall be made with funds specifically appropriated" for that end; and that the Executive shall not impose additional requirements or interfere with Congress's expressed priorities.  22 U.S.C. § 4412(a).

Congress could not possibly have intended to permit OMB to use § 1512(a) to effect that sort of end run around the NED Act.  And, indeed, OMB's apportionment discretion only holds in the "[a]bsen[ce of] some statutory provision to the contrary."  Red Book 6-126; *see also Md. Dep't of Hum. Res. v. HHS*, 854 F.2d 40, 42 (4th Cir. 1988) (examining OMB apportionment schedule for consistency with substantive statute).  Thus, § 1512(a) must be construed together with the NED Act and Congress's unbroken practice in annual appropriations acts of directing specified sums to the Endowment.  Those substantive statutes must control the scope of OMB's discretion in the apportionment process—and § 1512(a) therefore must be construed not to grant OMB free-ranging authority to refuse to apportion to the Endowment amounts of OMB's choosing.

### D.    The Executive Branch's Withholding of the Endowment's Funds Is Arbitrary and Capricious

The APA requires a reviewing court to set aside agency action that is "arbitrary [and] capricious."  5 U.S.C. §706(2)(A).  The Endowment is likely to succeed in showing that Defendants' impoundment meets that threshold.

### 1.    The decision to create a reserve is arbitrary and capricious.

To the extent Defendants are purporting to create a reserve under § 1512(c), that decision is not only contrary to law, it is also arbitrary and capricious.  Agency action is arbitrary and capricious when the agency "has relied on factors which Congress has not intended it to consider." *Sinclair Wyo. Refining Co. v. EPA*, 114 F.4th 693, 711 (D.C. Cir. 2024).  Defendants' effort to create a reserve is based on policy disagreement with the Endowment's funding—manifestly a factor that Congress did not intend for the Executive Branch to consider.  *See supra* at pp. 21-23.

Even apart from that, the action is arbitrary and capricious because Defendants have not offered any explanation as to how any reserve would satisfy the statutory prerequisites—that is, that it "provide[s] for contingencies" or "achieve[s] savings" related to "changes in requirements or greater efficiency."  31 U.S.C. § 1512(c)(1)(A), (B).  The APA requires an agency to provide a "satisfactory explanation for its action."  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Defendants have offered none whatsoever.  Such a failure to give an "indication of the basis" of their decision cannot withstand APA review.  *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962).

Compounding the problem, Defendants have not identified *any* facts that could substantiate some feared contingency or that create a hypothetical opportunity for savings.  True, Defendants profess they are withholding the rest of the Endowment's fiscal year 2025 appropriation "because sufficient funds had already been disbursed to NED for FY2025" and because a reserve "ensures that NED will retain at least that level of funding in the coming fiscal year."  AR000004, ¶¶ 7-8.  But an agency's explanation for its action must include the "findings" and "analysis" that "justify the choice" made.  *Burlington Truck Lines*, 371 U.S. at 167.  Defendants do not explain what led them to conclude that sufficient funds have already been disbursed.  They do not articulate why they are concerned that the Endowment's funding for fiscal year 2026 might require supplementing

(and, for all the reasons discussed above, the level at which the Endowment is funded in future years is a *congressional* decision, not an Executive one). Nor do they expound a "rational connection" between those vague assertions and the statutory requirements for a reserve. *State Farm*, 463 U.S. at 43 (citation omitted). The Endowment and this Court are left to guess as to the basis for Defendants' decision, rendering it arbitrary and capricious. *See Point Park Univ. v. NLRB*, 457 F.3d 42, 50 (D.C. Cir. 2006).

### 2. Any determination that withholding the Endowment's funds is "effective and economical" is arbitrary and capricious.

