# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL ENDOWMENT FOR DEMOCRACY, | : : : | No. 1:25-cv-648-DLF |
| *Plaintiff*, | : : | |
| v. | : : | |
| UNITED STATES OF AMERICA, et al., | : : | |
| *Defendants*. | : : | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## <u>MOTION FOR A PRELIMINARY INJUNCTION</u>

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

LEGAL STANDARD......................................................................................................... 6

ARGUMENT ...................................................................................................................... 7

I.      Plaintiff Cannot Establish a Likelihood of Success on the Merits.................................... 7

        A.      Plaintiff is Unlikely to Succeed on its APA claims. ................................................ 7

                1.      Defendants' decision to disburse remaining funds in Fiscal Year
                        2026 is fully consistent with the law.......................................................... 7

                        a.      NED Act and Appropriations Laws.......................................... 7

                        b.      Anti-Deficiency Act.................................................................. 12

                2.      Defendants' determination was reasonable and not arbitrary or
                        capricious ...................................................................................... 13

        B.      Plaintiff is Unlikely to Succeed on its Constitutional Claims.............................. 16

                1.      Appropriations and Spending Clauses ...................................................... 17

                2.      Presentment Clause.................................................................................... 17

                3.      Take Care Clause ....................................................................................... 18

                4.      Separation of Powers ................................................................................. 20

II.     Plaintiff Cannot Establish Irreparable Harm.................................................................... 21

III.    The Balance Of Equities (Including The Public Interest) Does Not Favor A
        Preliminary Injunction. ...................................................................................................... 25

IV.     Plaintiff Should Be Ordered to Post Security in Connection with Any Preliminary
        Injunctive Relief and this Court Should Stay Relief Pending the Government's
        Determination of Whether to Appeal.................................................................................. 27

CONCLUSION .................................................................................................................. 28

i

## TABLE OF AUTHORITIES

**Cases**

*Air Transport Ass'n of Am., Inc. v. Export-Import Bank of the U.S.*,
  840 F. Supp. 2d 327 (D.D.C. 2012) .......................................................................... 24

*Alcresta Therapeutics, Inc. v. Azar*,
  318 F. Supp. 3d 321 (D.D.C. 2018) .......................................................................... 25

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
  968 F. Supp. 2d 38 (D.D.C. 2013) ............................................................................ 24

*Amica Ctr. for Immigrant Rts. v. U.S. Dep't of Just.*,
  No. CV 25-298 (RDM), 2025 WL 1852762 (D.D.C. July 6, 2025) ................................. 16, 17

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
  897 F.3d 314 (D.C. Cir. 2018) .................................................................................. 6

*Baker v. Carr*,
  369 U.S. 186 (1962) ............................................................................................... 19

*Boivin v. U.S. Airways, Inc.*,
  297 F. Supp. 2d 110 (D.D.C. 2003) .......................................................................... 22

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) .................................................................................. 21

*Chi. & S. Air Lines v. Waterman S. S. Corp.*,
  333 U.S. 103 (1948) ............................................................................................... 20

*Church v. Biden*,
  573 F. Supp. 3d 118 (D.D.C. 2021) .......................................................................... 25

*Citizens for Resp. & Ethics in Was. v. U.S. Ctrs. for Disease Control & Prevention*,
  No. CV 25-1020 (TJK), 2025 WL 1580809 (D.D.C. June 4, 2025) ............................... 24-25

*Clifford v. Pena*,
  77 F.3d 1414 (D.C. Cir. 1996), *aff'd*, 77 F.3d 1414 (D.C. Cir. 1996) ............................. 14, 15

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ............................................................................................... 17, 18

*Clinton v. Jones*,
  520 U.S. 681 (1997) ............................................................................................... 20

*Dalton v. Specter*,
  511 U.S. 462 (1994) ............................................................................................... 16, 17, 19

*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) ........................................................... 26

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ................................................................................ 15

*\*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ........................................................................... 15

*DSE, Inc. v. United States*,
    169 F.3d 21 (D.C. Cir. 1999) ............................................................. 27

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ........................................................................... 15

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ........................................................................... 13

*Feng Wang v. Pompeo*,
    354 F. Supp. 3d 13 (D.D.C. 2018) ....................................................... 6

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ........................................................................... 20

*Gulf Oil Corp. v. Dep't of Energy*,
    514 F. Supp. 1019 (D.D.C. 1981) ...................................................... 22

*Hi-Tech Pharmacal Co. v. FDA*,
    587 F. Supp. 2d 1 (D.D.C. 2008) ................................................. 21, 25

*Kim v. FINRA*,
    698 F. Supp. 3d 147 (D.D.C. 2023) .................................................... 26

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ............................................................... 23

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................................... 19

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) ............................................................ 19

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1866) ....................................................... 19, 20

*Monzillo v. Biller*,
    735 F.2d 1456 (D.C. Cir. 1984) ......................................................... 27

*Morrison v. Olson*,
  487 U.S. 654 (1988).............................................................................. 20

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983).............................................................................. 14

*Mylan Pharms., Inc. v. Shalala*,
  81 F. Supp. 2d 30 (D.D.C. 2000)............................................................ 6

*Nat'l Mining Ass'n v. Jackson*,
  768 F. Supp. 2d 34 (D.D.C. 2011).......................................................... 22

*Nat'l Treasury Emps. Union v. Trump*,
  No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ................................. 27

*New Life Evangelistic Ctr., Inc. v. Sebelius*,
  753 F. Supp. 2d 103 (D.D.C. 2010)........................................................ 9

*New Mexico v. Musk*,
  769 F.Supp.3d 1 (D.D.C. 2025)............................................................. 25

*Nken v. Holder*,
  556 U.S. 418 (2009)........................................................................... 25

*Olivares v. Transp. Sec. Admin.*,
  819 F.3d 454 (D.C. Cir. 2016).............................................................. 14

*Overdevest Nurseries, L.P. v. Scalia*,
  454 F. Supp. 3d 46 (D.D.C. 2020).......................................................... 8

*Pharm. Rsch. & Mfrs. of Am. v. Fed. Trade Comm'n*,
  44 F. Supp. 3d 95 (D.D.C. 2014)........................................................... 8

*Planned Parenthood of Greater N.Y. v. U.S. Dep't of Health & Hum. Servs.*,
  No. CV 25-1334 (TJK), 2025 WL 1768100 (D.D.C. June 26, 2025)..................... 22-23

*Printz v. United States*,
  521 U.S. 898 (1997)........................................................................... 20

*Safari Club Int'l v. Jewell*,
  47 F. Supp. 3d 29 (D.D.C. 2014)............................................................ 22

*Seafarers Int'l Union of N. Am. v. United States*,
  891 F. Supp. 641 (D.D.C. 1995)............................................................ 14

