## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | : | |
| NATIONAL ENDOWMENT FOR | : | |
| DEMOCRACY, | : | |
|  | : | No. 1:25-cv-00648-DLF |
| *Plaintiff,* | : | |
|  | : | |
| v. | : | |
|  | : | |
| UNITED STATES, et al., | : | |
|  | : | |
| *Defendants.* | : | |
| _____ | : | |

## PLAINTIFF'S REPLY IN SUPPORT OF ITS
## MOTION FOR A PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................2

I.  THE ENDOWMENT IS LIKELY TO SUCCEED ON THE MERITS .............................2

    A.  The Endowment Is Likely to Succeed on Its Statutory Claims. .............................2

        1.  Defendants Are Withholding the Endowment's Funding for Impermissible Policy Reasons. .......................................................................2

        2.  Defendants' Actions Violate the NED Act. ................................................5

        3.  The Antideficiency Act Does Not Authorize Defendants' Actions Just Because the Endowment's Funds Are No-Year Funds. .......................8

    B.  The Endowment Is Likely to Succeed on Its Arbitrary-and-Capriciousness Claims. ...............................................................................................................14

    C.  The Endowment Is Likely to Succeed on Its Constitutional Claims. ...................16

II.  THE ENDOWMENT WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION ................................................................................19

III.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF GRANTING THE PRELIMINARY INJUNCTION ...................................................23

IV.  DEFENDANTS' REMAINING ARGUMENTS ARE MERITLESS. ...........................24

    A.  The Endowment's Proposed Injunction Is Appropriate .......................................24

    B.  The Endowment Should Not Be Forced to Post Security ......................................24

    C.  There Is No Basis for a Stay. ..............................................................................25

CONCLUSION ...................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**FEDERAL CASES**

*AIDS Vaccine Advoc. Coal. v. Dep't of State*,
766 F. Supp. 3d 74 (D.D.C. 2025) ...................................................................................20

\* *In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013) ..................................................................................10, 17

*Alabama Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) ........................................................................................................8

*Am. Gateways v. DOJ*,
2025 WL 2029764 (D.D.C. July 21, 2025) .....................................................................25

*Am. Horse Prot. Ass'n, Inc. v. Lyng*,
812 F.2d 1 (D.C. Cir. 1987) .............................................................................................5

*Camp v. Pitts*,
411 U.S. 138 (1973) ....................................................................................................4, 10

\* *City of New Haven v. United States*,
809 F.2d 900 (D.C. Cir. 1987) .........................................................................................8

*Climate United Fund v. Citibank, N.A.*,
2025 WL 1131412 (D.D.C. Apr. 16, 2025) .....................................................................22

*Clinton v. City of New York*,
524 U.S. 417 (1998) .......................................................................................................18

*Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*,
15 F. Supp. 2d 1 (D.D.C. 1997) ......................................................................................24

*D.C. v. USDA*,
444 F. Supp. 3d 1 (D.D.C. 2020) ....................................................................................19

*Dalton v. Specter*,
511 U.S. 462 (1994) .......................................................................................................17

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .........................................................................................................5

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ...........................................................................................................16

*DSE, Inc. v. United States*,
    169 F.3d 21 (D.C. Cir. 1999) ................................................24

*Env't Health Tr. v. FCC*,
    9 F.4th 893 (D.C. Cir. 2021) ...............................................15

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ................................................15, 16

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
    636 F.2d 755 (D.C. Cir. 1980) ...............................................24

*Harris Cnty., Texas v. Kennedy*,
    2025 WL 1707665 (D.D.C. June 17, 2025) ..................................21

*Huisha-Huisha v. Mayorkas*,
    27 F.4th 718 (D.C. Cir. 2022) ...............................................24

*Kendall v. United States*,
    37 U.S. (12 Pet.) 524 (1838) ................................................17

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
    2025 WL 1187730 (D.D.C. Apr. 24, 2025) ..............................24, 25

* *League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................20

*Mid-Atl. Equity Consortium v. Dep't of Educ.*,
    2025 WL 2158340 (D.D.C. July 30, 2025) ..................................21

* *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*,
    463 U.S. 29 (1983) ................................................15

*New Mexico v. Musk*,
    769 F. Supp. 3d 1 (D.D.C. 2025) ........................................22, 23

*Perkins Coie LLP v. DOJ*,
    2025 WL 1276857 (D.D.C. May 2, 2025) ....................................19

*Ramirez v. ICE*,
    568 F. Supp. 3d 10 (D.D.C. 2021) ...........................................23

*RFE/RL, Inc. v. Lake*,
    2025 WL 1232863 (D.D.C. Apr. 29, 2025) ..................................20

*Robertson v. Seattle Audubon Soc'y*,
    503 U.S. 429 (1992) ................................................7

*Rural Dev. Innovations, Ltd. v. Marocco,*
2025 WL 1807818 (D.D.C. July 1, 2025)............................................................................24

*S. Educ. Found. v. Dep't of Educ.,*
2025 WL 1453047 (D.D.C. May 21, 2025).........................................................................21

*Tennessee Valley Auth. v. Hill,*
437 U.S. 153 (1978)................................................................................................................7

*Tex. Educ. Agency v. U.S. Dep't of Educ.,*
992 F.3d 350 (5th Cir. 2021)...............................................................................................17

*West Virginia v. EPA,*
597 U.S. 697 (2022)................................................................................................................8

*Whitman v. Am. Trucking Ass'ns,*
531 U.S. 457 (2001)................................................................................................................7

*Widakuswara v. Lake,*
2025 WL 1166400 (D.D.C. Apr. 22, 2025).........................................................................18

*Widakuswara v. Lake,*
2025 WL 1521355 (D.C. Cir. May 28, 2025)......................................................................17

*Xiaomi Corp. v. Dep't of Def.,*
2021 WL 950144 (D.D.C. Mar. 12, 2021)...........................................................................21

*Yanjia Zeng v. Mayorkas,*
2021 WL 2389433 (D.D.C. Apr. 16, 2021).........................................................................20

* *Youngstown Sheet & Tube Co. v. Sawyer,*
343 U.S. 579 (1952)........................................................................................................17, 19

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
576 U.S. 1 (2015)..................................................................................................................18

**FEDERAL STATUTES**

22 U.S.C. § 4411(b)(1) .............................................................................................................20

* 22 U.S.C. § 4412(a) ......................................................................................................5, *passim*

31 U.S.C. § 1512 .....................................................................................................................1, 8

* 31 U.S.C. § 1512(a) ..............................................................................................8, 11, 12, 14

31 U.S.C. § 1512(c) ................................................................................................................8, 9

31 U.S.C. § 1512(c)(1)................................................................................9

* Pub. L. No. 118-47, 138 Stat. 460, 737 (2024)..........................................12

