UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL ENDOWMENT FOR
DEMOCRACY,

    *Plaintiff*,

    v.

UNITED STATES OF AMERICA, *et al.*,

    *Defendants*.

No. 25-cv-00648 (DLF)

**MEMORANDUM OPINION**

    National Endowment for Democracy brings this action to enjoin the federal government and federal executive agencies from withholding congressionally appropriated funds. Before the Court is the plaintiff's Motion for a Preliminary Injunction. Pl.'s Mot., Dkt. 40. For the reasons that follow, the Court will grant the plaintiff's motion.

**I.    BACKGROUND**

    National Endowment for Democracy is a private, nonprofit organization formally recognized under the National Endowment for Democracy Act of 1983 (NED Act), 22 U.S.C. §§ 4411 *et seq*. The Endowment's mission is to "encourage free and democratic institutions throughout the world through private sector initiatives, including activities which promote the individual rights and freedoms (including internationally recognized human rights) which are essential to the functioning of democratic institutions." *Id*. § 4411(b). As a grantmaking organization, the Endowment funds grantees both directly and through four "core institutes": the International Republican Institute, the National Democratic Institute, the Center for International Private Enterprise, and the Solidarity Center. Wilson TRO Decl. ¶¶ 3, 9, Dkt. 5-2.

On a yearly basis, the Endowment and its core institutes support approximately 2,000 nongovernmental projects in over 100 countries. *Id.* ¶ 3. The Endowment's projects aim to promote "long-term U.S. interests by fostering stability, countering authoritarian influence, and reducing the drivers of extremism and migration." Wilson Supp. Decl. ¶ 3, Dkt. 40-2. Grantees work with local partners to, for example, "heighten public pressure on the Iranian regime by highlighting government diversion of funds to opaque security and defense channels"; "identify, analyze, monitor, and expose the Chinese Communist Party's influence operations in South and Southeast Asia"; and support "democratic activists . . . as they adapt and plan the next steps in their movements to counter . . . authoritarian regimes." *Id.* ¶ 74. Many grantees operate in high-risk environments, under oppressive regimes, and depend on the Endowment's financial support. *Id.* ¶¶ 64, 74, 82.

Congress funds the Endowment through annual appropriations. The NED Act provides that the State Department "shall make an annual grant to the Endowment to enable the Endowment to carry out its purposes" and that "[s]uch grants shall be made with funds specifically appropriated for grants to the Endowment." 22 U.S.C. § 4412(a). When providing grants, the State Department "may not require the Endowment to comply with requirements other than those specified in" the Act. *Id.*

Every year since the Endowment's founding in 1982, Congress has enacted appropriations that the Endowment has received in full over the same fiscal year. Wilson Supp. Decl. ¶ 32. After Congress appropriates funding, the Office of Management and Budget (OMB) "apportions" those funds by setting a schedule to determine when they will become available to the relevant executive agency—here, the State Department. *See* GAO, A Glossary of Terms Used in the Federal Budget Process, GAO-05-734SP, at 12–13 (Sept. 1, 2005). In recent years, OMB has apportioned the full

amount of the Endowment's funds upon the enactment of a full-year appropriations law. *See* Pl.'s Mot., at 7 n.2. The State Department then "obligates" those funds to the Endowment, and the money is set aside for the Endowment in its Treasury account. *See* Wilson TRO Decl. ¶ 16. The Endowment, and its grantees, obtain money on an as-needed periodic basis. Wilson Supp. Decl. ¶ 8 ("NED can only access the obligated funds [in its Treasury account] by regularly requesting payment drawdowns based on spending."); *id.* ¶ 13 ("[A] grantee does not receive the full amount of the grant up front[.] . . . [P]ayments are tied to submission of scheduled progress reports and other deliverables.").

