## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL ENDOWMENT FOR DEMOCRACY, | : : : : | |
| *Plaintiff*, | : : | No. 1:25-cv-00648-DLF |
| v. | : : : | |
| UNITED STATES, et al., | : : | |
| *Defendants.* | : : | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................................................1

BACKGROUND ........................................................................................................3

      A.    Defendants Interfered with the Endowment's Fiscal Year 2025 Funding
           Until this Court Enjoined Them................................................................3

      B.    Defendants Have Renewed Their Interference with the Endowment's
           Funding in Fiscal Year 2026.....................................................................8

      C.    Defendants' Interference with the Endowment's Funding Again Imposes
           Irreparable Harm. ...................................................................................13

LEGAL STANDARD...............................................................................................14

ARGUMENT ...........................................................................................................14

I.     THE ENDOWMENT IS LIKELY TO SUCCEED ON THE MERITS...........................14

      A.    Defendants Are Violating the NED Act Again........................................15

           1.    Defendants are again withholding the Endowment's funding based
                on impermissible policy grounds. ...............................................16

           2.    Defendants have again failed to make an annual grant that enables
                the Endowment to carry out its purposes.....................................23

      B.    Defendants' Withholding of the Endowment's Funds Is Arbitrary and
           Capricious Again. ...................................................................................24

II.    THE ENDOWMENT WILL SUFFER IRREPARABLE HARM WITHOUT A
      PRELIMINARY INJUNCTION ........................................................................27

      A.    The $105 Million Withholding Is Damaging the Endowment's Ability to
           Fulfill Its Congressionally Recognized Mission.....................................27

      B.    Defendants' Withholding of the Endowment's Funding Threatens
           Irreparable Damage to the Endowment's Reputation as a Trusted Partner. ..........30

III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR
      OF GRANTING THE PRELIMINARY INJUNCTION................................................30

CONCLUSION.........................................................................................................32

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

\* *In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013) ........................................................................26

*Am. Ass'n of Political Consultants v. United States SBA*,
    613 F. Supp. 3d 360 (D.D.C. 2020) ...............................................................30

*Armour & Co. v. Freeman*,
    304 F.2d 404 (D.C. Cir. 1962) .......................................................................30

*AT&T Wireless Servs. v. FCC*,
    270 F.3d 959 (D.C. Cir. 2001) .......................................................................25

*Bennett v. Spear*,
    520 U.S. 154 (1997) .......................................................................................15

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962) ...................................................................................24, 25

*Consolidated Edison Co. of N.Y. v. FERC*,
    823 F.2d 630 (D.C. Cir. 1987) .......................................................................25

*Dep't of Homeland Sec. v. Regents of the Univ of Cal.*,
    591 U.S. 1 (2020) ...........................................................................................26

*Doctors for America v. OPM*,
    766 F. Supp. 3d 39 (D.D.C. 2025) .................................................................27

*Env't Health Tr. v. FCC*,
    9 F.4th 893 (D.C. Cir. 2021) .........................................................................26

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .......................................................................................26

*Huisha-Huisha v. Mayorkas*,
    27 F.4th 718 (D.C. Cir. 2022) .......................................................................14

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ...............................................................14, 27, 31

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) .......................................................................................15

\* *Motor Vehicle Mfr. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .........................................................................................24

*Nat'l Fuel Gas Supply Corp. v. FERC,*
    468 F.3d 831 (D.C. Cir. 2006) ................................................................25

*NextWave Personal Cmmc'ns, Inc. v. FCC,*
    254 F.3d 130 (D.C. Cir. 2001) ................................................................15

*Nken v. Holder,*
    556 U.S. 418 (2009) ..............................................................................30

*Ramirez v. U.S. Immigr. & Customs Enf't,*
    568 F. Supp. 3d 10 (D.D.C. 2021) ..........................................................31

*Shawnee Tribe v. Mnuchin,*
    984 F.3d 94 (D.C. Cir. 2021) ................................................................31

**FEDERAL STATUTES**

5 U.S.C. § 551 ..........................................................................................15

5 U.S.C. § 704 ..........................................................................................15

5 U.S.C. § 706(1) ......................................................................................16

5 U.S.C. § 706(2) ................................................................................15, 24

22 U.S.C. § 4411(a) ....................................................................................6

22 U.S.C. § 4411(b) ..................................................................................16

* 22 U.S.C. § 4412(a) ..............................................1, 2, 8, 15, 16, 17, 23

22 U.S.C. § 4412(c) ....................................................................................6

22 U.S.C. § 4412(d) ..................................................................................17

22 U.S.C. § 4413(b)(1) ..............................................................................27

22 U.S.C. § 4413(g) ................................................................................1, 9

**OTHER AUTHORITIES**

Mike Benz (@MikeBenzCyber), X (Jan. 14, 2026 at 3:39 PM),
    https://x.com/MikeBenzCyber/status/2011463091934945419 ..................20

Mike Benz (@MikeBenzCyber), X (Jan. 15, 2026 at 6:45 PM),
    https://x.com/MikeBenzCyber/status/2011947964965552628
    (reposted by DOGE State, @DOGE_STATE) ........................................18

Mike Benz (@MikeBenzCyber), X (Jan. 16, 2026 at 2:41 AM),
   https://x.com/MikeBenzCyber/status/2011992088078963008.................................................20

Mike Benz (@MikeBenzCyber), X (Jan. 23, 2026 at 10:29 PM),
   https://x.com/MikeBenzCyber/status/2014827809869365741.................................................19

CRA Staff, *Primer: The National Endowment for Democracy and an NGO
   Ecosystem Actively Undermining America*, Ctr. for Renewing Am.
   (Feb. 7, 2025), https://americarenewing.com/primer-the-national-endowment-
   for-democracy-and-an-ngo-ecosystem-actively-undermining-america/...................................4

Democracy Fund, *OpenOMB*, https://openomb.org/file/11505625...............................................21

Exec. Off. of the Pres., *Statement of Administration Policy* (Jan. 22, 2026),
   *available at* https://www.whitehouse.gov/wp-content/uploads/2026/01/SAP-
   HR-7147-HR-7148.pdf ...........................................................................................................11

*Fact-Sheet: NED and the 2026 Discretionary Budget Request*, Nat'l Endowment
   for Democracy (May 2, 2025), https://www.ned.org/fact-sheet-ned-and-the-
   2026-discretionary-budget-request/ ........................................................................................6

Arthur MacWaters (@ArthurMacwaters), X (Jan. 15, 2026 at 5:08 PM),
   https://x.com/ArthurMacwaters/status/2011847985521418514 (reposted by
   DOGE State, @DOGE_STATE)..............................................................................................18

Pete Marocco (@Petermarocco), X (Jan 14, 2026 at 10:19 PM), https://x.com/
   petermarocco/status/2011563849250717890?s=46.................................................................19

Memorandum from Russell T. Vought, Dir., Off. of Mgmt. & Budget, to Sen.
   Susan Collins, Chair, Comm. on Appropriations (May 2, 2025),
   https://www.whitehouse.gov/wp-content/uploads/2025/05/Fiscal-Year-2026-
   Discretionary-Budget-Request.pdf ...........................................................................................6

Wade Miller, *Policy Brief: Dismantle Entities Actively Censoring Americans*, Ctr.
   for Renewing Am. (Feb. 7, 2025), https://americarenewing.com/policy-brief-
   dismantle-entities-actively-censoring-americans/....................................................................4

Elon Musk (@elonmusk), X, *Defund NED* (Jan 14, 2026 at 6:53 AM),
   https://x.com/elonmusk/status/2011406310789775863 (reposted by DOGE
   State, @DOGE_STATE)...........................................................................................................18

National Endowment for Democracy, *OpenOMB*,
   https://openomb.org/file/11469436...........................................................................................21

Off. of Mgmt. & Budget, Exec. Off. of the President, OMB Bull. No. 26-01,
Apportionment of the Continuing Resolution(s) for Fiscal Year 2026
(Nov. 12, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/11/
OMB-Bulletin-No.-26-01-Apportionment-of-the-Continuing-Resolutions-for-
Fiscal-Year-2026.pdf .........................................................................................9, 10

OpenOMB, *Search Apportionments: Fiscal Year 2026* (last viewed Mar. 8, 2026),
https://openomb.org/search?term=&tafs=&account=&approver=&year=
2026&approvedStart=&approvedEnd=&lineNum=.............................................21

