# EXHIBIT 1

## SECOND SUPPLEMENTAL DECLARATION OF DAMON M. WILSON

I, Damon M. Wilson, declare as follows:

1. I am the President and CEO of the National Endowment for Democracy (NED). The statements made in this declaration are based on my personal knowledge and the information made available to me pursuant to my duties as President and CEO of the National Endowment for Democracy.

2. I previously submitted a declaration in support of NED's Motion for a Temporary Restraining Order and a supplemental declaration in support of NED's prior Motion for a Preliminary Injunction. I offer this second supplemental declaration in support of NED's new Motion for a Preliminary Injunction. This second supplemental declaration focuses on information that was not previously described in my prior declarations.

3. The Endowment is committed to engaging and continuing to consult the Executive Branch and Congress on our work. This is especially relevant in dynamic environments which are priorities for policymakers, such as Iran, Venezuela, and Cuba, where the Endowment plays a critical role in supporting peoples' aspirations for human rights, rule of law, and democratic governance. Furthermore, NED's work in support of religious freedom and freedom of speech around the world reinforces critical priorities of the United States that this Administration is vigorously pursuing.

4. We are also eager to focus on delivering on our congressional mandate without recourse to the courts. Therefore, the Endowment has been trying for several months to resolve the issues surrounding its FY26 funding without resorting to further legal action. We have made repeated inquiries to State Department officials regarding that funding. Initially, we were informed that the State Department had received the funding appropriated by Congress in its November 2025 continuing resolution. We were informed that the "confirmed amount" of that funding was $105,273,000, and a budget was requested for that amount. However, that message was unfortunately mistaken. We did not receive any of those funds. We therefore continued making repeated inquiries regarding our funding. We were informed only that our funding was not apportioned or allotted for obligation. State Department officials were not able to provide us a reason for the withholding of our funding. To this day, we have not received any of our fiscal year 2026 funding, despite Congress's passage of an initial continuing resolution appropriation in November.

5. Before 2025, it had never taken the Executive Branch more than four months to apportion and obligate the initial portion of the Endowment's congressionally appropriated funding. Nor had the Executive Branch ever refused to provide the Endowment its congressionally appropriated funding simply because that funding was appropriated in a partial-year funding bill. Instead, the Endowment has always received funding appropriated in initial continuing resolutions in a timely manner, even before a full-year appropriations law is enacted.

6. The Executive Branch's continued withholding leaves us with little choice but to pursue legal remedies. With Defendants' motion to dismiss due shortly, we filed a proposed supplemental complaint to make clear that this litigation also involves our fiscal year 2026

funding. And we are now filing a motion for a preliminary injunction in order to prevent significant and irreparable harm to the Endowment, the core institutes, and more than 1,300 partners worldwide. Without partners resourced to implement programs, the Endowment cannot carry out its congressionally mandated mission. Our worldwide grantmaking program is the means through which we fulfil our legislative mandate per the NED Act. Harm to grantees, whether through program disruption or security vulnerabilities or otherwise, directly compromises the Endowment's ability to fulfill its congressional mandate.

7. NED and its core institutes are experiencing irreparable harm due to the Executive Branch's withholding of NED's FY26 congressionally appropriated funds. That withholding jeopardizes our ability to fulfill our mission and causes a ripple effect of harm to our grantees and the communities they serve. And it once again threatens irreparable damage to NED's reputation as a trusted and reliable partner.

8. The withholding of NED's FY26 funds prevents NED from obligating 60% of its FY 2026 grant commitments projects that have already been approved for funding by the Endowment's Board of Directors. As in prior years, we have carefully planned our grantmaking work based on the expectation that we would receive the funding that Congress appropriated for us. The withholding of our funds prevents us from carrying through on that plan. This enormously impacts our ability to deliver on our congressionally-mandated mission as timely-projects are delayed and potentially canceled.

9. As grassroots nonprofit organizations, almost no grantees have significant cash to draw upon to withstand funding delays or disruptions. If the delay continues, our grantees will face disruption to critical, time-sensitive activities with narrow operational windows—including reporting on war-related developments in Ukraine and Iran, providing urgent legal and humanitarian support to political prisoners, ensuring the survival of citizen groups and independent media outlets in repressive regimes, defending religious freedom and freedom of expression, documenting human rights violations, and conducting election monitoring.

10. Moreover, without access to our congressionally appropriated funds, the Endowment and core institutes are unable to respond adequately to critical windows of opportunity, from capitalizing on the peaceful transfers of power following critical elections and citizens movements in Nepal and Bangladesh to a once in a generation opportunity to reverse democratic erosion in Bolivia and help shape a historic transition in Syria. These breakthrough opportunities require strategic and time-sensitive engagement and unwavering financial support to capitalize on the political moment: delaying programming due to a lack of funds undermines the effectiveness of our work and disadvantages the democratic forces at a formational period.

