**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NATIONAL ENDOWMENT FOR DEMOCRACY, | : : : : | |
| *Plaintiff,* | : : | No. 1:25-cv-00648-DLF |
| v. | : : | |
| UNITED STATES, et al., | : : | |
| *Defendants.* | : : | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS
MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................1

ARGUMENT......................................................................................................................2

I.     A PRELIMINARY INJUNCTION IS WARRANTED NOW ..........................................2

II.    THE ENDOWMENT IS LIKELY TO SUCCEED ON THE MERITS.............................6

      A.    Defendants' Withholding of Funding Is Reviewable Final Agency Action............6

      B.    Defendants Are Violating the NED Act. ..................................................................9

      C.    Defendants' Withholding Is Arbitrary and Capricious. .........................................15

III.   THE ENDOWMENT WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION ......................................................................................20

IV.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF GRANTING THE PRELIMINARY INJUNCTION..................................................24

CONCLUSION.................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*AIDS Vaccine Advoc. Coal. v. Dep't of State*,
  766 F. Supp. 3d 74 (D.D.C. 2025)......................................................................22

*In re Aiken Cnty.*,
  725 F.3d 255 (D.C. Cir. 2013)............................................................................16

*In re Am. Fed'n of Gov't Emps., AFL-CIO*,
  837 F.2d 503 (D.C. Cir. 1988)............................................................................20

*Bennett v. Spear*,
  520 U.S. 154 (1997).............................................................................................8

*Butte Cnty. v. Caudhuri*,
  887 F.3d 501 (D.C. Cir. 2018)............................................................................18

*District of Columbia v. USDA*,
  444 F. Supp. 3d 1 (D.D.C. 2020)........................................................................21

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)............................................................................................19

*Friedman v. FAA*,
  841 F.3d 537 (D.C. Cir. 2016)...........................................................................7, 8

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)............................................................................21, 22

*Media Matters for Am. v. FTC*,
  805 F. Supp. 3d 105 (D.D.C. 2025)....................................................................17

*Motor Vehicle Mfr. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*,
  463 U.S. 29 (1983)...............................................................................15, 18, 19

*New Mexico v. Musk*,
  769 F. Supp. 3d 1 (D.D.C. 2025)........................................................................23

*Open Tech. Fund v. Lake*,
  2025 WL 3289166 (D.D.C. Nov. 25, 2025) .......................................................22

*Ramirez v. ICE*,
  568 F. Supp. 3d 10 (D.D.C. 2021)......................................................................24

*RFE/RL, Inc. v. Lake*,
  2025 WL 1232863 (D.D.C. Apr. 29, 2025).........................................................22

*S. Educ. Fund v. U.S. Dep't of Educ.*,
    2025 WL 1453047 (D.D.C. May 21, 2025)...........................................................................23

*Texas v. United States*,
    798 F.3d 1108 (D.C. Cir. 2015) .........................................................................................17

*Williams Gas Processing-Gulf Coast Co. v. FERC*,
    475 F.3d 319 (D.C. Cir. 2006) ...........................................................................................18

*Xiaomi Corp. v. Dep't of Def.*,
    2021 WL 950144 (D.D.C. Mar. 12, 2021)..........................................................................22

*Yanjia Zeng v. Mayorkas*,
    2021 WL 2389433 (D.D.C. Apr. 16, 2021) ........................................................................21

**FEDERAL STATUTES**

22 U.S.C. § 4412(a) ......................................................................................................13, 14

22 U.S.C. § 4413(a) .............................................................................................................12

22 U.S.C. § 4414(b) ..........................................................................................................3, 11

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. II, § 3 ...........................................................................................................1

**OTHER AUTHORITIES**

Off. of Mgmt. & Budget, Exec. Off. of the President, OMB Bull. No. 26-01,
    Apportionment of the Continuing Resolution(s) for Fiscal Year 2026 (Nov.
    12, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/11/OMB-
    Bulletin-No.-26-01-Apportionment-of-the-Continuing-Resolutions-for-Fiscal-
    Year-2026.pdf ...................................................................................................................17

**INTRODUCTION**

Under our Constitution, faithful execution of the law is the paramount duty of the Executive.  U.S. Const. art. II, § 3.  Just as they did in the prior fiscal year, Defendants are violating that duty in refusing to disburse the funds that Congress appropriated in this fiscal year to enable the National Endowment for Democracy (the "Endowment" or "NED") to carry out the mission that Congress has defined for it.  One would hope that this Court's order last year was clear enough to convince Defendants that they lack any legal authority to withhold the Endowment's funding because they disagree with the policy choices Congress has made in the NED Act—and that they cannot hide behind pretextual rationales for refusing to disburse those funds.  Unfortunately, Defendants' conduct during the current fiscal year, and the meritless defenses they have put forward to justify that conduct, requires this Court once again to order Defendants to obey the law.

As this Court knows, Defendants have refused since November to disburse the interim $105 million appropriation that Congress provided to the Endowment—funding which Congress appropriated for the very purpose of ensuring NED had sufficient funding to continue to fulfill its statutory mission during the months Congress would need to complete the fiscal year 2026 appropriations process.  As this Court also knows, Defendants have offered up one shifting excuse after another for refusing to disburse those funds.  Now, having left the Endowment with no choice but to invoke this Court's equitable authority once again, last Friday Defendants manufactured yet another last-minute excuse—the claim, set forth in a March 13 letter from the State Department ("March 13 Letter"), that the Endowment has not been consulting with the State Department as the NED Act requires—and they are purporting to withhold *all* of the Endowment's $315 million in appropriated funding (not merely the interim funding they were previously withholding) on that basis.

Two things are notable about Defendants' latest allegation.  First, Defendants provide no

1

specific facts—none—to justify it.  Second, Defendants have not submitted any declaration attesting under oath to the factual basis for it.  That is doubtless because the allegation is false.  The declaration submitted with this reply provides specific factual evidence documenting that the Endowment has more than satisfied its consultation obligations during the present fiscal year, as it has consistently—and without any State Department objection—throughout its more than 40 years of existence.  Defendants' latest justification is just one more pretext for Defendants' refusal to faithfully execute its obligations under the NED Act.  Once that pretextual justification is put to the side, Defendants are left with no legal basis to refuse to disburse the Endowment's funding immediately.

