**THIRD SUPPLEMENTAL DECLARATION OF DAMON M. WILSON**

I, Damon M. Wilson, declare as follows:

1.      I am the President and CEO of the National Endowment for Democracy (NED). The statements made in this declaration are based on my personal knowledge and the information made available to me pursuant to my duties as President and CEO of the National Endowment for Democracy.

2.      I previously submitted a declaration in support of NED's Motion for a Temporary Restraining Order, a supplemental declaration in support of NED's prior Motion for a Preliminary Injunction, and a second supplemental declaration in support of NED's current Motion for a Preliminary Injunction.  I offer this third supplemental declaration to address information that was raised subsequent to the filing of the current Motion for a Preliminary Injunction and subsequent to the filing of my second supplemental declaration.

3.      I am also attaching to this declaration a copy of a letter that I sent today to the State Department in response to its letter of March 13.  All of the information in our response letter is accurate.

4.      NED is a private, nonprofit foundation dedicated to supporting freedom and democracy around the world.  Since 1983, NED has stood with frontline democracy advocates in more than 90 countries—and in doing so, supports long-term U.S. interests by fostering stability, countering authoritarian influence, and reducing the drivers of extremism and migration.  Our mission and work is consistent with the mandate of the organization recognized by Congress in the National Endowment for Democracy Act of 1983, including a board and staff, independent of the U.S. government.

I.      **NED's Consultations with the Department of State**

5.      For over forty years, we have worked cooperatively with the Executive Branch to discharge our mission.  Consistent with the NED Act's requirement that the State Department "shall make an annual grant to the Endowment to enable the Endowment to carry out its purposes," the State Department has consistently ensured that the Endowment receives all of the funding that Congress appropriates for the Endowment each fiscal year—funding which is used "for activities which the Board of Directors of the Endowment determines are consistent with the purposes described in" the NED Act.  22 U.S.C. § 4412(a).  The Endowment has likewise always "agree[d] to comply with the requirements specified" in the NED Act, *id.* § 4413(a), including the requirement that "[t]he Endowment shall consult with the Department of State on any overseas program funded by the Endowment prior to the commencement of the activities of that program," *id.* § 4414(b).  We always confirm our agreement to comply with the consultation requirement of the NED Act when we sign grant agreements with the State Department each year.

6.      The Endowment is committed to engaging and continuing to consult the Executive Branch and Congress on our work.  Since its founding, NED has a well-established history of open and collaborative dialogue and consultation with the Department of State and the

U.S. Information Agency (USIA), which initially administered NED grants.  The Endowment welcomes the opportunity to continue consultation with the Department of State on our work and shared priorities to advance America's interests and the cause of freedom.

7.      NED has always taken seriously its responsibility to consult with the Department of State.  Given our unique history and structure as a publicly funded, private organization, we believe we are strongest and most effective when there is sustained, structured engagement with both Congress and the Executive Branch.  This principle has guided our approach to consultation, transparency, and coordination across administrations.

8.      Consistent with that commitment, NED routinely provides the Department with detailed information about our programs and operations.  This includes annual reports, planning documents submitted to Congress, monthly obligation reports, independent financial audits, and, when requested, comprehensive grant listings.  For example, in June 2025, NED transmitted to the Office of Management and Budget and the Department (OMB) of State lists of all FY2024 grants, all FY2025 grants as of June 12, 2025, and all active grants as of June 15, 2025.  In September 2025, we transmitted additional grants lists to State's Bureau of Democracy, Human Rights, and Labor (DRL), as part of our submission of more than 22,000 pages of documents requested by the Department.  We also submitted to DRL a copy of our FY2025 Annual Report to the White House on February 3, 2026, and a copy of our FY2026 Planning Document on March 17, 2026.

9.      Additionally, the Endowment has sought to engage senior officials and leadership across the interagency, including at the State Department, to receive input on strategic priorities and provide visibility into our work at the highest levels.  These efforts reflect our commitment to sustained, structured engagement and consultation with decision-makers responsible for shaping U.S. foreign assistance policy and oversight.  There are numerous examples of this outreach over the past 15 months.

10.      In February 2025, NED leadership offered and scheduled an introductory briefing on NED for OMB officials given the start of a new administration.  OMB officials postponed and then cancelled the briefings and we were unable to get them rescheduled.

