**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | : | |
| NATIONAL ENDOWMENT FOR DEMOCRACY, | : | |
| | : | No. 1:25-cv-00648-DLF |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, et al., | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

**<u>PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS.................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................... ii

INTRODUCTION ...........................................................................................................................1

BACKGROUND .............................................................................................................................2

      A.     Congress's Direct Appropriations to the Endowment ...........................................2

      B.     Defendants Initiate a Campaign to Interfere with the Endowment's Funds ............3

      C.     The First Motion for a Preliminary Injunction .......................................................5

      D.     Defendants' Campaign Against the Endowment Persists in FY 2026 ....................7

      E.     The Second Motion for a Preliminary Injunction ...................................................9

ARGUMENT..................................................................................................................................11

I.      THE ENDOWMENT'S LAWSUIT IS NOT MOOT. ......................................................11

II.     THIS CASE FITS WITHIN EXCEPTIONS TO THE MOOTNESS DOCTRINE. .........15

      A.     Defendants Voluntarily Ceased Their Unlawful Conduct in FY25 and
              FY26. ...................................................................................................................15

      B.     The Controversy Is Capable of Repetition Yet Evading Review. .........................20

CONCLUSION...............................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Alaska v. USDA*,
17 F.4th 1224 (D.C. Cir. 2021)..................................................................................16

*Bailey v. Fed. Bureau of Prisons*,
780 F. Supp. 3d 96 (D.D.C. 2025)..............................................................................16

*Brit. Caledonian Airways Ltd. v. Bond*,
665 F.2d 1153 (D.C. Cir. 1981)..................................................................................23

*Chafin v. Chafin*,
568 U.S. 165 (2013)..............................................................................................11, 15

*Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*,
972 F.2d 365 (D.C. Cir. 1992)....................................................................................24

*Cnty. of Los Angeles v. Davis*,
440 U.S. 625 (1979).............................................................................................15, 16

*Conservation Force, Inc. v. Jewell*,
733 F.3d 1200 (D.C. Cir. 2013)..................................................................................12

*CREW v. Wheeler*,
352 F. Supp. 3d 1 (D.D.C. 2019)................................................................................17

*In re Ctr. for Auto Safety*,
793 F.2d 1346 (D.C. Cir. 1986).............................................................................18, 19

*Del Monte Fresh Produce Co. v. United States*,
570 F.3d 316 (D.C. Cir. 2009)....................................................................................15

*Doe v. Sullivan*,
938 F.2d 1370 (D.C. Cir. 1991)..................................................................................24

*Fares v. Smith*,
249 F. Supp. 3d 115 (D.D.C. 2017).............................................................................12

*Farrall v. D.C. Amateur Athletic Union*,
153 F.2d 647 (D.C. Cir. 1946)....................................................................................13

*FBI v. Fikre*,
601 U.S. 234 (2024)....................................................................................................19

*Authorities upon which we chiefly rely are marked with asterisks.

*Fed. Election Comm'n v. Wis. Right To Life, Inc.*,
  551 U.S. 449 (2007)................................................................................................23

*Fellowship of Christian Athletes v. District of Columbia*,
  2026 WL 275995 (D.D.C. Feb. 3, 2026) ...........................................................17, 18

\*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC),
  528 U.S. 167 (2000)...........................................................................................16, 18

*Genesis Healthcare Corp. v. Symczyk*,
  569 U.S. 66 (2013)..................................................................................................11

*Gray Panthers Project Fund v. Thompson*,
  273 F. Supp. 2d 32 (D.D.C. 2002)..........................................................................17

*J.D. v. Azar*,
  925 F.3d 1291 (D.C. Cir. 2019)...............................................................................11

*Jenkins v. Squillacote*,
  935 F.2d 303 (D.C. Cir. 1991)..................................................................................23

*Lewis v. Continental Bank Corp.*,
  494 U.S. 472 (1990).................................................................................................11

*Mass. Coal. for Immigr. Reform v. DHS*,
  800 F. Supp. 3d 134 (D.D.C. 2025)..........................................................................17

*Mehneh v. Rubio*,
  164 F.4th 928 (D.C. Cir. 2026)...........................................................................21, 24

*Nat'l Black Police Ass'n v. District of Columbia*,
  108 F.3d 346 (D.C. Cir. 1997)............................................................................16, 18

\*Pierre-Noel on behalf of K.N. v. Bridges Pub. Charter Sch.,
  113 F.4th 970 (D.C. Cir. 2024).............................................................21, 22, 23, 24

*Pub. Citizen, Inc. v. FERC*,
  92 F.4th 1124 (D.C. Cir. 2024).................................................................................16

\*Ralls Corp. v. Comm. on Foreign Inv. in U.S.,
  758 F.3d 296 (D.C. Cir. 2014)...............................................................21, 22, 23, 24

*Reid v. Hurwitz*,
  920 F.3d 828 (D.C. Cir. 2019)..................................................................................22

*Samma v. Dep't of Def.*,
  136 F.4th 1108 (D.C. Cir. 2025)...............................................................................16

*Schnitzler v. United States*,
 761 F.3d 33 (D.C. Cir. 2014) ........................................................................................12

*Sierra Club v. U.S. Army Corps of Eng'rs*,
 803 F.3d 31 (D.C. Cir. 2015) ........................................................................................12

*Singh v. Carter*,
 185 F. Supp. 3d 11 (D.D.C. 2016) .................................................................................13

*Super Tire Eng'g Co. v. McCorkle*,
 416 U.S. 115 (1974) ......................................................................................................13

*United Bhd. of Carpenters & Joiners of Am. v. Operative Plasterers' & Cement Masons' Int'l*,
 721 F.3d 678 (D.C. Cir. 2013) .................................................................................22, 25

*United States v. W.T. Grant Co.*,
 345 U.S. 629 (1953) ......................................................................................................15

*\*Zukerman v. USPS*,
 961 F.3d 431 (D.C. Cir. 2020) .............................................................................15, 16, 18

**FEDERAL STATUTES**

22 U.S.C. § 4411(a) .......................................................................................................5, 20

22 U.S.C. § 4411(b) ...........................................................................................................2

22 U.S.C. § 4412 ...............................................................................................................3

*\*22 U.S.C. § 4412(a) .................................................................................................3, 6, 20

22 U.S.C. § 4412(c) ...........................................................................................................5

22 U.S.C. § 4413(b) ...........................................................................................................2

22 U.S.C. § 4414(b) ...........................................................................................................9

**OTHER AUTHORITIES**

CRA Staff, *Primer: The National Endowment for Democracy and an NGO Ecosystem Actively Undermining America*, Ctr. for Renewing Am. (Feb. 7, 2025), https://americarenewing.com/primer-the-national-endowment-for-democracy-and-an-ngo-ecosystem-actively-undermining-america/ ...........................................................3