Any purported apportionment withholding under § 1512(a) is also arbitrary and capricious.

a. As above, any apportionment based on "Administration priorities" is arbitrary and capricious because Congress did not intend for the Executive Branch to consider that factor. *See supra* at p. 32; *State Farm*, 463 U.S. at 43. And even if Defendants *also* had legitimate reasons to withhold the Endowment's funds (which they do not), the apportionment decision would still be arbitrary. When "at least one of the rationales" undergirding agency action "is deficient," the action must be set aside unless the court is "certain" that the agency "would have adopted it even absent the flawed rationale." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006). Here, there is absolutely no evidence to indicate that Defendants would have taken the same course absent their disdain for the Endowment's work. As a result, their impermissible consideration of the Executive's policy priorities taints the entire decision. *See Consolidated Edison Co. of N.Y. v. FERC*, 823 F.2d 630, 641-42 (D.C. Cir. 1987).

In addition, any purported assertion that withholding funds achieves their most effective and economical use "runs counter" to all evidence. *State Farm*, 463 U.S. at 43. As explained above, the Endowment depends on an upfront annual appropriation of a definite amount to plan its grantmaking activities. It should be obvious that the sudden denial of 30% of the Endowment's

funding, most of the way through the fiscal year, fosters neither "effective" nor "economical" use of the funds. *See supra* at pp. 27-28. To the contrary, it will only hamstring the Endowment's operations, directly contrary to congressional intent. As against that undeniable reality, Defendants' conclusory assertion that the Endowment has received "sufficient" funds in 2025 cannot sustain Defendants' decision. *AT&T Wireless Servs. v. FCC*, 270 F.3d 959, 968 (D.C. Cir. 2001) ("Conclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice to meet the deferential standards of [judicial] review.").

b. "Sudden and unexplained change or change that does not take account of legitimate reliance on prior interpretation" may also be arbitrary and capricious. *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996). Indeed, when an agency changes its position, it must "display awareness" that it is doing so and establish that "there are good reasons" for the switch. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

As discussed above, Defendants' decision to withhold a share of the Endowment's funding past the end of the fiscal year reflects a stark deviation from unbroken past practice. For every year in the Endowment's forty-two year history, the Executive Branch has apportioned the Endowment's entire full-year appropriation in the fiscal year in which it was appropriated, Decl. ¶ 32, reflecting the determination that such an apportionment "achieve[s] ***the most*** effective and economical use" of the Endowment's appropriation. 31 U.S.C. § 1512(a) (emphasis added). Defendants have offered no explanation whatsoever for their abandonment of that settled position. Their statement that withholding the unobligated funds "ensures that [the Endowment] will retain at least that level of funding in the coming fiscal year" is no explanation at all. AR000004, ¶ 8. For a no-year appropriation, that statement would *always* be true. And, in all events, the Endowment's fiscal year 2026 funding level is for *Congress* to decide.

34

Defendants also have entirely failed to account for the substantial reliance interests of the Endowment, its core institutes, and its grantees in promptly receiving a dependable, known full-year appropriation every year. As noted, the Endowment has without fail detailed to Congress how it would spend every dollar appropriated that year, and the Endowment's partners likewise expected the Endowment's funds would be available during this fiscal year. When an agency departs from a longstanding policy or practice, it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ of Cal.*, 591 U.S. 1, 33 (2020); *see CSL Plasma Inc. v. CBP*, 628 F. Supp. 3d 243, 259 (D.D.C. 2022) (a "new practice" can be arbitrary and capricious "even if there [was] no previous formal policy" (citing *Am. Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914, 927 (D.C. Cir. 2017))). It is "arbitrary and ca-pricious to ignore such matters." *Regents*, 591 U.S. at 30 (citation omitted). Here, Defendants did not address or even acknowledge any of the ways in which the Endowment and its grantees have organized their affairs in expectation of the Endowment receiving its full appropriation this year. *E.g.*, Decl. ¶¶ 40, 54. In light of the significance of the reliance interests at stake, the APA required Defendants to provide a reasoned and adequate explanation before changing course. They did not.