*Strait Shipbrokers Pte. Ltd. v. Blinken*,
  560 F. Supp. 3d 81 (D.D.C. 2021)......................................................... 6, 7

*Trump v. Thompson*,
  20 F.4th 10 (D.C. Cir. 2021) ............................................................................ 6

*Widakuswara v. Lake*,
  No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ................................... 18

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ......................................................................................... 6, 26

*\*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ........................................................ 21, 22, 23, 24

**<u>Constitution</u>**

U.S. Const. art. II, § 3 ........................................................................................ 19

**<u>Statutes</u>**

22 U.S.C. § 4411 ........................................................................................... 3, 18

22 U.S.C. §§ 4411 *et seq* ..................................................................................... 3

22 U.S.C § 4412(a) .......................................................................................... 3, 7

31 U.S.C. § 1301(c) ............................................................................................. 8

31 U.S.C. §§ 1341 *et seq* ................................................................................... 12

*\*31 U.S.C. § 1512* ................................................................................... *passim*

31 U.S.C. § 1513 ................................................................................................ 11

44 U.S.C. § 4412(a) ............................................................................................. 8

*\*American Relief Act*,
  Pub. L. No. 118-158, 138 Stat. 1722 (2025) ..................................................... 3, 8

*\*Continuing Appropriations and Extensions Act*,
  Pub. L. No. 118-83, 138 Stat. 1525 (2025) ....................................................... 3, 8

*\*Full-Year Continuing Appropriations and Extensions Act*,
  Pub. L. No. 119-4, 139 Stat. 9 (2025) .............................................................. 3, 8

*\*Further Consolidated Appropriations Act*,
  Pub. L. No. 118-47, 138 Stat. 460 (2024) ....................................................... 3, 7-8

**<u>Rules</u>**

Fed. R. Civ. P. 65(c) ......................................................................................... 27

**Administrative & Executive Materials**

*Establishing the Divisions of the Executive Office of the President and Defining Their Functions and Duties*, Exec. Order No. 8,248,
4 Fed. Reg. 3864 (Sept. 8, 1939) ............................................................................................... 3

**Other Authorities**

GAO, *Principles of Federal Appropriations Law* 5-7 (3d ed. 2004) (Red Book)............... 3, 8, 11

OMB Cir. No. A-11 ................................................................................................................ 11

*The President's Veto Power*,
12 Op. O.L.C. 128 (1988) ..................................................................................................... 18

## INTRODUCTION

Defendants respectfully submit this opposition to Plaintiff's Motion for a Preliminary Injunction, ECF No. 40 ("Plaintiff's Motion").

In the current fiscal year, Defendant Department of State ("the Department" or "State") has disbursed to Plaintiff over $220,000,000 in grant funding between the Department and Plaintiff. The Department has determined, however, that the most effective and economical use of the remaining Fiscal Year 2025 funds appropriated for grants to Plaintiff would be to designate those resources for Fiscal Year 2026. These Fiscal Year 2025 funds are "no-year" funds, which means that, by law, they need not be expended in any particular fiscal year. Plaintiff's Motion seeks a mandatory injunction overriding the Department's judgment, and, in effect, requiring Defendants to facilitate disbursement of those funds to Plaintiff in the current fiscal year. The Court should deny Plaintiff's Motion for several reasons.

To begin, Plaintiff cannot show a likelihood of success on the merits of its claims. Plaintiff argues that the Department's decision in this case was contrary to law, but ignores that Congress specified, in the very statutes on which Plaintiff's funding depends, that the funds appropriated for Fiscal Year 2025 were no-year funds that were to "remain available until expended." Where Congress went out of its way to specify that the appropriated funds were not required to be spent in 2025, it is reasonable and consistent with law to designate those funds for spending in next fiscal year. The Department's decision to do so was also substantively reasonable: given the uncertainty about whether NED will receive *any* new appropriated funding next fiscal year, its decision ensures that NED will enjoy continued access to funds for at least another fiscal year.

1

Nor can Plaintiff establish a likelihood of success on its statutory claims by reframing them as constitutional.  The Supreme Court has made clear that allegations the Executive has acted in excess of statutory authority cannot properly be presented as constitutional claims.  And, even if that were not so, each of Plaintiff's constitutional claims would fail on its merits for the reasons discussed herein.

Ultimately, none of the four factors informing whether a party is entitled to preliminary relief favors entry of an injunction here.  Plaintiff has made no showing of cognizable irreparable harm likely to result in the absence of preliminary relief; and the balance of equities and the public interest cut against the Plaintiff's request.

For all these reasons, the Court should deny Plaintiff's Motion.

## **BACKGROUND**

This case involves the funding of the National Endowment for Democracy (NED).  NED is a private, non-profit corporation, whose purposes are, *inter alia,* to (1) encourage free and democratic institutions throughout the world through private sector initiatives; (2) facilitate exchanges between United States private sector groups (especially the two major American political parties, labor, and business) and democratic groups abroad; (3) promote United States nongovernmental participation (especially through the two major American political parties, labor, business, and other private sector groups) in democratic training programs and democratic institution-building abroad; (4) strengthen democratic electoral processes abroad; (5) foster cooperation with those abroad dedicated to the values, institutions, and organizations of democratic pluralism; and (6) encourage the establishment and growth of democratic development consistent with the United States' national interests and with the needs of

democratic groups in other countries which are supported by programs funded by the Endowment. 22 U.S.C. § 4411.

Under the National Endowment Act, 22 U.S.C. §§ 4411 *et. seq.*, (NED Act), Congress recognized the creation of the National Endowment for Democracy and provided that the Department of State "shall make an annual grant to the Endowment to enable the Endowment to carry out its purposes…" 22 U.S.C § 4412(a).

Via continuing resolutions, Congress appropriated $315,000,000 for use in grants to NED for Fiscal Year 2025. *See* Continuing Appropriations and Extensions Act, Pub. L. No. 118-83, § 101, 138 Stat. 1525, 1524 (2025); American Relief Act, Pub. L. No. 118-158, § 101, 138 Stat. 1722, 1723 (2025); Full-Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, § 1101, 139 Stat. 9, 10 (2025). These continuing resolutions provided for funding at the level Congress provided in FY 2024, and "under the authority and conditions provided" in the appropriations Act for Fiscal Year 2024. Further Consolidated Appropriations Act, Pub. L. No. 118-47, § 816, 138 Stat. 460, 592 (2024). These continuing resolutions provided for funding at the level Congress provided in FY 2024, and "under the authority and conditions provided" in the appropriations Act for Fiscal Year 2024. In the FY 2024 appropriations act, Congress clarified that the sum appropriated was "[f]or grants made by the Department of State to the National Endowment for Democracy, as authorized by the National Endowment for Democracy Act (22 U.S.C. 4412), $315,000,000, *to remain available until expended*." Further Consolidated Appropriations Act, Pub. L. No. 118-47, 138 Stat. 737 (emphasis added). Such language means that appropriations are available for multiple fiscal years, and are known as no-year funds. *See* GAO, *Principles of Federal Appropriations Law* 5-7 (3d ed. 2004) (Red Book).