LEGISLATIVE MATERIALS

H.R. Rep. No. 118-554 (2024)....................................................................11

H.R. Rep. No. 119-217 (2025)......................................................................5

S. Rep. No. 93-688 (1974)............................................................................8

OTHER AUTHORITIES

*Ending Weaponization of the Federal Government*,
    https://www.whitehouse.gov/wp-content/uploads/2025/05/Ending-
    Weaponization-of-the-Federal-Government-Fact-Sheet.pdf......................4

* GAO, *Principles of Federal Appropriations Law* (Red Book)...................13

*The President's Veto Power*,
    12 Op. O.L.C. 128 (1988)..............................................................17, 18

Wright & Miller, Federal Practice and Procedure: Civil..............................21

## INTRODUCTION

Under our Constitution, the Executive Branch has a duty to faithfully execute the laws that Congress enacts.  The Executive is violating that fundamental constitutional obligation in its treatment of the National Endowment for Democracy.  Congress has enacted mandatory appropriations laws directing that the Endowment "shall" receive its annual appropriation of $315 million for this fiscal year, and has further forbidden the Executive from imposing any conditions on the Endowment's use of those funds beyond those that Congress itself has imposed in the statutes that govern the Endowment's operations.  The Executive is disregarding those statutory commands by withholding almost one-third of the Endowment's appropriations for this fiscal year based on "Administration priorities" that evidently conflict with those of Congress.

Nothing Defendants say in their opposition to the Endowment's request for a preliminary injunction can obscure or explain away that core reality.  In particular, Defendants' new-found reliance on 31 U.S.C. § 1512 cannot justify their actions.  Congress was emphatic that the very limited authority conferred by those arcane budgeting provisions cannot be used to implement Executive policies that depart from those that Congress has legislated.  And even if—despite all evidence to the contrary—Defendants are choking off 30% of the Endowment's annual funding for fiscal rather than policy reasons, those narrow provisions do not authorize anything close to that kind of dramatic disruption of the Endowment's operations.  Statutory authority aside, this is as clear a case of arbitrary agency action as this Court will ever see.  Defendants have offered nothing approaching the kind of reasoned explanation the APA requires, especially given Defendants' stark departure from decades of consistent practice and the resulting upending of the Endowment's reliance interests.

The irreparable harm inflicted by Defendants' actions is grave and getting worse by the day.  Nearly $95 million that would have been allocated toward grantmaking activities that are

necessary for the Endowment to pursue its statutorily recognized mission is now stalled. The Endowment's ability to plan its operations, maintain critical staff, and ensure security for itself and its longstanding partners is in jeopardy. So too is the Endowment's hard-earned reputation as a trusted and reliable partner to support democracy and freedom around the world. A preliminary injunction is necessary to stop these harms and restore the Endowment's access to the funding that Congress directed that it receive.

## ARGUMENT

## I.    THE ENDOWMENT IS LIKELY TO SUCCEED ON THE MERITS

### A.    The Endowment Is Likely to Succeed on Its Statutory Claims.

Defendants' decision to withhold 30% of the Endowment's FY2025 funding is contrary to law. That decision was based on the Executive's policy determination that Congress's spending decision does not comport with "Administration priorities," AR000060—a plainly impermissible basis to withhold the Endowment's funds. Even if there were doubt about the real reason for Defendants' action, it would not matter; the NED Act and the Antideficiency Act prohibit a sudden, midstream halt to the Endowment's annual funding. That Congress allows the Endowment's funding to "remain available until expended" in no way permits Defendants to run roughshod over unambiguous and longstanding statutory constraints on the Executive's authority.

### 1.    Defendants Are Withholding the Endowment's Funding for Impermissible Policy Reasons.

Defendants' opposition leaves no doubt that they are withholding the Endowment's funds for policy reasons. They have made no secret of the fact that they believe Congress should not fund the Endowment's mission. Tellingly, Defendants have nothing to say about the unambiguous, definitive statement in the State Department's Spending Plan that the Endowment's funds were withheld based on a "review for alignment with Administration priorities." AR000060. The

Spending Plan is the *only* document in the record not created by Defendants especially for this litigation, and it states in plain terms that Defendants are withholding the Endowment's funds for policy reasons. Yet Defendants mention it only in passing in their statement of facts, and they ignore it entirely when trying to defend the lawfulness of their actions. But the Spending Plan cannot be ignored. When explaining the Administration's posture toward the Endowment's funds in the context of internal governmental processes, Defendants acknowledged that they were delaying disbursement based on "Administration priorities." And shortly thereafter, Defendants told the Endowment that they would not disburse the funds this fiscal year.

That evidence alone establishes that Defendants are withholding the Endowment's funds for policy reasons. But the Spending Plan does not stand alone. It is instead, as the record evidence establishes, the culmination of Defendants' months-long effort to eliminate the Endowment's funding entirely. PI Mem. 14-21. Defendants disparage that evidence as a "web of connections" (Opp. 9), but they notably *do not dispute any of the facts the Endowment has laid out*. Defendants do not dispute that high-ranking officials such as Elon Musk have called for the Endowment's elimination. They do not dispute that they abruptly and illegally froze the Endowment's funding (relenting only after the Endowment came to this Court), and then spent months using one stratagem after another to interfere with the flow of funds. They do not dispute that they threatened an unlawful onboarding of DOGE staff. They do not dispute that Defendant OMB sought to end FY2026 funding to the Endowment by making baseless accusations in a letter to Congress.

Unable to dispute the veracity or import of the evidentiary record, Defendants fall back to the contention that the Endowment "provides no evidence that any of [the] individuals" identified in the factual record "played a part in Defendant's determination" to withhold the Endowment's funding. Opp. 9. That is false. Defendants acknowledged in a sworn declaration that their

decision was made by "[t]he State Department in consultation with OMB." AR000004. The Endowment's evidence concerns those very agencies. It was OMB, for instance, that sent a letter to Congress, signed by Director Vought, setting forth the Executive Branch's official position that the Endowment's future funding should be zeroed out (based on spurious allegations that the Endowment has thoroughly debunked).[1] And it was the State Department that unlawfully froze the Endowment's funds earlier this year, demanded an unprecedented and unlawful "waiver" for routine disbursement of already obligated funds, and submitted a Spending Plan to Congress that dictated a "review" of the Endowment's funding "for alignment with Administration priorities," AR000060. It is as clear as can be that the agencies withholding the Endowment's funds are the very agencies that have targeted the Endowment for months.