For fiscal year 2024, Congress appropriated $315,000,000 in "no-year" funds for the Endowment's use. The relevant Further Consolidated Appropriations Act provided "[f]or grants made by the Department of State to the National Endowment for Democracy, as authorized by the National Endowment for Democracy Act (22 U.S.C. 4412), $315,000,000, to remain available until expended." Pub. L. No. 118-47, 138 Stat. 460, 737 (2024). For fiscal year 2025, Congress passed three continuing resolutions providing that same level of funding, "under the authority and conditions provided" in the 2024 appropriations act. *See* Pub. L. No. 118-83, 138 Stat. 1524 (2024); Pub. L. No. 118-158, 138 Stat. 1722 (2024); Pub. L. No. 119-4, 139 Stat. 9 (2025). "No-year" appropriations—denoted by the "available until expended" language—are available for multiple fiscal years and do not expire. *See* GAO, Principles of Federal Appropriations Law (Red Book), at 5-7 to 5-9 (3d ed. 2004); Wilson Supp. Decl. ¶ 7 ("Congress typically appropriates "no-year" funds to the Endowment, which means that the money does not expire, affording the Endowment vital flexibility to fund long-term projects that incur expenses over multiple years.").

At the end of January 2025, the Endowment began encountering difficulties in accessing its money. It did not receive roughly $97 million in routine drawdown requests from its Treasury

account, and the State Department delayed the obligation of an additional $72 million in apportioned funds. Wilson TRO Decl. ¶¶ 26–31. Unable to meet ongoing operational costs, the Endowment was forced to furlough significant numbers of staff and default on obligations to grantees. *Id*. ¶¶ 35, 40.

On March 5, 2025, the Endowment filed suit. Compl., Dkt. 1. It also moved for a temporary restraining order. TRO Mot., Dkt. 5. Five days later, on March 10, the Endowment received the $97 million in requested drawdowns and the State Department represented that it was in the process of obligating the additional $72 million in funds. Dkt. 14. The Court granted the parties' request to hold these proceedings in abeyance. *See* Minute Order of Mar. 11, 2025.

The defendants continued to slow-walk disbursements. On March 13, after the Endowment submitted a $450,000 drawdown request, State Department officials informed the Endowment that a "waiver" was required to access the funds. Wilson Supp. Decl. ¶ 17. The requirement was later withdrawn and the Endowment received the requested funds on March 21. *Id.* In April and May, OMB apportioned funds to the Endowment in 30-day increments, deviating from its previous practice of making full annual appropriations available upon enactment. Dkt. 17. In early May, the Director of OMB submitted a budget request for fiscal year 2026 to the Senate, proposing to eliminate the Endowment's funding entirely. *See* Letter from Russell T. Vought, Dir., OMB, to Sen. Susan Collins, Chair, Comm. on Appropriations (Vought Letter), at 3 (May 2, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/05/Fiscal-Year-2026-Discretionary-Budget-Request.pdf. *Id.*

Later that month, the State Department submitted a full-year spending plan to Congress that did not contemplate any additional apportionments or obligations to the Endowment for fiscal

4

year 2025.  Administrative Record (AR) 3–4, Dkt. 39-1.  The spending plan provided that unobligated funds would be "subject to review for alignment with Administration priorities."  *Id.*

As of early June, OMB had apportioned and the State Department had obligated only roughly $220 million of the $315 million in funds appropriated for the Endowment for fiscal year 2025.  AR 3.  On June 11, government counsel informed the Endowment that no more funding was forthcoming because the executive branch "contemplate[d] reserving" the remaining $95 million for "grants to NED for FY 2026."  Am. Compl. Ex. A at 1, Dkt. 35-2.  Counsel explained that, pursuant to the Antideficiency Act, "OMB is required to apportion no-year funds 'to achieve the most effective and economical use,' 31 U.S.C. 1512(a), and funding in this case requires apportionment for FY 2026 rather than additional obligations for FY 2025."  *Id.*; *see also* AR 4 (declaration from State Department official asserting that "disbursing the [$95 million in] funds in Fiscal Year 2026 would achieve the most effective and economical use of the remaining funds because sufficient funds had already been disbursed to NED for FY2025").