Isaac Stanley-Becker, *USAID Hired the Right-Wing Influencer Responsible for Its
Decimation*, The Atlantic (Dec. 9, 2025), https://www.theatlantic.com/
politics/2025/12/usaid-mike-benz-cia/685195/.........................................................19

Under Secretary of State Sarah B. Rogers (@UnderSecPD), X (Jan 26, 2026 at
6:22 AM), https://x.com/UnderSecPD/status/2015747081747546564 ...................18

## INTRODUCTION

Seven months ago, this Court held that the Executive Branch violated the National Endowment for Democracy Act (NED Act) by withholding the Endowment's congressionally appropriated funding for "impermissible policy reasons"—that is, because Congress's decision to fund the Endowment "does not align with 'Administration priorities.'" ECF No. 46 (PI Op.) 7. The Court further held that by withholding funding in a manner that interfered with the Endowment's ability to fulfill its congressionally recognized initiatives and annual grant commitments, Defendants violated the NED Act's provision that the Executive "shall" provide an annual grant that "enable[s] the Endowment to carry out its purposes." 22 U.S.C. § 4412(a). Although Defendants complied with the ensuing preliminary injunction with respect to fiscal year 2025 funding, their stance toward the Endowment—their determination to withhold the Endowment's funding because they disagree with its mission—never changed. As a result—and despite the clarity of this Court's ruling—the Endowment has not seen a *single dollar* of its appropriated fiscal year 2026 funding.

Defendants' conduct since the injunction leaves no doubt that the Executive Branch will not disburse the Endowment's funding absent a court order, even as they have tried and failed to manufacture a lawful rationale for their refusal to do so. On the very same day this Court issued its injunction, Defendants instituted a "programmatic" audit of the Endowment for compliance with "Administration priorities"—in clear violation of the NED Act, which permits an audit only of the "financial transactions of the Endowment," 22 U.S.C. § 4413(g). And when Congress appropriated $105 million in partial-year funding for the Endowment in November 2025—reflecting Congress's determination that the Endowment should continue the democracy-fostering activities contemplated in the NED Act—Defendants refused to apportion and disburse the funds. At first they refused to provide any explanation, but as the months passed, they offered a series of shifting, contradictory, and factually inaccurate explanations—all the while continuing to withhold funding

1

even as Congress appropriated the balance of the Endowment's full fiscal year 2026 funding—$315 million.  Meanwhile, Executive Branch officials continued to broadcast the Administration's vehement disagreement with the Endowment's congressionally mandated activities.  In January 2026, the State Department's official DOGE X account repeated Elon Musk's call to "Defund NED," took credit for having "frozen" the Endowment's "payments" in 2025, and criticized Congress's decision to fund the Endowment in 2026.  A high-ranking State official falsely accused the Endowment of fostering "censorship."  Another Executive Branch official criticized Congress for "protect[ing]" the Endowment.

There can be no doubt about what is going on here.  Although Defendants have continued (unsuccessfully) to cast about for a *lawful* basis on which to justify withholding the Endowment's funds, the Executive Branch's explicit public statements and actions could not be clearer: the Executive Branch continues to disagree with Congress's policy determination that the Endowment should receive appropriated funding to pursue its mission.  And the Executive Branch has once again implemented that disagreement by withholding the Endowment's funding.  That is particularly clear with respect to the $105 million appropriated in November: Defendants have withheld that amount without justification for *months*, and the long delay in receiving that funding—one-third of the Endowment's annual appropriation—is causing the Endowment irreparable harm and unlawfully interfering with its ability to "carry out its purposes."  22 U.S.C. § 4412(a).  Indeed, the withholding is preventing the Endowment from obligating *60%* of its fiscal year 2026 grant commitments.

Accordingly, although the Endowment has done its best to work cooperatively with the Executive Branch and to avoid the need for this Court's involvement, the Endowment now has no choice but to seek a preliminary injunction with respect to the $105 million that Defendants have

refused to disburse since November 2025.  The Endowment is more than likely to succeed on its claims that Defendants have violated the NED Act and acted in an arbitrary and capricious manner: Defendants' latest violation of the NED Act is particularly egregious in view of this Court's crystal clear ruling that Defendants may not withhold the Endowment's funds for policy reasons and interfere with its ability to pursue its mission.  And without an injunction, the Endowment will suffer the very same irreparable harm set this Court held justified injunctive relief seven months ago: the Endowment will be unable to satisfy its grant commitments; important and time-sensitive work in high-risk environments will suffer; and the Endowment will sustain severe harm to its reputation as a credible and dependable grant partner.  This Court's immediate intervention is, unfortunately, once again warranted.

## BACKGROUND

In light of this Court's familiarity with the case, and for the convenience of the Court, the Endowment will only briefly summarize prior factual submissions to the Court and will focus on the events most relevant to deciding the instant motion for a preliminary injunction.  The Endowment incorporates by reference the additional background material described in its prior Motion for a Preliminary Injunction.  *See* ECF No. 40 at 4-14.

### A.    Defendants Interfered with the Endowment's Fiscal Year 2025 Funding Until this Court Enjoined Them.

In fiscal year 2025, Defendants took a series of steps to interfere with the funding that Congress appropriated for the Endowment.  They took those steps because the Executive Branch disagrees with Congress's decision to fund the Endowment.  This Court ultimately issued a preliminary injunction to halt Defendants' unlawful actions.

1. The Executive Branch's interference with the Endowment's funding began as soon as the current Administration took office.  As previously explained, *see* ECF No. 40 at 8-9, in the

3

period immediately before and after inauguration, incoming Executive Branch officials made clear in numerous publications and public statements that they disagreed with Congress's longstanding support for the Endowment and wanted to eliminate its funding. The Center for Renewing America, a think tank founded by Defendant and OMB Director Russell Vought, issued two such publications, criticizing the Endowment's work and enumerating policy objections to its mission.[1]

At the end of January 2025, the Endowment first encountered problems accessing its appropriated funding. By that time, through two continuing resolutions, Congress had appropriated roughly $142 million to the Endowment for fiscal year 2025. Wilson TRO Decl. (ECF No. 5-2) ¶¶ 30-31. A little under half of that amount had previously been obligated to the Endowment and was in the Endowment's Treasury account, *id.* ¶ 30, while the remainder, from the second continuing resolution, was awaiting obligation to the Endowment, *id.* ¶ 31. The Endowment could not access any of it: the Endowment was unable to draw down funds from its Treasury account, *id.* ¶ 28, and the State Department refused to obligate the funds from the second continuing resolution, *id.* ¶ 31. That funding freeze inflicted immediate, existential harms on the Endowment. It furloughed staff. *Id.* ¶ 35. It defaulted on grant obligations for the first time in its history. *Id.* ¶ 40. And it began to suffer irreparable harm to its reputation with partners around the world. *Id.* ¶¶ 35-56.

With its very existence in jeopardy, the Endowment was left with no choice but to file this lawsuit and move for a temporary restraining order. ECF Nos. 1, 5. Just days later, Defendants stopped blocking the Treasury account funds. ECF No. 14 at 2 (Joint Mot. to Hold TRO in

---

[1] CRA Staff, *Primer: The National Endowment for Democracy and an NGO Ecosystem Actively Undermining America*, Ctr. for Renewing Am. (Feb. 7, 2025), https://americarenewing.com/primer-the-national-endowment-for-democracy-and-an-ngo-ecosystem-actively-undermining-america/; Wade Miller, *Policy Brief: Dismantle Entities Actively Censoring Americans*, Ctr. for Renewing Am. (Feb. 7, 2025), https://americarenewing.com/policy-brief-dismantle-entities-actively-censoring-americans/.

Abeyance).  Defendants also represented that the State Department was finalizing the obligation of the remaining funds.  *Id.*  As a result, at the parties' urging, the Court paused the TRO proceedings.  Minute Order of Mar. 11, 2025.  The funds from the second continuing resolution were obligated just over one week later.  ECF No. 15 at 1 (Joint Status Report of Mar. 21, 2025).

2.  Defendants then changed tactics, searching for new ways to interfere with the Endowment's fiscal year 2025 funding.

First, Defendants delayed approval of one of the Endowment's drawdown requests, incorrectly claiming the Endowment needed an unspecified "waiver" to access the money.  ECF No. 16 at 1-2 (Joint Status Report of Mar. 31, 2025).  Ultimately, after outreach from counsel, Defendants acknowledged no waiver was needed.  *Id.* at 2.