11. Venezuela provides a critical example of work that risks going unfunded. A break in Endowment funding will present immediate and irreparable harm to the broad-based political and societal effort to protect and advance the rights of Venezuelans following the elections in 2024 and the removal of Nicolás Maduro in January 2026. At this critical juncture where the situation on the ground is fluid and hundreds of political prisoners are being released, NED partners are working overtime to respond: advocating for the full implementation of the amnesty law, documenting political prisoners' time in detention and offering legal and psychosocial support to them and their families following their release. A disruption in funding

will undermine these timely efforts and would limit the ability of partners to provide accurate news and information for Venezuelans and the international community, an essential element of scenario planning.

12. In China, civil society partners rely on NED funding to maintain operations in a high-risk environment. NED partners provide assistance to entrepreneurs who have had their assets seized by corrupt local governments, legal and strategic support to Christian house churches that have been targets of the Chinese Communist Party, and legal support to victims of human trafficking. Without predicable, consistent NED funding, the Chinese government's assault on these communities would likely intensify, and the crucial in-country networks empowering Chinese citizens to push back against their government would be at risk of disintegration.

13. A sudden loss of funding would also imperil the efforts of organizations that support citizen journalists in China who, at great risk to themselves, expose the Chinese government's human rights violations. If that funding were to stop, these groups would be forced to lay off staff and lose essential digital security tools that allow them to work. The result would be an immediate halt in reporting from citizen journalists, the disintegration of legal defense networks for vulnerable communities, the loss of critical Uyghur and Tibetan region data and analysis, and the collapse of the global monitoring of China's propaganda and surveillance exports. Such a disruption would intensify the Chinese government's unchecked repression, leave countless victims without legal recourse, and erase the only independent documentation of abuses that could not be restored even if funding were later reinstated.

14. In Ukraine, a network of civil society partners and independent media outlets are critical to the country's wartime resilience and keeping democratic institutions functioning. Any break in funding presents a threat to the ecosystem of support during a particularly volatile and important time. For example, without continued support, over 25 partners on the ground will lose the resources essential to their ability to stay on the ground as strikes intensify. Without access to regular, predictable funds, these groups would be forced to cease operating, scale back lifesaving reporting on the war from the frontlines and the documentation of threats to life and property countrywide, and limit community engagement reporting in hard hit regions.

15. Further, NED funded Ukrainian anti-corruption watchdogs track defense procurement and publicly-funded reconstruction and expose embezzlement. They are the backbone of citizen oversight of public expenditure, a critical function of accountability and transparency. An interruption in funding to these initiatives would weaken investigations and increase the risk of waste and abuse. Any suspension of NED funding would interrupt critical programming for both independent media and accountability partners at a decisive moment, delivering irreversible harm to Ukraine's democratic future.

16. In Russia, NED grantees provide urgent legal and humanitarian support to political prisoners, ranging from high-profile dissidents to ordinary Russian citizens. These prisoners face repression for peacefully and legally challenging the Putin regime's abuse of power and speaking out against Russia's war on Ukraine. Without continued NED funding, these organizations will be forced to cease paying defense counsel for political prisoners,

resulting in harsher sentences and the interruption of critical humanitarian aid to prisoners, including lifesaving medicine.

17. Any lapse in NED funding would trigger employment termination—and with it, the loss of residency status—for dozens of exiled Russian journalists and political activists in a range of European countries, potentially forcing their return to Russia where they face a near-certain risk of arrest and imprisonment.

18. Many NED grantees depend on steady funding to maintain operations, retain local offices, or keep essential personnel in place. Interruptions in funding, even if temporary, can result in the loss of staff, the closure of facilities, or the end of ongoing relationships with communities. Once those institutional anchors disappear, they generally cannot be restored by later payments.

19. As I have explained previously, when we are unable to meet our grant commitments, we face harm to our mission and to our reputation as a trusted, reliable U.S. partner. Groups around the world, particularly in the most dangerous and difficult environments, seek out NED due to our well-established reputation for reliability, transparency, consistency, security-consciousness, and partnership as well as our capacity to adapt our grantmaking to dynamic political scenarios and engage in crisis response. Our reputation is critical to our ability to engage productively with partners worldwide, who see us as trusted partners. That reputation—along with the overall effectiveness of NED's programs—is threatened if we cannot make good on our grant commitments in a timely, predictable manner.