Given all that has transpired since the Endowment first filed this action a year ago, and given the absence of any plausible legal justification for Defendants' obstinate refusal to disburse the Endowment's funding, this Court should order Defendants to make all of the Endowment's fiscal year 2026 funding available immediately, and at the absolute latest by the April 4, 2026 deadline that Congress has imposed.  Starved of its funding, the Endowment is once again suffering the same kinds of irreparable harms to its ability to carry out its mission, and to its reputation, that this Court sought to remedy with the injunctive relief granted last year.  Immediate action by this Court is therefore urgently needed.

## ARGUMENT

### I.    A PRELIMINARY INJUNCTION IS WARRANTED NOW

Defendants' March 13 Letter confirms that Defendants are continuing to withhold the Endowment's funds because they disagree with Congress's policy decision to fund the Endowment's activities—and it leaves no doubt that this Court's intervention is urgently needed.

The March 13 Letter confirms that Defendants are continuing to withhold the Endowment's funding for the very policy reasons this Court has already found unlawful:  the Letter asserts

2

that the Executive is withholding *all $315 million* appropriated by Congress for the Endowment this fiscal year, and it reiterates the baseless view that the Endowment "has gravely undermined the foreign policy, safety and prosperity of the United States." ECF 65-1 at 1. In making that assertion, Defendants never acknowledge that Congress—which exercises concurrent foreign-relations authority under the Constitution—has emphatically rejected Defendants' views by continuing to appropriate funding for the Endowment, including in fiscal year 2026, after receiving detailed periodic reports on the Endowment's activities in furtherance of its statutory mandate, and after being fully apprised of Defendants' policy objections.

The Letter then purports to justify Defendants' withholding on grounds that are manifestly pretextual. Defendants assert that the Endowment has not "confirm[ed] [that] it will comply with its statutory requirements for an annual grant," and that Defendants seek such confirmation due to unspecified "issues that have occurred in the past" with respect to consultation. Opp. 8-9. Those assertions are not only unsupported; they are false. As the Endowment's President and CEO has attested in a sworn declaration submitted with this reply, the Endowment has always fully complied with its statutory consultation requirements. *See* 22 U.S.C. § 4414(b); Wilson Reply Decl. ¶¶ 3, 5-30. And the Endowment confirms that it will continue to do so every time it enters a grant agreement with the State Department. Wilson Reply Decl. ¶ 5. The Endowment's consultation with the State Department includes sharing detailed information about the Endowment's programs and operations, such as annual reports, planning documents submitted to Congress, monthly obligation reports, independent financial audits, and, when requested, comprehensive grant listings—the very listing of grants Defendants are now demanding as though the Endowment does not already share that information. *See* ECF 65-1 at 2. In addition—to take the past 15 months as an example—Endowment staff have substantively engaged with State Department representatives

3

dozens and dozens of times concerning activities in over 50 countries throughout every region of the world.  And the Endowment has repeatedly sought to engage with Executive Branch leadership at the political level and through budget and planning channels, providing extensive information both on the Endowment's own initiative and on request.

Defendants never even mention—much less challenge—that extensive evidence of the Endowment's compliance with the statutory consultation requirement.  Neither the March 13 Letter nor Defendants' brief provides a shred of evidence, or even a shred of factual detail, to support the letter's conclusory allegation that "consultation requirements were not followed."  ECF 65-1 at 1.  That omission is telling.  The timing of the March 13 Letter is equally telling.  Defendants sent it only after the Endowment filed its recent preliminary injunction motion.  If they had actual concerns about inadequate consultation, surely Defendants would have raised them earlier.  The record evidence is thus crystal clear, and entirely one-sided: the Endowment *has* complied with the statute, and Defendants' assertions to the contrary are just another in a long line of last-minute pretextual excuses for refusing to obey the law.[1]

That fact, together with the Defendants' pattern of misconduct over the past year as well as the Letter's assertion that the Endowment has in Defendants' view "undermined foreign policy," makes it impossible to accept at face value Defendants' assertion (Opp. 1) that they "are prepared to apportion and obligate" the Endowment's funding "assuming that [the Endowment] agrees to abide by the statutory requirements of the National Endowment for Democracy Act."  Defendants

---

[1] The March 13 Letter also falsely accuses the Endowment of not having had "clean" audits in certain years.  ECF 65-1 at 1.  That assertion too is baseless.  As the Wilson declaration explains, the referenced findings concern a now-resolved policy disagreement about how to comply with the public-reporting requirements of the Federal Funding Accountability and Transparency Act (FFATA) while also complying with the Endowment's statutory mandate to protect the safety of its partners operating in highly restrictive and often dangerous environments.  Wilson Reply Decl. ¶¶ 31-41.  The ultimate resolution confirmed the well-founded nature of the Endowment's concerns.  Contrary to Defendants' implication, no financial or oversight deficiencies were involved.

long ago forfeited any presumption of good faith in this case. Their latest gambit should be seen for what it is: just the latest made-for-litigation contrivance designed to give Defendants an excuse to continue withholding the Endowment's funding indefinitely. The Endowment *is* in compliance with the NED Act, as the unrebutted record evidence shows. And the Endowment *has* provided the very assurance that Defendants' opposition brief claims is needed, Opp. 6—repeatedly and unequivocally. The Endowment reaffirmed its longstanding and unbroken commitment to statutory compliance both in the parties' joint status report filed two days ago, ECF 66 at 2 ("[T]he Endowment will follow all statutory requirements set forth in the NED Act."), and in the Endowment's formal response to the March 13 Letter, see Wilson Reply Decl. Ex. A ("NED confirms that it will comply with all requirements in the NED Act.").[2] Yet Defendants have made no move to disburse the Endowment's funding.