11.      Throughout the spring of 2025, NED leadership reached out consistently to State Department officials in order to brief new officials on NED and to discuss our then-inability to access our congressionally appropriated funds.  In March and April 2025, NED leadership initiated direct outreach to senior State Department officials to establish consultations on priority regional portfolios.  For example, on April 14 and 15, 2025, I reached out to the leadership of State's Bureau of Western Hemisphere Affairs (WHA) to request a meeting to discuss NED's programming in Venezuela, Cuba, Nicaragua, and China's influence in Latin America.  This outreach was followed by a formal letter on April 17 outlining NED's work in Cuba and offering further engagement, stating, "We look forward to consulting with you and your colleagues on how best to advance U.S. national security interests by supporting human rights and political freedoms in Cuba and challenging the authoritarian kleptocratic regime."  That same month, I reached out to engage DRL leadership on issues regarding Tibet, given NED's long engagement on Tibetan issues.

12.     In parallel, NED engaged through formal budget and planning channels.  On April 18, 2025, NED received a Department of State passback request seeking additional information related to its programming and proposed use of funds.  NED responded substantively to this request, and on June 6, 2025, received a follow-up inquiry from the Department requesting further detail.  NED engaged in good faith throughout the process, providing additional information to support the Department's review and ensure transparency regarding its programs and priorities.

13.     On April 28, 2025, NED provided DRL leadership with a copy of its FY2025 Planning Document, formally submitted to Congress, providing extensive details on our forthcoming spending plans, and noting "we would welcome consulting on the challenges and opportunities of this moment for democracy and freedom around the world."

14.     NED continued its transparency and consultation efforts by providing the State Department with a copy of its 2024 Annual Report, submitted to the White House pursuant to the NED Act, and reiterating its commitment to work with the Administration to advance shared objectives.  NED also sent a letter to Secretary Rubio on May 13 outlining its support for the democratic movement in Venezuela and offering to coordinate closely on shared priorities, stating, "We welcome the opportunity to work with you and your team in our shared determination to help the Venezuelan people free themselves from Maduro's destructive dictatorship."

15.     NED also sought to engage on rapidly evolving geopolitical developments.  On June 19, 2025, NED shared a detailed update with State leadership on developments in Iran, including partner reporting, risks of internal instability, and opportunities to support democratic actors, and offered follow-on briefings with its Iran team.

16.     At the same time, NED made repeated efforts to engage directly.  On June 23, 2025, NED leadership followed up with State leadership noting prior outreach attempts and expressing continued interest in meeting to discuss programming in Cuba, Nicaragua, and Venezuela, offering to meet at the Department's convenience.  In September, NED also offered additional consultations during a virtual meeting with senior officials, including from the Office of Foreign Assistance, Humanitarian Affairs, and Religious Freedom, as well as DRL and OMB, regarding the Department's document request.  During that meeting, we were informed that further consultation would not be possible until NED had complied with the terms of the document request.  We promptly replied, submitting more than 22,000 pages of requested documents that month.

17.     NED has also sought to build relationships with newly appointed Department officials.  In July and again in October 2025, for example, we reached out to newly named officials to offer an introductory meeting and to propose briefings for new Department staff.  We also extended invitations to these Department officials to meet NED partners, including from Russia, Venezuela, and those working to advance religious freedom.

18.     Additionally, NED routinely engages in substantive programmatic consultations with the Department of State at regional and country levels.  We regularly provide briefings to Department officials in Washington and at U.S. embassies around the world on our programs,

share insights from our global network of partners, discuss country-specific political analysis, and participate in relevant Department-led engagements.  These interactions include consultations with ambassadors and senior officials, country desk officers, and subject-matter experts.