H.R. 8595, 119th Cong. (2026), *available at* https://www.congress.gov/119/bills/hr8595/BILLS-119hr8595rh.pdf...................................11

Memorandum from Russell T. Vought, Dir., Off. of Mgmt. & Budget, to Sen.
    Susan Collins, Chair, Comm. on Appropriations (May 2, 2025),
    https://www.whitehouse.gov/wpcontent/uploads/2025/05/Fiscal-Year-2026-
    Discretionary-Budget-Request.pdf ......................................................................................5

Off. of Mgmt. & Budget, Exec. Off. of the President,
    Budget of the U.S. Government for Fiscal Year 2027 (April 2026),
    https://www.whitehouse.gov/wp-content/uploads/2026/04/
    budget_fy2027.pdf.................................................................................................10, 11, 14

Wade Miller, *Policy Brief: Dismantle Entities Actively Censoring Americans*, Ctr.
    for Renewing Am. (Feb. 7, 2025), https://americarenewing.com/policy-brief-
    dismantle-entities-activelycensoring-americans/ ................................................................3, 4

**INTRODUCTION**

Defendants' motion to dismiss this case as moot is most notable for what it omits: any mention of Defendants' multiyear, relentless, and flatly unlawful campaign to deny the National Endowment for Democracy the funding that Congress has appropriated to it. There is every reason to think that that Defendants' efforts to block the Endowment's funding will continue in future fiscal years: even now, in urging mootness, Defendants notably do not disavow their efforts to interfere with the Endowment's funding or commit to complying with their legal obligations going forward. The case is not moot, and the motion should be denied.

Defendants' conduct toward the Endowment leaves little doubt that, absent permanent injunctive and declaratory relief, Defendants will not consistently comply with their statutory obligation to disburse the Endowment's appropriated funds. Beginning in January 2025, Defendants refused to disburse the Endowment's funding, forcing the Endowment to repeatedly seek emergency relief in this Court. In August 2025, this Court held that the Endowment was likely to succeed in showing that Defendants' withholding of funding was unlawful and preliminarily enjoined further interference. But after disbursing the Endowment's 2025 funds as required by that injunction, Defendants immediately began withholding the Endowment's 2026 funds. After months of receiving ever-shifting explanations, including some this Court described as "misleading," the Endowment again sought emergency relief. In response, Defendants falsely accused the Endowment of failing to satisfy its statutory consultation obligations. When the Endowment definitively refuted those allegations with a sworn declaration and this Court ordered Defendants to respond with a declaration of their own, they declined to litigate the issue further rather than substantiate their accusations under oath, and finally disbursed the Endowment's 2026 funding.

That history makes crystal clear that this case is not moot. Defendants have not even tried to satisfy their heavy burden of demonstrating that their unlawful conduct has ceased. Nor can

they.  Defendants' policy toward the Endowment remains the same as it has been since January 2025.  This case continues to present a live controversy even though the 2025 and 2026 funding immediately at issue in the Endowment's motions for preliminary relief has been disbursed.  And in all events, two well-established exceptions to mootness unquestionably apply here.  Even if Defendants were correct that their unlawful conduct ended with the disbursement of the Endowment's 2026 funding, that voluntary cessation could not moot the Endowment's claims.  Defendants cannot demonstrate, as they must, that there is no reasonable expectation that they will engage in the same conduct in future years.  To the contrary, there is *every* reason to think that Defendants will do exactly that.  And for much the same reason, Defendants' unlawful conduct is capable of repetition yet evading review.  As a result, the Endowment is entitled to a definitive adjudication of its statutory right to its funding under the NED Act, as well as the permanent declaratory and injunctive relief sought in its Supplemental Complaint.  The motion should be denied.

## BACKGROUND

### A.    Congress's Direct Appropriations to the Endowment

The National Endowment for Democracy (the "Endowment") is an independent, nonpartisan, nonprofit organization devoted to strengthening democratic institutions around the world. ECF No. 46 at 1 (PI Op.).  It was established in 1983, when Congress passed the National Endowment for Democracy Act (the "NED Act").  *Id.*  In the Act, Congress set forth several purposes that the Endowment is to pursue.  Its core mission includes seeking to "encourage free and democratic institutions throughout the world through private sector initiatives" and promoting "democratic training programs and democratic institution-building abroad."  22 U.S.C. § 4411(b).  The Act envisions that the Endowment will pursue those objectives primarily by operating as a grant-making organization.  *Id.* § 4413(b).

To enable the Endowment to carry out its mission—and to safeguard its independence—Congress has taken unusual steps to insulate its funding from political influence.  Unlike other non-governmental organizations, which typically receive funds at the discretion of federal agencies, the Endowment is statutorily entitled to receive an annual grant.  *See* PI Op. 2.  The NED Act provides that the Department of State "shall make an annual grant to the Endowment to enable the Endowment to carry out its purposes as specified in [the NED Act]."  22 U.S.C. § 4412(a).  To facilitate that grant, Congress has directly appropriated money for the Endowment's use every year since the Endowment's founding.  PI Op. 2.  For fiscal year 2026, for instance, Congress provided "[f]or grants made by the Department of State to the National Endowment for Democracy, as authorized by the National Endowment for Democracy Act (22 U.S.C. 4412), $315,000,000, to remain available until expended . . . ."  Pub. L. No. 119-75, 140 Stat. 173, 521 (2026).  Although the amount of the appropriation has changed over time, its terms have long remained consistent.

### B.    Defendants Initiate a Campaign to Interfere with the Endowment's Funds

In January 2025, almost immediately after the current Administration took office, Defendants instituted a campaign to interfere with the Endowment's congressionally appropriated funding.  PI Op. 3-4.  Around the time of the inauguration, Administration officials made clear in numerous publications and public statements that they disagreed with Congress's longstanding support for the Endowment and wanted to eliminate its funding.  For example, just weeks after President Trump took the oath of office, the Center for Renewing America, a think tank founded by Defendant and OMB Director Russell Vought, issued two such publications, criticizing the Endowment's work and enumerating policy objections to its mission.[1]

---

[1] CRA Staff, *Primer: The National Endowment for Democracy and an NGO Ecosystem Actively Undermining America*, Ctr. for Renewing Am. (Feb. 7, 2025), https://americarenewing.com/primer-the-national-endowment-for-democracy-and-an-ngo-ecosystem-actively-undermining-

Around the same time, the Endowment began encountering problems accessing its appropriated funding. It tried to make a routine withdrawal of $97 million from its Treasury account (which included funds that spanned five annual appropriations), but Defendants did not release the funds. ECF No. 5-2 ¶¶ 26-29 (Decl. of Damon Wilson). The State Department also refused to obligate the remaining $72 million that had been appropriated for the Endowment but not yet obligated to it in a grant agreement. *Id.* ¶ 31. Those maneuvers forced the Endowment to furlough staff and default on grant obligations for the first time in its history. *Id.* ¶¶ 35, 40. The Endowment also began to suffer irreparable harm to its reputation with partners across the world. *Id.* ¶¶ 35-56.