### E.    The Endowment is Likely to Succeed on Its Constitutional Claims

Defendants' actions violate the Appropriations Clause, the Spending Clause, the Present-ment Clause, and the Take Care Clause. The Endowment raises these claims both as implied constitutional causes of action, *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010), and through the APA, 5 U.S.C. § 706(2)(B). Each of these clauses acts in service of the Constitution's fundamental principle of separation of powers between the three branches of government. Taken together, they reinforce that this is a *Youngstown* "category 3" situation. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J.,

35

concurring).  Congress has expressly appropriated funds specifically for the Endowment and denied the Executive authority to interfere with that funding because it disagrees with Congress's policy judgments.  Yet the Executive has done exactly what Congress has forbidden.

### 1.    The Appropriations and Spending Clauses

The Executive's refusal to apportion the Endowment's funds infringes Congress's "exclusive power over the federal purse."  *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012).

a.  The Appropriations Clause gives Congress "plenary power" to define the terms of appropriations.  *Harrington v. Bush*, 553 F.2d 190, 194 (D.C. Cir. 1977); *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425-32 (2024); U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause).  The Clause gives Congress extensive authority to "circumscribe agency discretion to [spend]" through statutory restrictions.  *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993).

The Executive Branch lacks any independent constitutional authority to contravene Congress's direction about how appropriated funds will be disbursed and spent.  *Id.*  For two centuries, courts have repeatedly affirmed that the Executive Branch "does not have unilateral authority to refuse to spend" congressionally-appropriated funds.  *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 610-11 (1838) (granting writ of mandamus to compel Executive to pay congressionally mandated award; Executive's "right to resist the performance, must depend upon the act of congress"); *Train v. City of New York*, 420 U.S. 35, 42 (1975) (similar).  Those precedents are consistent with the Executive Branch's own longstanding view that it lacks any constitutional authority to impede mandatory appropriations. William H. Rehnquist, *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, Office of Legal Counsel, 1 Op. O.L.C. Supp. 303, 310 (1969) (the Executive has no "power to refuse to spend appropriations *other than such power as may be found*

*or implied in the legislation itself*" (emphasis added)). Indeed, OLC found no historical instance in which the Executive had refused to comply with a mandatory appropriations law. *Id.* at 309.

b. The Spending Clause similarly empowers Congress and limits the President's authority over federal spending. "[T]he ability to place conditions on federal grants ultimately comes from the Spending Clause, which empowers Congress, *not the Executive*, to spend for the general welfare." *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021) (emphasis added); *see* U.S. Const. art. I, § 8, cl. 1. Thus, "[a]llowing an executive agency to impose a condition that is not otherwise ascertainable in the law Congress enacted 'would be inconsistent with the Constitution's meticulous separation of powers.'" *West Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023) (quoting *Tex. Educ. Agency*, 992 F.3d at 362).

c. In the NED Act, Congress made particularly clear that it was exercising the full extent of its constitutional appropriations and spending authority. The Act expressly denies the Executive Branch any discretion to impose additional conditions on Endowment funding, and nothing in the Antideficiency Act gives the Executive authority to circumvent that clear provision. Defendants' attempt to do so directly contravenes Congress's express appropriations and spending determinations, thereby violating Appropriations and Spending Clauses. *See Aiken County*, 725 F.3d at 261.

### 2. The Presentment Clause

By denying the Endowment's remaining funding for policy reasons—and without any statutory authority—the Executive's actions have the effect of partially repealing both the appropriations laws mandating that the Endowment receive $315 million in 2025 and the NED Act itself. But "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes"—let alone unilaterally. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

In *Clinton*, the Supreme Court held that the line-item veto violated the Presentment Clause because "[i]n both legal and practical effect," it gave the President the authority to "amend[] . . .

37

Acts of Congress by repealing . . . portion[s]" thereof *after* they became law. *Id.* at 438. With-holding funding for the Endowment that Congress has specifically provided is simply a line-item veto by another name. The Executive's refusal to pay the Endowment effectively strikes Con-gress's appropriation of $315 million and replaces it with the $220 million the Executive prefers.