Plaintiff initiated this action on March 5, 2025, *see* Compl., ECF No. 1, and moved for a temporary restraining order the next day, *see* ECF No. 5.  At that time, Plaintiff sought disbursement of funds then in its FY 2025 National Endowment for Democracy appropriation, consisting of funds that the State Department had previously obligated to the Endowment through a grant, and obligation of additional funds in that appropriation that had not been obligated through a grant to Plaintiff.  *See id.*  By March 10, 2025, because the former tranche of previously obligated funds had been disbursed, and officials were taking steps to facilitate the obligation of the latter tranche, the parties jointly moved to hold the motion for a temporary restraining order in abeyance.  *See* Joint Mot. to Hold TRO Proceedings in Abeyance, ECF No. 14.  By the parties' next status report, on March 21, 2025, the latter tranche of funds had been obligated.  *See* Joint Status Report, ECF No. 15.  The parties continued, via status reports, to jointly update the Court regarding the status of funding for Plaintiff.  They reported that, from March 2025 to May 2025, OMB provided 30-day apportionments of funding for Plaintiff each month.  By May 28, 2025, NED had already received $220,059,000 of funds from the State Department.  AR000003 ¶ 3.

On May 29, 2025, the State Department submitted a Spending Plan for "Diplomatic Engagement" accounts, composed of accounts receiving appropriations in title I of the annual Department of State, Foreign Operations, and Related Programs Appropriations Act, including the appropriation for the National Endowment for Democracy, to the House Foreign Affairs Committee, Senate Foreign Relations Committee, House Appropriations Committee, and Senate Appropriations Committee.  *Id.*  This spending plan advised that remaining unobligated Fiscal Year 2025 funds appropriated for grants to NED "may be made available for obligation in Fiscal

Year 2025, subject to review for alignment with Administration priorities." *Id.* ¶ 4 (citation omitted).

As of May 29, 2025, $94,941,000 of the FY 2025 funds appropriated for grants to the National Endowment for Democracy out of a total of $315,000,000, remained unobligated. *Id.* ¶ 4. In other words, Defendants have obligated approximately 70% of the FY 2025 no-year funds.

On June 11, 2025, Defendants advised NED that remaining FY 2025 funds would be apportioned for FY 2026 rather than for additional obligations in FY 2025. *See* Joint Status Report, ECF No. 33. Defendants explained that this was so because these are no-year funds and Congress specifically permits the State Department to obligate these funds for the relevant purposes in this fiscal year and any subsequent fiscal year "until expended." OMB is required to apportion no-year funds "to achieve the most effective and economical use[,]" 31 U.S.C. § 1512(a). AR000003 ¶ 6. The State Department in consultation with OMB determined that disbursing the funds in FY 2026 would achieve the most effective and economical use of the remaining funds as sufficient funds totaling over $220,000,000 had already been disbursed to NED for FY2025. *Id.* at ¶ 7. Thus, reserving the $94,941,000 of FY 2025 funds ensures that NED will retain at least that level of funding in the coming fiscal year. *Id.* at ¶ 8.

Following the Defendants' determination, Plaintiff indicated that it wished to restart proceedings in this case. *See* ECF No. 33. On June 30, 2025, Plaintiff filed its Amended Complaint, *see* Am. Compl., ECF No. 35, and, on July 21, 2025, Plaintiff submitted its motion for a preliminary injunction, seeking "regular apportionment, obligation, and disbursement" of the remaining no-year funds Congress had appropriated in 2025, [Proposed] Order Granting Pl.'s Mot. for Prelim. Inj. at 1, ECF No. 40-4.

**LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Accordingly, the moving party must "make a 'clear showing that four factors, taken together, warrant [such] relief'": (1) "likely success on the merits"; (2) "likely irreparable harm in the absence of preliminary relief"; (3) "a balance of the equities in its favor"; and (4) "'accord with the public interest." *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 321 (D.C. Cir. 2018) (citation omitted). "The likelihood of success and irreparability of harm 'are the most critical' factors." *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) (citation omitted). And the third and fourth factors "merge when the government is the opposing party." *Id.*

Moreover, the particular form of injunction Plaintiff seeks here—an affirmative injunction ordering Defendants to change the status quo, and require the "regular apportionment, obligation, and disbursement" of funds going forward, under the Court's supervision, ECF No. 40-4 at 1—comprises a highly disfavored form of relief. Mandatory preliminary injunctions, which seek to alter rather than preserve the status quo by compelling affirmative action, "are disfavored as an even more extraordinary remedy than the typical preliminary injunction, especially when directed at the United States Government." *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 92–93 (D.D.C. 2021) (quotation marks and citations omitted); *see also*, *e.g.*, *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000). Plaintiffs seeking such relief face a "significantly heightened" burden of showing an entitlement to relief. *Feng Wang v. Pompeo*, 354 F. Supp. 3d 13, 20 (D.D.C. 2018). "[C]ourts exercise extreme caution in assessing" motions seeking affirmative injunctive relief, and as a general rule they

deny such relief unless "the facts and law clearly favor the moving party." *Shipbrokers*, 560 F.

Supp. 3d at 93 (citations omitted).

## ARGUMENT

I.    **Plaintiff Cannot Establish a Likelihood of Success on the Merits.**

    **A.  Plaintiff is Unlikely to Succeed on its APA claims.**

Plaintiff advances two primary APA claims: that the funding pause is contrary to law and

that the pause is arbitrary and capricious.  Neither is likely to succeed.

    **1.  Defendants' decision to disburse remaining funds in Fiscal Year 2026 is fully consistent with the law.**

NED argues that Defendants, by determining that the FY 2025 "no-year" funds should be

paid in FY 2026, are violating (1) the NED Act, (2) appropriation laws generally, and (3) the

Anti-Deficiency Act.  None of these claims are correct.

    **a.  NED Act and Appropriations Laws**

The NED Act requires the State Department to make an "annual grant to the

Endowment."  22 U.S.C. § 4412(a).  "Such grants shall be made with funds specifically

appropriated for grants to the Endowment."  *Id.*  The State Department did as the law dictates –

it made available to NED an annual grant of $220,059,000 in the current fiscal year. AR000003,

¶ 3.  Nothing in the language of the NED Act requires that Defendants do anything more or that

Defendants obligate and disburse all available funds to NED in the same year those funds are

appropriated.