Faced with this clear record, Defendants resort to obfuscation. The post hoc declaration they submitted in this litigation offers up a benevolent explanation: Defendants are merely trying to *preserve* the Endowment's "access to funds for at least another fiscal year," in light of "uncertainty about whether NED will receive *any* new appropriated funding." Opp. 1; *see* Opp. 13. Of course that explanation contradicts the Spending Plan's representation that the State Department was preparing to withhold the Endowment's funds to ensure compliance with "Administration priorities." *See Camp v. Pitts*, 411 U.S. 138, 143 (1973) (where agency provides rationale, legality of its action must be judged based on that rationale). In all events, it defies belief that the very same Defendants who froze the Endowment's 2025 funding as soon as they took office, later withheld funds while reviewing for compliance with Administration priorities, and *urged Congress to eliminate the Endowment's FY26 funding altogether*, have now suddenly become concerned that

---

[1] *See Ending Weaponization of the Federal Government*, https://www.whitehouse.gov/wp-content/uploads/2025/05/Ending-Weaponization-of-the-Federal-Government-Fact-Sheet.pdf (last visited Aug. 3, 2025).

the Endowment might not be funded in the 2026 appropriations act.  And as if all that were not enough, the House Appropriations Committee (after considering Defendants' baseless charges and the Endowment's refutation of those charges) has recommended a full $315 million appropriation for the Endowment in 2026, in "recogni[tion of] the essential role of the [Endowment] in promoting key national security interests by countering threats from dangerous adversaries around the world."[2]

Defendants are thus asking this Court to "exhibit a naivete from which ordinary citizens are free."  *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).  Their arguments do nothing to dispel the commonsense conclusion—forthrightly stated in the State Department's Spending Plan—that the Executive is withholding the Endowment's funding because its "priorities" diverge from those of Congress, AR000060.[3]

### 2.    Defendants' Actions Violate the NED Act.

The NED Act unequivocally denies the Executive Branch any authority to interfere with the Endowment's funding for policy reasons.  The Act provides that the State Department "shall make" an annual grant to the Endowment using funds "specifically appropriated" for that purpose, and it prohibits Executive Branch policy superintendence of that mandatory funding stream by denying the State Department any authority to require "compl[iance] with requirements other than those specified" in the NED Act itself.  22 U.S.C. § 4412(a).

---

[2] H.R. Rep. No. 119-217 at 29-30 (2025), *available at* https://www.congress.gov/119/crpt/hrpt217/CRPT-119hrpt217.pdf.

[3] Defendants argue that their post hoc declaration is admissible.  Opp. 14-15.  That is beside the point.  Admissible or not, Defendants declaration is of little value because it provides an explanation that is nowhere in the record at the time of Defendants' apportionment decision and was signed only after the filing of the amended complaint which exposed the legal problems with that decision. This Court should "take a critical view" of such an apparent "post hoc rationalization."  *Am. Horse Prot. Ass'n, Inc. v. Lyng*, 812 F.2d 1, 6 (D.C. Cir. 1987) (citation omitted).

Subjecting $95 million of the Endowment's 2025 funding to a "review for alignment with Administration priorities" is exactly the kind of additional requirement that Congress prohibited. The implication of that review is unmistakable: to receive its funds, the Endowment must align itself with the *Executive's* policy agenda, notwithstanding that *Congress* has "specified" the "purposes" of the Endowment and directed the State Department to make an annual grant "to enable the Endowment to carry out" those purposes. 22 U.S.C. § 4412(a). Defendants' conclusory assertion that they are "not asking NED to comply with any extra-statutory requirement," Opp. 9, cannot alter that reality.

Defendants' primary contention is that because Congress provided in the appropriations act that the Endowment's funding is "to remain available until expended," Congress has delegated to the Executive complete discretion to withhold the Endowment's funding this year. In Defendants' view, so long as the State Department "ma[kes] available to NED an annual grant of" some portion of its yearly appropriated funding, the "no year" nature of the rest allows Defendants to withhold the rest for any reason—including, as Defendants suggest, for *policy* reasons. Opp. 7-9 (arguing that "regardless" of the Endowment's contention that Defendants acted for policy reasons, the NED Act has not been violated).

That argument is meritless. Under Defendants' logic, the State Department could make an annual grant to the Endowment of $1 and *indefinitely* withhold the remaining $314,999,999 because the Executive Branch disagrees with the congressional policy of supporting the Endowment, or disagrees with the Endowment's activities. Or the State Department could withhold funding until the Endowment redirects itself away from the objectives Congress recognized and conforms its activities to "Administration priorities." All of those actions would fly in the face of Congress's explicit prohibition on requiring "compl[iance] with requirements other than those specified" in

the NED Act.  22 U.S.C. § 4412(a).

Defendants' argument therefore boils down to the assertion that by designating the funds "no-year," Congress impliedly repealed the NED Act's prohibition on Executive Branch policy interference with the Endowment.  But implied repeal, always disfavored, is "*especially* disfavored in the appropriations context."  *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 440 (1992) (emphasis added).  The Supreme Court has expressly rejected the argument that ordinary appropriations language can relieve the Executive Branch of the obligation to comply with substantive statutes limiting its discretion as to how it spends the funds.  *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978) (holding that appropriations for dam project did not impliedly repeal Endangered Species Act or Executive's obligation to comply with it in building the dam).  And although an especially "clear and manifest" statement of congressional intent in an appropriations statute can effectuate an implied repeal, *id.* (citation omitted), it should go without saying that Congress's instruction that the Endowment's funds are no-year funds—a common designation that applies to any number of other appropriations—falls far short of authorizing the Executive to place policy conditions on the Endowment's funding in contravention of the NED Act.  Were it otherwise, "every appropriations measure would be pregnant with prospects of altering substantive legislation, repealing by implication any prior statute which might prohibit the expenditure."  *Id.*

Congress does not "hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  In particular, Congress did not grant to the Executive a free-wheeling permission to make policy-based impoundments or otherwise frustrate the Endowment's access to its funding simply by declaring that the Endowment's appropriated funding would not expire at the end of the fiscal year.  Given the absence of any indication—much less a clear statement—that Congress intended to cede so much of its power of the purse to the Executive, it would be

irreconcilable with the separation of powers at the core of our constitutional system of governance to adopt Defendants' arguments.

### 3. The Antideficiency Act Does Not Authorize Defendants' Actions Just Because the Endowment's Funds Are No-Year Funds.

The only real import of the "no year" designation on which Defendants' current position depends is that it brings the Antideficiency Act into play, as OMB has limited authority under 31 U.S.C. § 1512 to apportion no-year funds to "achieve the most effective and economical use." But that does not help Defendants.

a. Most important, neither the reserve provision in § 1512(c) nor the apportionment provision in § 1512(a) permits the Executive Branch to withhold or impound funds for policy reasons.