The Endowment filed a renewed motion for a preliminary injunction to enjoin the defendants from withholding the remaining fiscal year 2025 appropriations.  *See* Pl.'s Mot.  The Endowment claims the withholding is contrary to law and in excess of statutory authority under the NED Act and the Antideficiency Act, 5 U.S.C. § 706(2)(A)–(C); arbitrary and capricious, *id.* § 706(2)(A); and in violation of multiple constitutional provisions, *id.* § 706(2)(B).  On August 10, the Court held a hearing on the motion.

## II.     LEGAL STANDARDS

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  To prevail,

a party seeking preliminary injunctive relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citation modified). Where a federal agency is the defendant, the last two factors merge. *See Am. Immigr. Council v. DHS*, 470 F. Supp. 3d 32, 36 (D.D.C. 2020).

## III.   ANALYSIS

### A.   Likelihood of Success on the Merits

The Court turns first to the Endowment's likelihood of success on its APA claims. Under the APA, a reviewing court must set aside a final agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C). Absent exceptions not relevant here, *id.* § 701(a), the APA authorizes judicial review of each "final agency action for which there is no other adequate remedy in a court," *id.* § 704.[1]

#### 1.   *Violations of the NED Act and the Antideficiency Act*

The Endowment claims that the defendants are violating the NED Act, by impeding the Endowment's statutory purposes and by withholding funds for impermissible policy reasons. The NED Act uses mandatory language directing the executive to fund the Endowment: It provides that the State Department "*shall* make an annual grant to . . . enable the Endowment to carry out its purposes." 22 U.S.C. § 4412(a) (emphasis added). The statute also expressly defines the Endowment's purposes, *id.* § 4411(b), and provides that compliance with those purposes should

---

[1] The defendants do not dispute that denial of the funding is a reviewable "final agency action." 5 U.S.C. § 704; *see* Pl.'s Mot. at 15 n.10; *see generally* Opp'n, Dkt. 43.

be "determine[d]" by the "Board of Directors of the Endowment," *id.* § 4412(a). And the statute limits the executive branch's discretion in imposing conditions on funding: The State Department is prohibited from "requir[ing] the Endowment to comply with requirements other than those specified" in the Act. *Id.* Instead, such policy oversight is the prerogative of Congress. *Id.* § 4412(d) ("The Endowment and its grantees shall be subject to the appropriate oversight procedures of the Congress."). Tellingly, the defendants do not dispute that the Act prohibits the executive branch from imposing extra-statutory policy based conditions on the Endowment's funding. *See* Hr'g Rough Tr. at 33 (agreeing that "the NED Act prohibits the executive branch from imposing any policy-based conditions on the Endowment's funding, other than what's in the statute").

Yet record evidence clearly shows that the defendants are withholding funding for impermissible policy reasons. The State Department's full-year spending plan—the sole document in the administrative record not created for purposes of this litigation—explicitly states that the withheld funds are being "subject to review for alignment with *Administration priorities*." AR 60 (emphasis added). Around that time, the Director of OMB urged the Senate to entirely defund the Endowment because of its alleged support of media organizations critical of the President and his allies. *See* Vought Letter at 3 (asserting that the Endowment's grantees had "called for prosecutions of allies of the President" and "targeted and blacklisted" media outlets supportive the president). An affidavit from the Director of the Bureau of Budget Planning at the State Department highlights that the withholding decision was made "in consultation with OMB." AR 4. Taken as a whole, that evidence leaves little doubt as to the defendants' motivations—the Endowment's work does not align with "Administration priorities." AR 60.