Next, on March 31, the Endowment learned that OMB had only apportioned a subset of the remainder of the Endowment's full-year appropriation—$26 million out of $172 million, or one month's worth.  That was highly unusual; in recent years, OMB had promptly apportioned the *entirety* of the Endowment's annual funding.  Wilson PI Decl. (ECF No. 40-2) ¶ 20.  In response to inquiries, Defendants indicated that OMB would apportion funds in 30-day increments until the State Department submitted a full-year spending plan to Congress.  ECF No. 17 (Joint Status Report of Apr. 30, 2025).

On April 24, while the Endowment was still receiving funding on a month-to-month basis, the Executive Branch tried another line of attack:  DOGE.  Endowment executives received an email from Marshall Wood, who identified himself as a "member of the DOGE team."  Wilson PI Decl. ¶ 21.  Mr. Wood informed the Endowment that DOGE "would like to have a call" the next day "to discuss onboarding [the] Endowment's team."  *Id.*  He threatened that if he did not hear back, he would "assume [the Endowment did] not plan to comply with the President's Executive

Order." *Id.*  He made this threat notwithstanding that it would be unlawful for DOGE to forcibly onboard a team at the Endowment.  DOGE's authority extended only to government agencies.  *See* Exec. Order No. 14158, § 3(c), 90 Fed. Reg. 8441, 8441 (Jan. 20, 2025).  The Endowment is a private corporation, not a government entity.  22 U.S.C. §§ 4411(a), 4412(c).  Ultimately, the Endowment agreed to have a call with DOGE and voluntarily answered a list of questions, but DOGE never acknowledged that it is barred from onboarding a team at the Endowment.  Wilson PI Decl. ¶¶ 25-26.

On May 2, OMB submitted to Congress the President's budget request for fiscal year 2026, calling for eliminating the Endowment's funding.  OMB justified this proposal on the ground that the Endowment "blocked public access to its grant details," "funded [a] Ukraine disinformation organization," and "funded the now-infamous Disinformation Index Foundation that targeted and blacklisted conservative [American] media outlets."[2]  As the Endowment has detailed, these claims ranged from the highly misleading to the patently false.[3]

On May 29, the State Department submitted a full-year spending plan to Congress.  Although OMB had only apportioned—and the State Department had only obligated—roughly $220 million of the Endowment's $315 million appropriation, the plan did not account for any additional apportionments or obligations to the Endowment in fiscal year 2025.  AR000003, ¶ 3.  Instead, it specified that "[r]emaining resources may be made available for obligation in FY 2025 subject to review for alignment with Administration priorities."  AR000060.

---

[2] Memorandum from Russell T. Vought, Dir., Off. of Mgmt. & Budget, to Sen. Susan Collins, Chair, Comm. on Appropriations (May 2, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/05/Fiscal-Year-2026-Discretionary-Budget-Request.pdf.

[3] *See Fact-Sheet: NED and the 2026 Discretionary Budget Request*, Nat'l Endowment for Democracy (May 2, 2025), https://www.ned.org/fact-sheet-ned-and-the-2026-discretionary-budget-request/.

On June 11, counsel for Defendants informed counsel for the Endowment that the Executive Branch had decided to withhold the ~$95 million balance of the funding appropriated for the Endowment in fiscal year 2025.  Defendants' counsel represented that the State Department's spending plan "contemplates reserving funds from State's no-year FY25 appropriation for grants to NED for FY 2026."  ECF No. 35-2 (Am. Compl. Ex. 2 (DOJ E-Mail)).  In a joint status report submitted the following day, Defendants confirmed that the Executive Branch was "reserving" the remainder of the Endowment's funding.  ECF No. 33 at 2 (Joint Status Report of June 12, 2025).  Defendants claimed that "funding in this case requires apportionment for FY 2026 rather than additional obligations for FY 2025."  *Id.*  Defendants did not articulate any reason why the remaining funds should be apportioned for fiscal year 2026, rather than for the current fiscal year (as had been OMB's consistent practice).

On July 10, Defendants filed the administrative record, which consisted only of the State Department's Spending Plan and a three-page declaration from a State Department official, signed on July 10—weeks after the apportionment decision.  The declaration confirmed that Defendants decided to withhold $95 million from the Endowment's fiscal year 2025 appropriation and repeated the legal arguments just described.  The declaration added that the "State Department in consultation with OMB determined that disbursing the funds in Fiscal Year 2026 would achieve the most effective and economical use of the remaining funds because sufficient funds had already been disbursed to NED for FY2025."  AR000004, ¶ 7.  It also asserted that "[r]eserving the unobligated $94,941,000 of FY 2025 funds ensures that NED will retain at least that level of funding in the coming fiscal year."  AR000004, ¶ 8.  No further explanation was provided.

3. The Endowment moved for a preliminary injunction to halt Defendants' unlawful withholding of $95 million of the Endowment's appropriated funds.  On August 11, 2025, this Court

granted the Endowment's motion.  ECF No. 45 (PI Order).

This Court concluded that by "subjecting $95 million of the Endowment's funding to 're-view for alignment with Administration priorities,'" Defendants had imposed "precisely the kind of extra-statutory requirement prohibited by the NED Act, 22 U.S.C. § 4412(a)."  PI Op. 10.  The Court further concluded that "the withholding of $95 million interferes with the statutory mandate that annual funding must 'enable the Endowment to carry out its purposes.'"  *Id.* at 8 (quoting 22 U.S.C. § 4412(a)).  This Court also found that the Endowment was likely to succeed on its arbi-trary-and-capricious claim, explaining that Defendants' reasons for withholding funding—that "sufficient funds had already been disbursed" and that reserving funds ensured the Endowment would retain that amount of funding the following fiscal year—were "neither reasoned nor ra-tional."  *Id.* at 10-11.

This Court issued an order enjoining Defendants from "withholding, blocking, reserving, or otherwise interfering with payment of appropriated funds for fiscal year 2025 to the Endow-ment, including by interfering with the apportionment, obligation, and ultimate disbursement of such funds."  PI Order.  Defendants complied with that order and disbursed the remainder of the Endowment's fiscal year 2025 funding, *see* ECF Nos. 47, 48—though they also filed a notice of appeal, ECF No. 51.

**B.    Defendants Have Renewed Their Interference with the Endowment's Funding in Fiscal Year 2026.**

Despite this Court's preliminary injunction, Defendants have reprised last year's unlawful behavior—refusing to apportion, allot, obligate, or disburse any of the funds that Congress appro-priated to fund the Endowment for this fiscal year, including the $105 million appropriated for the Endowment nearly *four months ago*.

Defendants previewed their post-injunction interference campaign on the same day this

Court entered a preliminary injunction.  The State Department notified the Endowment that it was initiating "a programmatic and financial audit of NED and each of its four core institutes."  *See* ECF No. 48 at 2 (Joint Status Report of Aug. 22, 2025).  Because the State Department appeared to be contemplating an audit that would violate the NED Act provision authorizing the State Department to audit only the "financial transactions of the Endowment," 22 U.S.C. § 4413(g), the Endowment requested a meeting with Executive Branch officials.  At that meeting, and notwithstanding this Court's preliminary injunction, the officials explained that a purpose of the audit is to ensure that the Endowment's activities are aligned with Administration "priorities."  ECF No. 48 at 2 (Joint Status Report of Aug. 22, 2025).

On November 12, 2025, Congress appropriated the first tranche of the Endowment's fiscal year 2026 funds.  In a continuing resolution, signed by the President, Congress extended the Endowment's fiscal year 2025 funding level for the first third of fiscal year 2026, appropriating the prorated amount of approximately $105 million "[f]or grants made by the Department of State to the National Endowment for Democracy."  Pub. L. No. 118-47, 138 Stat. 460, 737 (2024); *see* Pub. L. No. 119-37, 139 Stat. 495 (2025) (continuing resolution for first four months of fiscal year 2026).

On the day the President signed the continuing resolution and it became law, the Office of Management and Budget issued OMB Bulletin No. 26-01 over the signature of Director Vought.[4] In that bulletin, Director Vought stated that he was "automatically apportioning" to each Treasury account "the pro-rata share of the rate for operations provided" in the resolution.  The bulletin

---

[4] *See* Off. of Mgmt. & Budget, Exec. Off. of the President, OMB Bull. No. 26-01, Apportionment of the Continuing Resolution(s) for Fiscal Year 2026 (Nov. 12, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/11/OMB-Bulletin-No.-26-01-Apportionment-of-the-Continuing-Resolutions-for-Fiscal-Year-2026.pdf.

explained that "[a]ll automatically apportioned CR funds are apportioned as a 'lump sum.'"[5]  The

bulletin further explained that the "pro-rata share of the rate of operations" could be "calculated"

by computing "33.42 percent" of the appropriated amount, because the continuing resolution was

for "122 days/365 days."[6]  For the Endowment, that calculation yields $105,273,000,[7] which is

33.42 percent of $315 million (the amount appropriated in fiscal year 2025 and extended by the

November continuing resolution).