20. NED's operations depend significantly on consistent and predictable funding to enable strategic planning, effective prioritization, long-term grantmaking commitments, staffing stability, and the fulfillment of contractual and fiduciary obligations. NED's rigorous planning process enables the institution to allocate funds efficiently, ensuring that 84 cents of every dollar goes to grantmaking and partners on the frontlines. Disruptions to NED's funding only put at risk our efficient deployment of resources.

21. The FY2026 funding disruption compounds harm that originated during the FY2025 disruption, which forced the Endowment to make painful workforce adjustments under conditions of acute financial uncertainty. The Endowment lost experienced staff both through difficult organizational decisions and through the departure of valued personnel who, facing prolonged instability, made understandable choices to seek more stable employment elsewhere.

22. The prolonged funding uncertainty also takes a measurable toll on the Endowment's current workforce. Many staff experienced the disruptions of FY2025 and are now facing a second period of sustained instability. The resulting stress affects morale, focus, and the risk of further voluntary attrition, consequences that grow with each passing month and are not remedied by eventual reimbursement.

23. Against this backdrop, the Endowment used this period to assess its needs and make deliberate choices about how to structure its workforce going forward. The capabilities required to support democratic actors globally are constantly evolving, including the technology and tools the Endowment and its partners depend on, and the organization must be able to hire

accordingly. The uncertainty surrounding our funding prevents the Endowment from acting on those decisions. It cannot make credible employment offers to specialized candidates while its funding status remains unresolved, nor signal the institutional stability that recruitment demands. Professionals who might have joined the Endowment are being hired elsewhere, and that opportunity does not return when funds are eventually released.

24. Should the withholding of funds continue, the Endowment will once again be forced to confront painful workforce decisions that, given mandatory administrative lead times, must be made before their consequences take effect, inflicting a second round of harm on a workforce and institution still recovering from the first. These effects are not remedied by eventual reimbursement.

25. In addition to the operational harm described above, the financial implications extend across all five organizations with congressionally mandated missions described in the NED Act. Fixed overhead costs continue to accrue while direct program activity is curtailed, driving up indirect rates across the board. Donors notice. An inflated rate even when explained erodes confidence. There is also a real risk that if indirect rates exceed the negotiated allowable thresholds of each organization's Negotiated Indirect Cost Rate Agreement, those costs may be deemed unallowable by our federal cognizant agencies, entirely compounding the financial harm and further impairing the efficient and effective use of congressional appropriations. This harms all five organizations and cannot be undone by eventual reimbursement.

26. There are also safety and security concerns that partners face when funding interruptions cause programming to slow or stop entirely. As I have explained previously, for our grantee partners operating in authoritarian environments, a sudden interruption in support may expose their operations and staff as NED grantees, thereby inviting legal or other more dangerous reprisals from authoritarian governments that oppose their work. A lack of funding could also deprive our partners of critical support and leave them more susceptible to exploitation. Financial uncertainty exacerbates existing safety concerns, leaving staff and partners increasingly exposed to physical and operational dangers in high-risk locations.

27. In addition to awarding direct grants, NED supports the core institutes in accordance with our mandate. Investing in the core institutes reflects the views of our founders and Congress that democratic gains are more likely as part of fostering local pluralistic democratic ecosystems. This ecosystem approach ensures that democracy advocates are backed by a network of allies who can provide protection, amplify their voice, and coordinate strategy across the full spectrum of democratic practice. In turn, the possibility of positive democratic developments in any one country grows.

28. The withholding of NED's funds negatively impacts this strategy and impairs the ability of the core institutes to staff at the level needed to maintain operations and programs—causing great harm to the core institutes and to the important work they carry out.

29. Without FY2026 funding, the core institutes will lose the strategic ability to act swiftly and effectively in fast-moving political environments where the NED family has a deep, trusted presence. The core institutes' model depends on a predictable flow of resources so that they can support partners to seize emerging opportunities, address urgent needs, and sustain the

rapid-response networks that keep pro-democracy actors safe and able to maintain momentum. Consistent funding guarantees the NED family's overall readiness to act in the most complex operating contexts.

30. The financial uncertainty has disrupted planning and implementation of the International Republican Institute's (IRI) projects across the globe. Withholding funding for programming in Cuba and Venezuela would decimate IRI's programs that advance digital security and provide communication tools for activists in both countries, leaving them more exposed and at-risk to attack by authoritarian forces. Cuba is at a critical moment, with the next six to twelve months potentially determining its long-term political trajectory. Venezuela is on the brink of a democratic transition. Freedom fighters—peaceful dissidents, civic actors, and journalists—play a critical role in their country's democratic future. IRI supports dissident networks through secure, localized communication tools and digital security support. Withholding funding for these programs means that these tools are not provided to partners, and they would lose the ability to safely coordinate, share accurate information, and maintain readiness to respond to rapidly changing conditions. Once these trusted channels collapse or are compromised, the networks they sustain cannot be reconstructed, permanently dismantling a critical line of defense against authoritarianism.