There is thus no reason to assume that Defendants will accept the Endowment's assurance that it will comply with the NED Act or disburse the Endowment's funds on that basis. To the contrary, there is every reason to conclude that Defendants' *actual* reason for withholding the Endowment's funds is the policy disagreement that Defendants—remarkably—reiterated in the March 13 Letter: Defendants just disagree with Congress's decision to fund the Endowment. Defendants have steadfastly maintained that position over the past 15 months, notwithstanding this Court's prior order and Congress's overwhelming rejection of Defendants' demand that the Endowment be defunded. There is no reason to think things will change now—especially given that Defendants reiterated that very objection in the March 13 Letter. As the record stands, therefore, the Court can have no assurance that without an injunction, Defendants will do anything other than purport to be dissatisfied with the Endowment's assurances of statutory compliance—just as

---

[2] The Endowment sent that letter to the State Department today and it is attached to the concurrently filed Wilson declaration.

Defendants have falsely accused the Endowment of failing to comply with all manner of requirements, real and imagined, over the past 15 months.

A preliminary injunction therefore remains urgently needed now. The March 13 Letter is simply the latest iteration of Defendants' policy-based campaign of unlawfully withholding the Endowment's funding. It is Defendants' latest attempt to conjure a justification for their refusal to do what the NED Act and Congress's consistent appropriations require. But it is transparently pretextual, and it therefore demonstrates beyond any doubt both that Defendants have determined to withhold the full $315 million amount of the Endowment's funding on policy grounds, and that Defendants will not stop withholding the Endowment's funding in clear violation of the NED Act until this Court orders them to do so. In the meantime, the Endowment is suffering irreparable harm. It is time for Defendants' violation of the law to be stopped. This Court should grant a preliminary injunction now, as to the full $315 million amount of the Endowment's funding.

## II.    THE ENDOWMENT IS LIKELY TO SUCCEED ON THE MERITS

### A.    Defendants' Withholding of Funding Is Reviewable Final Agency Action.

The March 13 Letter confirms that Defendants have decided to withhold the full amount of the Endowment's appropriated funding for the very policy reasons reiterated in the Letter, that they are casting about for a legitimate rationale that could justify that action—and that while the asserted rationale has evolved over time, Defendants' determination to withhold the Endowment's funding has remained constant. *See* Mot. 15-16. That is the very definition of final agency action—and agency action unlawfully withheld. Defendants' contrary insistence that they "have made no final determination" about the Endowment's fiscal year 2026 funding, Opp. 7, is belied by the record and wholly unpersuasive.

Defendants' "consultation" gambit is the latest in a series of shifting explanations and maneuvers designed to block the Endowment's access to its congressionally appropriated funds. As

6

the Endowment has cataloged many times, since the current Administration took office, Defendants have tried everything they can think of to withhold the Endowment's funding. They spent last year trying tactic after tactic, from outright refusing to obligate funds and blocking the Endowment's access to the Payment Management System in January to an illusory waiver requirement in March to onboarding DOGE in April to refusing to apportion further funding in June, right up until this Court's preliminary injunction. And as soon as the fiscal year switched over, they picked up where they left off, offering evasive and misleading statements in status reports and deliberately slow-walking the Endowment's funding, presumably in hopes of never ultimately having to disburse it. The State Department's March 13 Letter, which demands the Endowment's confirmation that it will comply with certain consultation requirements, is the latest iteration of that pattern. The timing of the letter—coming as it does only after NED was forced by Defendants' latest obfuscations and maneuvering to seek further relief from this Court—makes clear that it is yet another pretext that lacks any good faith basis.

Given that consistent pattern of behavior, this Court should not allow Defendants to hide behind the APA's final agency action requirement. The final agency action inquiry is "pragmatic and flexible" in nature. *Friedman v. FAA*, 841 F.3d 537, 541 (D.C. Cir. 2016) (citation omitted). It is meant to be conducted with an eye toward "ensur[ing] justice" and preventing agencies from "thwarting" judicial review of agency actions that "in practical effect" determine rights or obligations. *Id.* at 542-43. That is precisely what Defendants seek to do here. Defendants' *search for a lawful justification* for withholding the Endowment's funds may superficially seem non-final, in the sense that Defendants' explanations have repeatedly shifted as the Endowment has pressed its statutory rights, and Defendants have burned through so many different meritless explanations in such a short period of time. But the reason their justifications have evolved so rapidly is not

7

because the decision is non-final; it is because every rationale they have advanced to date is either unlawful or illogical.  First it was that the lack of a full-year funding bill created "uncertainties" over funding.  ECF 58 at 1.  Then it was that Defendants were contemplating that the President might propose a rescission under the Impoundment Control Act.  ECF 59 at 1.  Now it is that the State Department is awaiting the Endowment's confirmation that it will engage in certain consultation-related activities.  ECF 65-1 at 2.  The purported rationale changes, but the underlying determination to withhold the Endowment's funding has remained and is unquestionably final: absent an order from this Court to obey the law, Defendants will continue to stonewall.  Allowing Defendants to hide behind this rotating cast of rationales would "thwart[]" judicial review of Defendants' decision to withhold NED's mandatory funding.  *Friedman*, 841 F.3d at 542.

That Congress included a 60-day deadline in the fiscal year 2026 appropriations act does not affect the reality that Defendants have made a final decision.  Agency action is final if it "mark[s] the 'consummation' of the agency's decisionmaking process."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  And Defendants came to their decision long before Congress enacted the full-year law.  As explained above, their current antics are just the latest ploy to withhold the Endowment's funding based on a disagreement with Congress's policy choice to appropriate funding for the Endowment's use.  That decision is neither "tentative" nor "interlocutory."  *Id.*  The fact that Congress has set a deadline for payment does not change the fact that Defendants are determined not to pay.