19.    Over the course of the past year, NED has also repeatedly sought opportunities to consult with the Department on its programs, priorities, and areas of shared interest through both formal communications and informal outreach at multiple levels.  Endowment Program staff regularly consult with peers across the Department.  These engagements, whether in person or via email or video calls, take place at both the staff and leadership level, ensuring consultation at the strategic and programmatic levels.  Since January 2025, NED engagements with the Department cover over 50 countries in every region of the world as well as engagements related to our thematic work.  To illustrate the type and breadth of engagements over the past 15 months, Endowment staff, conservatively, have collaborated with the State Department as follows:

20.    In Asia, Endowment staff have met, corresponded or spoken with State counterparts over 29 times to discuss our work in Thailand, Burma, Cambodia, Vietnam, Bangladesh, Pakistan, Sri Lanka, Nepal, Tibet, North Korea, and China.  These consultations included officials in U.S. embassies in Nepal, Sri Lanka, Thailand, Japan. and South Korea, as well officials from DRL, the Bureau of East Asian Pacific Affairs (EAP), the Bureau of South and Central Asian Affairs (SCA), and the Office of International Religious Freedom.

21.    In the Middle East, Endowment staff have met, corresponded or spoken with State counterparts over 21 times covering Iran, Lebanon, Iraq, Egypt, Jordan, Tunisia, Morocco, Algeria, Libya, Afghanistan, and the West Bank and Gaza.  These consultations included officials in U.S. embassies in Iraq, Lebanon, and Jordan, as well as officials from DRL, the Bureau of Near Eastern Affairs (NEA), and SCA.

22.    In Latin America and the Caribbean, Endowment staff have met, corresponded or spoken with State counterparts over 22 times covering Venezuela, Peru, Ecuador, Bolivia, Mexico, Cuba, Honduras, El Salvador, Nicaragua, and Guatemala.  These consultations included officials in U.S. embassies in Guatemala, Honduras, Ecuador, and the Organization of American States (OAS), as well as officials from DRL and WHA.

23.    In Africa, Endowment staff have met, corresponded, or spoken with State counterparts on over 24 occasions to discuss work in countries, including in Cote d'Ivoire, Central African Republic, Burundi, Rwanda, Democratic Republic of the Congo, Ethiopia, Kenya, Mali, Nigeria, Zambia, and Zimbabwe.  These consultations have included officials in U.S. embassies in Cote d'Ivoire, Central African Republic, Rwanda, Democratic Republic of the Congo, Ethiopia, Mali, Nigeria, Zimbabwe, and Zambia, as well as officials from DRL and the Africa regional bureau.

24.    In Europe, Endowment staff have met, corresponded or spoken with State counterparts at least ten times to discuss work in countries including Ukraine, Belarus, Moldova, Serbia, Kosovo, and Albania.  These consultations have included officials in U.S. embassies in North Macedonia, Serbia, Kosovo, and Albania, as well as officials from the Bureau of European and Eurasian Affairs (EUR/ACE), Public Diplomacy (PD), and the Office of International

Religious Freedom.  These consultations are in addition to the regular reporting that NED provides each year on State Department-funded programs for Ukraine, Belarus, and the Western Balkans Region.

25.     In Eurasia, Endowment staff have met, corresponded, or spoken with State counterparts at least 29 times to discuss our work in countries including Kazakhstan, Turkmenistan, Russia, Georgia, Azerbaijan, and Armenia.  These consultations have included officials in U.S. embassies in Kazakhstan, Georgia, and Armenia, as well as officials from DRL's Office of Natural Rights and the Office of the Coordinator of U.S. Assistance to Europe, Eurasia, and Central Asia.

26.     In January 2026, NED's grant operations staff began weekly check-in meetings to coordinate with the new team in DRL's Program Unit who administer awards to NED, including providing an overview of NED's grantmaking program and operations.

27.     In addition to these targeted engagements, NED has consistently ensured transparency and information sharing with the Department through regular reporting and operational coordination. This includes:

- Monthly reports listing all grant awards obligated in the prior month, including names of the recipients, countries, and award amounts;
- Quarterly Federal Financial Reports (FFRs);
- An Annual Report required under the NED Act;
- An annual Planning Document required by Congress;
- Annual Single Audit submissions;
- Notifications regarding any instances of grantee fraud;
- Requests for prior approvals, as required under 2 CFR 200, including for single audit waivers, new grant mechanisms, and other compliance matters;
- Occasional no-cost extensions of Department-funded awards; and
- Coordination on the applicability of OFAC licenses for NED-funded activities.

28.     NED also routinely engages with the Department on budget and programmatic matters, including:

- Regular requests for budget materials supporting submissions to the Bureau of Budget and Planning (BP) and OMB, including passbacks;
- Program-to-program consultations on regional and country-specific priorities; and
- Responses to ad hoc Department requests regarding NED programming and operational practices.