On March 6, 2025, the Endowment had no choice but to move for a temporary restraining order. ECF No. 5. Almost immediately, the Endowment regained the ability to withdraw funds from its account, and Defendants represented that the State Department would shortly obligate the balance. ECF No. 14 at 2 (Joint Mot. to Hold TRO in Abeyance). At the parties' request, the Court paused the TRO proceedings, and the State Department obligated the outstanding funds shortly afterwards. Minute Order (Mar. 11, 2025); ECF No. 15 at 1 (Joint Status Report of Mar. 21, 2025).

After the proceedings were placed in abeyance, Defendants' interference restarted. First, from March 13 until March 21, Defendants prevented the Endowment from accessing approximately $450,000 of obligated funds on the baseless ground that the Endowment needed a "waiver." ECF No. 15 at 1-2 (Joint Status Report of Mar. 21, 2025). After outreach from the Endowment's counsel, Defendants abandoned that demand. ECF No. 16 at 2 (Joint Status Report of Mar. 31, 2025).

---

america/; Wade Miller, *Policy Brief: Dismantle Entities Actively Censoring Americans*, Ctr. for Renewing Am. (Feb. 7, 2025), https://americarenewing.com/policy-brief-dismantle-entities-actively censoring-americans/.

Defendant OMB also began manipulating the apportionment process.  Previously, OMB had always apportioned all of the Endowment's annual funding at once, soon after its appropriation.  *See* ECF No. 40-2 ¶ 20 (Suppl. Decl. of Damon Wilson).  But in March, OMB apportioned only one month's worth of the Endowment's funding.  ECF No. 16 at 2 (Joint Status Report of Mar. 31, 2025).

Next, in April, the Administration attempted to embed a Department of Government Efficiency ("DOGE") team at the Endowment.  Suppl. Decl. of Damon Wilson ¶ 21.  That would have been flatly unlawful because the Endowment is a private entity, not a government agency.  *See* Exec. Order No. 14158, § 3(c), 90 Fed. Reg. 8441, 8441 (Jan. 20, 2025); 22 U.S.C. §§ 4411(a), 4412(c).  After an exchange with the Endowment's counsel, Defendants abandoned the attempt.  Suppl. Decl. of Damon Wilson ¶¶ 22-23.

On May 2, OMB released the President's budget proposal, which called on Congress to eliminate the Endowment's funding in fiscal year 2026.[2]  Defendants justified the proposal with numerous false and misleading claims about the Endowment's projects.  *See* ECF No. 40-1 at 8, 9 n.7 (Brief ISO Mot. for PI).

### C.    The First Motion for a Preliminary Injunction

By the end of May, the Endowment still had not received $95 million of its $315 million annual appropriation for fiscal year 2025.  Suppl. Decl. of Damon Wilson ¶¶ 27-28.  On May 29, the State Department submitted its spending plan for the rest of the fiscal year.  AR000007.  The plan stated that the outstanding funds "may be made available for obligation . . . subject to review for alignment with Administration priorities."  AR000060.  Two weeks later, Defendants conveyed

---

[2] Memorandum from Russell T. Vought, Dir., Off. of Mgmt. & Budget, to Sen. Susan Collins, Chair, Comm. on Appropriations (May 2, 2025), https://www.whitehouse.gov/wpcontent/up-loads/2025/05/Fiscal-Year-2026-Discretionary-Budget-Request.pdf.

that they did not intend to make these appropriated funds available to the Endowment during fiscal year 2025.  ECF No. 33 at 2 (Joint Status Report of June 12, 2025).  They ultimately stated that they were "[r]eserving" the $95 million balance of the Endowment's fiscal year 2025 appropriation because the "State Department in consultation with OMB determined that disbursing the funds in Fiscal Year 2026 would achieve the most effective and economical use of the remaining funds because sufficient funds had already been disbursed to NED for FY2025."  AR000004, ¶¶ 7-8.

Facing existential risks to its operations and reputation, the Endowment moved for a preliminary injunction.  ECF No. 40 at 1 (Mot. for PI).  On August 11, 2025, this Court granted the Endowment's motion, holding that the Endowment was likely to succeed in showing that Defendants' interference with its funding was contrary to law.  ECF No. 45 at 1 (PI Order); PI Op. 10. The Court concluded that by "subjecting $95 million of the Endowment's funding to 'review for alignment with Administration priorities,'" Defendants had imposed "precisely the kind of extra-statutory requirement prohibited by the NED Act" and violated their "statutory mandate" to make an annual grant to "enable the Endowment to carry out its purposes."  PI Op. 8, 10 (quoting 22 U.S.C. § 4412(a)).  This Court also held that the Endowment was likely to succeed on its arbitrary-and-capricious claim, explaining that Defendants' stated reasons for withholding funding were "neither reasoned nor rational."  *Id.* at 10-11.  This Court issued an order enjoining Defendants from "withholding, blocking, reserving, or otherwise interfering with payment of appropriated funds for fiscal year 2025 to the Endowment, including by interfering with the apportionment, obligation, and ultimate disbursement of such funds."  PI Order 1.

Even then, Defendants' interference with the Endowment's funding did not stop.  Defendants did disburse the ~$95 million remainder of the Endowment's fiscal year 2025 funding.  *See* ECF No. 47 at 1 (Joint Status Report of Aug. 13, 2025); ECF No. 48 at 1 (Joint Status Report of

Aug. 22, 2025).  But they also filed a notice of appeal.  ECF No. 51.  And on the same day this Court entered its order, the State Department notified the Endowment that it was initiating a "programmatic and financial audit of NED and each of its four core institutes."  *See* ECF No. 48 at 2 (Joint Status Report of Aug. 22, 2025).  Executive Branch officials explained in a meeting with the Endowment that the audit was designed to ensure that the Endowment's activities aligned with Administration "priorities," *id.*—the precise extra-statutory requirement this Court had just held unlawful.  *Id.*

D.   **Defendants' Campaign Against the Endowment Persists in FY 2026**

In a November 12, 2025 continuing resolution, Congress appropriated funds to the Endowment for the first third of fiscal year 2026, which amounted to a prorated sum of $105 million. Pub. L. No. 119-37, 139 Stat. 495 (2025).  Defendants refused to disburse that funding and were unresponsive to repeated inquiries.  ECF No. 63-2 ¶ 4 (Second Suppl. Decl. of Damon Wilson). On January 30, this Court directed Defendants to "indicate" by February 9 "whether they have obligated and disbursed the Endowment's Fiscal Year 2026 funding and, if not, provide an explanation for why not."  Minute Order (Jan. 30, 2026).