### 3.    The Take Care Clause

The Executive's refusal to comply with the direction contained in the NED Act and asso-ciated appropriations laws also violates the Take Care Clause. That Clause imposes on the Presi-dent, and by extension his subordinates, the duty to "take Care that the Laws be faithfully exe-cuted." U.S. Const. art. II, § 3; *Youngstown*, 343 U.S. at 587. The Supreme Court has expressly rejected the idea that the Take Care Clause's obligation "to see the laws faithfully executed, im-plies a power to forbid their execution." *Kendall*, 37 U.S. (12 Pet.) at 612-13. It is "settled, bed-rock" law that "[u]nder Article II of the Constitution . . . the President must follow statutory man-dates," and that "the President may not decline to follow a statutory mandate or prohibition simply because of policy objections." *Aiken County*, 725 F.3d at 259 (emphasis omitted). Here, the re-fusal to comply with Congress's mandates violates the Take Care Clause.

### 4.    The Separation of Powers

The Executive's violation of statutory commands in the NED Act, the appropriations acts, and the Antideficiency Act also violates the Constitution's structural separation of powers. *See supra* at pp. 15-31. Where the Executive violates a statute, its "power is at its lowest ebb," *Youngs-town*, 343 U.S. at 637 (Jackson, J., concurring), and the Executive's action is permissible only if it is based "on powers the Constitution grants to [it] alone," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (citation omitted). Here, as explained above, the Executive lacks any con-stitutional authority over appropriations or spending—let alone any exclusive authority. Rather, the Executive is purporting to exercise powers assigned to Congress—in some cases, solely so—

in effectively rewriting both the NED Act and the appropriations laws. *See supra* at pp. 36-37.

Defendants cannot justify their defiance of Congress by relying on the fact that the Endowment's work involves foreign affairs. The Executive's foreign-affairs authority is not exclusive, but shared with Congress, including through Congress's Appropriations Clause power. *Zivotofsky*, 576 U.S. at 10, 16. The Endowment's work does not implicate any of the narrow foreign-affairs powers that are exclusive to the President alone, such as recognition or treaty negotiation. *Id*. Nor is the Endowment's work something on which "the Nation must 'speak . . . with one voice.'" *Id.* at 14. By congressional design, the Endowment's efforts are *nongovernmental*, done by private parties who do not speak for the Executive.

## II.    THE ENDOWMENT WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION

The Endowment is suffering irreparable harm. The uncertainty surrounding Defendants' campaign to interfere with the Endowment's funding has already forced the Endowment to make significant cuts in order to devote as many resources as possible to grantmaking activities. But a $95 million cut—30% of the Endowment's annual appropriation—is not a cost that the Endowment can internalize. That funding halt is irreparably hamstringing the Endowment's ability to pursue its congressionally endorsed objectives and compromising its reputation as a reliable partner around the globe. Those injuries become more acute with each passing day. *See Drs. for Am. v. OPM*, 766 F. Supp. 3d 39, 53-54 (D.D.C. 2025).

### A.    The $95 Million Funding Cut Will Severely Damage the Endowment's Ability to Fulfill Its Congressionally Recognized Mission

Even before Defendants' current impoundment, their campaign to cut off the Endowment's funding drove the Endowment to cut back until it was operating on a shoestring budget. Those cuts included laying off 100 of the Endowment's staff members—35% of its workforce—and suspending important democracy support initiatives. Decl. ¶¶ 33-34. The Endowment lost employees

with critical skills and institutional knowledge, and grantees lost access to important services that help them build organizational capacity and learn from one another. *Id.* ¶¶ 36-39. But the Endowment made as many operational reductions as it could withstand so that it could maximize the funding available for its grantmaking activities, even while receiving funding in short-term increments. *Id.* ¶ 34. But the $95 million shortfall that the Administration has now imposed is far more extreme—and far more damaging—than anything the Endowment could have planned for. *Id.* ¶ 35. It will cripple the Endowment's ability to support its partners, including the core institutes. *Id.* ¶ 45-95. These financial pressures directly impede the Endowment's ability to efficiently and effectively carry out its mission. *See id.* ¶ 45. That is irreparable harm. *See League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