The NED Act must be read in concert with the relevant appropriations laws.  Congress's

appropriation language for NED stated that "[f]or grants made by the Department of State to the

National Endowment for Democracy, as authorized by the National Endowment for Democracy

Act (22 U.S.C. 4412), $315,000,000, *to remain available until expended . . . .*" Pub. L. No. 118-

47, 138 Stat. at 737.[1]  As NED acknowledges, *see* Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. ("Pl.'s Mem.") at 30, ECF No. 40-1, the "to remain available until expended" language means that NED's funds are "no-year" funds.  No-year funds are "available for obligation without fiscal year limitation."[2]  Red Book 5-7.  Notably, such language is not part of every appropriation; Congress specifically decided to include that provision with respect to the funds appropriated for grants to NED.

Thus, Defendants are entitled to make available for obligation a part of NED's appropriated funds in the next fiscal year, consistent with the "to remain available until expended" language that Congress directed.  And, therefore, no violation of the NED Act exists here.  Defendants made a grant to NED as required by 44 U.S.C. § 4412(a) and decided to allocate the remaining amount for obligation in the next fiscal year as allowed by the appropriation language.  Both decisions are consistent with the law.  Indeed, were these statutes read to require all FY 2025 funding to be obligated and disbursed in the current fiscal year, the no-year language would be rendered a nullity.  *See Overdevest Nurseries, L.P. v. Scalia*, 454 F. Supp. 3d 46, 56 (D.D.C. 2020) (courts should give "effect, if possible, to every clause and word of a statute") (quoting *Pharm. Rsch. & Mfrs. of Am. v. Fed. Trade Comm'n*, 44 F. Supp. 3d 95, 112 (D.D.C. 2014))), *aff'd sub nom. Overdevest Nurseries, L.P. v. Walsh*, 2 F.4th 977 (D.C. Cir. 2021).

---

[1] Congress appropriated the same $315,000,000 amount for FY 2025 in successive continuing resolutions, subject to the same terms and conditions as the FY 2024 appropriation. *See* Pub. L. No. 118-83, 138 Stat. 1524; Pub. L. No. 118-158, 138 Stat. 1722; Pub. L. No. 119-4, 139 Stat. 9.

[2] For an appropriation to be considered a no-year appropriation, the appropriating language must expressly so provide. 31 U.S.C. § 1301(c).  The standard language used to make a no-year appropriation is "to remain available until expended."  Red Book at 5-7.  As discussed above, that language is used here.

NED spins a web of connections running from Elon Musk to a private think tank to various high-level government officials to ascribe nefarious motivations to Defendants and to assert that Defendants are withholding funds for improper policy reasons.  Pl.'s Mem. at 15–19.  Yet, Plaintiff provides no evidence that any of these individuals played a part in Defendant's determination.  Regardless, the crux of all of these arguments is disagreement over Defendants' decision, not evidence of action "not in accordance with [the] law."  *See*, *e.g.*, *New Life Evangelistic Ctr., Inc. v. Sebelius*, 753 F. Supp. 2d 103, 133 (D.D.C. 2010) ("[W]hile New Life may understandably disagree with HHS' determination, mere disagreement cannot discharge its burden of establishing that the determination was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.").  In any event, NED points to no part of the NED Act that prohibits the action Defendants have taken here.

NED claims that "Congress expressly denied the Executive any discretion to require the Endowment to comply with requirements beyond those specified in the statute . . . ."  Pl.'s Mem. at 20.  But Congress gave the Executive limited discretion to obligate funding outside of the initial fiscal year, as discussed above.  Defendants are not asking NED to comply with any extra-statutory requirement—Defendants are merely exercising their own authority under the relevant appropriations laws in executing the NED Act.

And the fact that Defendants have made different decisions in prior years as to how to apportion NED's funding does not mean Defendants are acting contrary to law now, as the currently applicable law explicitly allows for obligation and disbursement over multiple years.  *See* AR000003, ¶ 5.

NED's claim that this process somehow not only violates the NED Act but relevant appropriations laws is belied by the facts.  NED argues that Congress' specification of a "sum

certain" to the Endowment, combined with language in the 2024 appropriation acts directing funding "'as authorized by the [NED] Act' – i.e., through an 'annual' grant" is proof that "Congress intends the Endowment to receive its full appropriation and to make the directed allocation each year." Pl.'s Mem. at 29-30.

But, as discussed above, the appropriations act expressly contemplates holding funds over for future fiscal years. That is the meaning of "to remain available until expended" and that is why NED's appropriated funds are no-year funds. *Supra* at 4-5. In the course of arguing that Defendant's lack authority to take this action, NED actually acknowledges the no-year nature of these funds and the authority given to the Executive to ensure that such funds are apportioned for the most "effective and economical use" under the Anti-Deficiency Act (31 U.S.C. § 1512(a)). *See* Pl.'s Mem. at 30 (citation omitted).

This is exactly what has occurred here. As part of standard apportionment authority, no-year funds must be apportioned to achieve the "most effective and economical use." 31 U.S.C. § 1512(a). State, in consultation with OMB, determined that the most effective and economical use would be to allocate funds from the FY 2025 appropriation for obligation in the next fiscal year.

Plaintiff posits that the authority to determine how to spend no-year funds rests entirely with NED, and not with the government generally, nor State specifically as "the passthrough agency that disburses its funds pursuant to Congress's mandatory instruction." Pl.'s Mem. at 30. But this position defies logic as it would remove the Executive from its statutory role, acknowledged by NED, *id.*, to achieve the most effective and economical use of appropriated no-year funds. *Id.* And as other parts of the applicable statutory authorities clarify, the Executive retains authority over what is the most effective and economical use of appropriated funds. 31

U.S.C. § 1512(a) states "[a]n appropriation for an indefinite period and authority to make obligations by contract before appropriations shall be apportioned to achieve the most effective and economical use." 31 U.S.C. § 1513 designates to the President authority over apportionments to Executive agencies. And 31 U.S.C. § 1512(b)(2) states that "[t]he official designated in section 1513 . . . to make apportionments shall apportion an appropriation . . . *as the official considers appropriate*." (emphasis added).

That official is the President, who delegated his authority to OMB over eighty years ago. *See Establishing the Divisions of the Executive Office of the President and Defining Their Functions and Duties*, Exec. Order No. 8,248, 4 Fed. Reg. 3864 (Sept. 8, 1939); *see also* OMB Cir. A-11, § 120.1. Thus, OMB and the relevant agency, rather than the grantee, are responsible for approving the apportionments of funds and determining the most effective and economical use of appropriated funds based on the agency's request. *See also* Exec. Order No. 8,248, 4 Fed. Reg. at 3864–65 (tasking OMB with "aid[ing] the President to bring about more efficiency and economical conduct of Government service" and other activities so "that the monies appropriated by the Congress may be expended in the most economical manner possible.").

Further, NED's citation to the nonbinding Red Book as support for its argument is unavailing. The Red Book discusses no-year appropriations generally and provides examples of how some agencies resolved questions relating to use of such funds. Red Book 5-7 to 5-9. But NED's Red Book citations contain no discussion of the funding of non-government entities or remotely suggest that an agency in State's role would have no authority beyond serving as a "passthrough." Pl.'s Mem. at 30.