With respect to § 1512(a)'s direction that OMB "shall" apportion to "achieve the most effective and economical use," there is a longstanding consensus that the Executive Branch may not use this limited apportionment authority "as a form of executive control or influence." GAO, *Letter to Hon. William Proxmire*, B-163628, at 2 (Jan. 4, 1974) (PI Mot. Ex. B). Indeed, Congress amended the Antideficiency Act for the express purpose of ensuring that the "apportionment process is to be used only for routine administrative purposes," rather than as a "vehicle for furthering Administration policies and priorities at the expense of those decided by Congress." S. Rep. No. 93-688, at 3573, 3575 (1974); *see City of New Haven v. United States*, 809 F.2d 900, 906 n.18 (D.C. Cir. 1987). It is "not plausible" that, through a "vague" reference to "effective and economical" apportionment, Congress created a back door for policy impoundments in the very statute it amended to foreclose that practice. *West Virginia v. EPA*, 597 U.S. 697, 724, 735 (2022); *see Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 764-65 (2021) (per curiam). As a result, Congress's provision that the Endowment's funds are no-year does not give the Executive carte blanche to withhold funds for policy reasons, because § 1512(a)—which governs apportionment

of no-year funds—does not authorize apportionment on that basis.

As for § 1512(c)'s reserve provision, Defendants rightly do not contend that they may create a reserve for policy reasons.  PI Mem. 22-23.  They instead insist that they have not created a reserve at all.  Opp. 12.  That assertion contradicts Defendants' own representation to this Court that they are "reserving" the Endowment's funding, ECF No. 33 at 2 (Joint Status Report of June 12, 2025), as well as their sworn declaration asserting that they are "[r]eserving" the Endowment's funding, AR000004 ¶ 8.  Defendants now switch gears on the theory that a "reserve" is "an amount withheld from obligation for one of the three purposes outlined under subsection (c)(1)(A)-(C)."  Opp. 12.  But that circular reading of the statute is unsupported by its text, which does not *define* a reserve by reference to the listed purposes, but instead *prohibits* reserves that do not meet those statutory criteria.  *See* 31 U.S.C. § 1512(c)(1) (providing that "a reserve may be established only" for the specified purposes).  Defendants lastly note that they have "allocated" the balance of the Endowment's funds "*for the next fiscal year*."  Opp. 12.  But that is not nearly the same as setting an apportionment timetable.  *See* PI Mem. 22.  Defendants have been careful to avoid any suggestion, much less a commitment, as to when the Endowment will receive the balance of its funding, or whether Defendants will even disburse it at all rather than shifting the schedule yet again based on a new set of excuses.

Whether Defendants' action is characterized as an apportionment or a reserve, the answer is the same: Defendants may not withhold the Endowment's no-year funds due to a policy disagreement with Congress's spending decision.  That is precisely what has occurred.

b.  Defendants' effort to justify their withholding of the Endowment's funds thus turns entirely on their newly minted assertions that (1) they are withholding the funds only to ensure the Endowment's "access to funds for at least another fiscal year," Opp. 1, and (2) § 1512(a)'s

direction to apportion for "the most effective and economical use" gives them the authority to withhold funding on that basis. Opp. 1. To accept that rationale, this Court would have to blind itself to the overwhelming—and undisputed—evidence that Defendants are withholding the funds for impermissible policy reasons. The legality of Defendants' actions must be judged based on their actual rationale, not their arguments in litigation. *Camp*, 411 U.S. at 143. But even accepting Defendants' rationale at face value—that is, even if Defendants' action is not grounded in policy disagreement with Congress—their asserted rationale cannot justify their actions.

*First*, Defendants' withholding is not founded on any actual judgment about the "most effective and economical use" of the funds. Defendants' assertion that the withholding "ensures that NED will retain at least that level of funding in the coming fiscal year," AR000004, ¶ 8, evidently assumes that Congress might not appropriate any funding to the Endowment in 2026. Relying on any such prediction is improper. "[A]n agency may not rely on political guesswork about future congressional appropriations as a basis for violating existing legal mandates." *In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh, J.). *Congress* determines the amount of the Endowment's funding each year. OMB's limited authority to apportion to achieve the "most effective and economical use" of *already* appropriated funds provides no statutory authority to predict what Congress might do with respect to *future* appropriations or to apportion the already appropriated funds to *offset* Congress's possible future appropriations determination.

*Second*, Defendants have far exceeded any statutory discretion to determine the "most effective and economical use" of funds. Where, as here, Congress has appropriated funds to an entity and directed it to satisfy specific statutory purposes, Congress expects the funds to be used to further those purposes. 22 U.S.C. § 4412(a). An apportionment "to achieve the most effective and economical use" therefore is one that enables the entity to use the funds to economically and

effectively pursue its statutory purposes. Defendants' sudden withholding of 30% of the Endowment's funding does exactly the opposite. It predictably undermines economy and effectiveness by forcing the Endowment to make severe midstream cuts to critical grantmaking activities, *impeding* the Endowment's ability to fulfill its statutorily recognized mission. PI Mem. 27-28. And it prevents the Endowment from executing the plan that Congress instructed it to provide—a plan that was premised on the Endowment's access to all $315 million that Congress appropriated. *Id.* at 28. It is thus unsurprising that, in every year prior to this one, Defendants construed § 1512(a)'s direction that OMB "shall" apportion "to achieve the most effective and economical" to require a full annual apportionment of the Endowment's funding.

Defendants still provide no reason why present circumstances suddenly demand a $95 million cut. Their bare assertion that the Endowment has received "sufficient" funds this year does not remotely support the proposition that withholding the remainder is effective or economical. The Endowment has, after all, structured its 2025 grantmaking commitments based on the entire annual amount—at the direction of the Appropriations Committees. *See, e.g.*, H.R. Rep. No. 118-554, at 33 (2024). And the unsupported statement that the Endowment might receive the $95 million in 2026 does not establish that withholding the funds achieves the "most" effective and economical use of those funds later on either. With no assurances from Defendants, and every reason to doubt their intentions, the Endowment cannot reasonably make any plans to use the funds in 2026. As the Endowment has explained, it cannot deliver on its commitments to partners and grantees if it does not know when (or if) it will actually receive its funding, and it cannot use funds effectively and economically without that certainty. There is nothing effective or economical about that state of affairs.