Moreover, the withholding of $95 million interferes with the statutory mandate that annual funding must "enable the Endowment to carry out its purposes." 22 U.S.C. § 4412(a). The Endowment structures its initiatives and makes commitments to grantees in reliance on receiving the full amount of appropriated funds, as it has every year for the past 42 years. Wilson Supp. Decl. ¶¶ 40, 47. It submitted a plan to Congress describing its "programmatic goals" for 2025 and documenting how "every appropriated dollar would be spent." *Id.* ¶ 47. The sudden and unprecedented withholding of $95 million—or roughly 30%—from its anticipated budget has forced the Endowment to renege on commitments. *Id.* ¶ 47. It was unable to fund 226 approved grants, 124 grants recommended for approval by the Board, and 53 core institute projects. *Id.* ¶¶ 49, 51. These are activities that the Endowment, in consultation with Congress, has determined are "important and time-sensitive" to furthering "critical election monitoring, helping democracy activists overcome authoritarian censorship, [and] maintain[ing] access to independent news and information," *id.* ¶ 52—in other words, to fulfilling the Endowment's mission. The defendants have fallen woefully short of providing an "annual grant" that "enable[s]" the Endowment to fulfill its statutory purposes. *See* 22 U.S.C. § 4412(a).

The defendants' official justification for that withholding—preserving the Endowment's funding stability for the coming year—is not plausible. Opp'n at 13. Before and during litigation, the defendants obstructed routine drawdown requests on money already set aside in the Endowment's Treasury account, imposed and then abandoned a novel waiver requirement, and delayed the obligation of apportioned funds. *See* Hr'g Rough Tr. at 42 (not disputing the plaintiff's factual allegations). These actions vitiate any inference that the defendants' concern has been to "ensure" the Endowment's "level of funding in the coming fiscal year." AR 4. Indeed, counsel for the State Department provided that rationale to the Endowment for the first time in a June 11

8

email, well after this litigation began. *See* Am. Compl. Ex. A. In light of the defendants' repeated maneuvers to impede the Endowment's flow of funds, the Court does not find credible an explanation offered in the shadow of pending litigation. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) ("[Courts] are not required to exhibit a naiveté from which ordinary citizens are free." (citation modified)).

Nor does the Antideficiency Act authorize the defendants' actions. Section 1512(a) of the Act[2] does permit OMB to set an apportionment schedule for no-year funds to ensure their efficient and orderly spending. That provision directs that "[a]n appropriation for an indefinite period . . . shall be apportioned to achieve the most effective and economical use." 31 U.S.C. § 1512(a). But the executive branch has long recognized that the apportionment authority under § 1512(a) does not alter the *substantive* obligations imposed by other statutes on the expenditure of funds. *E.g.*, Red Book 6-122 (noting that apportionment does not "affect the operation of statutory requirements concerning the availability or use of appropriated funds"); OMB Circular No. A-11 at § 120.9 (2024) ("[A]pportionment of funds is not a means for resolving any question dealing with . . . the legality of using funds for the purpose for which they are apportioned."); *see also City of New Haven v. United States*, 809 F.2d 900, 906 n.18 (D.C. Cir. 1987) (noting Congress's intent to "preclude" that provision from being invoked "as authority for implementing 'policy' impoundments"). Thus, the defendants cannot rely on § 1512(a) to act in contravention of the NED Act.[3]

---

[2] The parties agree that OMB was not acting under 31 U.S.C. § 1512(c) to create a funding reserve. *See* Opp'n at 12; Reply at 9, Dkt. 44.

[3] The Court is not aware of, and the defendants cannot point to, *see* Hr'g Rough Tr. at 43, any other circumstance under which § 1512(c) has been used to withhold such a substantial amount of funds.

9

To be clear, the Court does not reach whether "the Endowment must receive [its] full appropriated amount in [the same] fiscal year" in every case. *See* Pl.'s Mot. at 29. And it need not decide whether the defendants are categorically prohibited from imposing an alternative apportionment schedule in *all* instances. The Court merely finds that the defendants may not withhold appropriated funds under the present conditions: on the grounds that the Endowment's projects do not align with the Executive's priorities.

In sum, subjecting $95 million of the Endowment's funding to "review for alignment with Administration priorities," AR 60, is precisely the kind of extra-statutory requirement prohibited by the NED Act, 22 U.S.C. § 4412(a). Accordingly, the Court concludes that the Endowment is likely to succeed on its claim that the defendants violated the NED Act.