Following the appropriation, the Endowment reached out repeatedly to Executive Branch

officials to inquire about the status of its fiscal year 2026 funding.  Second Supplemental Decla-

ration of Damon Wilson (Exhibit 1) (hereafter "Wilson 2d PI Decl.") ¶ 4.  Initially the Endowment

was informed that its "confirmed amount" of funding from the continuing resolution was

$105,273,000—the same amount that the calculation in OMB Bulletin No. 26-01 yields.  *Id.*  But

the Endowment received none of those funds.  *Id.*  The Endowment thus made further inquiries

regarding its funding.  *Id.*  This time, Executive Branch officials confirmed that the Endowment's

funds were not yet apportioned or allotted for obligation and stated that they were unable to provide

an explanation for the withholding of the Endowment's funding.  *Id.*

The Endowment then tried to learn more through this litigation, asking counsel for Defend-

ants to inquire about the Endowment's difficulty in obtaining the funding that Congress had ap-

propriated.  After Defendants reported to this Court that they did "not have responsive infor-

mation" at the end of January—when the period covered by the November continuing resolution

was about to end—this Court directed Defendants to "indicate" by February 9 "whether they have

obligated and disbursed the Endowment's Fiscal Year 2026 funding and, if not, provide an

---

[5] *Id.* at 1-2.

[6] *Id.* at 5.

[7] This memorandum refers to that amount as simply $105 million.

explanation for why not." Minute Order (Jan. 30, 2026).

In the intervening days, on February 3, 2026, Congress passed and the President signed a full-year appropriations law. The law appropriates $315 million "[f]or grants made by the Department of State to the National Endowment for Democracy." Pub. L. No. 119-75, 140 Stat. 173, 521 (2026). It also provides that the funds appropriated to the Endowment "shall be apportioned to the Endowment not later than 60 days after the date of enactment of this Act." *Id.* The law passed Congress with overwhelming and bipartisan support, the Administration's issued a Statement of Administration Policy in support, and the President signed it into law.[8]

On February 9, 2026, Defendants responded to this Court's directive that they indicate whether they have obligated and disbursed the Endowment's funding or else "provide an explanation for why not." *See* ECF No. 58 (Joint Status Report of Feb. 9, 2026). Defendants acknowledged that they still had not provided the Endowment with any of its fiscal year 2026 funds, including the $105 million appropriated in November. Defendants' purported "explanation" for that unprecedented, extended delay was that, "due to uncertainties over full year funding, the Department of State did not allot any FY 2026 funding to the Bureau of Democracy, Human Rights, and Labor (DRL), the bureau responsible for obligating funds to NED." *Id.* at 1. Defendants represented, however, that because a full-year funding bill had now passed, they were "working on the allotment of that funding to State bureaus, including DRL." *Id.* The Endowment responded by stating that it "appreciates Defendants' confirmation" that they were "working on allotting full-year funding to NED, which will ensure the obligation and disbursement of full-year funds to the Endowment," and that it "look[ed] forward to [Defendants'] prompt action." *Id.* at 2.

The Court appeared to understand Defendants' representation exactly as the Endowment

---

[8] *See* Exec. Off. of the Pres., *Statement of Administration Policy* (Jan. 22, 2026), *available at* https://www.whitehouse.gov/wp-content/uploads/2026/01/SAP-HR-7147-HR-7148.pdf.

did—that is, as confirming that Defendants were working on allotting funding *to the Endowment*. The Court ordered the parties to file another status report on or before February 19. Minute Order (Feb. 10, 2026). "At that time," the Court directed, "defendants shall explain what steps they have taken toward allotting, apportioning, obligating and disbursing the Endowment's Fiscal Year 2026 funding and they shall specify when the Endowment will receive the funding that Congress has appropriated for it." *Id.*

On February 19, 2026, Defendants purported to respond to this Court's order. Defendants observed that Congress's full-year appropriations bill requires that the Endowment's funds be apportioned no later than 60 days after enactment. Defendants stated that they "will either apportion funding in the NED account by [the] 60-day deadline (April 4, 2026); if so directed by the President, propose to Congress a full or partial rescission under the Impoundment Control Act, 2 U.S.C. §§681-688; or consider other lawful options. No decision has yet been made, and the statutory deadline remains six weeks away." ECF No. 59 at 1 (Joint Status Report of Feb. 19, 2026).

Considering the stark difference between Defendants' February 9 representation and their February 19 status report, the Endowment requested—and this Court scheduled—a status conference. This Court asked Defendants to explain the "discrepancy" between their representations. Status Conference Tr. (Suppl. Compl. Ex. 1) at 3. Defendants refused to acknowledge any such discrepancy, instead claiming that their February 9 representation went no further than stating that they were working on allotting funds to the State Department Bureau of Democracy, Human Rights, and Labor (DRL), not to the Endowment itself. *Id.* at 3-4. According to Defendants, that work is necessary but not sufficient to provide the Endowment its funding because DRL is the "bureau that the funding for the Endowment . . . goes into." *Id.* at 4; *see id.* at 6 (asserting that the Endowment's funding "does not go directly to" the Endowment and that the "Endowment's

12

funding resides" in DRL).  Defendants thus stuck to their February 9 explanation that the Endowment did not receive any of the $105 million appropriated in November because DRL had not received that money due to "uncertainties over full-year funding."  *See id.* at 5.

### C.    Defendants' Interference with the Endowment's Funding Again Imposes Irreparable Harm.

As this Court contemplated, Defendants' shifting representations and withholding of the Endowment's fiscal year 2026 funding has put the Endowment in "the untenable position" where it "just ha[s] to take legal action."  Status Conference Tr. 7-8.  Due to Defendants' renewed interference with the Endowment's funding, the Endowment cannot obligate 60% of its fiscal year 2026 grant commitments—"projects that have already been approved for funding by the Endowment's Board of Directors."  Wilson 2d PI Decl. ¶ 8.  Those projects further "critical, time-sensitive activities with narrow operational windows—including reporting on war-related developments in Ukraine and Iran," *id.* ¶ 9—and they allow the Endowment and its core institutes to respond to "critical windows of opportunity" that "require strategic and time-sensitive engagement and unwavering financial support," *id.* ¶ 10.

Without such support, the grantees that the Endowment relies upon to pursue its mission lack access to the "steady funding" they need to "maintain operations, retain local offices, or keep essential personnel in place," *id.* ¶ 18, and they are exposed to "safety and security" risks, including because "a sudden interruption in support may expose their operations and staff as NED grantees, thereby inviting legal or other more dangerous reprisals from authoritarian governments that oppose their work," *id.* ¶ 26.  The Endowment's core institutes suffer as well; they are unable to "staff at the level needed to maintain operations and programs," *id.* ¶ 28, and they "lose the strategic ability to act swiftly and effectively in fast-moving political environments," *id.* ¶ 29.

The Endowment's inability to provide consistent funding to its partners also once again

threatens the Endowment's "reputation as a trusted, reliable U.S. partner." *Id.* ¶ 19. "Groups around the world, particularly in the most dangerous and difficult environments, seek out" the Endowment due to its "well-established reputation for reliability" and "consistency"—a reputation that is "critical" to the Endowment's "ability to engage productively with partners worldwide." *Id.* "That reputation—along with the overall effectiveness of [the Endowment's] programs—is threatened if [the Endowment] cannot make good on [its] grant commitments in a timely, predictable manner." *Id.*

## LEGAL STANDARD

To obtain a preliminary injunction, a movant must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citation omitted); *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733-34 (D.C. Cir. 2022) (preliminary injunction preserves the "last uncontested status which preceded the pending controversy" (citation and alterations omitted)).

## ARGUMENT

## I.    THE ENDOWMENT IS LIKELY TO SUCCEED ON THE MERITS

As this Court has observed, Defendants are following a "similar playbook" to the one they pursued last year before this Court ordered them to obey the law. Status Conference Tr. 8. They are withholding the Endowment's funding because they have policy objections to Congress's decision to fund the Endowment. With respect to the $105 million that Congress appropriated last November, that withholding has now lasted nearly four months, and the Executive Branch has provided no sufficient explanation for its decision to withhold that funding. For substantially the same reasons specified in this Court's preliminary-injunction opinion last year, the Endowment is

likely to succeed in showing that Defendants' action violates the NED Act and is arbitrary and capricious.