31. Inability to access NED funds would also impact IRI's ability to provide critical support for pro-U.S. and pro-democracy activists in Iran to help keep them in the struggle when they need it most, with the risk of IRI programming ending soon. IRI supports young activists to organize and consolidate their visions for the future of Iran consistent with keeping maximum pressure on the regime. This work has been particularly critical since the protests in January 2026, after which IRI quickly increased support for real-time needs on the ground to detained activists, in addition to support on resilient communications networks, protest safety, and potential transitional political scenarios.

32. Inability to access NED funding will impair the National Democratic Institute's (NDI) operational capacity and jeopardize the continuity of critical programs. For example, efforts funded through NED enable Iranian activists across the country to heighten pressure on the regime by exposing its diversion of funds to forces that oppress the Iranian people and destabilize the region. These activists are informing citizens of the regime's mismanagement and corruption and holding local governments accountable for violations of fundamental rights and laws. Timely efforts to collectively envision, build consensus on and develop the leadership necessary to shape a post-Islamic Republic country would be stalled, severely hindering Iran's ability to become a stable, responsible, constructive state actor as it emerges from the conflict. Without continued NED funding, critical trust-based networks that have been developed over years and are enabling these activists to reach and impact citizens would be disrupted; connections between experts and activists would be lost, with reputational harm to the Institute from perceptions of abandonment at a moment of critical need; and an NDI-supported resource center with tools and expertise that reaches hundreds of thousands of Iranians each year would have to be shuttered.

33. With respect to Solidarity Center, the funding uncertainty weakens leverage for advocacy and collective bargaining, strains relationships with workers and employers, and pauses organizing campaigns. This disrupts years of careful, nonpartisan engagement with

policymakers and institutional decision-makers, causing lasting reputational harm to the Solidarity Center and its partners. For instance, in the Democratic Republic of Congo, funding delays will result in unions lacking the credible, independently collected evidence necessary to identify labor rights violations, determine responsible employers, and substantiate claims before government ministries and other decision-making bodies. Without this documentation, unions will be unable to pursue advocacy or meaningfully participate in policy dialogue on labor protections in the mining sector. Because partner unions lack alternative funding or technical capacity to conduct this specialized research, the harm cannot be mitigated. Workers will remain exposed to unaddressed labor abuses and unsafe conditions, and unions' institutional capacity to represent them effectively will be significantly weakened.

34. The Center for International Private Enterprise's (CIPE) reputation will suffer globally due to its inability to deliver on its commitments to partners in every region. CIPE will be unable to complete the rebuilding of its global technical network and the creation of regional hubs in the Middle East and North Africa and Europe and Eurasia, an effort that was undertaken after the closure of offices across each region due to the pause in funding in 2025. Not being able to establish its regional hubs would impair CIPE's ability to identify and counter corruption and corrosive capital and strengthen democratic governance through private sector engagement, thereby limiting its effectiveness in responding to rapidly evolving political and economic threats in priority regions. This would also weaken efforts to promote fair and transparent market conditions that enable companies operating under democratic standards of accountability and rule of law to compete on equal terms.

35. NED is an essential pillar of support for those advancing freedom and democratic values around the world. Our work is based on strategies that recognize that democratic development is an inherently complex and long-term enterprise, not a project-by-project approach that can be easily started or stopped without quickly and demonstrably undermining the impact of the work. Supporting local communities that take initiative and have the courage to defend democratic values in their own societies is consistent with long-term U.S. interests. When local communities succeed, their nations succeed, becoming better partners of the American people.

36. Supporting those who seek freedom is a strategic investment in U.S. national and economic security. Where democratic institutions and free markets are weak, conflict, drug and human trafficking, terrorism, refugee flows, and coercive economic practices take root. Where citizens have a say in their future, societies are more stable partners for the United States. NED advances this mission by stewarding taxpayer resources with discipline—making NED one of the United States' most cost-effective national security investments.

37. This is ultimately the congressional mandate enshrined in the NED Act, reaffirmed in the renewal of our FY 2026 appropriation, and one NED is committed and eager to carry out.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 9, 2026, in Washington, D.C.

Damon M. Wilson
President and CEO
National Endowment for Democracy