The March 13 Letter eliminates any remaining doubt that Defendants have made a final decision to withhold the entire $315 million appropriated to the Endowment in the full-year appropriations act, not just the $105 million appropriated in the continuing resolution.  The letter does not distinguish between the two tranches of funding—it requires the Endowment to comply

8

with its demands before a single dollar is obligated from any source.  Defendants have now an-nounced the purported basis on which they are withholding not only the $105 million but the En-dowment's full-year $315 million appropriation.  And if the letter were not simply designed to provide a pretextual basis for continued withholding, Defendants would have already disbursed the full amount of appropriated funding—because according to the letter, all that needed to be done was for the Endowment to "confirm[] that it will be abide [sic] by its statutory requirements." Opp. 6.  Yet even though the Endowment has now done so, at least twice over, no funding has been forthcoming.  *See* pp. 3-5, *supra*.  Defendants' failure to comply with the very terms they purported to set in the letter, together with their reiteration of their policy disagreement with Con-gress, leaves no doubt:  Defendants have made a final decision to withhold the Endowment's fund-ing, and that decision applies to the full $315 million amount.

**B.      Defendants Are Violating the NED Act.**

Defendants' withholding of the Endowment's fiscal year 2026 funds once again violates the NED Act—first, because that withholding is based on impermissible policy objections to Con-gress's decision to fund the Endowment; and second, because that withholding threatens to prevent the Endowment from fulfilling its statutory purposes.  Defendants' sparse responses are meritless.

1.  As this Court concluded last year, and as Defendants have never contested, the NED Act "prohibits the executive branch from imposing extra-statutory policy based conditions on the Endowment's funding."  PI Op. 7.  Yet that is precisely what Defendants are doing once again. They have adopted the same "playbook" that they used last fiscal year, Status Conference Tr. 8— refusing to fund the Endowment and breaking sharply from historical practice based on their claim of a misalignment between the Endowment's congressionally prescribed mission and "Admin-istration priorities," PI Op. 7.  They have even confirmed as much on social media, where the State Department's DOGE account and State Department officials repeatedly broadcast to the world

9

their policy-based objections to funding the Endowment.  *See* Mot. 17-20.  And now Defendants have doubled down:  their March 13 Letter reiterates in black and white Defendants' spurious accusation—rejected by Congress when it chose to continue funding the Endowment—that the Endowment "has gravely undermined the foreign policy, safety and prosperity of the United States." ECF 65-1 at 1.  That policy view is stated expressly in the March 13 Letter that confirms Defendants' current decision to withhold *all $315 million* appropriated by Congress for the Endowment this fiscal year.  Such policy-based withholding is a blatant violation of the NED Act, and it warrants injunctive relief as to the full amount Congress appropriated this fiscal year.[3]

Defendants' responses do not withstand even the slightest scrutiny.  Defendants' frontline response is to repeatedly invoke the 60-day deadline provided in the full-year appropriations law. *See* Opp. 8-11.  But that deadline hurts, not helps, Defendants' arguments.  Congress's inclusion of a 60-day apportionment deadline in this year's funding bill cannot possibly be read as permission for Defendants to withhold the Endowment's funding for policy reasons, in clear violation of the NED Act.  The 60-day deadline did not impliedly repeal the NED Act's prohibition on such policy-based withholding; indeed, Defendants do not even advance such an argument.  The NED Act thus applies both before and after April 4, and Defendants are bound to follow it.  Moreover, Defendants never dispute that the 60-day deadline is a *limit* on their authority that Congress added to this year's appropriations bill "*in response to Defendants' unlawful attempt to [delay apportionments] last fiscal year*."  PI Mem. 22 n.22 (emphasis added).  Defendants thus have nothing to say about the clear import of Congress's addition of the 60-day language to prevent recurrences of Defendants' unprecedented, unlawful withholding.  That addition underscores Congress's own policy determination that the Endowment should not only receive its appropriated funding, but

---

[3] A new proposed order addressing the full $315 million appropriation accompanies this filing.

should receive it promptly—and that policy determination, not Defendants', must control under the NED Act.

Defendants' main fallback is to invent a new justification for their withholding—the one articulated in the March 13 Letter.  Defendants say they need to withhold the Endowment's funding for now because the Endowment has not "confirm[ed] [that] it will comply with its statutory requirements for an annual grant," and that such confirmation is necessary due to "issues that have occurred in the past" with respect to consultation.  Opp. 8-9.  That argument fails several times over.  As an initial matter, it is obviously pretextual.  *See* pp. 3-5, *supra*.  The March 13 Letter—signed by a State Department official who has posted policy-based objections to the Endowment on social media, *see* PI Mem. 18-19 & nn.13-14—makes clear that the State Department's true concern is its unfounded belief that the Endowment "has gravely undermined the foreign policy, safety and prosperity of the United States."  ECF 65-1 at 1.  Indeed, that letter comes after more than a year of efforts to interfere with the Endowment's funding, *see* PI Mem. 3-13, without Defendants *ever* justifying their actions based on their purported concerns about the Endowment's compliance with its consultation requirements.  Defendants' newly discovered "serious concerns" about such compliance, ECF 65-1 at 1, cannot be taken at face value.[4]

That is especially so because the Endowment has fully complied with its statutory consultation requirements.  *See* 22 U.S.C. § 4414(b).  As explained above, *see* pp. 3-4, *supra*, the Endowment's President and CEO has attested in a sworn declaration to the extensive consultation that the Endowment regularly engages in with the State Department.  That evidence is *completely* uncontradicted by Defendants' submissions, which provide no evidence whatsoever supporting

---

[4] The letter purports to have discovered the cited "concerns" after a "review of recent Endowment activities and available program information."  ECF 65-1 at 1.  That too cannot be taken seriously.  Certainly the State Department has long known about the Endowment's prior consultations *with the State Department*.

the letter's conclusory allegation that "consultation requirements were not followed." ECF 65-1 at 1. And Defendants are well aware that this extensive consultation has occurred. After all, *Defendants' officers and employees are the very people with whom the Endowment is consulting.* So the absence of any acknowledgement by Defendants of the actual facts or any assertions as to what consultative shortcomings there could possibly be in light of those facts is extremely telling. The plain truth is that the Endowment has not just complied with the NED Act's consultation requirements—it has gone above and beyond in a spirit of full transparency and cooperation. Defendants' pretextual concerns about consultation therefore cannot justify any further withholding of the Endowment's funding.[5]

In all events, the Endowment has already provided the very assurance that Defendants' opposition brief claims is needed. *See* Opp. 6 ("These requests amount to nothing more than NED confirming that it will be abide [sic] by its statutory requirements . . . ."). The Endowment has always "agree[d] to comply with the requirements specified" in the NED Act, as that law has long required. 22 U.S.C. § 4413(a). And as explained above, *see* pp. 3, 5, *supra*, the Endowment has repeatedly reaffirmed that commitment in response to Defendants' request. Defendants are thus left with no possible remaining excuse for their withholding.