29.     Throughout this period, NED has consistently expressed its willingness to meet, brief, and consult with Department counterparts—whether through formal meetings, informal discussions, or participation in Department-hosted engagements.  In several instances, NED followed up on outreach where responses were not received, reflecting its continued good-faith effort to maintain an active and constructive dialogue.

30.    Taken together, these efforts reflect NED's longstanding and proactive commitment to consultation and transparency.  NED remains eager to identify practical mechanisms to further strengthen coordination and consultation with the Department going forward.

**II.    Response Regarding FFATA-Related Audit Findings**

31.    The assertion that NED's prior audits were not "clean" mischaracterizes the nature of the findings referenced.  NED's FY 2021, 2022, and 2023 Single Audit reports each received an unmodified opinion on its financial statements and on its compliance with federal award requirements, and NED was designated as a low-risk auditee each year.  An "unmodified opinion" represents the highest standard possible from an independent auditor meaning the financial statements are accurate, complete, follow the relevant accounting standards, and that there are no material weaknesses identified—that is, that there are not any issues significant enough to matter materially.

32.    The audit findings cited relate specifically to the Federal Funding Accountability and Transparency Act (FFATA) and did not involve any misuse of funds, financial mismanagement, or deficiencies in internal controls over financial reporting.

33.    From the outset, NED identified a fundamental tension between FFATA's public reporting requirements and our statutory mandate to protect the safety of our partners operating in highly restrictive and often dangerous environments.  As early as 2011, NED raised these concerns with senior officials at the Office of Management and Budget and the Department of State, noting that public disclosure of subaward recipient identities could place individuals and organizations at risk of dangerous reprisal in the authoritarian countries in which they operate.  NED sought a waiver and, in the absence of a formal resolution, adopted an alternative compliance approach.

34.    Under this approach, which was briefed to State Department officials, NED publicly disclosed information about its grants through its own website in a manner that preserved transparency while allowing for the anonymization of sensitive awards and rapid updates in response to changing security conditions.  This approach was reviewed with NED's independent auditors and reflected a good-faith effort to balance transparency obligations with partner protection requirements.

35.    Following the issuance of OMB's 2021 Compliance Supplement, which directed auditors of federal programs to formally assess FFATA compliance, NED engaged in renewed discussions with the Department of State to resolve the issue.  The resulting audit findings in FY 2021–2023 reflect this unresolved policy disagreement—not a failure of financial stewardship.

36.    NED formalized and published its duty of care policy and updated its public disclosure policy in consultation with Congressional oversight staff and Department officials.  A November 2023 resolution is reflected in subsequent audit outcomes and confirms that NED's longstanding concerns regarding partner safety were well-founded.

37.    NED's approach has consistently been guided by its statutory obligation—including under FOIA provisions incorporated into the NED Act—to protect information where

disclosure could endanger individuals or undermine program effectiveness. Public reporting of all first-tier subrecipients would, in many cases, expose NED partners to retaliation and create a misleading impression that such partners are directly approved or funded by the U.S. government.

38.     At the time of the audit findings, NED maintained hundreds of active grants in high-risk environments requiring protection of partner identities. Flexibility to anonymize and adjust public disclosures in real time is essential to the success and safety of these programs.

39.     The FFATA-related findings reflected a narrow and now-resolved issue rooted in legitimate security concerns, not any deficiency in NED's financial integrity, oversight, or accountability.

40.     NED has consistently acted in good faith, maintained full transparency with its auditors and federal counterparts, and worked collaboratively with the Department of State to reach an appropriate and durable resolution.

41.     Additionally, NED has taken significant steps to publicly articulate its approach to transparency while ensuring the protection of our partners. This includes publishing our duty of care and public disclosure policies on our website (https://www.ned.org/ned-policy/), as well as a detailed essay explaining how we protect sensitive information about grantees (https://www.ned.org/2024-grant-listings/), why this protection is essential for those advancing freedom in repressive environments (https://www.ned.org/protecting-at-risk-democracy-activists-ned-approach/), and how the Endowment carefully balances discretion with accountability.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 18, 2026, in Washington, D.C.

Damon M. Wilson
President and CEO
National Endowment for Democracy