On February 3, 2026, Congress enacted a full-year appropriations law for fiscal year 2026. The law appropriated $315 million "[f]or grants made by the Department of State to the National Endowment for Democracy."  Pub. L. No. 119-75, 140 Stat. 173, 521 (2026).  It also provided that the funds appropriated to the Endowment "shall be apportioned to the Endowment not later than 60 days after the date of enactment of this Act," *id.*, a deadline that fell on April 4, 2026.

In response to this Court's February 9 deadline for an explanation of Defendants' refusal to disburse the 2026 funding appropriated in November, Defendants claimed the unprecedented, extended delay was "due to uncertainties over full year funding."  ECF No. 58 at 1 (Joint Status

Report of Feb. 9, 2026).  They also represented that because a full-year funding bill had now passed, they were "working on the allotment of that funding to State bureaus, including DRL."  *Id.*

In a status report on February 19, 2026, Defendants reversed course.  They stated that they would "either apportion funding in the NED account by [the] 60-day deadline (April 4, 2026); if so directed by the President, propose to Congress a full or partial rescission under the Impoundment Control Act, 2 U.S.C. §§681-688; or consider other lawful options."  ECF No. 59 at 1 (Joint Status Report of Feb. 19, 2026).  Notwithstanding their earlier representation that they were "working on" allotting funding, they also reported that "[n]o decision" about apportionment "ha[d] yet been made," noting that "the statutory deadline remains six weeks away."  *Id.* at 1-2.

In light of this reversal, the Endowment requested a status conference, which the Court scheduled for February 25.  Minute Order (Feb. 23, 2026).  The Court asked Defendants to explain the "discrepancy" between their representations on February 9 and 19.  ECF No. 62-2 at 3 (Status Conference Tr.).  The Court recognized that "[a]t best, there's been a shift," and that "at worst," Defendants' initial representations were "misleading."  *Id.* at 3-4.  Defendants claimed that there was no discrepancy because they only ever committed to allot funds within the State Department, not to the Endowment itself.  *Id.*  The Court questioned why Defendants had "made no effort to correct th[e] obvious misunderstanding that both the Court and the plaintiff had," but Defendants were unable to provide a satisfactory answer.  *Id.* at 8-9.

The Court also recognized that Defendants' evasiveness left the Endowment in an increasingly difficult position.  It noted that "[i]t seems that [the Endowment was] not going to get answers" and observed that "we went through the same sort of process a year ago" when Defendants employed a "similar playbook."  *Id.* at 8-9.  Accordingly, the Court acknowledged that the Endowment might once again need to "seek emergency relief."  *Id.* at 9.

E.      **The Second Motion for a Preliminary Injunction**

On March 8, 2026, the Endowment filed a supplemental complaint. ECF No. 64. Among other things, the Endowment sought a permanent injunction barring Defendants from interfering with the Endowment's appropriated funding and a declaration that their ongoing efforts to withhold those funds was unlawful. ECF No. 62-1 at 18, ¶¶ B, D (Suppl. Prayer for Relief). The Endowment also moved for a new preliminary injunction. ECF No. 63 (Second Mot. for PI). The Court set a brief schedule requiring Defendants to file any opposition on or before Monday, March 16. Minute Order (Mar. 9, 2026).

The Friday night before their opposition was due, the State Department sent the Endowment a letter baselessly claiming that the Endowment had not been consulting with the State Department as required by the NED Act. ECF No. 65-1 at 1 (March 13 Letter); *see* 22 U.S.C. § 4414(b). Defendants provided no facts and no evidence whatsoever to support that claim. And yet they asserted, without support, that the Endowment "has gravely undermined the foreign policy, safety and prosperity of the United States," March 13 Letter at 1, and purported to withhold all the Endowment's $315 million in appropriated funding for fiscal year 2026 on that basis, *see id.* at 2.

Alongside its reply brief, the Endowment submitted a declaration that completely and definitively refuted Defendants' accusations. ECF No. 67-2 (Third Suppl. Decl. of Damon Wilson). The declaration provided specific factual evidence documenting the many ways in which the Endowment had met and exceeded its consultation obligations during fiscal year 2026. And it also explained that the Endowment had done the same throughout its four-decade existence, without a hint of objection from the State Department.

On March 19, the day after the Endowment filed its reply brief, the Court issued a minute order requesting answers from Defendants. Minute Order (Mar. 19, 2026). The order directed

9

Defendants to "file a surreply that includes declarations" and that, "[a]t a minimum, . . . address[es]" seven specific questions about Defendants' accusations. *Id.*; *see, e.g.*, *id.* ("1. Do the defendants dispute any of the factual assertions in the plaintiff's [67-2] Declaration? If yes, the defendants shall identify and respond to each paragraph in the Declaration with which they disagree."). The Court also informed the parties that it was "prepared to hold an evidentiary hearing on the plaintiff's motion for preliminary injunction on April 1 or 2" and that both sides "shall have any relevant witnesses prepared to testify on those dates." *Id.*

Rather than submit any declarations under oath, Defendants obligated and disbursed the Endowment's fiscal year 2026 funds. On March 25, 2026, more than four months after the initial appropriation, the State Department reported that it had obligated the $315 million in fiscal year 2026 funding. *See* ECF No. 69 (Consent Mot. to Stay Deadlines). Defendants provided no explanation for their baseless assertions that the Endowment failed to comply with its consulting obligations, and no explanation for their previous refusal to disburse the funding.

Nor did Defendants cease their campaign against the Endowment. Four days after the Endowment gained access to its funding, OMB published the President's budget for fiscal year 2027.[3] In the budget, the Administration proposes to "eliminate[] wasteful and dangerous spending for NED."[4] The document falsely asserts that the Endowment "refused to comply with laws requiring disclosure about the grants it made,"[5] echoing the allegations in the March 13 Letter—allegations that the Endowment refuted with a sworn declaration in this Court, and that Defendants

---

[3] *See* Off. of Mgmt. & Budget, Exec. Off. of the President, Budget of the U.S. Government for Fiscal Year 2027 at 48 (April 2026) (hereafter "OMB Budget for Fiscal Year 2027"), https://www.whitehouse.gov/wp-content/uploads/2026/04/budget_fy2027.pdf.