    1. Defendants' withholding of $95 million is taking a tremendous toll on the Endowment's essential operations. It is losing critical staffing, beyond the extensive cuts already made, because the funding uncertainty has accelerated attrition among key personnel—including employees who possess specialized technical, language, and strategic expertise that is not easily replaceable. Decl. ¶ 41. The longer the Endowment goes without full funding, the more the uncertainty grows, driving more employees to seek out more stable employment elsewhere. *Id.* ¶ 42. The magnitude of the departures is devastating to the Endowment's effectiveness. And because the funding withholding has forced the Endowment to offer primarily short-term employment opportunities, it cannot backfill some of the most critical roles, including two open vice president positions. *Id.* Even if the Endowment could hire at full force, the ongoing financial instability and Defendants' active interference with the Endowment's funding discourages qualified candidates from applying. *Id.* The resulting talent drain also demoralizes those who remain. Many employees are stretched thin, performing multiple functions to cover for those who have left. *Id.*

The ongoing uncertainty about when and if the Endowment will receive the balance of its fiscal year 2025 funds has also severely hampered its strategic planning. *Id.* ¶ 40. The Endowment's operations depend significantly on consistent and predictable access to funds. *Id.* To be maximally effective, it needs to be able to prioritize projects, make long-term funding commitments, and fulfill contractual and fiduciary obligations. *Id.* The unpredictability generated by even short-term interference with the Endowment's access to its appropriation compromises that work and makes the Endowment less efficient and productive.

2. Defendants' refusal to apportion and obligate the remainder of the Endowment's appropriation also jeopardizes its mission of advancing democracy and freedom. If the halt in funds continues, it will severely undercut the Endowment's ability to maintain relationships with its grantees—substantially compromising the Endowment's ability to accomplish its mission.

In a typical year, NED funds approximately 1,900 projects. Decl. ¶ 12. If Defendants' actions are allowed to stand, however, it will fall well short of that figure this year. Defendants' withholding of $95 million has forced the Endowment to scale back its grant commitments. There are currently over 500 direct grants that qualify for support but that cannot be fully funded unless the funds are restored. *Id.* ¶ 48. Those grantees do critical work. They engage in election monitoring activities, work to overcome authoritarian censorship, strive to preserve access to independent news sources, and advance reforms to protect labor rights. *Id.* ¶ 52. The withholding of the Endowment's funds has made fully supporting these efforts impossible. *Id.* ¶ 50.

Such delays or reductions in funding would inflict substantial harm on the Endowment's partners. Many grantees rely on uninterrupted access to Endowment funding. *Id.* ¶ 54. As grassroots nonprofit organizations, they often cannot build up significant reserves. *Id.* ¶ 55. Indeed, given the funding uncertainty, most grantees have already downsized staff, eliminated nonessential

(but important) expenses, and reduced activities. If the remainder of the 2025 funds do not arrive promptly, grantees will be forced to curtail important and time-sensitive work, such as election monitoring, voter education, and other support for free-and-fair elections in countries with upcoming elections. *Id.* ¶ 61. Grantees will also be unable to provide critical independent reporting on topics including the frontlines of the war in Ukraine and human rights violations in Iran. *Id.* ¶ 62. And even a short delay will likely force some grantees to close down entirely. *Id.* ¶ 56.