For all these reasons, Defendants' actions here are fully consistent with the NED Act and appropriations laws more broadly.

### b.  Anti-Deficiency Act

Plaintiff's arguments grounded in the Anti-Deficiency Act, *see* Pl's Mem. at 21–28, fare no better.  Broadly, the Anti-Deficiency Act prohibits federal agencies and employees from spending, or committing themselves to spending, in advance of or in excess of appropriations. *See* 31 U.S.C. §§ 1341, *et seq*.  Plaintiff here relies on portions of the Anti-Deficiency Act, addressing apportionment and reserves.  *See* Pl.'s Mem. at 21–28 (citing 31 U.S.C. § 1512). Specifically, Plaintiff cites the requirement that "[a]n appropriation for an indefinite period . . . shall be apportioned to achieve the most effective and economical use[,]" 31 U.S.C. § 1512(a), and the requirement that "a reserve may be established only" in certain specified circumstances, *see id.* § 1512(c).

With the latter argument, Plaintiff sets up a strawman, insisting that the Anti-Deficiency Act's reserve provision does not authorize Defendants' actions in this case.  *See* Pl.'s Mem. at 21–23.  On Plaintiff's own telling, section 1512(c) outlines circumstances in which the government may "withhold funds from the spending agency altogether instead of setting an apportionment timetable."  *Id.* at 22.  But that is not what Defendants have done in this case. Defendants have instead allocated a fraction of no-year funds *for the next fiscal year* as discussed above.  *See supra* at 4-5, 9-10.  They have not withheld funds or created a reserve within the meaning of the relevant authority.

A reserve, under section 1512(c), is an amount withheld from obligation for one of the three purposes outlined under subsection (c)(1)(A)–(C).  Those purposes of a reserve—to provide for contingencies (e.g., debt limit), to achieve savings, and as specifically authorized by law—are different than the purposes for which the appropriation was made available. Apportionment for a subsequent fiscal year is not reserving funds for those purposes, but rather

12

making those funds available for obligation for their original appropriated purposes in that subsequent fiscal year.  Here, the apportionment does not preclude the obligation of funds on annual NED grants, nor otherwise reserve those appropriated funds for contingencies or savings. Therefore, the reserve provision of the Anti-Deficiency Act has no application here.

Likewise, Plaintiff's other argument grounded in the Anti-Deficiency Act—the contention that Defendants are attempting to exercise policy control over Congress's appropriation decisions, *see* Pl.'s Mem. at 23–28—similarly targets a position that Defendants have not taken here.  Defendants are giving effect to Congress's decision to designate these funds as no-year funds.  Defendants' decision that designation of the remaining no-year funds for FY 2026 would "achieve the most effective and economical use" of those funds, 31 U.S.C. § 1512(a), was based on the determination that this would ensure Plaintiff would have funding during the next fiscal year.  *See infra* at 5.  As discussed below, that was a reasonable determination, and the Anti-Deficiency Act imposes no contrary requirement.  Indeed, this effectuates the Congressional requirements of both section 1512(a) and the relevant appropriations statutes.

### 2.  Defendants' determination was reasonable and not arbitrary or capricious.

"The APA's arbitrary-and-capricious standard requires" only that an "agency action be reasonable," and "[j]udicial review under that standard is deferential[.]"  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  Defendants here acted reasonably in allocating a portion of NED's funding for obligation in FY 2026.  Defendants articulated a rational basis for their decision: a determination that no-year funds should be allocated for the next fiscal year because sufficient funds had already been disbursed to NED for FY2025. AR000004 ¶ 7. Retaining the remaining $94,941,000 of FY 2025 funds for disbursement in FY 2026 ensures

that NED will maintain at least that level of funding in the coming fiscal year, which is consistent with the most effective and economical use of those funds. *Id.* ¶ 8. That basis was reasonable and reasonably explained—which is all the APA requires. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Pitkin Declaration included as part of the administrative record is not, as NED maintains, an impermissible post-hoc rationalization of Defendants' determination. Rather, the declaration is a further articulation of that decision and remains consistent with the May 29, 2025 Spending Plan and the apportionment decision as reported to NED on June 11, 2025 and to the Court on June 12, 2025. *See* ECF No. 33. "[T]here is nothing improper in receiving declarations that 'merely illuminate[] reasons obscured but implicit in the administrative record.'" *Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996) (quoting *Seafarers Int'l Union of N. Am. v. United States*, 891 F. Supp. 641, 647 (D.D.C. 1995), *aff'd*, 77 F.3d 1414 (D.C. Cir. 1996)); *see also Olivares v. Transp. Sec. Admin.,* 819 F.3d 454, 464 (D.C. Cir. 2016) (admitting a declaration that is "merely explanatory of the original record" and helps to "furnish[] an explanation of the administrative action that is necessary to facilitate effective judicial review." (internal citation omitted)).

The Pitkin Declaration does just that. The declaration amplifies the statements in the Spending Plan and apportionment decision to clarify Defendants' reasoning. In other words, consistent with the review discussed in the Spending Plan, AR000060, Defendants concluded that sufficient funds had already been disbursed to NED. Thus, in order to achieve the most effective and economical use of the remaining FY 2025 funds, Defendants determined that those funds would be obligated and disbursed in Fiscal Year 2026. Rather than obscuring Defendants' "obvious motivation" as NED claims, Pl.'s Mem. at 19, the declaration's statement explaining

14

that reserving this funding ensures that NED will retain at least $94,941,000 of funding in the

coming fiscal year in fact "merely illuminate[s]" the Defendants' decision. *Clifford*, 77 F.3d at

1418.

Finally, NED's claims that Defendants have improperly changed positions and failed to

address NED's reliance interests also fall flat. Pl.'s Mem at 34-35. Defendants have not

changed positions on their legal obligations. Rather, Defendants are merely using existing

authority to obligate funding differently than in prior years. But even if Defendants' decision is

seen as a change in policy, the Supreme Court has been clear that in such situations, the APA

does not require a heightened level of arbitrary and capricious review. *See FCC v. Fox

Television Stations, Inc.*, 556 U.S. 502, 515 (2009). An agency still must only articulate "a

rational connection between the facts found and the choice made." *Dep't of Com. v. New York*,

588 U.S. 752, 773 (2019) (citation omitted). As discussed above, Defendants have done so here.

As for NED's putative reliance interests, this case is not like *Department of Homeland

Security v. Regents of the University of California*, 591 U.S. 1 (2020), upon which NED

principally relies. Pl.'s Mem. at 35. That case featured a challenge to the recission of the

Deferred Access to Childhood Arrivals (DACA) program. The Supreme Court noted that DACA

recipients had made significant economic, personal, and financial commitment "in reliance on

the DACA program." *See Regents*, 591 U.S. at 31 (citation modified). But even there, the

Supreme Court emphasized that while "[t]hese are certainly noteworthy concerns, . . . they are

not necessarily dispositive." *Id*. Rather, the agency may determine that other interests and policy

concerns outweigh any reliance interests, or it may accord them no or diminished weight. *Id*. at

32. NED's reliance interests in continued unfettered federal funding must be judged in light of

the legal framework authorizing Defendants to obligate and disburse funding in future fiscal

years.  And NED never persuasively explains why NED and its grantees could not sufficiently "organize[] their affairs," Pl.'s Mem. at 35, to adjust for the obligation and disbursement of funds in the next fiscal year, especially in light of the already more than $220,000,000 disbursed in FY 2025.