*Third*, and independently, the NED Act and the appropriations statutes constrain whatever

11

discretion Defendants otherwise would have under § 1512(a) to withhold funds across fiscal years. The NED Act requires the State Department to make an "annual grant to the Endowment" using "funds specifically appropriated" by Congress "for grants to the Endowment." 22 U.S.C. § 4412(a). For FY2025, Congress specifically appropriated $315 million for grants to the Endowment, "as authorized by the [NED] Act," and each year since the Endowment's establishment Congress has annually appropriated a sum certain. Pub. L. No. 118-47, 138 Stat. 460, 737 (2024). Congress thus made clear that it intends the Endowment to receive its full appropriated amount each year. PI Mem. 29. Defendants nevertheless claim that they satisfied their legal requirements by making "an annual grant of $220,059,000." Opp. 7. Even if that is the sum that the *Executive Branch* deems "sufficient," AR000004 ¶ 7, it is not the sum *Congress* selected for this year. Defendants point to nothing in the NED Act that even suggests that the Executive Branch has discretion to withhold from its mandatory "annual grant" tens of millions of dollars that Congress "specifically appropriated." That the Executive has "responsib[ility]" (Opp. 11) for making apportionment decisions does not give it license to contravene Congress's instruction that the State Department "shall make an annual grant to the Endowment" using the funds Congress "specifically appropriated" for that purpose, 22 U.S.C. § 4412(a), and that apportionment "shall … achieve the most effective and economical use" of the appropriated funds, 31 U.S.C. § 1512(a).

c. The no-year nature of the appropriation changes none of that. It is no doubt true, as Defendants emphasize, that Congress uses the phrase "to remain available until expended" to provide that funds "need not be expended in any particular fiscal year." Opp. 1. In the ordinary course—where Congress appropriates funds to a federal agency to fulfill statutory purposes as *the agency* determines appropriate—that designation may convey discretion for an agency to decide the pace of its own expenditures. But here Congress has made clear that *the Endowment*, rather

than any Executive official, is responsible for determining the activities it funds, consistent with the purposes Congress itself recognized. *See* 22 U.S.C. §§ 4412(a) ("Board of Directors" determines grant expenditures), 4412(c) (Endowment is not "an agency or establishment of the United States Government"). It is therefore clear that the designation of the Endowment's funding as "no-year funds" is not meant to give discretion to the State Department or to OMB to dictate the pace at which the Endowment spends its appropriated funds; the designation is meant to ensure that the Endowment is able to spend its appropriated funds over multiple years to carry out its mission. *See* GAO, *Principles of Federal Appropriations Law* (Red Book), 5-7 to 5-9.

Congress's decades-long practice of replenishing the Endowment's funding each fiscal year confirms as much. If Congress had intended to give the Executive Branch discretion to spread the Endowment's funding out over multiple years, it would have made a lump sum appropriation that the State Department could obligate as needed. Instead, Congress each year appropriates funds for the Endowment, and it has instructed the State Department to obligate those funds in an "annual grant." 22 U.S.C. § 4412(a).

Defendants are wrong that under the Endowment's view "the no-year language would be rendered a nullity." Opp. 8. That language "afford[s] the Endowment vital flexibility to fund long-term projects that incur expenses over multiple years." Wilson Supp. Decl. (PI Mot. Ex. A) ¶ 7. It also ensures that the State Department is able to re-obligate to the Endowment any funds that the Endowment does not spend during the term of a grant agreement—an action that would be impossible if Congress imposed an expiration date on the Endowment's funding.[4] What that language does *not* do is give license to the Executive Branch to withhold the Endowment's funds

---

[4] That has happened twice in the last five years. *See* https://www.usaspending.gov/award/ASST_ NON_SAQMIP24GR0005_019 (obligating in FY2024 an extra $249,799.62 from prior fiscal years); https://www.usaspending.gov/award/ASST_NON_SLMAQM21GR3016_019 (obligating in FY2021 an extra $864,340 from prior fiscal years).

based on disagreements with Congress's policy choices, *see supra* at pp. 6-8, or otherwise to exert a fiscal stranglehold over the Endowment's activities. On Defendants' view, Defendants could subvert congressional objectives as to all no-year appropriations by refusing to apportion most appropriated funds year after year, starving entities of funds specifically appropriated for them that they need to survive. This Court should not accept such a sweeping assertion of Executive power.

### B. The Endowment Is Likely to Succeed on Its Arbitrary-and-Capriciousness Claims.

Even if Defendants theoretically possessed statutory authority to withhold the Endowment's appropriated funds (and they do not), their decision to withhold those funds would still have to be set aside because it is a textbook example of arbitrary and capricious decision-making.[5] Defendants' blithe defense of their conclusory assertion that the Endowment has received "sufficient" funding willfully ignores the relevant legal and factual framework. The Endowment has received its full annual appropriation each year for the past 42 years, reflecting the Executive's determination that doing so represented "the most effective and economical use" of the Endowment's appropriation, 31 U.S.C. § 1512(a); the Endowment has repeatedly submitted plans at the Appropriations Committees' direction detailing how every dollar would be spent in that year; it has committed its appropriated funds to the core institutes and other grantees each year in reliance on that annual certainty; and it cannot function as a grantmaking entity without that certainty. Now, the Executive Branch has abruptly abandoned 42 years of unbroken practice and withheld 30% of the Endowment's funding midstream, in a manner that inevitably inflicts significant disruption and uncertainty on an entity that carries out important congressionally specified purposes.

Against that backdrop, Defendants' summary assertion that the Endowment has received

---

[5] As the Endowment has explained, Defendants' improper policy motivation renders their withholding arbitrary and capricious. PI Mem. 33-34. But even putting that aside, the decision is arbitrary and capricious on the terms on which Defendants have attempted to justify it.

"sufficient" funding this year is precisely the sort of arbitrary and capricious decision-making that the APA prohibits. It is fundamental that, as a baseline minimum, agencies must "examine the relevant data and articulate a satisfactory explanation for [their] action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mrfs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983) (citation omitted). An agency's "conclusory and unreasoned" statements "do not substitute for the reasoned explanation that the APA requires." *Env't Health Tr. v. FCC*, 9 F.4th 893, 905 (D.C. Cir. 2021). Yet here, that is all we have. Defendants declared that the Endowment has received "sufficient" funding this year, full stop. No analysis, data, or anything else supports that naked assertion. Indeed, the only thing resembling an explanation—Defendants' one-sentence statement that withholding the funds ensures that "level of funding in the coming fiscal year," Opp. 14—is a non-sequitur. Whatever theoretical interest Defendants may have in ensuring the Endowment has some money *next year* (*but see supra* at pp. 4-5, 10), it reveals nothing about why the Endowment has purportedly received "sufficient" funding *this year*.