### 2.   *Arbitrary and Capriciousness*

The Endowment also claims that withholding the appropriated funds is an arbitrary and capricious agency action. In an arbitrary and capriciousness challenge, the core question is whether the agency's decision was "the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). An action is arbitrary and capricious if the agency has "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or [the explanation] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 43. An agency that fails to give an "indication of the basis" of its decision cannot withstand APA review. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962).

The defendants' justification for its withholding is that reserving the funds "would achieve the most effective and economical use of the [$95 million] because sufficient funds had already

been disbursed to NED for [fiscal year] 2025"; and reservation "ensures that NED will retain at least [$95 million in] funding in the coming fiscal year." AR 4. Those assertions are neither reasoned nor rational.

As noted, the Endowment planned its 2025 grantmaking activities in expectation of receiving the full amount of its annual appropriations, as it has for over four decades. It committed every dollar of expected appropriations to operational expenses, core institutes, and grantees; and it submitted the details of its spending plan to the congressional appropriations committees. Wilson Supp. Decl. ¶ 47. The defendants fail to explain how funds falling 30% short of the Endowment's anticipated budget could be "sufficient" to meet its operational needs, AR 4, or "enable" it "to carry out its purposes," *see* 22 U.S.C. § 4412(a). They do not address why it is "the most efficient and economical" result, 31 U.S.C. § 1512(a), for the Endowment to default on current financial obligations to grantees. Wilson TRO Decl. ¶ 40. Nor does the record show that the defendants weighed, assessed, or displayed any awareness of the Endowment's reliance interests on the historical practice of routinely disbursing annual appropriations in full. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And finally, even if the defendants' concerns with ensuring the Endowment's "level of funding in the coming fiscal year" were well-founded,[4] AR 4, "an agency may not rely on political guesswork about future congressional appropriations as a basis for violating existing legal mandates," *In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh, J.).

---

[4] The House Appropriations Committee has recommended $315 million in appropriations for the Endowment in fiscal year 2026, in "recogni[tion of] the essential role of the [Endowment] in promoting key national security interests by countering threats from dangerous adversaries around the world." H.R. Rep. No. 119-217 at 29–30 (2025).

Because the defendants' "conclusory and unreasoned" assertions, *Env't Health Tr. v. FCC*, 9 F.4th 893, 905 (D.C. Cir. 2021), are entirely insufficient to justify their actions, the Endowment is also likely to succeed on its claim that withholding the $95 million in appropriated funds was arbitrary and capricious.[5]

### B. Irreparable Harm

To establish irreparable harm, a plaintiff must demonstrate that the harm is (1) "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief," and (2) "beyond remediation." *Newby*, 838 F.3d at 7–8 (citation modified). The Endowment has done so here.

The Endowment has lost access to over 30% of its anticipated budget for this fiscal year. Because it plans projects "based on the premise that [it] will have reliable access to all of the funds that Congress appropriated for . . . this fiscal year," the abrupt withholding of funding has forced the Endowment to terminate critical staff and suspend impactful democracy-supporting initiatives. Wilson Supp. Decl. ¶ 47. The Endowment has been forced to lay off 100 staff members—approximately 35% of its core workforce—and the uncertainty of future funding is accelerating attrition rates among key personnel. *Id*. ¶¶ 33, 39, 41. These individuals possess specialized skillsets, including language proficiencies, regional knowledge, and technical and cybersecurity expertise. *Id.* ¶ 41. The loss of key personnel has hampered the Endowment's ability to "facilitate[e] secure communication, support[] program monitoring and evaluation, and navigat[e] complex political and cultural landscapes—particularly in restrictive environments such as Iran, China, Venezuela, Russia, and North Korea." *Id.* ¶ 37. These harms are not merely monetary,

---

[5] Having concluded that the Endowment is likely to succeed on the merits of its APA claims on two alternative grounds, the Court will not address the constitutional claims.