### A.    Defendants Are Violating the NED Act Again.

Under the APA, a court must set aside agency action that is "not in accordance with law" or "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A)-(C).  That provision requires a court to invalidate agency action that conflicts with a federal statute.  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391-92 (2024); *NextWave Personal Cmmc'ns, Inc. v. FCC*, 254 F.3d 130, 149 (D.C. Cir. 2001).  Here, Defendants are violating the NED Act in the same two respects as this Court found in its preliminary-injunction opinion last year:  by withholding the Endowment's funds because they object to its mandate on policy grounds and by failing to make an annual grant that "enable[s] the Endowment to carry out its purposes."  22 U.S.C. § 4412(a).

Defendants' denial of funding is reviewable "final agency action."   5 U.S.C. § 704.  "[A]gency action" includes an agency's "denial" or "withholding" of a "grant of money," 5 U.S.C. § 551(10), (11), (13), and here, the Executive is withholding the Endowment's appropriated funds.  That refusal to make the Endowment's money available is final for essentially the same reasons that Defendants' refusal to make the Endowment's money available in fiscal year 2025 was final.  *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); PI Op. 6 n.1 ("The defendants do not dispute that denial of the funding is a reviewable 'final agency action.'").  Defendants' posture towards the Endowment's funding has not changed since this Court found that Defendants were improperly withholding the Endowment's funding based on "Administration priorities." PI Op. 10.  Immediately after the injunction issued, Defendants purported to institute an unlawful "programmatic" audit to ensure the Endowment's activities aligned with Administration priorities.  And, as explained at pp. 17-22, *infra*, when Congress appropriated funds for the Endowment in November 2025, Defendants withheld the funds without explanation, and over the subsequent months,

15

Executive Branch officials publicly criticized the Endowment, its mission, and Congress for funding the Endowment—just as they did when the current Administration first withheld the Endowment's funding in early 2025.  Thus, Defendants' current withholding is simply a continuing implementation of the decision that Defendants made in 2025 to block the Endowment's funding on improper policy grounds.  That Defendants continue to cast about for a lawful rationale to *justify* their withholding of the Endowment's funds does not make that withholding any less final an action.

At a minimum, Defendants' failure to apportion, obligate, and disburse the Endowment's funding for nearly four months is agency action "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).  The NED Act's obligations are mandatory:  the State Department "shall" make an annual grant to the Endowment that complies with the law.  22 U.S.C. § 4412(a).  And Defendants' extended delay in apportioning, obligating, and disbursing the Endowment's funds is as unprecedented as it is unreasonable.  *See* Wilson 2d PI Decl. ¶ 5.

### 1.    Defendants are again withholding the Endowment's funding based on impermissible policy grounds.

Defendants are violating the NED Act by once again withholding the Endowment's funding for impermissible reasons: their disagreement with Congress's decision to fund the Endowment.  As this Court has recognized, the NED Act prohibits the Executive Branch from withholding the Endowment's funding on policy grounds.  "The NED Act uses mandatory language directing the executive to fund the Endowment:  It provides that the State Department '*shall* make an annual grant to . . . enable the Endowment to carry out its purposes.'"  PI Op. 6 (quoting 22 U.S.C. § 4412(a) (emphasis added by PI Op.)).  The NED Act then goes further by restricting the Executive Branch's ability to interfere with the Endowment's funding for policy reasons.  The statute not only defines the Endowment's purposes, 22 U.S.C. § 4411(b), and "provides that compliance

16

with those purposes should be 'determine[d]' by the 'Board of Directors of the Endowment,'" PI Op. 6-7 (quoting 22 U.S.C. § 4412(a)), but it states in no uncertain terms that the State Department is forbidden from "requir[ing] the Endowment to comply with requirements other than those specified" in the NED Act, 22 U.S.C. § 4412(a). "Instead, such policy oversight is the prerogative of Congress." PI Op. 7 (citing 22 U.S.C. § 4412(d)). Those constraints on Executive Branch authority are so clear that, when this issue arose last year, "the defendants [did] not dispute that the Act prohibits the executive branch from imposing extra-statutory policy based conditions on the Endowment's funding." *Id.*

Yet, once again, Defendants are doing precisely that—withholding the Endowment's funding due to their continued policy disagreements with the Endowment's mission. This Court is familiar with the extensive "record evidence clearly show[ing] that the defendants" have previously "withh[eld] funding" from the Endowment for "impermissible policy reasons." *Id.* That evidence includes the State Department's fiscal year 2025 spending plan, "the sole document in the administrative record not created for purposes of this litigation," which "explicitly states" that the funds Defendants withheld last year were "subject to review for alignment with *Administration priorities*." *Id.* It also includes a letter from the OMB Director urging Congress "to entirely defund the Endowment because of its alleged support of media organizations critical of the President and his allies." *Id.*; *see also* pp. 3-7, *supra* (cataloguing Defendants' repeated attempts to interfere with the Endowment's funding in fiscal year 2025). The only logical inference from Defendants' decision to adopt the very same "playbook" in fiscal year 2026 as in fiscal year 2025, Status Conference Tr. 8, is that Defendants have continued to interfere with the Endowment's funding for the very same impermissible policy reasons that motivated them last year.

Defendants' statements made *during* the current withholding of the Endowment's funds

amply confirm that their continued interference remains grounded in the same unlawful policy objections that led them to withhold funding last year.  In January 2026, when Congress considered an amendment to the full-year funding bill that would have eliminated the Endowment's funding, the State Department's DOGE account on "X" retweeted Elon Musk's call to "Defund NED."[9] When that amendment failed by overwhelming margins in Congress, the same account retweeted a post stating (in an astounding admission) that the Endowment "had payments frozen by DOGE" and bemoaning the fact that "every single democrat + 81 republicans voted to fund it more than ever."[10]  The post concluded with the false allegation that "[w]e're feeding the hand that bites us" and "our taxes are literally being used to fund our own censorship and subjugation."[11]  The State Department DOGE account also retweeted a post baselessly claiming that the Endowment engaged in "'coordinated, interjurisdictional' lawfare."[12]

The sentiments of several Executive Branch officials were much the same.  For example, shortly after the January 2026 vote, a high-ranking State official retweeted a post falsely claiming that the Endowment's Board "helped craft and develop" the "EU's censorship laws."[13]  The

---

[9] Elon Musk (@elonmusk), X, *Defund NED* (Jan 14, 2026 at 6:53 AM), https://x.com/elonmusk/status/2011406310789775863 (reposted by DOGE State, @DOGE_STATE).

[10] Arthur MacWaters (@ArthurMacwaters), X, *Let me get this straight*. (Jan. 15, 2026 at 5:08 PM), https://x.com/ArthurMacwaters/status/2011847985521418514 (reposted by DOGE State, @DOGE_STATE).

[11] *Id.*

[12] Mike Benz (@MikeBenzCyber), X, *NED pushed a "coordinated, interjurisdictional" lawfare drive to "demonetize disinformation" by creating a "common regulatory floor" across the EU & 12 foreign countries to force advertisers & brands to bankrupt you because of your speech*. (Jan. 15, 2026 at 6:45 PM), https://x.com/MikeBenzCyber/status/201194 7964965552628 (reposted by DOGE State, @DOGE_STATE).

[13] Under Secretary of State Sarah B. Rogers (@UnderSecPD), X, *A central preoccupation of the "censorship-industrial complex" (NGOs + their govt principals) was the creation of a de facto DSA / OSA regime in the United States. Compare, eg, DSA "trusted flagger" structure with the prioritized "content moderation" channels seen in Murthy*. (Jan 26, 2026 at 6:22 AM), https://x.com/UnderSecPD/status/2015747081747546564.

official signaled her agreement with that false claim, as she asserted (in response to the post about the Endowment) that a "central preoccupation of the 'censorship-industrial complex' (NGOs + their govt principals) was the creation of a de facto DSA / OSA regime in the United States."[14]  In addition, a former high-ranking State official who then moved to a different appointed position asked in January 2026 for "the names of the republican Senators who championed NED activists in 2017, lauded them with awards and protected them even last year against the President's mandate."[15]  In effect, that post confirmed what the Executive Branch's made-for-litigation filings last year tried to obscure: that the Administration had it in for the Endowment because it disagreed with Congress's policy choices and in particular Congress's support of the Endowment's mission.