Defendants have little else to say to defend their policy-based withholding. They explain that the November 2025 continuing resolution "expired" after the passage of a full-year appropriations bill, Opp. 9, but that is a red herring. Even Defendants acknowledge that the $105,273,000 appropriated in the continuing resolution is "available as part of the $315,000,000 included in the full-year appropriations act." Opp. 10. They also assert that the continuing resolution "did not require agency action to occur at a specific point in time." Opp. 9. But that misses the point.

---

[5] As explained above as well, *see* p. 4, n.1, *supra*, the letter's allegations regarding FFATA also do not withstand scrutiny.

12

Neither the continuing resolution nor the full-year appropriations act said anything to contradict the NED Act, which requires that the State Department "shall" grant appropriated funds to the Endowment, 22 U.S.C. § 4412(a), and prohibits the Defendants' policy-based withholding of the Endowment's funding.

Defendants weakly try to downplay the social media posts that confirm the policy-based nature of the withholding, characterizing those posts as "mostly from former State Department employees." Opp. 10. But that is not true. The Endowment has cited social media content from the State Department's official DOGE account, which echoed Elon Musk's call to "Defund NED" as well as several false claims about the Endowment's work. Mot. 18 & nn. 9-12. The Endowment has also cited a post from the same high-ranking State Department official who signed the March 13 Letter, disparaging the Endowment as part of a "censorship-industrial complex." Mot. 18-19 & nn. 13-14. Those posts represent powerful evidence of Defendants' unvarnished views; they cannot be ignored.

Defendants' latest submission is also notable for what it does not contest. Defendants do not dispute that they failed to comply with an OMB bulletin calling for the "automatic apportion-ment" of the Endowment's funding, nor do they offer any justification for their noncompliance. Mot. 20. Defendants also have nothing to say in defense of the false or misleading statements in their February 9 status report—statements that Defendants invoked just weeks ago to deny NED's funding, before swapping in the latest pretextual rationale. For instance, Defendants do not contest that—contrary to their prior representation—the Endowment does *not* draw funding from DRL's accounts. Mot. 21. Nor do Defendants contest that other agencies received their appropriated funding following the November 2025 continuing resolution, despite the exact same purported "uncertainties" about full-year funding that Defendants cited on February 9 as the justification for

13

withholding all of NED's funds. *Id.* at 22.

At this point, given all the joint status reports, the letter-writing, and the briefing, this Court is left with only one possible explanation for Defendants' continued refusal to provide the Endowment its fiscal year 2026 funding: Defendants still disagree with Congress's decision to fund the Endowment. This Court held last year that Defendants violated the NED Act by withholding funding based on that policy disagreement. Nothing is different now. The Endowment is thus once again likely to succeed on its NED Act claim.

2. The Endowment is also likely to succeed in showing that Defendants have again "fallen woefully short of providing an 'annual grant' that 'enable[s]' the Endowment to fulfill its statutory purposes." PI Op. 8 (quoting 22 U.S.C. § 4412(a)). Defendants ignore the many arguments in support of that claim, such as the extended duration of the withholding, the substantial sum that has been withheld, and the severe consequences imposed—including that the Endowment is unable to follow through on its plans for the fiscal year because it has been prevented from obligating sixty percent of its grant commitments. Mot. 23-24. Defendants' lone response to all of this is, again, to fall back on the 60-day deadline. Opp. 10. But, again, that deadline does not assist Defendants. Just as that language does not give Defendants license to withhold the Endowment's funding for policy reasons, *see* p. 10, *supra*, so too it does not permit Defendants to ignore the NED Act's requirement that the State Department "shall make an annual grant to the Endowment to enable the Endowment to carry out its purposes." 22 U.S.C. § 4412(a).[6]

---

[6] At a minimum, Defendants' action with respect to the funding appropriated last November constitutes an unreasonable delay. Beyond Defendants' repeated invocation of the April 4 deadline, which is addressed above, Defendants only insist that the Endowment has not alleged a "specific, unequivocal command." Opp. 12. That argument ignores the NED Act, which states specifically and unequivocally that the State Department "shall make an annual grant to the Endowment to enable the Endowment to carry out its purposes." 22 U.S.C. 4412(a). Defendants' withholding of the Endowment's funding for more than four months is an unprecedented and unreasonable failure to abide by that command.

C.      **Defendants' Withholding Is Arbitrary and Capricious.**

The Opposition also confirms that Defendants' decision to withhold the Endowment's funding was not "the product of reasoned decisionmaking." *Motor Vehicle Mfr. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 52 (1983).  Defendants offer two principal explanations: first, that they are withholding the Endowment's funding because of the 60-day deadline; and second, that they are withholding the Endowment's funding because of the State Department's newfound focus on consultation.  Both are inadequate.  As an initial matter, neither could possibly explain why Defendants failed to apportion, obligate, or disburse any of the Endowment's funding before the full-year appropriations act passed. And even now, with the full-year appropriations law on the books, Defendants' so-called justifications remain deficient.  It is clear from the Opposition that Defendants have relied on factors Congress did not intend for them to consider, that their explanations run counter to all available evidence, and that they failed to give due weight to the Endowment's reliance interests.  *See id.*