[4] *Id.*

[5] *Id.*

declined to support with their own sworn declaration. The budget also falsely claims that the Endowment funds "a vast network of leftist non-governmental organizations."[6]

In sum, not only have Defendants declined to disavow their unlawful efforts to withhold the Endowment's appropriated funding, they have given every indication that eliminating the Endowment's funding remains Administration policy. Of course, in 2026 OMB also had proposed eliminating the Endowment's funding, and Congress responded by appropriating $315 million as usual—which Defendants then attempted to withhold. The 2027 appropriations act currently under consideration in the House of Representatives would appropriate $296 million to the Endowment, notwithstanding the President's proposed elimination of that funding.[7] There is thus every reason to believe that Defendants will run the same unlawful "playbook" in 2027 and beyond. *See* Status Conference Tr. at 8. Nevertheless, Defendants have moved to dismiss this case as moot.

**ARGUMENT**

## I.    THE ENDOWMENT'S LAWSUIT IS NOT MOOT.

A party seeking to dismiss a case as moot bears a "heavy burden." *J.D. v. Azar*, 925 F.3d 1291, 1307 (D.C. Cir. 2019) (citation omitted). A case becomes moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party," *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation omitted), or an "intervening circumstance" has completely eliminated the plaintiff's interest in maintaining the lawsuit, *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013); *see Lewis v. Continental Bank Corp.*, 494 U.S. 472, 478 (1990). A case is therefore not moot so long as the litigants retain *some* "concrete interest. . . in the outcome of the litigation," *Chafin*, 568 U.S. at 172 (citation omitted), and the court can fashion *some* form of

---

[6] *Id.*

[7] *See* H.R. 8595, 119th Cong., at 18-19 (2026), *available at* https://www.congress.gov/119/bills/hr8595/BILLS-119hr8595rh.pdf.

11

"meaningful relief," *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 44 (D.C. Cir. 2015) (citation omitted).

Here, the Endowment has not yet "received all the relief [it] sought"—a definitive adjudication of its rights on the merits and permanent declaratory and injunctive relief—and the case therefore continues to present an actual controversy. *See Schnitzler v. United States*, 761 F.3d 33, 39 (D.C. Cir. 2014); *see Fares v. Smith*, 249 F. Supp. 3d 115, 120 (D.D.C. 2017) (case was "not moot" because "Plaintiffs ha[d] not received all the relief that they ha[d] sought in their Complaint"); *cf. Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (a case is generally moot when a "party has already obtained all the relief that it has sought" (citation omitted)). The Endowment's supplemental complaint seeks, among other things, a "permanent injunction barring Defendants from withholding, blocking, reserving, or otherwise interfering with payment of funds Congress appropriates for grants to the Endowment" and a declaration that Defendants' interference with its funding is unlawful. Suppl. Prayer for Relief ¶¶ B, D. The reason for seeking such relief is obvious. The Endowment has received appropriated funds from Congress every year since 1984, giving rise to a reasonable expectation that the Endowment will continue to receive funds in the future—an expectation Defendants have not disputed or attempted to rebut. Yet for the past two years, Defendants have done everything they could to withhold that funding. And although Defendants disbursed the Endowment's fiscal year 2025 and 2026 funding, they did so only in response to litigation. Even after this Court entered its preliminary injunction concerning the fiscal year 2025 funding, Defendants immediately turned around and began interfering with the Endowment's fiscal year 2026 funding—and they were so determined to withhold that funding that they ultimately resorted to baseless accusations that the Endowment definitively refuted and that Defendants were evidently unwilling to support with a sworn declaration. Tellingly,

12

Defendants have *never* disavowed their policy-based desire to defund the Endowment or committed not to engage in the same sort of unlawful interference that this litigation has challenged and that this Court has already preliminarily enjoined once—*even in this motion to dismiss as moot*. In every sense, then, the Endowment has not yet received the complete relief it seeks: it lacks any permanent protection from the Defendants' continuing campaign of interference that threatens the Endowment's access to its appropriated funding in fiscal year 2027 and beyond.

In that situation, the fact that the Endowment has received two years of its funding—a portion of the relief it seeks—does not alter the fact that its request for permanent relief remains live. *See Singh v. Carter*, 185 F. Supp. 3d 11, 13 (D.D.C. 2016) (finding that plaintiff who was given a "long-term" religious accommodation by the Army still had a live case because he sought a "permanent" accommodation); *Farrall v. D.C. Amateur Athletic Union*, 153 F.2d 647, 648 (D.C. Cir. 1946) (suit seeking permanent injunction against policy of segregating athletic competition was not moot, even though the boxing competition described in the complaint had already occurred, because the plaintiffs were not concerned with a single sporting event but instead "s[ought] permanent relief" from the policy); *see also Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 123-24 (1974) (lawsuit challenging refusal to pay welfare benefits during strike was not moot after strike settled because plaintiffs sought relief from future applications of policy).

Defendants make two contrary arguments, both meritless. First, studiously ignoring the Endowment's request for permanent declaratory and injunctive relief, Defendants maintain that the Endowment has obtained its requested relief in full. But they can make that argument only by misrepresenting the relief the Endowment sought. It is true that the Endowment sought preliminary relief "enjoining Defendants from . . . interfering with payment of the $315 million in funding appropriated for grants to Plaintiff *for fiscal year 2026*." ECF No. 74-1 at 2 (Mot. to Dismiss)

13

(emphasis added).  But, in the Supplemental Complaint, the Endowment also sought permanent relief—as only permanent relief will fully safeguard the Endowment's interests going forward, and hopefully avoid the need to return to this Court in every future appropriations cycle.

Second, Defendants' insistence that the "challenged conduct has ceased" does not withstand scrutiny.  Mot. to Dismiss 5 (citation omitted).  Defendants have not even tried to satisfy their heavy burden of demonstrating that their "challenged conduct"—their ongoing policy of interfering with the Endowment's appropriated funding—has ceased.  Nor could they.  Over the past eighteen months, Defendants have been engaged in repeated efforts to block the Endowment's funds.  They have tried tactic after tactic—refusing to obligate grant funds, silently freezing the payment system, demanding an unspecified "waiver," threatening to onboard DOGE, attempting to withhold apportionment of $95 million in funding because it did not align with "Administration priorities," launching a program "audit" outside their statutory authority, slow-walking answers to the Endowment's questions about the status of its funding, misleading the Endowment and this Court about the steps they had taken to make appropriated funds available, and, most recently, raising spurious allegations questioning the Endowment's compliance with its obligation to consult with the State Department.  *See* pp. 3-10, *supra*.  That Defendants ultimately resorted to false allegations (and relented only when this Court required declarations substantiating Defendants' assertions and threatened to hold an evidentiary hearing) speaks volumes about whether Defendants' campaign has ended.  Indeed, Defendants continue to maintain that the Endowment should be defunded.[8]  *See* ECF No. 59 at 1 (Joint Status Report of Feb. 19, 2026); Status Conference Tr. 7.  That behavior leaves no doubt that Defendants intend to run a "similar playbook" in perpetuity. Status Conference Tr. 8.