If funding is not restored, the consequences for the Endowment's partners working in challenging environments will be particularly severe. For example, the director of one grantee fostering peace and religious tolerance in Pakistan has recently returned there after being forced to relocate temporarily out of safety concerns. *Id.* ¶ 64. The Endowment intends to approve additional funds for heightened security, but Defendants' actions have jeopardized that grant. *Id.* Additionally, the Endowment supports Afghan media and civil society organizations that require consistent funding to meet basic obligations and maintain broadcast and publication schedules. *Id.* A disruption risks compromising the organizations' credibility with their audiences and could lead to insolvency, forced closure, and heightened exposure to retaliation by the Taliban. *Id.*

Indeed, a lack of funding poses special risks to grantee partners who operate in authoritarian environments, because the sudden interruption might expose them as Endowment grantees, inviting reprisals from those in power. *Id.* ¶ 57. A funding interruption could expose an Iranian grantee that documents human rights abuses and amplifies civic activists, particularly at this moment of heightened tension in Iran. *Id.* An independent media grantee in Cuba faces similar risks. *Id.* Several Venezuelan media outlets likewise rely heavily on Endowment funding and could see their staff and operations face harsh retaliation if their funding is interrupted. *Id.*

3. Further, the funding crisis threatens the operations of the Endowment's core institutes.

The Endowment's core institutes "play[] a critical role in [the Endowment's] ability to fulfill its mission." TRO Decl. ¶ 9; *see also id.* ¶ 41. These institutes ensure that Endowment initiatives "represent the full breadth of American political life." *Id.* ¶ 9. But the funding halt has prevented the Endowment from disbursing approximately $39 million in funding specifically allocated by Congress *for the core institutes*. Decl. ¶ 65. Those cuts are especially harmful given the institutes' loss of other funding streams. Today, the Endowment's funding constitutes the vast majority of each institute's funding. *Id.* ¶¶ 67, 72, 76, 88.

Each core institute faces the prospect of severe harm. The International Republican Institute will be forced to reduce critical staff and eliminate programming, including programs aimed at countering economic coercion by the Chinese Communist Party and supporting dissidents struggling in North Korea, Burma, and Iran. *Id.* ¶¶ 68-69. The National Democratic Institute (NDI) would have to suspend numerous projects, such as work supporting pro-democracy efforts in Cuba and Afghanistan and efforts to improve public accountability around China's public debt management practices. *Id.* ¶ 74. NDI may be forced to make additional operational and staffing reductions that could prevent it from realizing the full potential of already-funded work. *Id.* ¶ 75. The Center for International Private Enterprise (CIPE) likewise faces severe harm. Funding disruptions earlier this year forced CIPE to lay off 90% of its field-based staff and close 11 of 15 country offices. *Id.* ¶ 78. After its funding was restored, CIPE restarted programming, but the withholding of 2025 funds will prevent CIPE from carrying out crucial work, including efforts to shore up democratic governance and improve economic stability in countries like Yemen, Lebanon, and Iraq. *Id.* ¶ 84. Finally, the Solidarity Center could be forced to lay off one-third of its staff, reduce its program budget by one third, and cut its global infrastructure by the same margin. *Id.* ¶ 89. In short, the institutes that have been "central to the Endowment's success and impact," TRO Decl. ¶ 41, face

the risk of decimation.  Absent relief, they will be forced to abandon critical work.

**B.    The Halt in Funding Threatens Irreparable Damage to the Endowment's Reputation as a Trusted Partner**

The funding crisis goes beyond the immediate work of the Endowment; it reaches the Endowment's long-term reputation.  *See Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962).  Nongovernmental organizations "around the world, particularly in the most dangerous and difficult environments, seek out" the Endowment for its reputation as a reliable partner.  TRO Decl. ¶ 54.  Each grantee expects "that [the Endowment] will honor its financial and operational obligations to partners, as [the Endowment] has done for 42 years." *Id.*  This reputation is "critical to [the Endowment's] ability to engage productively with partners worldwide." *Id.*  But this reputation would be imperiled if the Endowment is forced to deny full funding to grantees midstream. Even if the Endowment's funding is later restored, grantees are unlikely to soon forget the disruption.  Decl. ¶ 97.  The reputational harms cascade to the grantees as well.  Abruptly "ceasing their activities will destroy the trust, credibility, relationships, and networks these organizations have built up over decades."  TRO Decl. ¶ 55.  Accordingly, absent prompt relief, some Endowment grantees "may simply not be around to continue their important work," even if Endowment funding were to resume.  *Id.*  That is irreparable harm.