### B.  Plaintiff is Unlikely to Succeed on its Constitutional Claims.

Plaintiff's constitutional claims are barred because they are, at their heart, purely statutory.  The Supreme Court has confirmed, "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims."  *Dalton v. Specter*, 511 U.S. 462, 473 (1994); *see also*, *e.g.*, *Amica Ctr. for Immigrant Rts. v. U.S. Dep't of Just.*, No. CV 25-298 (RDM), 2025 WL 1852762, at *17 (D.D.C. July 6, 2025) (same) (quoting *Dalton*, 511 U.S. at 473), *appeal filed*, No. 25-5254 (D.C. Cir. docketed July 16, 2025).  In *Dalton*, the Supreme Court rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation of powers doctrine."  511 U.S. at 471.  Not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id*. at 472.  This keeps with the long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority."  *Id.*  In reaching this conclusion, the Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases).  The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the officers rely on an unconstitutional statute.  *Id.* at 473 & n.5.

In this case, because Plaintiff's claims focus entirely on Plaintiff's contentions that Defendants have not acted consistent with their statutory obligations, *see* Am. Compl. ¶¶ 171–

206, such claims are untenable under *Dalton*. *See Amica Ctr for Immigrant Rts.*, 2025 WL 1852762, at *17 (noting that "'claims simply alleging that [an agency] has exceeded [its] statutory authority are not "constitutional" claims.'" (alteration in original) (quoting *Dalton*, 511 U.S. at 473).

Examining each constitutional claim in turn, it is evident that none is viable.

### 1. Appropriations and Spending Clauses

NED asserts that Defendants' "refusal to apportion the Endowment's funds" infringes on the Appropriations and Spending Clauses of the Constitution. Pl.'s Mem. at 36. But neither of these constitutional provisions—nor even the appropriations statute that Congress passed pursuant to its Article I powers—requires payment of the funds at issue to NED in fiscal year 2025. To the contrary, as discussed above, Congress specified that the funds at issue are no-year funds. While Plaintiff may bring an APA claim, as Plaintiff has done here, to dispute the correct interpretation of the appropriations statutes, there is no basis for a constitutional claim on these facts. *See Dalton*, 511 U.S. at 473; *Amica Ctr. for Immigrant Rts.*, 2025 WL 1852762 at *17.

### 2. Presentment Clause

Plaintiff's Presentment Clause claim fares no better. Plaintiff contends: "[w]ithholding funding for the Endowment that Congress has specifically provided is simply a line-item veto by another name." Pl.'s Mem. at 38. To begin, Defendants have not withheld any such funding, rather, as discussed repeatedly, they acted consistent with Congressional direction that the funds be no-year. But, in any event, this case differs significantly from *Clinton v. City of New York*, 524 U.S. 417, 436-41 (1998), where the Supreme Court held that the Line Item Veto Act violated the Constitution's Presentment Clause by allowing the President to cancel portions of statutes enacted by Congress. The instant suit, by contrast, does not involve "unilateral

Presidential action that either repeals or amends parts of duly enacted statutes." *Id*. at 439.

Rather, the dispute here concerns the Executive's authority to determine when to obligate and

expend appropriated funds pursuant to authority provided for in the appropriations statutes

themselves (i.e., the designation of "no-year funds"). Further, although no President had ever

asserted or exercised inherent line-item veto power, *see id.*, 524 U.S. at 440, there is a long

history of the Executive Branch declining to spend the full amount of appropriated funds in

various contexts, particularly in the realm of foreign affairs, *see The President's Veto Power*, 12

Op. O.L.C. 128, 168 & n.56 (1988). NED is a foreign policy entity. *See* 22 U.S.C. § 4411. The

Court in *Clinton* explicitly noted the President's "traditional authority to decline to spend

appropriated funds" stood in stark contrast to the Line Item Veto. 524 U.S. at 446-47.

Regardless, in *Widakuswara v. Lake*, which involved challenges to federal grant

terminations including a Presentment Clause claim as well as other constitutional claims, the

D.C. Circuit assessed: "these constitutional claims simply flow from allegations that the

Executive Branch has failed to abide by governing congressional statutes, which does not suffice

to trigger the distinctively strong presumptions favoring judicial review of constitutional claims."

*Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *5 (D.C. Cir. May 3, 2025) (per

curiam), *rev'd on other grounds on reconsideration en banc*, No. 25-5144, 2025 WL 1521355

(D.C. Cir. May 28, 2025). The same is true of Plaintiff's claim in this case.

**3. Take Care Clause**

As to the Take Care Clause: it should be noted at the outset that the Government is

unaware of any case that has ever held that that provision of the Constitution could be used as a

mechanism to obtain affirmative relief.  Plaintiff thus cannot prevail on its Take Care Clause

claim because the Take Care Clause does not provide a cause of action.

Through the Take Care Clause, the Constitution vests the President with broad,

discretionary authority to "take Care that the Laws be faithfully executed." U.S. Const. art. II,

§ 3.  Inevitably, the laws that the President executes are those enacted by Congress.  But no court

has read the Take Care Clause as opening the door to any plaintiff seeking to challenge the way

the President executes Congress's laws.  Rather, as the Supreme Court has recognized, the duty

of the President when exercising his power to see that the laws are faithfully executed is "purely

executive and political," and not subject to judicial direction.  *Mississippi v. Johnson*, 71 U.S. (4

Wall.) 475, 499 (1866); *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66 (1803) ("[T]he

President is invested with certain important political powers, in the exercise of which he is to use

his own discretion, and is accountable only to his country in his political character.").  To hold

otherwise would upset our constitutional scheme of separation of powers and allow judicial

superintendence over the exercise of Executive power that the Clause commits to the President

alone.  *Baker v. Carr*, 369 U.S. 186, 217 (1962) (Courts lack jurisdiction over a claim where

there is "a textually demonstrable constitutional commitment of the issue to a coordinate political

department."); *see also Dalton*, 511 U.S. at 474–75 (judicial review of discretionary Presidential

decisions "is not available"); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (holding that it

would be improper for the courts to take over the President's duty to "take Care that the Laws be

faithfully executed" (quoting U.S. Const. art. II, § 3)); *Marbury*, 5 U.S. (1 Cranch) at 170 ("The

province of the court is, solely, to decide on the rights of individuals, not to enquire how the

executive, or executive officers, perform duties in which they have a discretion.  Questions, in

their nature political, or which are, by the constitution and laws, submitted to the executive, can

never be made in this court."); *Chi. & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 114 (1948) (refusing to review President's decision that "embod[ied] Presidential discretion as to political matters beyond the competence of the courts to adjudicate"); *Mississippi*, 71 U.S. (4 Wall.) at 499.