Even worse, Defendants' unreasoned "sufficiency" determination represents a stark, unacknowledged deviation from past practice that takes no account of the Endowment's substantial reliance interests. Defendants insist that they have not changed positions, but are forced to acknowledge that they are "obligat[ing] funding differently than in prior years" (Opp. 15), and they never dispute that this year is the first in the Endowment's 42-year history in which the Executive has refused to apportion the Endowment's full-year funding in the fiscal year in which it was appropriated (PI Mem. 34). Defendants point out that the APA does not require a "heightened level of arbitrary and capricious review" when agencies change positions (Opp. 15), but they omit that the APA *does* require agencies to "display awareness that it is changing position," to "show

15

that there are good reasons for the new policy," and to take account of "serious reliance interests." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Defendants have not attempted to do that, doubtless because there are no "good reasons" to disrupt the Endowment's pursuit of its statutory mission by withholding 30% of its funding midstream and without warning.

As to the Endowment's reliance interests, Defendants seek to distinguish *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020), but that case is on point in precisely the way that matters: the Supreme Court made clear that agencies must "assess" reliance interests, "determine" their significance, and "weigh" those interests against competing policy concerns. *Id.* at 33. Defendants have done none of that. And the points they do make are borderline frivolous. The Endowment is not asserting a reliance interest in "continued unfettered federal funding" into the future, *contra* Opp. 15; it is asserting a reliance interest in receiving the remaining 30% of its *already-appropriated* funds, and in being able to fulfill the commitments it made to Congress and its grantees with respect to those very funds. And Defendants' assertion that they may "determine that other . . . policy concerns outweigh" the Endowment's reliance interests, *id.*, is a notable confession that Defendants have indeed acted out of disagreement with Congress's judgment that $315 million should be disbursed to the Endowment to further its democracy-supporting purposes—putting the lie to their assertion that their sole focus is ensuring the Endowment's "effective and economical" use of those funds.

## C.    The Endowment Is Likely to Succeed on Its Constitutional Claims.

The Constitution carefully separates the powers of the Legislative and Executive Branches when it comes to federal spending. It is Congress that has the power of the purse, and it is the President who must take care that Congress's spending decisions are faithfully executed. Defendants seek to invert the Constitution's allocation of authority by asserting their own power to determine whether the Endowment receives the funds that Congress appropriated. That is a violation

of the separation of powers and the constitutional provisions that enforce it.  PI Mem. 35-39.

Defendants contend (Opp. 16-17) that the Endowment's constitutional claims are barred by *Dalton v. Specter*, 511 U.S. 462 (1994).  But *Dalton* held only that not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution."  *Id.* at 472.  The Endowment does not contend that *every* statutory violation gives rise to a constitutional claim.  The Endowment's core argument is that the Executive has invaded Congress's exclusive authority over appropriations and spending by refusing to honor Congress's spending decision.  *See, e.g.*, *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 610 (1838); *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021).  When the Executive Branch disregards Congress's spending directions, it does not merely exceed statutory authority; it usurps Congress's exclusive constitutional powers (and exceeds its own).  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).[6]

Defendants nonetheless briefly suggest (Opp. 18) that the Executive Branch may "declin[e] to spend the full amount of appropriated funds in various contexts, particularly in the realm of foreign affairs."  But the law provides no support whatsoever for that sweeping view of Executive power.  *See, e.g.*, *Kendall*, 37 U.S. at 610; *Aiken Cnty.*, 725 F.3d at 261 n.1 ("[T]he President does not have unilateral authority to refuse to spend . . . funds.").  Defendants cite an Office of Legal Counsel (OLC) opinion, but—much like the foundational OLC opinion written by William Rehnquist two decades earlier (PI Mem. 36)—that opinion *rejects* an "inherent, constitutional power to impound funds" because there is "no textual source in the Constitution" for such a power and it has never been "recognized by the courts."  *The President's Veto Power*, 12 Op. O.L.C. 128,

---

[6] Defendants suggest (Opp. 18) that the D.C. Circuit adopted its view of *Dalton*.  That is mistaken. Defendants' citation is to an order by a motions panel of the D.C. Circuit.  That order was vacated by the en banc court.  *Widakuswara v. Lake*, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025).

166-67 (1988).  Defendants focus on a footnote in the opinion stating OLC's "belie[f]" that the President may impound funds when Congress "compel[s] the spending of funds for an unconstitutional purpose or in violation of specific provisions of the Constitution," such as by "infring[ing]" the President's "duties in the area of foreign affairs."  *Id.* at 168 n.56.  But Congress does not "infringe" any Presidential foreign-affairs power by directing funds to the Endowment.  As the Supreme Court made clear in a decision issued long after Defendants' preferred OLC opinion, the President's foreign-affairs authority is not exclusive, but is instead shared with Congress.  *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10, 16 (2015).  And Congress has ample foreign-affairs authority to fund a private entity that furthers democracy-support initiatives without purporting to speak for the United States.  *Id*.  Tellingly, Defendants say nothing about *Zivotofsky* even though the Endowment cited it for these very points in its opening memorandum.[7]

Defendants' remaining quibbles with the Endowment's constitutional claims are unpersuasive.  On the Presentment Clause, they assert that this case "does not involve 'unilateral Presidential action that either repeals or amends parts of duly enacted statutes,'" (Opp. 17-18 (citation omitted)), but that is precisely the effect of their decision to withhold 30% of the funds Congress appropriated.  On the Take Care Clause, Defendants say they are "unaware" of any case finding that clause as a basis for relief, but a court in this District recently did precisely that.  *See Widakuswara v. Lake*, 2025 WL 1166400, at *15 (D.D.C. Apr. 22, 2025).  Defendants further claim that the Endowment's Take Care claim would "allow judicial superintendence over the exercise of Executive power" (Opp. 19), but the Endowment seeks only for the ordinary judicial remedy of

---

[7] Defendants also seek to draw support from *Clinton v. City of New York*, 524 U.S. 417 (1998), urging that that case "noted the President's 'traditional authority to decline to spend appropriated funds.'"  Opp. 18 (citing *Clinton*, 524 U.S. at 446-47).  But in that case, the Court was referring to "statutes in which Congress has given the Executive broad discretion over the expenditure of appropriated funds."  *Clinton*, 524 U.S. at 446.  Here, of course, Congress expressly denied the Executive any such discretion.

an order that the Executive Branch stop violating the law.  Nor does the Take Care Clause bar review of officials who are responsible for discharging the President's constitutional duties.

At bottom, this is a *Youngstown* "category 3" case: the President's authority is at its lowest ebb because he is acting in defiance of express statutory commands.