*contra* Opp'n at 21–24—they "unquestionably make it more difficult for the [Endowment] to accomplish [its] primary mission" of supporting democracy-promoting initiatives around the globe. *Newby,* 838 F.3d at 9; *see AIDS Vaccine Advoc. Coal. v. Dep't of State*, 766 F. Supp. 3d 74, 81 (D.D.C. 2025) (finding irreparable harm from significant cuts to staff and reduction in core operations).

Additionally, as a result of the current withholding, the Endowment is unable to provide full funding to "more than 500 direct grants and approximately 53 core [institute] projects." *Id.* ¶¶ 36, 48, 52 ("These projects . . . support important and time-sensitive activities including critical election monitoring, helping democracy activists overcome authoritarian censorship, maintain access to independent news and information across many media environments, and advance reforms to level the playing field for American businesses and protect labor rights."). The Endowment has been "forced to scale back support, both in terms of duration and amount, for priority projects including in countries such as Cuba and China, delay consideration of others, as well as simply pass on a wide range of initiatives that require longer term investment." *Id.* ¶ 47. This drawback poses "special risks to grantee partners operating in authoritarian contexts, as the sudden interruption in support may expose" their affiliation with the Endowment, inviting "reprisals from authoritarian governments." *Id.* ¶ 57. Reneging on commitments destroys the Endowment's credibility and "harms the Endowment's mission and reputation as a trusted, reliable U.S. partner." *Id.* ¶ 96 ("Groups around the world, particularly in the most dangerous and difficult environments, seek out [the Endowment] due to our well-established reputation for reliability, transparency, consistency, security-consciousness, and partnership."). These harms to the Endowment's global reputation and to the "very existence of its programs" are irreparable. *S. Educ. Found. v. U.S. Dep't of Educ.*, No. 25-cv-1079 (PLF), 2025 WL 1453047, at *15 (D.D.C.

May 21, 2025); *see Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 119 (D.D.C. 2025) (irreparable harm where grant terminations harmed organizations' reputation as "reliable and trustworthy partners and investors" (citation modified)).

Accordingly, the Court finds that the Endowment has shown that it will suffer irreparable harm absent an injunction.

### C. Balance of Harms and Public Interest

The two remaining factors—the balance of the equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors also weigh in the Endowment's favor. The defendants cannot show that they will be harmed by an injunction—it will not "disrupt" the defendants' "oversight" of "taxpayer money" because they are not authorized exercise such oversight. *Contra* Opp'n at 33. As explained, the defendants' present withholding of appropriated funds on policy grounds violates the NED Act and appropriations laws. The government "cannot suffer harm from an injunction that merely ends an unlawful practice." *See R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (citation modified). To the contrary, the "public interest is served when administrative agencies comply with their obligations under the APA." *Northern Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009). In contrast, as explained, the Endowment will suffer significant harm from funding cuts that impede its ability to retain essential personnel and fulfill its obligations to grantees.

Accordingly, the balance of equities and the public interest also weigh in the Endowment's favor.

14

**D.     Bond**

The Court will not order the Endowment to post an injunction bond. Federal Rule of Civil Procedure 65(c) vests "broad discretion in the district court to determine the appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), including the "discretion to require no bond at all," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (citation modified); *see Fed. League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 25-cv-0946 (CKK), 2025 WL 1187730, at *62 (D.D.C. Apr. 24, 2025) (collecting cases). The defendants have likely unlawfully frozen the Endowment's funding. It makes little sense to exacerbate the financial strain by requiring the Endowment to post bond.

**E.     Administrative Stay and Stay Pending Appeal.**

The Court will deny the defendants' request for an administrative stay and a stay pending appeal. For the reasons explained, the Endowment is likely to succeed on the merits of its APA claims, and the defendants will not be irreparably harmed by the entry of an injunction.

### CONCLUSION

For the foregoing reasons, the Court grants the plaintiff's Motion for a Preliminary Injunction. The defendants are enjoined from withholding or otherwise interfering with the remaining fiscal year 2025 funds appropriated to the Endowment. A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

August 11, 2025