Perhaps the most prominent online presence belonged to Mike Benz, who was recently hired as a special government employee seemingly to assist the State Department in collapsing the functions of the U.S. Agency for International Development.[16]  Benz tweeted (or retweeted) about the Endowment hundreds of times before and after the January 2026 vote over the Endowment's funding.  His posts were so frequent, and so hyperbolic, that it is impossible to catalogue every post objecting to the Endowment and its mission.  But to highlight just a few of his outrageous and baseless claims:  Benz called the Endowment a "covert action tool of the US government,"[17] a

---

[14] *Id.*

[15] Pete Marocco (@Petermarocco), X, *What are the names of the republican Senators who championed NED activists in 2017, lauded them with awards and protected them even last year against the President's mandate?* (Jan 14, 2026 at 10:19 PM), https://x.com/petermarocco/status/2011563849250717890?s=46.

[16] *See* Isaac Stanley-Becker, *USAID Hired the Right-Wing Influencer Responsible for Its Decimation*, The Atlantic (Dec. 9, 2025), https://www.theatlantic.com/politics/2025/12/usaid-mike-benz-cia/685195/.

[17] Mike Benz (@MikeBenzCyber), X, *Yet another internal NED file stressing the importance of lying to you, so you falsely believe NED is an NGO rather than a covert action tool of the US government.* (Jan. 23, 2026 at 10:29 PM), https://x.com/MikeBenzCyber/status/2014827809869365741.

"private CIA weaponized politically against the American people,"[18] and a "global spy agency built to destroy Trump, Trump's allies, and all Trump-aligned movements."[19]

Against that stark background, Defendants' purported explanation for withholding the $105 million that Congress appropriated last November is simply not credible. Defendants claimed that they withheld that funding during the period covered by the continuing resolution (October 2025 to January 2026) because, at the time, Congress had not yet passed a full-year appropriations bill and there were "uncertainties over full year funding." ECF No. 58 at 1. That explanation made no sense: As Defendants have never refuted, the Executive Branch's practice in prior years was to apportion, obligate, and disburse to the Endowment any funding that was appropriated in an initial partial-year continuing resolution, even before Congress passed a full-year appropriations bill. Wilson 2d PI Decl. ¶ 5. No reason existed to treat the Endowment differently this year—at least, no reason beyond Defendants' undisguised policy objections.

Defendants' excuse also failed to account for how the Executive Branch treated other identically-situated appropriations this year. As an initial matter, OMB issued a bulletin following the passage of the November 2025 continuing resolution calling for the "automatic apportionment" of appropriated funding, using a calculation that should have yielded an immediate $105.273 million apportionment to the Endowment. *See* pp. 9-10, *supra*. The State Department reached the same calculation when it corresponded with the Endowment following the continuing resolution.

---

[18] Mike Benz (@MikeBenzCyber), X, *When you fund NED, you are funding a private CIA weaponized politically against the American people run by people like this https://t.co/kpGxTEgUCt" / X.* (Jan. 14, 2026 at 3:39 PM), https://x.com/MikeBenzCyber/status/2011463091934945419.

[19] Mike Benz (@MikeBenzCyber), X, *like yeah of course Democrats will insist on funding NED, NED is a global spy agency built to destroy Trump, Trump's allies, and all Trump-aligned movements — the question isn't why Democrats put the hemlock in the wine the question is why Republicans see the hemlock and drink it.* (Jan. 16, 2026 at 2:41 AM), https://x.com/MikeBenzCyber/status/2011992088078963008.

Wilson 2d PI Decl. ¶ 4.  Yet the apportionment never came.  Moreover, whatever the OMB bulletin required, the Executive Branch provided funding to other agencies following the November 2025 continuing resolution and prior to the passage of the full-year appropriations bill.[20]  So the "uncertainty" rationale proffered by Defendants is an obvious pretext that cannot justify their withholding of the Endowment funds appropriated in November 2025.

Defendants' only other purported justification is that the Executive Branch has not allotted any funding to the State Department DRL bureau, which Defendants claim is the source of the "accounts" from which "the Endowment draws" its funding.  Status Conference Tr. 6.  Even taken at face value, that explanation does not justify the withholding: if Defendants refuse to disburse appropriated funds to the bureau that funds the Endowment, that is still action against the Endowment.  In any event, the Endowment does not "draw[]" funding from DRL's "accounts," and Defendants' contrary assertion is inaccurate—as they well know.  Status Conference Tr. 6.  The Endowment's funding is appropriated specifically for grants to the Endowment, separate from any appropriation made for DRL, *see, e.g.*, 138 Stat. at 737, and the Endowment has its own Treasury account that is separate from any maintained for DRL.[21]  As a result, although DRL does serve as an administrative pass-through for the Endowment's funding, DRL could perform that function even if DRL itself did not receive appropriated funding for its activities.  In casting about for a legitimate explanation for their decision to withhold the Endowment's funds, Defendants have landed on one that has no basis in fact.

---

[20]  *See* OpenOMB, *Search Apportionments: Fiscal Year 2026* (last viewed Mar. 8, 2026), https://openomb.org/search?term=&tafs=&account=&approver=&year=2026&approvedStart= &approvedEnd=&lineNum= (listing apportionment actions in fiscal year 2026).

[21]  *Compare* National Endowment for Democracy, *OpenOMB*, https://openomb.org/file/11469436 (apportionment account for the Endowment's appropriation). *with* Democracy Fund, *OpenOMB*, https://openomb.org/file/11505625 (apportionment account for Democracy Fund appropriation for DRL).

Finally, even if Defendants' explanation could have been plausible when it was offered on February 9, it was proven false just ten days later by Defendants' statements in the next joint status report. The obvious implication of Defendants' February 9 explanation was that the Endowment would receive its funding imminently, because a full-year appropriations bill had become law and appropriated the same amount to the Endowment that it received in fiscal year 2025. After all, if Defendants had truly withheld the Endowment's funding due to "uncertainties over full year funding," that would have been the only logical course. ECF No. 58 at 1. And Defendants' representations on February 9 suggested that they were indeed taking that course, as they stated that they were "working on the allotment of that funding to State bureaus, including DRL," *id.*, and did not correct the Endowment when it responded by stating that it "appreciates Defendants' confirmation that it is working on allotting full-year funding to NED, which will ensure the obligation and disbursement of full-year funds." *Id.* at 2. But on February 19, it became clear that Defendants' February 9 explanation could not have been accurate, because Defendants clarified that they were *not* working on allotting the Endowment's funding at all. ECF No. 59 at 1; *see* Status Conference Tr. 6-7 (confirming the same). Instead, Defendants were searching for "lawful options" to justify their withholding decision. ECF No. 59 at 1.[22]

In short, as Yogi Berra would have said, it is déjà vu all over again: the same Defendants are following the same playbook against the same entity for the same reasons. This Court should respond accordingly, by entering the same injunction.

---

[22] The clause in the February full-year appropriations bill requiring apportionment of the Endowment's funds within 60 days clearly does not assist Defendants with respect to the $105 million appropriated *three months prior*. Defendants' reasoning for withholding that money necessarily formed well before the passage of the February bill—which is why Defendants' February 9 status report did not even mention the 60-day language. In all events, Defendants cannot credibly claim that the 60-day language gives them *more* authority than they otherwise would have; that language is a *limit* on Defendants' ability to delay apportionments to the Endowment and was added by Congress in response to Defendants' unlawful attempt to do precisely that last fiscal year.

### 2. Defendants have again failed to make an annual grant that enables the Endowment to carry out its purposes.

Defendants' withholding of the Endowment's funding is once again "interfer[ing] with the statutory mandate that annual funding must 'enable the Endowment to carry out its purposes.'"  PI Op. 8 (quoting 22 U.S.C. § 4412(a)).  In its prior preliminary-injunction decision, this Court recognized that the "Endowment structures its initiatives and makes commitments to grantees in reliance on receiving the full amount of appropriated funds, as it has every year for the past 42 years." *Id.*  Defendants' "unprecedented withholding of $95 million—or roughly 30%—from its anticipated budget" last year prevented the Endowment from following through on its carefully structured plan, including by impeding the Endowment's grants for "important and time-sensitive" work in furtherance of the Endowment's mission.  *Id.*  Under those circumstances, Defendants had "fallen woefully short of providing an 'annual grant' that 'enable[s]' the Endowment to fulfill its statutory purposes."  *Id.* (quoting 22 U.S.C. § 4412(a)).