1. To begin with the $105 million appropriated to the Endowment in the continuing resolution, Defendants have failed to explain why they have withheld that amount for over four months. They make a half-hearted attempt to revive the contention that they acted based on "uncertainties as to how much (if any) funding NED would receive in the full year appropriations bill."  Opp. 2. But that effort fails, because that explanation was patently arbitrary and capricious.  As the Endowment explained in the motion for a preliminary injunction, in invoking such "uncertainties," Defendants failed to explain why they deviated from the Executive Branch's consistent practice of apportioning, obligating, and disbursing funds during a continuing resolution.  *See* Mot. 25 (citing Mot. 20).  They also did not explain why they completely disregarded an OMB bulletin issued by Defendant Russell Vought in November 2025 calling for the "automatic apportionment" of appropriated funding.  *Id.* at 20; *see id.* at 25.  Nor did they provide any factual support for the

15

claimed "uncertainties." *Id.* at 25-26. In all events, Defendants' reliance on concerns about how much full-year funding NED would actually get ran afoul of this Court's instruction that they "may not rely on political guesswork about future congressional appropriations as a basis for violating existing legal mandates." PI Op. 11 (quoting *In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh, J.)); *see* Mot. 26.

In the Opposition, Defendants barely respond to these points. They briefly push back on the notion that they inexplicably deviated from past practice, contending that times have changed because the "currently applicable law explicitly gives [them] until April 4, 2026 to apportion any funds." Opp. 10. Of course, that cannot possibly explain their decision to withhold funding during the continuing resolution period. The statutory provision imposing the 60-day deadline was not enacted until February, months after Congress appropriated the $105 million in continuing resolution funding to the Endowment. Even more to the point, Congress obviously included the deadline to constrain Defendants' discretion—that is, to ensure that Defendants did not repeat the shenanigans of the prior fiscal year—not to confer on Defendants the discretion they claim to stonewall the disbursement of mandatory funding that was appropriated almost a half a year ago.

Defendants also dispute that they engaged in impermissible "political guesswork" when they relied on "uncertainties about full-year funding." Opp. 10-11 (quoting *Aiken Cnty.*, 725 F.3d at 260). They try to differentiate between the circumstances here and the facts of *Aiken County*, stressing that there, deadlines were ignored. That misses the forest for the trees. The relevant point of *Aiken County* is that, as this Court held in August, "an agency may not rely on political guesswork about future congressional appropriations as a basis for violating existing legal mandates." PI Op. 11 (quoting *Aiken Cnty.*, 725 F.3d at 260). By the same token, Defendants could not rely on unsubstantiated speculation about the Endowment's future annual appropriation in

16

order to refuse—*month after month*—to apportion, obligate, and disburse *any* of the $105 million in already-appropriated funding.

What is more, Defendants' own operative guidance requires much more substantial evidence that a program will receive reduced full-year funding before a delay in apportionment is authorized. OMB Bulletin 26-01—the same bulletin that calls for "automatic apportionment" of fiscal year 2026 continuing resolution funding—provides that if, at the time a continuing resolution is enacted, "either the House or Senate has reported out of committee or passed an applicable appropriations bill that provides no funding for an entire" Treasury account, then that account "is automatically apportioned zero."[7] In other words, OMB's general rule is that apportionment should be automatic when a continuing resolution is in place, absent compelling evidence that Congress intends to defund the program entirely. Defendants' uncorroborated reference to "uncertainties" does not come close to rising to that level.

Aside from those half-hearted attempts, Defendants do not grapple with the Endowment's objections or otherwise attempt to rehabilitate their "uncertainties" explanation. Together with the weakness of the responses Defendants *do* offer, their silence all but concedes that they had no reasoned basis to refuse to make the Endowment's funds available. *See Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 138 (D.D.C. 2025), *appeal docketed*, No. 25-5302 (D.C. Cir. Aug. 19, 2025) ("Local Rule 7(b) is understood to mean that if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded." (quoting *Texas v. United States*, 798 F.3d 1108, 1110 (D.C. Cir. 2015))).

2. Defendants' reasons for withholding the Endowment's full appropriated funds after the

---

[7] Off. of Mgmt. & Budget, Exec. Off. of the President, OMB Bull. No. 26-01, Apportionment of the Continuing Resolution(s) for Fiscal Year 2026 at 6 (Nov. 12, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/11/OMB-Bulletin-No.-26-01-Apportionment-of-the-Continuing-Resolutions-for-Fiscal-Year-2026.pdf

full-year appropriations act passed are equally meritless. Neither the March 13 Letter nor the 60-day deadline provides a reasoned basis to withhold the $315 million that Congress has appropriated to the Endowment for fiscal year 2026.

As an initial matter, both rationales are impermissible post hoc rationalizations. Arbitrary and capricious review demands evidence that the agency exercised reasoned judgment at the time it made a decision. *See Butte Cnty. v. Caudhuri*, 887 F.3d 501, 506 (D.C. Cir. 2018). "[R]ationales developed for the first time during litigation do not serve as adequate substitutes." *Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006) (citation omitted). That bars Defendants from relying on either the March 13 Letter or the 60-day deadline. That result is particularly obvious with respect to the March 13 Letter, which Defendants whipped up to levy a set of unprecedented demands four days after the Endowment filed its motion for a preliminary injunction. But it is also true with respect to the 60-day deadline. As explained above, *see* pp. 6-7, *supra*, the current controversy is just the latest chapter of a story that started when Defendants made a decision to withhold the Endowment's appropriated funds in January 2025. That decision substantially predated the fiscal year 2026 appropriations act and its 60-day deadline.

Even if the Court considers Defendants' explanations, they still do not provide a reasoned basis for Defendants' actions. The record makes clear that Defendants are relying on "factors which Congress has not intended [them] to consider." *State Farm*, 463 U.S. at 43. As demonstrated above, both explanations are pretextual; Defendants are withholding the Endowment's funding because they disagree with Congress's decision to support its work. *See* pp. 9-10, *supra*. That is an impermissible consideration, because the NED Act does not allow the Executive Branch's policy preferences to play a role. PI Op. 7 (noting that "policy oversight" of the Endowment "is the prerogative of Congress," not Defendants).