---

[8] OMB Budget for Fiscal Year 2027 at 48.

The conduct that the Endowment challenges is thus an "ongoing policy" that will extend into the future—not simply isolated past funding denials. *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 321 (D.C. Cir. 2009) ("[A] plaintiff's challenge will not be moot where it seeks declaratory relief as to an ongoing policy."); Suppl. Prayer for Relief ¶ B.  Having been subjected to that unlawful conduct for the past eighteen months, and having been forced to seek emergency relief on three separate occasions, the Endowment is entitled to a definitive adjudication of its claims on the merits, and "effectual relief"—permanent relief—that protects the Endowment's statutory right to its funding and ensures that the Endowment is able to continue accomplishing its congressionally mandated mission. *Chafin*, 568 U.S. at 172 (citation omitted).

## II.    THIS CASE FITS WITHIN EXCEPTIONS TO THE MOOTNESS DOCTRINE.

In all events, this case fits squarely within two exceptions to the mootness doctrine.  First, any potential mootness is due to the Defendants' decision to voluntarily cease their unlawful withholding of the Endowment's funding in fiscal year 2025 and fiscal year 2026.  Second, the parties' recurring disputes over the legality of Defendants' interference with the Endowment's funding are capable of repetition yet evading review.

### A.    Defendants Voluntarily Ceased Their Unlawful Conduct in FY25 and FY26.

"[A]s a general rule, voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot." *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (citation modified).  "If the rule were otherwise, '[a] defendant [would be] free to return to his old ways,' and that, 'together with a public interest in having the legality of the [disputed] practices settled, militates against a mootness conclusion.'" *Zukerman v. USPS*, 961 F.3d 431, 442 (D.C. Cir. 2020) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)).  Accordingly, when voluntary cessation has occurred, the case is not moot unless "the party urging mootness demonstrates that (1) 'there is no reasonable expectation

15

that the alleged violation will recur,' and (2) 'interim relief or events have completely or irrevocably eradicated the effects of the alleged violation.'" *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997) (quoting *Davis*, 440 U.S. at 631). Defendants bear a "heavy burden" in making those showings, *Zukerman*, 961 F.3d at 442, including the "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur," *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC)*, 528 U.S. 167, 190 (2000).

Here, to the extent that Defendants have stopped engaging in unlawful conduct, they have undisputedly done so in response to this litigation. And Defendants do not and cannot come close to meeting their heavy burden of showing both no reasonable expectation of recurrence and a complete eradication of the effects of their unlawful actions.

1. The Endowment received its fiscal year 2025 and fiscal year 2026 funding due to Defendants' voluntary cessation of their unlawful conduct—a fact that Defendants do not even dispute. Courts in this Circuit have found voluntary cessation when an agency takes actions "because of" litigation it faces. *Bailey v. Fed. Bureau of Prisons*, 780 F. Supp. 3d 96, 117 (D.D.C. 2025) (citations omitted); *see Alaska v. USDA*, 17 F.4th 1224, 1229 (D.C. Cir. 2021) (voluntary cessation where defendant acts "in order to avoid litigation" (citation omitted)); *Samma v. Dep't of Def.*, 136 F.4th 1108, 1114 (D.C. Cir. 2025) (asking whether there is "some evidence that the party sought to manipulate the court's jurisdiction"); *Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1128 (D.C. Cir. 2024) (asking whether "the facts . . . suggest any 'arguable manipulation of [the court's] jurisdiction'" (citation omitted)). That precisely describes this case.

Indeed, each time Defendants have disbursed the Endowment's funds, they have done so only due to rulings or threatened rulings of this Court. Defendants ceased their initial freeze of the

16

Endowment's fiscal year 2025 funding shortly after the Endowment filed this lawsuit and moved for a temporary restraining order. The timing leaves little doubt that Defendants did so for the evident purpose of avoiding a ruling on the Endowment's motion. *See* p. 4, *supra*; Joint Mot. to Hold TRO in Abeyance at 1 (citing "changed circumstances since the filing of [the] Motion" as basis to hold TRO in abeyance). Defendants ceased their withholding of $95 million of fiscal year 2025 funding only after this Court issued a preliminary injunction. *See Fellowship of Christian Athletes v. District of Columbia*, 2026 WL 275995, at *8 (D.D.C. Feb. 3, 2026) ("The fact that, shortly after the Court issued a preliminary injunction in this case, [the defendant] revised its guidance and then moved to dismiss [plaintiff's] claims as moot 'suggest[s]' at least 'arguable manipulation' of the Court's jurisdiction." (citation omitted)); *Gray Panthers Project Fund v. Thompson*, 273 F. Supp. 2d 32, 34 (D.D.C. 2002) (voluntary-cessation exception applied where agency took action "in compliance with the court's preliminary injunction"). And they ceased their withholding of the Endowment's fiscal year 2026 funding only after the Endowment filed a second motion for a preliminary injunction and this Court entered a minute order that would have required the Defendants to provide evidence in support of their false allegations about the Endowment. *See* pp. 9-10, *supra*; ECF No. 68 at 2 (Defendants requesting to hold their response deadline in abeyance because they began the process of obligating fiscal year 2026 funding to the Endowment and promised not to terminate the Endowment's grant based on their false allegations).

At no point along the way have Defendants even suggested that they acted due to a change in Executive Branch policy toward the Endowment or for any other "reason[] unrelated to the litigation." *CREW v. Wheeler*, 352 F. Supp. 3d 1, 13 (D.D.C. 2019) (citation omitted); *cf. Mass. Coal. for Immigr. Reform v. DHS*, 800 F. Supp. 3d 134, 141-42 (D.D.C. 2025), *appeal docketed*, No. 25-5410 (D.C. Cir. Nov. 18, 2025). They have not even made that suggestion in their motion

17

to dismiss.  Nor would such a suggestion be plausible considering the timing of Defendants' actions and their evident interest in avoiding a final judgment that would bind them to follow the law.  There is no serious doubt that Defendants' actions qualify as voluntary cessation—which is presumably why Defendants do not even dispute that part of the analysis.