**III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF GRANTING THE PRELIMINARY INJUNCTION**

The balance of equities and public interest "merge when the Government is the opposing party." *Am. Ass'n of Political Consultants v. SBA*, 613 F. Supp. 3d 360, 365 (D.D.C. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Those factors both counsel in favor of relief—to halt the Executive Branch's unlawful failure to follow clear congressional directions, and to ensure access to funds that are critical for the Endowment, its core institutes, and its grantees.

Here, the Endowment's likelihood of success on the merits, *see supra* pp. 14-39, establishes

both factors. "[T]here is a substantial public interest 'in having governmental agencies abide by . . . federal laws,'" *Newby*, 838 F.3d at 12 (citation omitted), and "[t]here is generally no public interest in the perpetuation of unlawful agency action," *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021). "[A]ny hardship" the government "might claim is not legally relevant because as a legal matter '[t]he Government "cannot suffer harm from an injunction that merely ends an unlawful practice.'" *Ramirez v. ICE*, 568 F. Supp. 3d 10, 34 (D.D.C. 2021) (citation omitted).

Beyond the conclusive public interest in having the Executive follow the law, there is a strong public interest in the Endowment's functioning. President Reagan inspired Congress to recognize the Endowment when he called for a global effort to support democracy worldwide. TRO Decl. ¶ 3. For over forty years, the Endowment, led by a bipartisan Board, has contributed directly to our national interest by fostering a "more prosperous, safer, and democratic world" and building a "deep reservoir" of world leaders "predisposed to working collaboratively with the United States in pursuit of shared interests." *Id.* ¶ 10. It is not in the public interest for this important institution to be thrust into financial jeopardy and hamstrung from pursuing its mission.

Nor is there an equitable justification for withholding a preliminary injunction. Since its inception, the Endowment has received a consistent source of funds from Congress, and it has used those funds to meet its grant obligations to its core institutes and grantees. *See id.* ¶ 39. An injunction would restore that forty-plus-year status quo and avert the substantial and irreparable injuries that the Endowment is facing. *See supra* pp. 39-44. It would also restore the appropriate balance between Congress, with its power of the purse, and the Executive Branch, which must take care that Congress's instructions are followed. Conversely, allowing the freeze on the Endowment's funds to persist would not serve any articulated interest of the Defendants.

## CONCLUSION

This Court should grant the motion for a preliminary injunction.

Dated: July 21, 2025                    Respectfully submitted,

                                        /s/ *Donald B. Verrilli, Jr.*
                                        Donald B. Verrilli, Jr. (D.C. Bar No. 420434)
                                        Ginger D. Anders (D.C. Bar No. 494471)
                                        Jeremy S. Kreisberg (D.C. Bar No. 1048346)
                                        Helen E. White (D.C. Bar No. 1741368)
                                        Esthena L. Barlow (D.C. Bar No. 90000252)
                                        MUNGER, TOLLES & OLSON LLP
                                        601 Massachusetts Avenue NW, Suite 500E
                                        Washington, D.C. 20001
                                        (202) 220-1100
                                        Donald.Verrilli@mto.com
                                        Ginger.Anders@mto.com
                                        Jeremy.Kreisberg@mto.com
                                        Helen.White@mto.com
                                        Esthena.Barlow@mto.com

                                        Gabriel M. Bronshteyn (*pro hac vice*)
                                        MUNGER, TOLLES & OLSON LLP
                                        560 Mission Street, Twenty-Seventh Floor
                                        San Francisco, California 94105
                                        (415) 512-4000
                                        Gabriel.Bronshteyn@mto.com

                                        Miranda E. Rehaut (*pro hac vice* forthcoming)
                                        MUNGER, TOLLES & OLSON LLP
                                        350 S. Grand Avenue, Fiftieth Floor
                                        Los Angeles, California 90071
                                        (213) 683-9100
                                        Miranda.Rehaut@mto.com

                                        *Attorneys for the National Endowment for
                                            Democracy*