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials. The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492–93 (2010) ("It is his responsibility to take care that the laws be faithfully executed." (emphasis omitted)); *id.* at 495–97; *see also Printz v. United States*, 521 U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 689–90 (1988); *Clinton v. Jones*, 520 U.S. 681, 712–13 (1997) (Breyer, J., concurring). A subordinate Executive officer cannot violate the President's duty to faithfully execute the laws. To the extent Plaintiff seeks to challenge the Defendants' not having amended Plaintiff's grant agreement to provide for disbursement of further funds for this year, *see* Am. Compl. ¶ 137, Plaintiff cannot do so through the Take Care Clause, but must do so, if at all, through the APA, which in this case presents separate insurmountable obstacles for Plaintiff for the reasons discussed above.

### 4. Separation of Powers

Plaintiff also does not state a viable claim asserting a violation of the separation of powers. Indeed, it is the relief that Plaintiff seeks that threatens the separation of powers and would undermine the President's authority. NED acknowledges the funds at issue in its preliminary injunction motion are no-year funds. *See*, *e.g.*, Pl.'s Mem. at 30; *see also supra* at 9-10. This means that Congress specifically intended to vest the Executive with the authority to

20

disburse them during years other than FY2025.  NED's arguments to the contrary ignore this statutory framework giving the Executive the authority to determine the year in which these funds are disbursed.  *See id.*

## II.    Plaintiff Cannot Establish Irreparable Harm

Plaintiff likewise fails to establish that it will suffer irreparable harm without a preliminary injunction.  To demonstrate irreparable harm, plaintiffs must meet a "high standard"—they must show that they face injuries that are "certain, great, actual, and imminent," *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (citation omitted), and that are "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  Making that showing requires "proof" that the harm they identify "is certain to occur in the near future." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

Plaintiff identifies three sources of irreparable harm: Economic harm stemming from the funding pause, reputational harms, and additional harm, including third-party harms, related to the withheld funds.  *See* Pl.'s Mem. at 39-44.  None of the injuries plaintiff identifies meet the "high standard" for irreparable harm. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  First, NED identifies several purported economic harms that stem from its lack of immediate access to paused funding.  NED alleges that its loss of access to those funds has caused cascading harms to its business operations and efforts to fulfill its mission.  Pl.'s Mem. at 39-41.  But "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297-98 (quoting *Wis. Gas Co.*, 758 F.2d at 674).

Rather, it is black-letter law that economic harm is generally not irreparable. *Wis. Gas Co.*, 758 F.2d at 674 (describing that principle as "well-settled").  The only exceptions are "where the

loss threatens the very existence of the movant's business," *id.* (citation omitted), or "where the claimed economic loss is unrecoverable." *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36 (D.D.C. 2014) (citation omitted).  Neither is true here.

The first exception encompasses only cases where a plaintiff demonstrates "extreme hardship to the business," *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1025 (D.D.C. 1981), or a threat to the business's "very existence," *Wis. Gas Co.*, 758 F.2d at 674.  Plaintiff may be forced to make difficult choices and lose profits in critical areas of its business without incurring irreparable harm sufficient to warrant injunctive relief.  *Cf. Boivin v. U.S. Airways, Inc.*, 297 F. Supp. 2d 110, 118–19 (D.D.C. 2003) ("[T]he forced sale of a house, a boat or stock . . . do[es] not rise to the level of 'irreparable' harm necessary to warrant the extraordinary remedy of a preliminary injunction.").  And Plaintiff must document any claim that an alleged harm is a threat to the organization's very existence with specific details.  *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 51–52 (D.D.C. 2011) (plaintiff needed to "offer a projection of anticipated future losses, tie that to an accounting of the company's current assets, [and] explain with . . . specificity how he arrived at the conclusion that he would be forced out of business in eighteen months" to show irreparable harm on this theory).

Here, Plaintiff's declaration focuses on harm to NED's mission and operational capacities and on the possibility of further staff reductions.  Pl.'s Mem. at 39-41.  But nowhere does NED assert that the pause on $94,941,000 of funding for no longer than fourteen months will threaten its "very existence." *Wis. Gas Co.*, 758 F.2d at 674.  As NED's "very existence" is not "at stake, a temporary, remediable loss of funding is not an irreparable harm." *Planned Parenthood of Greater N.Y. v. U.S. Dep't of Health & Hum. Servs.*, No. CV 25-1334 (TJK), 2025 WL 1768100, at *6

(D.D.C. June 26, 2025) (quoting *Wis Gas Co.*, 758 F.2d at 674), *appeal filed*, No. 25-5238 (D.C. Cir. docketed June 30, 2025).

Plaintiff tries to expand the scope of the first exception, claiming irreparable harm based on "imped[ing] the Endowment's ability to efficiently and effectively carry out its mission." Pl.'s Mem. at 40 (citing *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)). But *Newby* involved *statutory* obstacles, not economic harm. Here, Defendants have not enacted or enforced laws that make it more legally or logistically difficult for Plaintiff to execute the missions it has identified. Defendants have instead allocated a portion of FY 2025 funding for the next fiscal year, purportedly impacting NED's mission and activities. Plaintiff's reliance on *Newby* is therefore misplaced.

Further, NED offers no meaningful explanation for why, after already receiving more than $220 million dollars in FY 2025, it cannot continue normal operations, or would not be able to resume normal operations if it were to prevail in this matter. Nor does NED explain why, given that its yearly appropriated funds are of the no-year variety, as NED itself acknowledges (Pl.'s Mem. at 30), it does not have enough funds available to prevent irreparable harm. If, for instance, such funds enable "the Endowment to fund multi-year projects that may incur expenses over several years, *id*, then NED must retain at least a baseline level of funding even without additional appropriated funds. And even if NED must temporarily scale back from funding the "1,900 projects" it typically funds each year, *id.* at 41, and instead fund some smaller number of projects, it has not established that such reductions would irreparably harm NED's mission.

Additionally, nothing prevents NED from raising money from other sources or prevents its grantees from similarly seeking alternative funding. Even now, 5% of NED's funding comes from sources beyond its annual congressional appropriation, including from private funds. Suppl. Decl.

of Damon M. Wilson ("Wilson Decl.") ¶ 6, ECF No. 40-2.  NED does not explain why it cannot

seek increased contributions from those sources.