## II.  THE ENDOWMENT WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION

Defendants' decision to choke off the Endowment's funding is imposing severe irreparable harms.  The Endowment has lost access to 30% of the funding that it had budgeted for necessary expenses this year.  As a result, hundreds of grantmaking projects—including time-sensitive work to promote democracy and freedom—cannot receive full funding.  Critical staff have left and continue to leave.  Longstanding partners that, by law, the Endowment relies upon to carry out its mission now face existential threats, including the imminent risk that they may be exposed as Endowment partners and face reprisal from authoritarian regimes.  And the Endowment's reputation as a trusted partner is in jeopardy as democracy activists come to wonder whether the Endowment will be able to make good on its financial promises.  Defendants do not dispute any of those facts.

Defendants instead treat this case as though it were a run of the mill fight over money, protesting that the Endowment's harms are monetary and therefore not irreparable.  Opp. 21-24.  It is true that "economic harm is generally not irreparable" (Opp. 21), but "economic loss caused by federal agency action is an exception: typical economic harm is not irreparable because it is generally recoverable as monetary damages . . . , whereas economic injury caused by federal agency action is unrecoverable because the APA's waiver of sovereign immunity does not extend to damages claims."  *D.C. v. USDA*, 444 F. Supp. 3d 1, 34 (D.D.C. 2020); *see also Perkins Coie LLP v. DOJ*, 2025 WL 1276857, at *48 (D.D.C. May 2, 2025) (collecting cases).  In that context,

courts have not required injured parties to show a "threat" to their "very existence" (Opp. 22), but instead have required only a showing of "significant" harm. *Yanjia Zeng v. Mayorkas*, 2021 WL 2389433, at *2 (D.D.C. Apr. 16, 2021) (citation omitted). The Endowment has easily met that bar.

For similar reasons, the Endowment has shown that its harms are not merely financial, but "unquestionably make it more difficult for the [Endowment] to accomplish [its] primary mission" of supporting democracy abroad. *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *see* 22 U.S.C. § 4411(b)(1). The funding halt threatens over 500 direct grants that would support critical work, including monitoring of upcoming elections abroad and independent journalism in areas besieged by war or gross human rights violations. PI Mem. 41-42. Much of that work is time-sensitive and cannot be completed if the funding halt persists. *Id* at 42. Defendants try to distinguish *Newby* as a case that concerns only "*statutory* obstacles, not economic harm." Opp. 23. But *Newby* does not limit its reasoning in that manner, nor is there any evident reason to distinguish between mission harms that arise from obstacles created by statutes, on the one hand, and other governmental actions, on the other. That is why courts in this District have repeatedly found irreparable, mission-based harm under *Newby* in cases challenging cuts to federal funding. *See, e.g.*, *AIDS Vaccine Advoc. Coal. v. Dep't of State*, 766 F. Supp. 3d 74, 81 (D.D.C. 2025); *RFE/RL, Inc. v. Lake*, 2025 WL 1232863, at *8 (D.D.C. Apr. 29, 2025).

Defendants next downplay the seriousness of the crisis they have created. They question why the Endowment "does not have enough funds available to prevent irreparable harm" or could not "continue normal operations" later. Opp. 23. But it is no mystery why the sudden flash-cut loss of almost a third of the amount Congress provided is inflicting irreparable harm. The extensive planning, documented in a mandatory report to Congress, that the Endowment did for this fiscal year has been thrown into chaos—upending the Endowment's ability to keep critical staff,

sustain effective operations, and fund important projects. *See* PI Mem. 28, 39-43. The Endowment does not maintain significant cash reserves for a rainy day; it "depend[s]" on "consistent access to the funds that Congress appropriates." Supp. Wilson Decl. ¶ 40. And even if the Endowment later received the funds that the Defendants are withholding, that would do nothing to ameliorate the here-and-now harms to the time-sensitive democracy projects that are going unfunded, or the disruption caused by departures of critical staff, or the imminent security risks provoked by a funding halt, or the long-term harm to the Endowment's reputation as a trusted partner.[8]

Defendants' only answer is to muse that the Endowment might be able to "rais[e] money from other sources." Opp. 23. The idea that the Endowment could through private contributions fill a $95 million gap, after Defendants halted their funding with less than four months remaining in the fiscal year, cannot be taken seriously.

Defendants also dispute that the Endowment's reputational harm is sufficient; they characterize that harm as economic "and therefore recoverable." Opp. 24. But the caselaw refutes that argument. *See Xiaomi Corp. v. Dep't of Def.*, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021) (collecting cases). Cases in this District instead "demonstrate" that "because '[i]njury to reputation or goodwill is not easily measurable in monetary terms' it is typically 'viewed as irreparable.'" *Id.* (quoting Wright & Miller, Federal Practice and Procedure: Civil § 2948.1). Here, the reputational harm is both irreparable and severe. Grantees on which the Endowment relies "are not likely to

---

[8] *See, e.g.*, *S. Educ. Found. v. Dep't of Educ.*, 2025 WL 1453047, at *15 (D.D.C. May 21, 2025) (irreparable harm where funding cut "threaten[s] the livelihoods" of party's "employees," its "professional reputation," and the "existence of its programs"); *Mid-Atl. Equity Consortium v. Dep't of Educ.*, 2025 WL 2158340, at *19–20 (D.D.C. July 30, 2025) (similar); *Harris Cnty., Texas v. Kennedy*, 2025 WL 1707665, at *16–17 (D.D.C. June 17, 2025) (irreparable harm where "loss of federal funding continues to force [plaintiffs] to lay off employees, cut . . . programming, and suspend other operations that the grants were intended to promote," and where "restoring all funding at a later date cannot make up for lost time that would have been spent fulfilling plaintiffs' . . . missions").

forget a failure to follow through on [the Endowment's] obligations to provide timely and consistent funding," and many "may choose to refrain from engaging with NED in the future if [it is] perceived as an unreliable partner." Wilson Supp. Decl. ¶ 97; *see* PI Mem. 44. In other words, the reputational harm at stake here would directly undermine the Endowment's ability to achieve its mission—reinforcing irreparable harm. *See Climate United Fund v. Citibank, N.A.*, 2025 WL 1131412, at *19–20 (D.D.C. Apr. 16, 2025) (plaintiffs "demonstrated irreparable harm in damage to their business reputation" where their "reputation . . . as 'reliable and trustworthy partner[s]'" is "critical to their operations" and, "without imminent restoration of their funds, it will be 'more difficult, if not impossible,' for these organizations to find partners willing" to work with them (citations omitted)). Defendants suggest that reputational harm is speculative because grantees might "ascribe blame on Defendants" rather than the Endowment. Opp. 24. But no matter who grantees blame for the situation, grantees will be unable to trust the Endowment as a reliable source of funding. That is the irreparable, reputational harm that Defendants' action will produce.