The same is true this year.  Since last November, Defendants have withheld even more funding from the Endowment than they did last year—specifically, $105.273 million, or roughly 33% of its budget.  Withholding such a substantial amount into March—more than five months since the fiscal year began—is once again an "unprecedented" action by the Executive Branch.  *Id.*  And once again, that action is interfering with the Endowment's mission.  Just like last year, the Endowment has "structure[d] its initiatives and ma[de] commitments to grantees in reliance on receiving" the funds Congress appropriated in the usual manner.  *Id.*; *see* Wilson 2d PI Decl. ¶ 8.  Just like last year, Defendants' actions have stopped the Endowment from following through on its plan—including by preventing the Endowment from obligating *sixty percent* of its grant commitments this fiscal year.  Wilson 2d PI Decl. ¶ 8.  And just like last year, those unfunded grant commitments impede important and time-sensitive work that directly furthers the Endowment's

mission. *See id.* ¶¶ 8-17 (explaining that Defendants' actions will jeopardize time-sensitive work in several critical countries, including Ukraine, Iran, and Venezuela). Accordingly, Defendants have again "fallen woefully short of providing an 'annual grant' that 'enable[s]' the Endowment to fulfill its statutory purposes." PI Op. 8. Whatever Defendants' reasons for doing so, they are violating the NED Act.

### B. Defendants' Withholding of the Endowment's Funds Is Arbitrary and Capricious Again.

The APA requires a reviewing court to set aside agency action that is "arbitrary [and] capricious." 5 U.S.C. §706(2)(A). "In an arbitrary and capriciousness challenge, the core question is whether the agency's decision was 'the product of reasoned decisionmaking.'" PI Op. 10 (quoting *Motor Vehicle Mfr. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)). An agency may not "rel[y] on factors which Congress has not intended it to consider, entirely fail[] to consider an important aspect of the problem, offer[] an explanation for its decision that runs counter to the evidence before [it], or" provide an explanation "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. Moreover, "an agency that fails to give an 'indication of the basis' of its decision cannot withstand APA review." PI Op. 10 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962)); *see also State Farm*, 463 U.S. at 43 (requiring an agency to give a "satisfactory explanation for its action").

Defendants have failed to satisfy these core APA obligations. As an initial matter, based on the evidence recounted above, pp. 17-20, *supra*, it is clear that Defendants are withholding the Endowment's funding for policy reasons—and thus plainly "rel[ying] on [a] factor[] which Congress has not intended [for them] to consider." *State Farm*, 463 U.S. at 43. Even if Defendants' decision were also motivated by some other ground, it would not matter. When "at least one of

the rationales" undergirding agency action "is deficient," the action must be set aside unless the court is "certain" that the agency "would have adopted it even absent the flawed rationale." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006). Here, there is absolutely no evidence to indicate that Defendants would have taken the same course absent the vehement disagreement of so many Executive Branch officials with Congress's decision to fund the Endowment. Instead, the far more natural conclusion is that they would have proceeded as every prior Administration has in the Endowment's history, and readily made the Endowment's funding available. As a result, their impermissible consideration of the Executive's policy priorities taints the entire decision. *See Consolidated Edison Co. of N.Y. v. FERC*, 823 F.2d 630, 641-42 (D.C. Cir. 1987).

Moreover, Defendants' purported explanation for their withholding does not satisfy the basic standards of reasoned decisionmaking. As explained above, Defendants claimed that they withheld the funds Congress appropriated for the Endowment in the November continuing resolution due to "uncertainties over full year funding." ECF No. 58 at 1. That explanation makes no sense for the many reasons described above. *See* pp. 20-22, *supra*. But even apart from those problems, Defendants have an obligation to support their rationale with "findings" and "analysis" that "justify the choice" they made. *Burlington Truck Lines*, 371 U.S. at 167. And yet Defendants provide no reasoned basis for the purported "uncertainties" they cite—let alone any factual support for an asserted concern that never arose before, despite many previous continuing resolutions. Even Defendants' counsel was left to "assume" the basis for Defendants' purported "concern" because none was cited or explained. Status Conference Tr. 6. Defendants' conclusory assertion of uncertainties is insufficient to sustain their action. *AT&T Wireless Servs. v. FCC*, 270 F.3d 959, 968 (D.C. Cir. 2001) ("Conclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice to meet the deferential standards of

[judicial] review.").  And "even if the defendants' concerns" about the results of the full-year funding process were "well founded," "'an agency may not rely on political guesswork about future congressional appropriations as a basis for violating existing legal mandates.'"  PI Op. 11 (quoting *In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh J.)).

Finally, "the record" once again fails to "show that the defendants weighed, assessed, or displayed any awareness of the Endowment's reliance interests on the historical practice of routinely disbursing annual appropriations in full."  *Id.* (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).  Those reliance interests are especially strong here, given the unbroken history (prior to the events giving rise to this litigation) of the Executive Branch providing funds to the Endowment based on partial-year continuing resolutions passed at the beginning of the fiscal year—funding that is badly needed to ensure the Endowment can engage in strategic planning, maintain continuity, and fulfill its statutory mission.  Wilson 2d PI Decl. ¶ 5.  Defendants' explanation does not "display awareness" of those reliance interests—a remarkable omission, given this Court's prior opinion—nor explain why "there are good reasons" to override them.  *Fox*, 556 U.S. at 515; *see also Dep't of Homeland Sec. v. Regents of the Univ of Cal.*, 591 U.S. 1, 33 (2020) (agencies are "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns").

Once again, Defendants' "'conclusory and unreasoned' assertions . . . are entirely insufficient to justify their actions."  PI Op. 12 (quoting *Env't Health Tr. v. FCC*, 9 F.4th 893, 905 (D.C. Cir. 2021)).  The Endowment is thus likely to succeed on its arbitrary-and-capricious challenge.[23]

---

[23] The Endowment is also likely to succeed on its constitutional claims for the same reasons explained in its previous memorandum in support of a preliminary injunction.  *See* ECF No. 40-1 at 35-39.  But this Court need go no further than the statutory and APA issues on which this Court's last preliminary-injunction decision rested.

## II.    THE ENDOWMENT WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION

The Endowment is again suffering irreparable harm.  Defendants' decision to withhold $105 million for nearly four months, when the Endowment has not received any funding from the Executive Branch this fiscal year, is hamstringing the Endowment's ability to pursue its congressionally endorsed objectives and compromising its reputation as a reliable partner around the globe.  Those injuries become more serious with each passing day and warrant this Court's preliminary relief.  *See Doctors for America v. OPM*, 766 F. Supp. 3d 39, 53-54 (D.D.C. 2025).

### A.    The $105 Million Withholding Is Damaging the Endowment's Ability to Fulfill Its Congressionally Recognized Mission.

Defendants' withholding of $105 million for almost four months is directly impeding the Endowment's ability to efficiently and effectively carry out its mission.  That is irreparable harm.  *See League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *see* PI Op. 13.

Due to Defendants' action, the Endowment cannot obligate 60% of its fiscal year 2026 grant commitments—"projects that have already been approved for funding by the Endowment's Board of Directors."  Wilson 2d PI Decl. ¶ 8.  That consequence represents a direct interference with the Endowment's statutorily recognized mission because the Endowment's "worldwide grantmaking program is the means through which [it] fulfill[s its] legislative mandate per the NED Act."  *Id.* ¶ 6; *see* 22 U.S.C. § 4413(b)(1) ("The Endowment may only provide funding for programs of private sector groups and may not carry out programs directly.").  It needlessly tilts the Endowment's spending toward "[f]ixed overhead costs" rather than the "direct program activity" that would otherwise receive 84 percent of the Endowment's funds.  Wilson 2d PI Decl. ¶¶ 20, 25.  And it interrupts the Endowment's "carefully planned" grantmaking work, which is structured "based on the expectation that" the Endowment will "receive the funding that Congress appropriate[s]."  *Id.* ¶ 8; *see* PI Op. 12 (recognizing that the Endowment "plans" its "projects" based on

that expectation); *see also* Wilson 2d PI Decl. ¶ 20 ("NED's operations depend significantly on consistent and predictable funding to enable strategic planning, effective prioritization, long-term grantmaking commitments, staffing stability, and the fulfillment of contractual and fiduciary obligations.");