18

The March 13 Letter has additional problems all its own.  Defendants insist that withholding funding was "reasonable to ensure that NED complies with" the NED Act's consultation requirement "given the issues that have occurred in the past."  Opp. 9.  But that letter provides no factual support whatsoever—none—for the vague accusation that NED has not met its statutory consulting obligations.  That is because the accusation is false.  As explained at length above, the undisputed factual record before this Court makes clear that the Endowment has faithfully complied with all its statutory obligations.  *See* pp. 3-5, *supra*.  Defendants' explanation thus "runs counter to the evidence."  *State Farm*, 463 U.S. at 43.

The 60-day deadline provides an equally flimsy rationale for Defendants' withholding.  Defendants treat the deadline as a license to refrain from apportioning and obligating the Endowment's funding for a period of 60 days.  But in viewing the 60-day deadline as an effective two-month stay of their obligations, Defendants have once again "relied on factors which Congress ha[d] not intended [them] to consider."  *State Farm*, 463 U.S. at 43.  The enactment history makes clear that Congress enacted the deadline in response to Defendants' attempts to block the flow of the Endowment's funding last year.  The deadline was meant to prevent, not authorize, Defendants' interference with the apportionment process.

Defendants also seem to think that the 60-day deadline absolves them of the need to consider reliance interests, but it is unclear where they got that impression.  The APA indisputably requires Defendants to show that they "weighed, assessed, or"—at the very least—"displayed any awareness of the Endowment's reliance interests on the historical practice of routinely disbursing annual appropriations in full."  PI Op. 11 (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).  Defendants suggest that when Congress enacts a timetable, such as the 60-day deadline, that "resolve[s]" any reliance interest an entity might have in faster resolution.  Opp. 11.

19

But they offer no support for that proposition—aside from citing a decision that has nothing to do with either arbitrary-and-capricious review or the need for an agency to consider reliance when changing positions. *See id.* (citing *In re Am. Fed'n of Gov't Emps., AFL-CIO*, 837 F.2d 503, 506 (D.C. Cir. 1988)). And the 60-day window cannot retrospectively justify Defendants' withholding of the $105 million for months after the continuing resolution.

Moreover, Defendants' effort to brush the Endowment's reliance interests aside only reinforces that they have failed to grasp both the nature of those interests and the damaging cumulative impact that disruptions to the Endowment's funding have had and will continue to have. Defendants protest that there is no reason that the deprivation of a "few months of appropriated funding" should interfere with the Endowment's strategic planning, not when the Endowment knows how much money it will receive and the day on which it will arrive. Opp. 11. The central problem with that reasoning is that the Endowment knows nothing of the sort. Last fiscal year, it took months of back-and-forth, prolonged litigation, and this Court's intervention to secure the Endowment's funding. This fiscal year, the Endowment has not been paid a dollar. These dramatic departures from past practice are disruptive. And they devastate the Endowment's ability to make plans with any certainty. These concerns cannot be dismissed as a quibble over the timing of a "few months of appropriated funding." *Id.*

## III. THE ENDOWMENT WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION

The Endowment is again suffering irreparable harm to its mission and its hard-earned reputation. Because of Defendants' withholding of the Endowment's funding, the Endowment cannot obligate *sixty percent* of its fiscal year 2026 grant commitments, including for "time-sensitive activities with narrow operational windows." Wilson 2d PI Decl. ¶¶ 8-9. That problem will grow even more severe as the withholding of Defendants' funding continues further into the fiscal

year—especially given that the withholding decision now unquestionably encompasses all of the Endowment's funding. The effects run to every aspect of the Endowment's operation and its manner of accomplishing its mission. The Endowment's core institutes will lose the ability to act swiftly and effectively in fast-moving political environments, including Cuba, Venezuela, and Iran. *Id.* ¶¶ 29-32. The Endowment's longstanding partners that by law the Endowment must rely upon to carry out its mission will face existential threats, including the risk of being exposed as an Endowment partner to authoritarian regimes that will seek reprisal. *Id.* ¶ 26. And the Endowment's reputation as a trusted partner for groups around the world that operate in the "most dangerous and difficult environments" and depend on the Endowment for "reliability" and "consistency" will again be threatened. *Id.* ¶ 19. Defendants do not provide any evidence to counter any of those facts.

Defendants instead repeat many of the same arguments they tried in the first preliminary-injunction dispute between the parties, *see* ECF 43 at 21-25—which this Court decided against them, *see* PI Op. 12-14. They assert that the Endowment has not demonstrated a threat to the "very existence" of its "business." Opp. 14 (citations omitted). But they again refuse to acknowledge the settled rule that, where economic loss is caused by federal agency action, plaintiffs need only show "significant" harm to satisfy the irreparable-harm test, *Yanjia Zeng v. Mayorkas*, 2021 WL 2389433, at *2 (D.D.C. Apr. 16, 2021) (citation omitted), because "economic injury caused by federal agency action is unrecoverable" due to the "APA's waiver of sovereign immunity" from "damages claims," *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 34 (D.D.C. 2020). Plus, even if economic harm were not enough here, the Endowment focuses on the Defendants' direct interference with the Endowment's organizational mission—a type of harm separate from purely economic harm that the D.C. Circuit recognized as irreparable in *League of Women Voters of the*

21

*United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

Defendants again quibble with the Endowment's reliance on *Newby*, arguing again that *Newby* "turned on *statutory* obstacles, not economic harm." Opp. 14-15. That argument fails here for the same reasons it failed the last time around. *Newby*'s reasoning is not limited in the manner Defendants describe, nor is there any evident reason to distinguish between mission harms that arise from obstacles created by statutes, on the one hand, and other governmental actions, on the other. That is why courts in this District have repeatedly found irreparable, mission-based harm under *Newby* in cases challenging cuts to federal funding. *See, e.g.*, *AIDS Vaccine Advoc. Coal. v. Dep't of State*, 766 F. Supp. 3d 74, 81 (D.D.C. 2025); *Open Tech. Fund v. Lake*, 2025 WL 3289166, at *13 (D.D.C. Nov. 25, 2025); *RFE/RL, Inc. v. Lake*, 2025 WL 1232863, at *8 (D.D.C. Apr. 29, 2025). Indeed, that is precisely what this Court did last year. *See* PI Op. 12-13 (citing *Newby* as support for this Court's holding that Defendants' actions "'unquestionably ma[d]e it more difficult for the [Endowment] to accomplish [its] primary mission' of supporting democracy-promoting initiatives around the globe").