2.  Accordingly, this case is not moot unless Defendants meet their "heavy burden," *Zukerman*, 961 F.3d at 442, of showing *both* that "(1) 'there is no reasonable expectation that the alleged violation will recur,' and (2) 'interim relief or events have completely or irrevocably eradicated the effects of the alleged violation,'" *Nat'l Black Police Ass'n*, 108 F.3d at 349 (citation omitted).  Defendants cannot make either showing.

a.  Defendants have not met their "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190.  Quite the opposite.  Defendants have repeatedly withheld or otherwise interfered with the Endowment's funding during the last two fiscal years. *See In re Ctr. for Auto Safety*, 793 F.2d 1346, 1352 (D.C. Cir. 1986) (agency did not meet its burden when "during the course of th[e] litigation the agency ha[d] repeatedly" engaged in the challenged conduct).  Even *after* this Court entered a preliminary injunction that made clear that Defendants' actions violated the NED Act, they persisted in the practice in fiscal year 2026.  And Defendants have steadfastly "refus[ed] to admit the illegality of [their] past conduct"—they are even (still) appealing this Court's preliminary-injunction order—which further "heightens the probability that [they] will once again fail" to follow the law. *Id.* at 1353.  Nor have Defendants so much as "suggest[ed] that they would not resume" their interference with the Endowment's funding in future fiscal years. *Fellowship of Christian Athletes*, 2026 WL 275995, at *8.  In fact, the evidence suggests just the opposite, because even after their latest voluntary cessation (the payment of fiscal year 2026 funding)

18

Defendants *continued* to make baseless statements about the Endowment in an effort to block their fiscal year 2027 funding. *See* pp. 10-11, *supra*.

Defendants counter that there is no reasonable expectation of recurrence when "an agency takes the action a plaintiff's suit seeks to compel (as opposed to ceasing allegedly unlawful conduct) because there is no risk the agency will undo the action." Mot. to Dismiss 7. In Defendants' view, that purported rule fits this case because Defendants have obligated the Endowment's fiscal year 2026 funding and have promised to process drawdown requests promptly. *Id.* That argument fails several times over. As an initial matter, Defendants have once again misunderstood the conduct the Endowment challenges and the relief the Endowment seeks. The "action" at issue in this litigation is not limited to the payment of a single year's appropriated funds. The Endowment instead challenges the Executive Branch's campaign to interfere with the Endowment's appropriated funding in violation of the NED Act—a campaign that continues to this day. *See* pp. 14-15, *supra*. Consistent with that challenge, the Endowment seeks *permanent* injunctive and declaratory relief that will prevent Defendants from ever again violating their obligations under the NED Act. *See* p. 14, *supra*; *Ctr. for Auto Safety*, 793 F.3d at 1352 ("The agency's pattern of [alleged lawbreaking] remains, even though petitioners' requests for relief for specific . . . years are moot.").

In any event, even if this case were focused on a single year, it would still fit neatly in the voluntary-cessation exception. That exception is meant to ensure that a defendant is not able to "suspend its challenged conduct after being sued, win dismissal, and later pick up where it left off." *FBI v. Fikre*, 601 U.S. 234, 241 (2024). Yet that is precisely what Defendants could do if any challenge to their actions during a given fiscal year could be mooted through temporary, voluntary compliance with the law. The Endowment would be left to file seriatim lawsuits every time Congress appropriates new funding—just as Congress has done every year since the Endowment's

19

founding, and just as it is on track to do once again in fiscal year 2027. *See* p. 3, *supra*. The voluntary-cessation doctrine is meant to avoid that very outcome.

b. Defendants also cannot (and do not even try to) meet their heavy burden of showing that their actions have completely or irrevocably eradicated the effects of their violation of the NED Act. As this Court explained in its preliminary-injunction decision, Defendants violated the NED Act by "subjecting $95 million of the Endowment's funding to 'review for alignment with Administration priorities,'" which imposed "precisely the kind of extra-statutory requirement prohibited by the NED Act, 22 U.S.C. § 4412(a)." PI Op. 10. Defendants then followed the same playbook in fiscal year 2026—once again withholding the Endowment's funding due to the Executive Branch's policy disagreement with Congress's decision to fund the Endowment. Without a final judgment protecting the Endowment into the future, Defendants' unlawful actions will put the Endowment in an untenable position: The Endowment will know that if it does not follow "Administration priorities," it runs the risk of further interference with its funding—even though (as this Court held) Defendants have no statutory right to subject the Endowment's funding to that litmus test. *See* PI Op. 10; *see also* 22 U.S.C. § 4412(a) (putting the "Board of Directors of the Endowment" in charge of grant decisions); *id.* § 4411(a) (recognizing that the Endowment is a "private, nonprofit corporation"—"not an agency or establishment of the United States Government"). Defendants' disbursement of the Endowment's fiscal year 2025 and 2026 funding does nothing to eradicate that prospective problem the Endowment would face, absent permanent relief.

**B.    The Controversy Is Capable of Repetition Yet Evading Review.**

The parties' dispute is also capable of repetition yet evading review. That exception to mootness applies where "(1) the challenged action is too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again." *Mehneh v. Rubio*, 164 F.4th 928, 931 (D.C. Cir. 2026)

20

(citation omitted). There is far more than a reasonable expectation that the Endowment will once again be subject to the "same action," namely, Defendants' unlawful withholding of the Endowment's appropriated funding. Defendants have repeatedly subjected the Endowment to that very action, each time relenting only because of this Court's intervention. And Defendants' withholding of funding will evade review, because that withholding will threaten the Endowment's survival long before it is able to obtain Supreme Court review.

1. a. Defendants' unlawful refusal to disburse the Endowment's appropriated funding is capable of repetition. That prong of the analysis is satisfied when there is "'a reasonable degree of likelihood' that the complained-of 'wrong'—defined 'in terms of the legal questions it presents for decision'—'will be the basis of a continuing controversy between the two parties.'" *Pierre-Noel on behalf of K.N. v. Bridges Pub. Charter Sch.*, 113 F.4th 970, 978 (D.C. Cir. 2024) (citation omitted); *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 324 (D.C. Cir. 2014). Here, there can be no question that the "complained-of wrong"—Defendants' unlawful withholding of the Endowment's funding—is highly likely to recur. There is every reasonable expectation that Congress will again appropriate funds to the Endowment: it has done so every year since 1983, it did so in 2026 notwithstanding Defendants' proposed limitation of the Endowment's funding, and the fiscal year 2027 appropriations bill currently under consideration includes funding for the Endowment. Defendants do not attempt to suggest otherwise. They have already refused to disburse the Endowment's appropriated funding in both 2025 and 2026, after incoming administration officials publicly expressed disagreement with the Endowment's activities and the Executive itself asserted that disbursing the Endowment's funding would be inconsistent with "Administration priorities." In both years, the Executive disbursed the funding only after the Endowment was forced to pursue emergency relief in this Court. That repeated refusal to disburse appropriated

21

funds gives rise to more than a reasonable expectation that Defendants will commit the same legal wrong again. *See Reid v. Hurwitz*, 920 F.3d 828, 834 (D.C. Cir. 2019) (repeated unlawful treatment of prisoner was evidence that unlawful action was likely to recur in the future); *United Bhd. of Carpenters & Joiners of Am. v. Operative Plasterers' & Cement Masons' Int'l*, 721 F.3d 678, 688 (D.C. Cir. 2013) ("In estimating the likelihood of an event's occurring in the future, a natural starting point is how often it has occurred in the past." (citation omitted)).