The second exception, for monetary harms that are unrecoverable, also does not apply.

Defendants have not terminated any of NED's funding.  Rather, Defendants have determined,

consistent with statutory authority, to allocate remaining no-year funds in FY 2026, instead of FY

2025.  Thus, none of the approximately $95 million is unrecoverable as remaining funding will be

allocated in FY 2026.

Plaintiff also claims reputational harm because of Defendants' conduct.  Pl.'s Mem. at 44.

But the loss of goodwill and related harms "are typically considered to be economic harms"—and

therefore recoverable.  *Air Transport Ass'n of Am., Inc. v. Export-Import Bank of the U.S.*, 840 F.

Supp. 2d 327, 335 (D.D.C. 2012).  Further, any alleged harm must "directly result from the action

which the movant seeks to enjoin." *Wis. Gas Co.*, 758 F.2d at 674.  When a harm is "based on

independent market variables such as how [a company's] customers and/or retail consumers might

react," that harm does not flow directly from the challenged action.  *Am. Meat Inst. v. U.S. Dep't of

Agric.*, 968 F. Supp. 2d 38, 81 (D.D.C. 2013).  The same is true for harm based on the reaction of

NED's grantees or other nongovernmental organizations.  Here, it also requires speculation

regarding those expected reactions, which may ascribe blame on Defendants rather than on

Plaintiff.

Additionally, a substantial part of NED's irreparable harm argument focuses on claims of

harm not to NED but to third parties served by NED's mission.  *See* Pl.'s Mem. at 41-43 (citing

harms to NED's partners and grantees); Wilson Decl. ¶¶ 53-95 (contrast to ¶¶ 33-52 discussing

alleged direct harm to NED).  Plaintiff may not assert claims based on harm to someone else—they

are limited to injuries for which they have standing.  *See Citizens for Resp. & Ethics in Was. v.*

*U.S. Ctrs. for Disease Control & Prevention*, No. CV 25-1020 (TJK), 2025 WL 1580809, at *8 (D.D.C. June 4, 2025) (movant cannot rely on "'injuries to third parties' to support 'irreparable harm.'") (quoting *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018)).

Nor is harm to any unnamed parties, such as NED's employees, sufficient. "Harm that might befall unnamed third parties does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must instead be connected specifically to the parties before the Court." *New Mexico v. Musk*, 769 F.Supp.3d 1, 7 (D.D.C. 2025) (quoting *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021)).

Further, even by Plaintiff's own admission, many of these alleged harms remain speculative. *See, e.g.,* Pl.'s Mem. at 42 (funding disruptions *could lead* to grantees "insolvency, forced closure and heightened exposure to retaliation…" (emphasis added)); *id.* (funding "interruption *could expose* an Iranian grantee" to reprisals); *id.* at 43 (National Democratic Institute "*may be forced* to make additional operational and staffing reductions…" (emphasis added)); *id.* (Solidarity Center "*could be forced* to lay-off" staff (emphasis added)).

NED has not shown that these alleged harms are "actual[] and imminent," *Hi-Tech Pharmacal Co.*, 587 F. Supp. 2d at 11; rather, they merely identify possible outcomes. A mere possibility of harm is not enough to warrant injunctive relief.

## III.    The Balance Of Equities (Including The Public Interest) Does Not Favor A Preliminary Injunction.

A preliminary injunction also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that "[t]hese factors merge when the Government is the opposing party"). As an initial matter, given that Plaintiff cannot establish the first two factors necessary to obtain a preliminary injunction, "it is clear [Plaintiff] cannot make the corresponding strong showings [on the second

two factors] required to tip the balance in their favor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009).

But even if Plaintiff could satisfy one or both of those factors, the remaining factors weigh in Defendants' favor. *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims."), *appeal dismissed*, No. 23-7136, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025).

The risk of harm to NED's asserted interests must be weighed against the obstruction of legitimate government functions that could result if the Court entered NED's proposed injunction. *See Winter*, 555 U.S. at 24 ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." (citations omitted)).

In this setting, granting the preliminary injunction that Plaintiff seeks would disrupt Defendant's oversight of its grantees to ensure taxpayer money is stewarded responsibly, as intended by the statutory scheme that Congress provided. *See supra* at 7-11.

Meanwhile, Plaintiff, as discussed above, will suffer no cognizable irreparable harm from the denial of its motion, as each of the potential harms that Plaintiff identifies is economic, and therefore inherently not irreparable; speculative; or asserted on behalf of a third party not before this Court. On these facts, the balance of the equities and the public interest align against the entry of relief.

**IV.      Plaintiff Should Be Ordered to Post Security in Connection with Any Preliminary Injunctive Relief and this Court Should Stay Relief Pending the Government's Determination of Whether to Appeal.**

Last, if the Court determines that entry of a preliminary injunction is warranted, the Court should require NED to post a bond.  Federal Rule of Civil Procedure 65(c) provides that a district court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  As the D.C. Circuit has regularly directed "injunction bonds are generally required." *Nat'l Treasury Emps. Union v. Trump,* No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025); *Monzillo v. Biller*, 735 F.2d 1456, 1461 (D.C. Cir. 1984) ("Rule 65(c) of the Federal Rules of Civil Procedure requires the filing of a security bond by a party who benefits from a temporary restraining order or preliminary injunction").

The Court should order the posting of an appropriate sum to compensate Defendants in the event a court determines that Defendants were correct.  *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").  Without such a protective measure, there may be no way to recover the funds lost to United States taxpayers if the Court were later to find that Defendants were "wrongfully enjoined." *See* Fed. R. Civ. P. 65(c).

Finally, to the extent the Court issues injunctive relief, the United States respectfully requests that the Court stay any order pending appeal, or at a minimum, enter a seven-day administrative stay to allow the United States to determine whether to seek emergency appellate relief.

## <u>CONCLUSION</u>

For all these reasons, the Court should deny the Plaintiff's Motion for a Preliminary Injunction.

Dated: July 30, 2025                    Respectfully submitted,


                                        BRETT A. SHUMATE
                                        Assistant Attorney General

                                        ALEXANDER K. HAAS
                                        Director, Federal Programs Branch

                                        JOSEPH E. BORSON
                                        Assistant Branch Director
                                        Federal Programs Branch


                                        */s/ Julia A. Heiman*
                                        JULIA A. HEIMAN
                                        JOSHUA N. SCHOPF
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street NW
                                        Washington, DC 20530
                                        Tel.:   (202) 616-8480
                                        Fax:   (202) 616-8460
                                        julia.heiman@usdoj.gov
                                        joshua.n.schopf@usdoj.gov


                                        *Counsel for Defendants*