Defendants also dismiss the harm to grantees, the core institutes, and the Endowment's employees as "harm not to NED but to third parties served by NED's mission." Opp. 24. But those are harms to the Endowment itself, because the Endowment's grantees, core institutes, and employees are essential to the Endowment's ability to carry out *its* mission. *See* Wilson TRO Decl. ¶ 39 ("Without [its] grantees, NED's ability to carry out its mission would be impossible."); *id.* ¶ 9 (describing the core institutes as part of the Endowment "family" because each "plays a critical role in NED's ability to fulfill its mission"); Wilson Supp. Decl. ¶¶ 38-43 (describing importance of Endowment staff, including specialized technical, language, and strategic expertise). Defendants cite no case holding that harm to third parties cannot be considered when it directly harms the plaintiff itself. *See, e.g.*, *New Mexico v. Musk*, 769 F. Supp. 3d 1, 7 (D.D.C. 2025)

(requiring that irreparable harm be "connected specifically to the parties before the Court" (citation omitted)).  Defendants also characterize the harm to grantees and core institutes as speculative—but nothing could be further from the truth.  Grantees *will* lose funding across over 500 projects that the Endowment would otherwise fully support.  Wilson Supp. Decl. ¶ 48.  The core institutes *will* lose funding for approximately 53 projects, *id,.* and each will experience a 30% shortfall in their expected annual allotment from the Endowment, *id.* ¶¶ 67-95.  Those harms are both predictable and imminent.

In addition, the implications of Defendants' arguments are quite extreme.  Considering that irreparable harm is a requirement not only for a preliminary injunction, but also a permanent injunction, Defendants' position would seemingly mean that they could withhold tens of millions of dollars in funding that Congress required them to disburse, and the judiciary could do nothing to stop them.  That is not an outcome our constitutional system can tolerate.

## III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF GRANTING THE PRELIMINARY INJUNCTION

The balance of equities and public interest overwhelmingly favor an injunction.  There is a public interest in having the government follow the law, and no public interest in interfering with the mission of the Endowment—a longstanding organization with bipartisan support that has promoted this nation's highest ideals for more than four decades.  Defendants respond that an injunction would "disrupt [Defendants'] oversight of [their] grantees to ensure taxpayer money is stewarded responsibly."  Opp. 26.  But following the law is not a cognizable "disruption," *see Ramirez v. ICE*, 568 F. Supp. 3d 10, 34 (D.D.C. 2021), and Defendants have never claimed that their withholding of the Endowment's funds is in furtherance of some need for responsible stewardship of taxpayer funds.  In any event, the Endowment is not a discretionary grantee over which Defendants exercise broad funding oversight.  *Congress* determines the appropriate amount of taxpayer funds

23

that must go to the Endowment this year. It is the Executive's role to follow that instruction—not to second guess it. An injunction disrupts nothing by restoring that balance.

## IV. DEFENDANTS' REMAINING ARGUMENTS ARE MERITLESS.

### A. The Endowment's Proposed Injunction Is Appropriate.

Defendants argue (Opp. 6) that the Endowment is moving for a mandatory injunction by seeking to "alter rather than preserve the status quo." Not so. "The status quo is the last *uncontested* status which preceded the pending controversy." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (citation omitted); *see Rural Dev. Innovations, Ltd. v. Marocco*, 2025 WL 1807818, at *5 (D.D.C. July 1, 2025) (same). Here, that describes the ordinary funding process that has prevailed for 42 years—in which Defendants apportion and obligate *all* of the funds specifically appropriated for the Endowment in the year in which they are appropriated. The Endowment seeks nothing more than a return to that status quo. *See* Proposed Order ¶ 1 (proposing to enjoin Defendants from "impounding, blocking, reserving, or otherwise interfering with payment of appropriated funds to the Endowment"). And even if the proposed injunction could be characterized as mandatory, a plaintiff may secure a mandatory injunction by showing that the "facts and law clearly favor" it. *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997). That is precisely the showing the Endowment has made.

### B. The Endowment Should Not Be Forced to Post Security.

Defendants urge this Court to require the Endowment to post a bond as a condition of a preliminary injunction. Opp. 27. District courts have "broad discretion" over that question, *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), including discretion to "dispense with any security requirement whatsoever" in the absence of prejudice to the defendants, *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980). "Accordingly, multiple courts in this District have recently declined to require plaintiffs to post any bond as a condition of

obtaining an injunction against" the federal government. *League of United Latin Am. Citizens v. Exec. Off. of the President*, 2025 WL 1187730, at *62 (D.D.C. Apr. 24, 2025) (collecting cases).

Here, the only alleged prejudice is that, according to Defendants, "there may be no way to recover the funds lost to United States taxpayers if the Court were later to find that Defendants were 'wrongfully enjoined.'" Opp. 27. But even Defendants do not deny that the Endowment has a statutory entitlement to the funds Congress appropriated. Defendants wrongly argue that they can withhold those funds until later, but they do not argue (today, at least) that they can deny them forever. For its part, the Endowment would face substantial prejudice from an injunction bond, considering the immense resource constraints that Defendants' actions have inflicted. It would make little sense to force the Endowment to post a bond to obtain an injunction, when it is Defendants' action that would make it difficult for the Endowment to pay that bond. *See Am. Gateways v. DOJ*, 2025 WL 2029764, at *11 (D.D.C. July 21, 2025) ("Requiring resource-strapped nonprofits to post bond before they can obtain preliminary relief from likely unlawful government action that imposed financial strain on them would frustrate the goals of judicial review.").

**C.    There Is No Basis for a Stay.**

Finally, Defendants ask for a stay pending appeal of any injunction this Court may issue. Opp. 27. The Court should deny that request. The Endowment is likely to succeed on the merits. And Defendants have not even attempted to show that they would be irreparably harmed by paying the Endowment the funds that Congress specifically appropriated for its use. The Court should likewise decline Defendants' request for an administrative stay. The Endowment suffers ongoing and substantial harms each day that it is denied its funds. Defendants should not be allowed to continue inflicting those harms.

**CONCLUSION**

This Court should grant the motion for a preliminary injunction.

25

Dated:  August 4, 2025                    Respectfully submitted,

/s/ *Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr. (D.C. Bar No. 420434)
Ginger D. Anders (D.C. Bar No. 494471)
Jeremy S. Kreisberg (D.C. Bar No. 1048346)
Helen E. White (D.C. Bar No. 1741368)
Esthena L. Barlow (D.C. Bar No. 90000252)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com
Ginger.Anders@mto.com
Jeremy.Kreisberg@mto.com
Helen.White@mto.com
Esthena.Barlow@mto.com

Gabriel M. Bronshteyn (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105
(415) 512-4000
Gabriel.Bronshteyn@mto.com

Miranda E. Rehaut (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
(213) 683-9100
Miranda.Rehaut@mto.com

*Attorneys for the National Endowment for
    Democracy*

26