Like last year, the projects threatened by Defendants' withholding would further "critical, time-sensitive activities with narrow operational windows." Wilson 2d PI Decl. ¶ 9; *see* PI Op. 13. Those projects include "reporting on war-related developments in Ukraine and Iran" and "providing urgent legal and humanitarian support to political prisoners." Wilson 2d PI Decl. ¶ 9. Much of the Endowment's work, along with the work of the core institutes, seeks to capitalize on "critical windows of opportunity," including in countries like Nepal, Bangladesh, Bolivia, and Syria where "strategic and time-sensitive engagement," along with "unwavering financial support," assist "democratic forces at a formational period." *Id.* ¶ 10. Venezuela is another country where critical work "risks going unfunded"; that country is at a "critical juncture," with "hundreds of political prisoners" now "being released" following the "removal of Nicolás Maduro," but a "disruption in funding will undermine" the Endowment's "timely efforts" to respond. *Id.* ¶ 11. Similar risks are present in China, where Endowment funding provides urgently needed "legal and strategic support to Christian house churches that have been targets of the Chinese Communist Party," *id.* ¶ 12; in Ukraine, where a "network of civil society partners and independent media outlets are critical to the country's wartime resilience and keeping democratic institutions functioning," *id.* ¶ 14; and in Russia, where Endowment grantees "provide urgent legal and humanitarian support to political prisoners, ranging from high-profile dissidents to ordinary Russian citizens," *id.* ¶ 16.

The threatened harms to the grantees on which the Endowment relies are severe. Many

Endowment grantees "depend on steady funding to maintain operations, retain local offices, or keep essential personnel in place." *Id.* ¶ 18.  Accordingly, even a temporary interruption in funding "can result in the loss of staff, the closure of facilities, or the end of ongoing relationships with communities" that generally "cannot be restored by later payments." *Id.*  Moreover, Endowment grantees are exposed to "safety and security" risks when the Endowment's funding is frozen, including because "a sudden interruption in support may expose their operations and staff as NED grantees, thereby inviting legal or other more dangerous reprisals from authoritarian governments that oppose their work." *Id.* ¶ 26; *accord* PI Op. 13.

The Endowment's core institutes—each a part of the NED family and a statutorily designated recipient of Endowment funding—suffer as well when the Endowment cannot disburse its funding to them.  Without funding, the core institutes are unable to "staff at the level needed to maintain operations and programs," *id.* ¶ 28, and they "lose the strategic ability to act swiftly and effectively in fast-moving political environments," *id.* ¶ 29.  For example, the International Republican Institute provides "communication tools for activists" in Cuba and Venezuela and "critical support for pro-U.S. and pro-democracy activists in Iran," *id.* ¶¶ 30-31; the National Democratic Institute likewise is funding activists who are "exposing" the "diversion of funds" in Iran "to forces that oppress the Iranian people and destabilize the region," *id.* ¶ 32; the Solidarity Center funds programs that document "labor rights violations" in the Democratic Republic of Congo, *id.* ¶ 33; and the Center for International Private Enterprise is working to rebuild its "global technical network" that is critical to identifying and countering corruption and corrosive Chinese influence, *id.* ¶ 34.  All of that work is at the core of the Endowment's mission, and all of it is threatened by Defendants' withholding of funding.

**B.     Defendants' Withholding of the Endowment's Funding Threatens Irreparable Damage to the Endowment's Reputation as a Trusted Partner.**

The funding crisis goes beyond the immediate work of the Endowment; it once again endangers the Endowment's long-term reputation. *See Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962); *see* PI Op. 13 ("[H]arms to the Endowment's global reputation and to the 'very existence of its programs' are irreparable." (citation omitted)). The Endowment's "reputation as a trusted, reliable U.S. partner" is threatened when it cannot provide consistent funding to its grantees. Wilson 2d PI Decl. ¶ 19. "Groups around the world, particularly in the most dangerous and difficult environments, seek out" the Endowment due to its "well-established reputation for reliability" and "consistency." *Id.* That reputation is "critical" to the Endowment's "ability to engage productively with partners worldwide, who see [the Endowment] as [a] trusted partner[]." *Id.* "That reputation—along with the overall effectiveness of [the Endowment's] programs—is threatened if [the Endowment] cannot make good on [its] grant commitments in a timely, predictable manner." *Id.* That harm is irreparable, especially because the Endowment's grantees are unlikely to soon forget the disruption in their funding, even if the Endowment's funding is later restored. Wilson TRO Decl. ¶ 96-97.

**III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF GRANTING THE PRELIMINARY INJUNCTION**

The final two preliminary injunction factors—balancing the equities and weighing the public interest—"merge when the Government is the opposing party." *Am. Ass'n of Political Consultants v. United States SBA*, 613 F. Supp. 3d 360, 365 (D.D.C. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The equities and the public interest both counsel in favor of relief—to halt the Executive Branch's unlawful failure to follow clear congressional directions, and to ensure access to funds that are critical for the Endowment, its core institutes, and its grantees.

Here, the Endowment's likelihood of success on the merits, *see* pp. 14-26, *supra*,

establishes both factors. A preliminary injunction would serve the public interest because "there is a substantial public interest 'in having governmental agencies abide by . . . federal laws,'" *Newby*, 838 F.3d at 12 (citation omitted), and "[t]here is generally no public interest in the perpetuation of unlawful agency action," *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (citation omitted). "[A]ny hardship" the government "might claim is not legally relevant because as a legal matter '[t]he Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 34 (D.D.C. 2021) (citation omitted); *accord* PI Op. 14.

Beyond the conclusive public interest in having the Executive follow the law, there is a strong public interest in the Endowment's functioning. President Reagan inspired Congress to recognize the Endowment when he called for a global effort to support democracy worldwide. Wilson TRO Decl. ¶ 3. For over forty years, the Endowment, led by a bipartisan Board, has contributed directly to our national interest by fostering a "more prosperous, safer, and democratic world" and building a "deep reservoir" of world leaders "predisposed to working collaboratively with the United States in pursuit of shared interests." *Id.* ¶ 10; *accord* Wilson 2d PI Decl. ¶ 35. It is not in the public interest for this important institution to be hamstrung from pursuing its mission.

Nor is there an equitable justification for denying a preliminary injunction. As this Court rightly concluded last year, "[t]he defendants cannot show that they will be harmed by an injunction—it will not 'disrupt' the defendants' 'oversight' of 'taxpayer money' because they are not authorized to exercise such oversight." PI Op. 14 (citation omitted). Moreover, since its inception, the Endowment has received a consistent source of funds from Congress, and it has used those funds to meet its grant obligations to its core institutes and grantees. Wilson TRO Decl. ¶ 39. With respect to the particular action at issue here, the break from historical practice is stark:

"Before 2025, it had never taken the Executive Branch more than four months to apportion and obligate the initial portion of the Endowment's congressionally appropriated funding," "[n]or had the Executive Branch ever refused to provide the Endowment its congressionally appropriated funding simply because that funding was appropriated in a partial-year funding bill."  Wilson 2d PI Decl. ¶ 5.  An injunction would restore the status quo and avert the substantial and irreparable injuries that the Endowment is facing.  *See* pp. 27-30, *supra*.  It would also restore the appropriate balance between Congress, with its power of the purse, and the Executive Branch, which must take care that Congress's instructions are followed.  Conversely, allowing the freeze on the Endowment's funds to persist would not serve any articulated interest of the Defendants.[24]

## CONCLUSION

This Court should grant the Endowment's motion for a preliminary injunction.

---

[24] To the extent Defendants again request the posting of bond or move for a stay pending appeal, this Court should deny those requests for the same reasons the Court provided in its prior preliminary-injunction decision.  PI Op. 15.

Dated: March 9, 2026          Respectfully submitted,

/s/ *Donald B. Verrilli, Jr.*

Donald B. Verrilli, Jr. (D.C. Bar No. 420434)
Ginger D. Anders (D.C. Bar No. 494471)
Jeremy S. Kreisberg (D.C. Bar No. 1048346)
Helen E. White (D.C. Bar No. 1741368)
Esthena L. Barlow (D.C. Bar No. 90000252)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com
Ginger.Anders@mto.com
Jeremy.Kreisberg@mto.com
Helen.White@mto.com
Esthena.Barlow@mto.com

Gabriel M. Bronshteyn (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105
(415) 512-4000
Gabriel.Bronshteyn@mto.com

Miranda E. Rehaut (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
(213) 683-9100
Miranda.Rehaut@mto.com

*Attorneys for the National Endowment for Democracy*