Defendants also again question whether reputational harm can qualify as irreparable, and they argue that the harm they have visited on the Endowment's reputation is only "speculati[ve]." Opp. 15. Those arguments likewise fail again. Numerous decisions in this District have made clear that reputational harm can support a finding of irreparable harm. *See Xiaomi Corp. v. Dep't of Def.*, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021) (collecting cases). And here, the reputational harm is anything but speculative; it is *uncontested*. Defendants offer no evidence whatsoever to dispute the Endowment's sworn declaration explaining, based on the extensive experience of the Endowment's President and CEO, that the Endowment's reputation is "threatened" if it "cannot make good on [its] grant commitments in a timely, predictable manner." Wilson 2d PI

22

Decl. ¶ 19.  Nor do Defendants say anything in response to this Court's crystal-clear holdings that "[r]eneging on commitments destroys the Endowment's credibility and 'harms the Endowment's mission and reputation as a trusted, reliable U.S. partner,'" PI Op. 13 (citation omitted), and that "[t]hose harms to the Endowment's global reputation and to the 'very existence of its programs' are irreparable," *id.* (quoting *S. Educ. Fund v. U.S. Dep't of Educ.*, 2025 WL 1453047, at *15 (D.D.C. May 21, 2025)).

Defendants also again characterize any harms to the Endowment's core institutes, its grantee partners, and its employees as mere "injuries to third parties."  Opp. 15.  But Defendants once again miss the point.  Those harms run to the Endowment itself because the Endowment's grantees, core institutes, and employees are essential to the Endowment's ability to carry out its mission.  *See, e.g.*, Wilson TRO Decl. ¶ 39 ("Without [its] grantees, NED's ability to carry out its mission would be impossible."); *id.* ¶ 9 (describing the core institutes as part of the Endowment's "family" because each "plays a critical role in NED's ability to fulfill its mission").  As explained last time around, Defendants do not cite a single case holding that harm to third parties must be hermetically sealed from the case even when such harm directly injures the plaintiff.  *See, e.g.*, Opp. 16 (citing *New Mexico v. Musk*, 769 F. Supp. 3d 1, 7 (D.D.C. 2025), for the unremarkable proposition that irreparable harm must be "connected specifically to the parties before the Court").

Defendants' only new argument on irreparable harm is the same one they make throughout the remainder of the brief—that the Endowment need not worry because the April 4 deadline is fast approaching.  Opp. 13.  That argument fails for the many reasons explained above.  *See* pp. 8-11, *supra*.  Notably, in the irreparable-harm part of Defendants' opposition, they are unusually candid: "By no later than April 4, 2026, all of Plaintiffs [sic] FY2026 funding must be apportioned and *may* be obligated."  *Id.* (emphasis added).  Defendants thus acknowledge the very problem

23

that animates the present preliminary-injunction proceedings.  Despite their legal obligation to obligate the Endowment's funding, Defendants refuse to commit to doing so.

## IV.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF GRANTING THE PRELIMINARY INJUNCTION

Both the public interest and the balance of the equities forcefully support an injunction. There is a public interest in having the government follow the law, and no public interest in interfering with the mission of the Endowment—a longstanding organization with bipartisan support that has promoted this nation's highest ideals for more than four decades.

Contrary to Defendants' view, a preliminary injunction would not "disrupt the statutory scheme that Congress provided."  Opp. 17.  On the public interest, too, Defendants cannot hide behind the 60-day deadline.  As explained above, the deadline does not license interference with the Endowment's funding or otherwise excuse Defendants from their statutory obligations.  *See* p. 10, *supra*.  Requiring Defendants to follow the law is not a cognizable "disruption."  *See Ramirez v. ICE*, 568 F. Supp. 3d 10, 34 (D.D.C. 2021).

Defendants' eleventh-hour "consultation" argument confirms that the balance of the equities overwhelmingly tilts in the Endowment's favor too.  As this Court is all too aware, Defendants' conduct over the course of this litigation strongly suggests they have not been operating in good faith.  After repeatedly deflecting inquiries about the status of the Endowment's fiscal year 2026 funding and insisting this litigation is moot, Defendants made highly misleading representations to both the Endowment and to this Court about their plans to make the funds available.  ECF 60 at 5-8.  Then, in the last week, they manufactured a new basis to withhold funds.  They have given this Court and the Endowment the runaround.  That behavior should not be rewarded.

The equities also require consideration of Defendants' latest maneuver as one piece in a broader scheme.  The current withholding of the Endowment's funding is the latest chapter of a

24

campaign that has been underway for over a year.  Even before Inauguration Day, officials were eager to defund the Endowment.  They have since lost that battle both in Congress and in the courts.  Yet they remain as committed as ever to their goal of undermining the Endowment's statutorily recognized mission.  They are now simply trying to achieve that end by resort to administrative devices and delay rather than a frontal attack.

## CONCLUSION

This Court should grant the motion for a preliminary injunction.

Dated: March 18, 2026

Respectfully submitted,

/s/ *Donald B. Verrilli, Jr.*

Donald B. Verrilli, Jr. (D.C. Bar No. 420434)
Ginger D. Anders (D.C. Bar No. 494471)
Jeremy S. Kreisberg (D.C. Bar No. 1048346)
Helen E. White (D.C. Bar No. 1741368)
Esthena L. Barlow (D.C. Bar No. 90000252)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com
Ginger.Anders@mto.com
Jeremy.Kreisberg@mto.com
Helen.White@mto.com
Esthena.Barlow@mto.com

Gabriel M. Bronshteyn (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105
(415) 512-4000
Gabriel.Bronshteyn@mto.com

Miranda E. Rehaut (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
(213) 683-9100
Miranda.Rehaut@mto.com

*Attorneys for the National Endowment for Democracy*