There is thus every reason to think that Defendants will attempt to withhold the Endowment's appropriated funding, and when they do, that withholding will present the same "legal questions." *Pierre-Noel*, 113 F.4th at 978. The Endowment contends that the NED Act entitles it to receive the funds that Congress appropriates, and that Defendants may not interfere with that funding for policy reasons, pretextual reasons, or any other basis not permitted by statute. Defendants have taken the position that they have the authority to refuse to disburse the Endowment's appropriated funds notwithstanding the NED Act, including for policy reasons: Defendants have now (at least) twice withheld funds on just that basis (first for purported inconsistency with "Administration priorities," AR000060, and then on the ground that the Endowment "has gravely undermined the foreign policy, safety and prosperity of the United States," March 13 Letter at 1). They have likewise withheld funding that Congress appropriated in a continuing resolution "due to uncertainties over full year funding," ECF No. 58 at 1 (Joint Status Report of Feb. 9, 2026), a pretextual explanation they may well reach for again if Congress passes a continuing resolution at the beginning of fiscal year 2027 (as Congress often does at the beginning of a new fiscal year). The Executive "has given no indication" that it has changed its position, *Ralls*, 758 F.3d at 325, so "the legal issue will likely—if not certainly—arise" with respect to future appropriations, *Pierre-Noel*, 113 F.4th at 978; *see Brit. Caledonian Airways Ltd. v. Bond*, 665 F.2d 1153, 1158 (D.C. Cir.

22

1981) (where government had not changed its legal position, plaintiff "reasonably can expect to be subjected to the same action at some time in the future").

b. In arguing that this case is moot, Defendants notably do not suggest that it will not seek to withhold the Endowment's appropriated funding in future years. Nor do they disavow their claim of authority to withhold funding in defiance of the NED Act, including on the policy grounds they have previously invoked. Instead, Defendants argue only that any unlawful withholding "will not involve fiscal year 2026 money, and will be based on a different appropriations act." Mot. to Dismiss 6. That is irrelevant. As the D.C. Circuit has explained, "[t]he question is not 'whether the precise historical facts that spawned the plaintiff's claims are likely to recur' but 'whether the legal wrong . . . is reasonably likely to recur.'" *Ralls*, 758 F.3d at 324 (citation omitted). It does not matter that the funding in question will be appropriated by a future appropriations act; the parties' legal dispute over the NED Act's commands will remain the same. The D.C. Circuit and the Supreme Court have consistently held that where the fundamental legal controversy between the parties could recur, the case is not moot, even if future disputes might arise out of different factual contexts or vary in minor respects. *See, e.g.*, *Jenkins v. Squillacote*, 935 F.2d 303, 308 (D.C. Cir. 1991) (dispute over time-limited education plans could recur even if future education plans would vary, where parties' positions on statutory requirements continued to differ, and legal questions could "recur"); *Fed. Election Comm'n v. Wis. Right To Life, Inc.*, 551 U.S. 449, 463 (2007) (dispute was recurring because plaintiff would likely run "materially similar" ads, giving rise to a similar as-applied challenge, even if the "legally relevant" facts might vary).

2. Defendants' withholding of funding also evades review. "A challenged action evades review if it is too short in duration to be fully litigated in the United States Supreme Court before it expires." *Ralls*, 758 F.3d at 321; *Mehneh*, 164 F.4th at 931. The D.C. Circuit uses two years as

23

a "rule of thumb" for actions that evade review. *Ralls*, 758 F.3d at 321. Even under Defendants' view—that the challenged "action" persists only for the duration of the fiscal year, Mot. to Dismiss 6—the legal wrong will evade review, because the Endowment would be unable to obtain full review through the Supreme Court before the action expired. *See Pierre-Noel*, 113 F.4th at 978 (challenge to education plan for a particular school year would evade review).

Here, as the two previous funding cycles demonstrate, Defendants' withholding of funding is by its nature too short in duration to be fully litigated to the Supreme Court. In both 2025 and 2026, the deprivation of funding quickly inflicted severe harm on the Endowment's essential operations, its reputation, and its grantees' ability to function. In each year, those harms were inflicted upon the Endowment within less than six months of when the Executive began withholding funding. Without emergency relief from this Court, the harms inflicted by Defendants would have become existential to the Endowment long before the expiration of the two-year rule-of-thumb period, and long before the dispute could have been fully litigated to the Supreme Court.

Defendants contend that the dispute will not evade review because the Endowment was able to obtain emergency relief. Mot. to Dismiss 6. But "[t]he possibility of expedited review" does not keep an action from evading review. *Doe v. Sullivan*, 938 F.2d 1370, 1376 n.9 (D.C. Cir. 1991). Quite the contrary: government actions that—like this one—require the plaintiff to seek emergency relief to avoid irreparable harm "surely qualif[y]" as evading review. *Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 972 F.2d 365, 369 (D.C. Cir. 1992). That is because the legal wrong in question "cannot be expected to receive 'considered, plenary review' even in this [circuit] court, much less the Supreme Court, prior to events overtaking the litigation." *Id*. (action evaded review where dispute concerning parade permit would arise days before the scheduled parade, necessitating emergency litigation); *United Bhd. of Carpenters*,

24

721 F.3d at 688 ("[b]ecause the judiciary is ordinarily unable to keep pace with the employer's need to complete the work assignment" without emergency litigation, wrong would evade review). The fact that the Endowment was forced to seek emergency relief to safeguard its survival establishes that the action will evade review, because the Executive's unlawful withholding will by its nature prevent review in the normal course.

## CONCLUSION

This Court should deny Defendants' motion to dismiss.

Dated: July 2, 2026

Respectfully submitted,

/s/ *Donald B. Verrilli, Jr.*

Donald B. Verrilli, Jr. (D.C. Bar No. 420434)
Ginger D. Anders (D.C. Bar No. 494471)
Jeremy S. Kreisberg (D.C. Bar No. 1048346)
Helen E. White (D.C. Bar No. 1741368)
Esthena L. Barlow (D.C. Bar No. 90000252)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com
Ginger.Anders@mto.com
Jeremy.Kreisberg@mto.com
Helen.White@mto.com
Esthena.Barlow@mto.com

Gabriel M. Bronshteyn (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105
(415) 512-4000
Gabriel.Bronshteyn@mto.com

Miranda E. Rehaut (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
(213) 683-9100
Miranda.Rehaut@mto.com

*Attorneys for the National Endowment for Democracy*

26